UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No: 1:18-cv-4814-AJN

---------------------------------------x

JODI ROUVIERE, Individually and
ANDRÉ ROUVIERE, her husband,
Individually,

                    Plaintiff,

        v.


DEPUY ORTHOPAEDICS, INC.
DEPUY PRODUCTS, INC.,
DEPUY INTERNATIONAL, LIMITED,
JOHNSON & JOHNSON, INC.,
and JOHNSON & JOHNSON SERVICES INC.,
and STRYKER CORPORATION,
STRYKER SALES CORPORATION, and
HOWMEDICA OSTEONICS CORPORATION,
d/b/a STRYKER ORTHOPAEDICS,

                    Defendants.

---------------------------------------x

VIDEOTAPED DEPOSITION

OF

ROBERT BULY, M.D.

New York, New York

Wednesday, February 19, 2020


Reported by:
ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
JOB NO. 236859

February 19, 2020

8:10 a.m.

Videotaped deposition of ROBERT BULY, M.D., held at the offices of Robert Buly, M.D., 523 East 72nd Avenue, New York, New York, pursuant to Notice, before Annette Arlequin, a Certified Court Reporter, a Registered Professional Reporter, a Certified Realtime Reporter, and a Realtime Systems Administrator and a Notary Public of the State of New York and New Jersey.

A P P E A R A N C E S:

LAW OFFICES OF ANDRÉ A. ROUVIERE

Attorneys for Plaintiffs

    4070 Laguna Street

    Coral Gables, Florida  33146

BY:  ANDRÉ A. ROUVIERE, ESQ., PRO SE

    Phone: 305.774.7000

    Email: Andre@rouvierelawfirm.com

PAUL E. WALKER, PLLC

Attorney for the Witness, Robert Buly, M.D.

    315 West 106th Street - Suite 1A

    New York, New York  10025

    Phone: 646.678.0608

    Email: pewalker1@gmail.com

A P P E A R A N C E S(Cont'd.):

BARNES & THORNBURG LLP

Attorneys for Defendants DePuy Orthopaedics, Inc.,

DePuy Products, Inc., DePuy International, Limited

 and Stryker Corporation and Stryker Sales Corporation

        11 South Meridian Street

        Indianapolis, Indiana 46204

BY:   JOSEPH G. EATON, ESQ.

        Phone: 317.236.1313

        Email: Joe.eaton@btlaw.com


GIBBONS, P.C.

Attorneys for Defendants Howmedica Osteonics

 Corporation

        One Pennsylvania Plaza, 37th Floor

        New York, New York  10119-3701

BY: PAUL E. ASFENDIS, ESQ.

        Phone:  212.613.2067

        Email:  Pasfendis@gibbonslaw.com

A P P E A R A N C E S(Cont'd.):

ALSO PRESENT:

Adriana Grosso Agnihotri, Director,
    Claims Resolution & Litigation - Stryker

Robert Ratiner, Paralegal, Rouviere Law Firm
   (Telephonically)

Danny Ortega, Legal Videographer

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- o0o -

THE VIDEOGRAPHER: We are now on the record. My name is Danny Ortega, and I am the legal videographer for Golkow Litigation Services.

Today's date is February 19th, 2020, and the time is 8:11 a.m.

This video deposition is being held at 523 East 72nd Street, New York, New York, in the matter of DePuy, et. al., versus DePuy Orthopaedics Inc. for the United States District Court, Southern District of New York.

The deponent today is Robert Buly, M.D.

Counsel, please identify yourselves for the record.

MR. ROUVIERE: For the plaintiff, Jodi Rouviere and André Rouviere and Jose André Rouviere.

MR. EATON: Joe Eaton for DePuy Orthopaedics Inc.

MR. ASFENDIS: Paul Asfendis for defendant Howmedica Osteonics.

MR. WALKER: Paul Walker. I'm representing Dr. Buly.

THE WITNESS:  And I am Dr. Buly.

THE VIDEOGRAPHER:  The court reporter today is Annette Arlequin, and will now swear in the witness.

              *         *         *

R O B E R T   B U L Y, M.D., called as a
        witness, having been duly sworn by a
        Notary Public, was examined and
        testified as follows:

THE WITNESS:  Yes.

EXAMINATION BY

MR. EATON:

Q.   Good morning.

A.   Good morning.

Q.   Can you state your full name for the record, please?

A.   Sure.

Robert Leon Buly.

Q.   What is your current business address?

A.   Hospital For Special Surgery, 535 East 70th Street, New York, New York 10021.

Q.   Dr. Buly, my name is Joe, and I represent DePuy Orthopaedics.

We've never met before today,

correct?

A.   Correct.

Q.   You've had your deposition taken before?

A.   Yes.

Q.   I know you know the ground rules, but let me just go over them very quickly.

I'm going to ask you a series of questions.  If at any point in time you don't understand my question or need me to repeat it or rephrase it, I want you to do so.

Do you understand that?

A.   Yes.

Q.   If you don't ask me to repeat or rephrase the question, I'm going to assume that you understood the question.

Do you understand that as well?

A.   Yes.

Q.   Okay.  Great.

Did you do anything to prepare for the deposition today?

A.   Yes.

Q.   What did you do?

A.   I looked through my chart this

morning.

Q. All right. Anything else?

A. I had met with my attorney previously when he told me that a deposition would be required.

Q. Did you meet with or speak to Mr. Rouviere in connection with the deposition?

A. No.

Q. I'm going to hand you what's been marked as Exhibit 73.

(Defendants' Exhibit 73, Deposition Notice, marked for identification, as of this date.)

BY MR. EATON:

Q. It's a copy of the deposition notice which asked that you bring your file or chart. And when you walked in today, you have what looks to be your chart.

Can you describe what documents you brought with you today?

A. This is my office chart which has a variety of documents.

Q. All right. And I notice that you have copies of some of the X-rays.

Are all of the X-rays included in the chart or just selected ones?

A.   No.

Q.   Did you select those to be included in the chart for the deposition or that's just what's in your chart?

A.   Just what's in the chart.

Q.   Does the chart include essentially all of your treatment records for Jodi Rouviere?

A.   Yes.

Q.   I'm just going to mark the outside of your chart as a Group Exhibit 74.

(Defendants' Exhibit 74, Medical Chart of Jodi Rouviere, marked for identification, as of this date.)

BY MR. EATON:

Q.   Did you happen to bring a CV with you?

A.   I did not.

Q.   Okay.  That's all right.

I'll to run through your educational background very quickly.

You went to Penn State undergrad,

correct?

A.    Yes.

Q.    1978 in plant sciences?

A.    Yes.

Q.    And then a master's in animal physiology in 1982?

A.    Yes.

Q.    Okay.  And medical school at Weil Medical College of Cornell in 1985?

A.    Yes.

Q.    Okay.  And then residency?

A.    Hospital For Special Surgery.

Q.    And fellowship?

A.    Yes.  Two fellowships.

Q.    Okay.  How about the first one?

A.    The first one in Bern, Switzerland, in hip preservation surgery.

Q.    And the second one?

A.    The second at Case Western University, University Hospital in Cleveland, in total joint replacement.

Q.    The fellowship in Switzerland, what was the focus of the hip preservation surgery fellowship?

A.    The Swiss are sort of like

pioneers in hip-preserving surgery, techniques that are done to try to prevent hip replacement.  So it's sort of like a mecca for people interested in that type of surgery.

Q.   Did you focus on any particular type of procedure or preliminary surgery, revision surgery, limb preservation?

A.   It was some joint replacement, but mostly hip preserving surgery.

Q.   And when you say a hip preserving surgery as opposed to joint replacement, what is the difference?

A.   Well, a technique like an osteotomy is where a patient has a problem that leads to hip pain and arthritis. Examples are hip dysplasia, hip impingement and you try to do something to relieve pain and prolong the life of the hip, especially in young patients.

Q.   What is hip impingement?

A.   Hip impingement is when the anatomy is abnormal due to the socket or the femur and the range of motion is not normal.  The resulting impingement causes

hip damage, hip pain, ultimately arthritis.

Q. And the fellowship in Switzerland, was that one year?

A. That was six months.

Q. And then at Case Western, how long was that?

A. Six months.

Q. Any particular focus at Case Western? You said total joint replacement?

A. Yes. Primarily revision, joint replacement.

Q. Okay. And during your fellowship and residency, what were you taught about explaining the risk and benefits of a particular procedure to a patient?

A. It's a pretty broad topic, but you mean what did we learn during residency?

Q. Yes. And fellowship about conveying risk and benefits to a patient.

A. Well, to try to be honest an explain the possibilities of what could happen.

Q. And you learned that that was the obligation or responsibility of the surgeon

in connection with a physician/patient relationship, correct?

A.    Correct.

Q.    You didn't rely on -- you didn't learn to rely on a manufacturer or sales rep to convey those risk and benefits, correct?

A.    That's correct.

Q.    And then, I'm sorry, what year was the Case Western?

A.    That was 1991.

Q.    And then where did you start?

A.    Then I started my practice as an attending surgeon at Case Western Reserve University hospital in 1991.

Q.    And how long were you there?

A.    Until 1994.

Q.    What was your role as an attending surgeon at Case Western?

A.    Clinical practice, research, teaching.

Q.    Did you participate in primary revision hip surgeries during that time?

A.    Yes.

Q.    And then in 1994, where did you

go?

A.   I came back to Hospital For Special Surgery.

Q.   What was your position when you first started?

A.   Assistant professor.

Q.   And you've been with Hospital For Special Surgery consistently?

A.   Since 1994.

Q.   Okay.  What's your current title or role?

A.   I am currently the chief emeritus of the Hip Preservation Service and associate professor.

Q.   What is the Hip Preservation Service?

A.   It's a service here at the hospital dealing with surgery and treatment to try to prolong the life of the hip. Similar conditions such as dysplasia, hip impingement.

Q.   Annually, what is your estimate of how many total hip replacement surgeries that you do a year?

A.   Probably in the range of 150 to

200.

Q.   Of that number, how many are primary versus revision?

A.   I don't know offhand.

Q.   Okay.

A.   It was certainly more primaries than revisions.

Q.   And you're a member of the American Academy of Orthopedic Surgeons?

A.   Yes.

Q.   Okay.  For the 150 to 200 total hip replacements that you do a year, what is the typical product or products that you use?

A.   Currently?

Q.   Currently.

A.   Currently usually the Biomet, now Zimmer Biomet, acetabular component, and usually a DePuy femoral stem.

Q.   And the femoral head?

A.   Almost always ceramic unless it can't be used for some reason.

Q.   How long has that been your practice, using ceramic?

A.   Pretty much since I've been in

practice, but with an increasing number of ceramic as time goes on.

Q. And what is -- currently, what is the typical construct? Is it ceramic-on-ceramic or --

A. Typically, the vast majority of cases would be ceramic-on-polyethylene, crosslinked polyethylene.

Q. And the ceramic head, is that the BIOLOX?

A. Delta, yes.

Q. Do you typically use the DePuy delta ceramic head, or do you use other manufactures?

A. The DePuy.

Q. Who is the current DePuy sales representative that you work with or your office works with?

A. Lee Posner is our main rep.

Q. And how about with Stryker Howmedica?

A. Stryker, there is a team. There is about four of them.

Q. Any one of them your primary contact?

A.   Probably Angela Schiavo.

Q.   In your practice, were the sales reps there just to provide product information, ask any questions?

A.   Right.

It's very convenient to have them available in the operating room, if there is a missing item, questions about compatibility of implants.

Q.   In terms of conveying the risk and benefits to the patient, you don't rely on the sales rep or any manufacturer to do that, correct?

A.   Correct.

Q.   And in terms of selecting the products that you identified for us, that's a decision that you make based on your education, training, and the thousands of total hip replacements that you've done?

A.   Correct.

Q.   You don't rely on the specific manufacturer in terms of identifying and selecting the product?

A.   No.

Q.   Do you currently consult with any

product manufacturer?

A. Am I a paid consultant, in other words?

Q. Yes.

A. No.

Q. Have you been in the past?

A. Yes.

Q. And when was that?

A. I was a consultant with DePuy for -- started with Johnson & Johnson before the merger, and then with DePuy. And that stopped probably maybe six, seven years ago.

Q. Okay. And how long were you a consultant?

A. Probably for 10 to 12 years.

Q. And what did you do in that role?

A. I contacted at the time it was Joint Medical Products, and then there was a merger with Johnson & Johnson. I wanted to help develop better revision stems and starting with the S-ROM stem.

And then this eventually evolved into a team with a number of other surgeons to develop a revision, a new revision stem

for DePuy.

Q.   And did you do that?

A.   It was extremely frustrating.  I never saw it come to market and one of the reasons I stopped working with DePuy.

Q.   Okay.  Did you have any role or work on the Summit stem?

A.   I did not.

Q.   You mentioned earlier that currently your choice of stem typically is a DePuy femoral stem?

A.   Yes.

Q.   Is there a particular brand of stem?

A.   The Summit.

Q.   The Summit?

A.   Yes.  The Summit, in most cases, if there is unusual anatomy, for example, excessive anteversion or retroversion, then I'll use an S-ROM stem.

Q.   And what is it about the DePuy Summit stem that makes it your kind of go-to stem at this point?

A.   I really like the way it fits.  It's extremely stable.  And I've had

extremely high success rate with it for many years.  I think probably 15 years.

Q.   The Summit stem has a porous coating on it?

A.   Yes.

Q.   Can you explain what that's for?

A.   A porous coating is applied to orthopedic implants in the hip, both the femoral component and acetabular component, to achieve bone ingrowth so that it remains fixed long term.

Q.   A follow-up question on consulting.

Do you participate in any litigation or litigation consulting?

A.   No.

Q.   There is reference in the medical records from you and other physicians that Jodi Rouviere has Ehlers-Danlos Syndrome?

A.   Yes.

Q.   Can you explain what Ehlers-Danlos Syndrome is?

A.   The Ehlers-Danlos Syndrome is a genetic condition where the collagen is abnormal.  And because of the collagen

abnormality, patients are hypermobile or hyperlax.

Q. And what does hypermobile or hyperlax mean?

A. I think the best way to describe it is their joints are too elastic and this tends to lead to instability and joint pain.

Q. And what impact does that type of instability and joint pain have on joint replacement?

A. How does it make it more --

Q. More complicated?

A. More complicated?

Yes, because of the hypermobility, it makes it more complicated.

Q. And in what way? Can you explain that?

A. For any total joint replacement to work well, the implant has to be stable. And stability is more difficult to achieve if the joint is hypermobile.

Q. And is that instability focused on the acetabular component or on the stem

or both?

A.   Well, it's both.

Q.   And prior to August 2012, had you performed total hip replacement on patients with Ehlers-Danlos Syndrome?

A.   Yes.

Q.   Do you know an estimate of how many patients you had seen?

A.   Probably a handful.

Q.   Is it rare?

A.   For total joint replacement, it's fairly rare compared to the other conditions we treat with hip replacement.

Q.   So when you say you had a handful of patients, so six to eight patients is your estimate?

A.   That would be an estimate, yes.

Q.   Okay.  Is there a higher rate of surgical complications with total hip replacement in patients with Ehlers-Danlos Syndrome?

A.   I am not aware of a study that shows that, but I think it is a more complicated situation.

Q.   Is that because, in part, you

could have more frequent subluxation and dislocation?

A. Yes.

Q. What is subluxation?

A. Subluxation is where the joint doesn't dislocate completely but almost goes out.

Q. You mentioned hyperlax. Is that the same thing as laxity?

A. Yes.

Q. And what is laxity?

A. Looseness.

Q. And that is another condition associated with Ehlers-Danlos Syndrome?

A. Yes.

Q. Does laxity impact the potential successor rate of complication similar to hypermobility?

A. No, it's the same thing.

Q. It's the same thing?

A. Right.

Q. In patients getting ready for total hip replacement who have Ehlers-Danlos Syndrome, are there additional or different warnings or

instructions that you convey because of the hypermobility and laxity?

A. Well, we go through -- with any patient, we go through the risks and benefits of surgery, potential risks. With Ehlers-Danlos Syndrome, though, because of the hypermobility, we often stress the need for implants that are more stable. And we tell patients that they may require either a constrained implant or the newer generation of implants, which are called modular dual mobility implants, which have two centers of rotation and allow for a larger femoral head. The larger the femoral head, the more potential stability the hip has.

Q. And that head size and the size of all the components is based on the patient's anatomy?

A. Yes.

(Discussion off the record.)

MR. EATON: Go off the record.

THE VIDEOGRAPHER: The time is 8:34 a.m. Going off the record.

(Discussion off the record.)

THE VIDEOGRAPHER: The time now is 8:36 a.m. We are back on the record.

BY MR. EATON:

Q. Dr. Buly, we were talking about Ehlers-Danlos Syndrome.

Can Ehlers-Danlos Syndrome lead to impingement in a patient?

A. Yes.

Q. And how does that work? How does that manifest itself?

A. How would we know that it's occurring?

Q. Yes.

A. If the hip dislocates. If there is any sensation with range of motion testing that the implants are hitting each other. And then direct observation would be the most accurate.

Q. And when you say "direct observation," by X-ray?

A. No, at surgery if it were necessary to reoperate.

Q. With a patient who has had, who has Ehlers-Danlos and has had a total hip

replacement, you said if the implants are

hitting each other. Can you be more

specific? What exactly occurs with

impingement in that situation?

A. Impingement can occur if when the hip is maximally flexed, for example. Or when the hip is in maximum extension, it may impinge in the front of the socket or in the back of the socket.

Q. Impingement can occur in connection with a total hip replacement through no fault of the surgeon in terms of positioning, correct?

A. Correct.

Q. And impingement can occur in a total hip replacement through no fault of the components as well, correct?

A. That's correct.

Q. Impingement, especially in a patient with Ehlers-Danlos Syndrome, can be related to hypermobility or laxity?

A. Yes.

Q. If there is impingement is that one of the reasons to revise a patient?

A. Yes.

Q. Other than Ehlers-Danlos Syndrome, what are the other patient factors that can lead to impingement of the implants?

A. Well, you can have hypermobility, excessive range of motion. And it's not only Ehlers-Danlos Syndrome. Sometimes patients that don't -- that don't have severe arthritis or have not had arthritis for a long period of time going into surgery may have very high range of motion after the hip replacement. So that's one's cause of impingement.

The other would be malposition of the implants. So if the components are not put in the correct position, there may be impingement even if the soft tissues aren't hyperlaxed.

Q. Ehlers-Danlos Syndrome is a type of connective tissue disorder?

A. Yes.

Q. And you have had patients receive a total hip replacement who have had other types of connective tissue disorders?

A. Yes.

Q.   And in those instances, you have the same concerns about complications, including impingement?

A.   Yes.

Q.   You referenced positioning.  What are the steps that you typically go through, especially in a patient with a connective tissue disorder, to confirm positioning?

A.   During total hip replacement?

Q.   Yes.

A.   It's the same thing you do on any total joint replacement.  You put the components in, the cup and the stem, but you don't put the final implants in. They're provisional implants that we put in.  And we describe it as taking the hip for a test drive, putting it through range of motion to see how stable it is and to see if there is any impingement.  If there is any impingement at all, then something needs to be changed.  Either the component has to be changed or the stem or changing the rotation.  But this needs to be determined and ascertained during surgery.

Q.    In connection with your work in total hip replacement, have you observed metallosis?

A.    Yes.

Q.    And what is metallosis?

A.    Metallosis is metallic staining of the soft tissues inside the hip.

Q.    When that occurs, what is the typically the color of the tissue?

A.    It depends on the source of the metal.

Q.    All right.  If it's cobalt chrome, typically what is the color?

A.    If it's cobalt chrome, it can be from a metal/metal articulation, where you have a metal head and a metal liner, and there may be gray, brownish, dark red, and it's from the microscopic cobalt chrome particles.

Another type of metallosis would be if there is titanium debris, usually from impingement, and that would have more black-colored synovium.

Q.    When you say microscopic, you can't see the metal debris?

A.    No.

Q.    Whether it's cobalt chrome or titanium; is that correct?

A.    No.

Q.    And with titanium debris, that stained tissue may not necessarily be damaged tissue; is that fair?

A.    I don't understand the question.

Q.    If you have -- with titanium debris, in your clinical experience, have you observed that the tissue is just stained but it's still in satisfactory condition?  It hasn't died or there is no necrosis connected with it?

A.    It may be difficult to tell necrosis without seeing the pathologic tissue.

Q.    Another way to ask it is, can the tissue still be healthy even if it has been stained by either titanium or cobalt?

A.    Can it be healthy?

Q.    Yes.

A.    Well, the synovium would be unusual.  It's not normal with -- because it's got metal particles in it, but other

tissues nearby may still be normal.

Q. Okay. And in connection with your clinical experience with metallosis, do you also corroborate a diagnosis with either cobalt chrome levels or titanium levels in the blood?

A. We do not do titanium levels in the blood.

Q. Okay.

A. And cobalt chrome levels in the blood are done routinely if we have concerns in patients that have metal-on-metal implants.

Q. What is -- based on your experience, what is the level of cobalt chrome at the point where you become concerned about potential problems?

A. It's in the range of seven. I think it's -- I can't remember the units, whether it's nanograms per liter, but it's a level of around seven, which is in the literature, above which one may be more concerned that there can be adverse tissue reaction or pseudo tumor.

Q. And what is pseudo tumor?

A.    Pseudo tumor is a benign condition where there is a lot of inflamed tissue within the hip joint as a result of the metal debris that's in the joint.

Q.    And when you say benign condition, what do you mean by that?

A.    It's not malignant.

Q.    Prior to each primary revision surgery, you obtain an informed consent from your patients, correct?

A.    Did you mean primary or revision?

Q.    Yes.  Let me rephrase it.

Prior to your primary or revision surgeries, you obtain informed consent from the patients?

A.    Yes.

Q.    And what is informed consent?

A.    Any surgical procedure has risks, and you have to weigh the risks with the benefits and make sure that the patient is aware of any potential risk going into surgery.

Q.    And in connection with total hip replacement, you convey those risks and benefits to the patient yourself, correct?

A.    Yes.

Q.    You don't rely on a sales rep or any other manufacturer's representative to convey those risks?

A.    That's correct.

Q.    The manufacturers, including the sales reps, don't interact with your patients at all, correct?

A.    No.

Q.    Is that right?

A.    That's correct.

Q.    And the informed consent that you discuss with your patients prior to total hip replacement is based on your years of clinical experience and thousands of joint replacements?

A.    That's correct.

Q.    I want to ask you next about the IFU or Instructions For Use.

Are you familiar with an IFU or the package insert that comes with each product?

A.    I'm aware there is one.

Q.    When you're in the middle of your surgery, you don't stop and pull out the

booklet from each box and read the package insert, correct?

A. That's correct.

Q. All right. You, based on your experience, you have already reviewed those types of documents or information, and you're fully versed in the risks and benefits of using each product, correct?

A. I don't know that I've studied the documents, but I'm sure I've looked at it at some point.

Q. At some point, you've looked at the package insert for the products that you use, at some point back in your medical clinical experience?

A. Yes.

Q. And the package inserts that come with each product convey instructions, warnings, and risks of using the product, correct?

A. I can't remember what's included.

Q. Do you recall that they have some information on potential adverse events and complications?

A. I would imagine, but I can't say

with certainty what's included.

Q.   If you needed to know additional information about a particular risk or complication of using a product, you know you can go back to the package insert and review it if you need to?

A.   Correct.

Q.   I'm going to ask you about your treatment of Jodi Rouviere.  And you can feel free to refer to your chart.  I'm going to -- I brought copies so we can mark them as exhibits and keep your chart intact --

A.   Okay.

Q.   -- but if you have a particular question, you can refer to your chart.

How did Jodi Rouviere come to be treated by you?  Is there an indication in your file?

A.   The first office visit was April 4, 2012.

Q.   And is there anything in that record or note that indicates how Mrs. Rouviere contacted you or came to you?

A.   I recall that she was referred by

Dr. Bryan Kelly or his office.

Q.   And who is Dr. Bryan Kelly?

A.   He's one of the orthopedic surgeons at Hospital For Special Surgery.

Q.   I'm going to hand you what's been previously marked as Exhibit 8, which is a copy of your office record through August 13th, 2012, right before the surgery.

(Document review.)

Q.   That is the same record that's in your original file, correct?

A.   Correct.

Q.   Okay.  On Exhibit 8, it references the medical history.  It says, "She has a history of Ehlers-Danlos Syndrome with hypermobility."

How did you obtain that information?

A.   From the patient.

Q.   Okay.  Do you recall on the first visit if Mrs. Rouviere brought any past medical records, X-rays, or other documents?

A.   I don't recall if it was that day

or if they were obtained later.

Q. Okay. But at some point, you did obtain her -- some of her prior medical records?

A. Yes.

Q. If you go to page 3 of Exhibit 8, it says, "Impression: Pain, both hips, more on the right than left. With multiple procedures done, labral repair and some bony debridement with evidence of overcoverage, Ehlers-Danlos Syndrome, and recurrent dislocations of the patella."

Do you see that?

A. Yes.

Q. What's "evidence of overcoverage" refer to?

A. Meaning a socket that's deeper than normal.

Q. Was that on the right or the left or both?

A. I'd have to look at my notes.

(Document review.)

A. On both, but more on the right.

Q. Is it common that patients with connective tissue disorder have that

problem in both hips; it's not essentially

one versus the other?

    A.    If it's a genetic condition,

that's going to be throughout the body, so

it would be in both hips.  But the anatomy

can be different in one hip compared to the

other.

    Q.    Under "Plan" you note, "The hip

may need something like a surgical

dislocation to get rid of impingement and

probably a capsule repair as well to try to

tighten her hypermobility."

        So on physical exam, did you find

evidence of impingement?

    A.    She had a fairly good range of

motion but did have pain, so she did seem

to have painful impingement.

    Q.    All right.  The next page, page 4

of your notes, it says "Addendum."

        You note that the patient went

for new film, so you got X-rays.  You say,

"Alignment looks good.  There is good joint

space between femur and tibia.  No

osteophytes are seen."

        What does that mean?

A.   There did not appear to be severe arthritis of the knee.

Q.   And this film was of the knee?

A.   Yes.

Q.   I'm handing you what's been marked as Exhibit 75.

(Defendants' Exhibit 75, Doctor's notes of Mrs. Rouviere of her office visit on 4/2/12, Bates-stamped JR UHMC 000163 through 165 marked for identification, as of this date.)

BY MR. EATON:

Q.   This is a medical record from the University of Miami from April 2nd, 2012.

Do you recall if you were provided any medical records prior to seeing Mrs. Rouviere for the first time from the University of Miami?

A.   I don't recall when we got medical records.

Q.   Okay.  It says, "Chief Complaint: Severe right hip pain."

And then if you go to the next page under "Assessment and Plan," it says, "A long discussion..."  about four lines

down there under "Assessment and Plan:

A long discussion was held with the patient

explaining to her that at least

radiographically, she does not have any

evidence of end-stage degenerative

osteoarthritis.  Furthermore, her pain

presentation is not one typically

associated with hip pain.  Her pain is

located posteriorly at..."

What is that word?

A.    "Posteriorly."

Q.    "...at the..." what's that?

A.    "...ischial tuberosity..."

Q.    "...ischial tuberosity..."

Thank you.

(Continuing.)

[As read] "...and not in location

where it would typically associate with hip

pain such as the groin.  She also has no

pain in greater trochanter.  She has full

active and passive range of motion."

Is that consistent with the

findings that you had a few days later when

you saw her on April 4th?

A.    Not exactly what I had, no.

Q.   All right.   When you saw her, she did have -- did she have full active and passive range of motion?

A.   She had good range of motion.

Q.   Okay.   If you go on there in that medical record, it says, "It was explained to the patient that she would not benefit from a total hip arthroplasty.   It was suggested that she perhaps seek psychologic evaluation in an attempt for interdisciplinary treatment for her right hip pain since it appears that no surgical intervention has yet alleviated her pain."

Do you see that?

A.   Yes.

Q.   All right.   Did you have any discussions with her about having any psychologic evaluation in terms of treating her hip pain?

A.   No.

Q.   I want to run through some of the imaging that you did during the first consult.

I'm going to hand you what's been marked as Exhibit 76 which is a copy of the

MRI report.

(Defendants' Exhibit 76, MRI Report of Jodi Rouviere, marked for identification, as of this date.)

BY MR. EATON:

Q. Under "Findings," it says -- in the second paragraph there under "Findings." "There is also evidence of a prior anterior femoral head-neck debridement" --

A. Where is that? I have an MRI of the right knee.

Q. Oh, I'm sorry. Let me switch that out, and I'm going to hand you again what's been marked as 76, which is now the correct copy of the MRI of the right hip.

Sorry about that.

Looking under "Findings" on the first page, second paragraph under "Findings" it says, "There's also evidence of a prior anterior femoral head-neck debridement, presumably for treatment of cam-type femoroacetabular impingement."

Can you explain what that is?

A. Cam impingement is where there is

an abnormal bump on the femoral neck and that causes impingement when the hip is flexed and internally rotated.

Q. And above in "History" it says, "Ehlers-Danlos. Three arthroscopies to the right hip performed in an outside institution."

In your clinical experience, what is the potential effect or impact of a patient who has had three arthroscopies?

A. I'm not sure I understand your question. What is the outcome?

Q. Yeah. When you have a patient that's had three arthroscopies, are there any additional complications or concerns in connection with the total hip replacement because someone has had that many?

A. It all depends on the condition of the hip when the arthroplasty is done.

Q. Okay. If you go to the third page of Exhibit 76, the MRI, the MRI says "There's moderate to severe arthrosis."

Is that arthritis?

A. Yes.

Q. And it says "...associated with

mild reactive synovitis."

What is that?

A.   "Synovitis" means inflammation of the joint lining.

Q.   And there is a note, "A non-displaced apical tear of the degenerated anterior labrum."

So that was a prior tear?

A.   It occurred sometime before the MRI, yes.

Q.   And it goes on to note, "Degeneration and fraying of the diminutive anterior superior labrum at the site of labrum repair."

So what was your impression or your takeaway of the MRI of the right hip?

A.   That the joint, the hip joint is in trouble.  It has arthritis, it has inflammation, and it's wearing out.

Q.   I hand you next what's been marked as Exhibit 77, which is a CAT scan of the right hip for Jodi Rouviere.

(Defendants' Exhibit 77, CAT scan of the right hip, Jodi Rouviere, Bates-stamped JR:SAND:00237 through

00239, marked for identification, as of this date.)

BY MR. EATON:

Q. And if you go to the last page for impression, it says, "Right hip, postoperative changes involving the femoral head-neck junction, as well as the acetabulum measurements given above."

What was your takeaway or reading of the CAT scan of the right hip?

A. I'm not sure I understand your question.

Q. What did the CAT scan tell you about the condition of her hip?

A. Well, we used this to obtain numbers if we're considering hip-preserving surgery at all.

Q. Okay. Did these numbers tell you whether or not her hip was highly anteverted or had other similar conditions or problems?

A. The hip does have more anteversion than normal, both on the socket and on the femur.

Q. Lastly, we have the X-ray of the

pelvis.

(Defendants' Exhibit 78, Copy of
X-ray and medical advice dated 4/4/12,
Bates-stamped JR:SAND:00240, marked for
identification, as of this date.)

BY MR. EATON:

Q.   I'm handing you a copy of the
X-ray of the medical advice dated 4/4/12.
It's Exhibit 78.

Exhibit 78 for this X-ray says
"Impression:  Bony prominences in both
femoral necks.  Metallic density in the
left femoral head."

What is "bony prominence in both
femoral necks"?

A.   That would be the cam lesion that
you asked about previously.

Q.   And "the metallic density in the
left femoral head," what does that refer
to?

A.   I don't recall what that is
referring to.

Q.   I'm going to hand you what's been
previously marked as Exhibit 7.  This is a
record from Miami Children's Hospital,

Department of Orthopedics, Dr. Michael

Tidwell. It's dated 4/11/12, and the first

entry --

A. Can I answer your previous

question?

After referring to my notes, it

looked to me -- I mentioned that there was

a bit of metal seen in the front of the

left hip. I thought it may have been a

remnant of an anchor or something that was

used with her previous surgery.

Q. All right. And what note were

you referring to there?

A. My initial office visit.

Q. Okay. Referring to Exhibit 7, in

the first entry there for 4/11/12, the last

sentence, it says, "It turns out that

Dr. Buly at a Hospital For Special Surgery

in New York is experienced with the

treatment of patients with Ehlers-Danlos

Syndrome."

Do you see that?

A. Yes.

Q. Was there information that either

your office advertised or publications that

connected you or your experience with Ehlers-Danlos Syndrome prior to seeing Jodi Rouviere?

A.   I'm not sure where that came from.

Q.   It's accurate that you had seen patients with Ehlers-Danlos Syndrome prior to seeing Mrs. Rouviere?

A.   Yes.

Q.   All right.  If you can go back to Exhibit 8, which is your initial office visit notes, if you want to refer to this, it's here, or you can refer to yours.

Going to the next date of treatment, which is at page 5 in your office visit addendum, it's dated May 2nd, 2012.

Do you have that?

A.   Yes.

Q.   It says, "The patient was presented this morning at the Hip Preservation Conference to get some other opinions."

What is the Hip Preservation Conference that's referred to there?

A.   As mentioned previously, we have a Hip Preservation Service here at the hospital, and we have a weekly meeting that covers a variety of topics, but often we will present cases to get opinions from other surgeons who perform hip preservation.

Q.   Is that done routinely with every case or only cases that present additional issues or potential complications?

A.   Cases where there may be questions as to what the best treatment would be.  And it's often helpful to get opinions from other surgeons.

Q.   This record has a cc to Dr. Bryan Kelly and Dr. Ernest Sink.

Were those at least two of the other surgeons who were part of the Hip Preservation Conference?

A.   Yes.

Q.   Do you recall if there are any others?

A.   I can't recall exactly who was there.  It varies from week to week.

Q.   The next sentence says, "The

bottom line seems to be that she has
over-coverage seen with a high center-edge
angle on both the AP and lateral..."

What does that mean?

A.   It means the socket is deeper
than normal.

Q.   And what kind of complications or
concerns does that raise in connection with
total hip replacement?

A.   It's not much of a concern with
total hip replacement, but it's a cause of
hip pain and hip arthritis.

Q.   The note goes to the say, "...but
she has Ehlers-Danlos Syndrome, and she is
acting more like an unstable-type hip."

What does that refer to, "an
unstable-type hip"?

A.   Patients have feelings of
instability, like they can't trust the
joint.  Like they feel like it goes out of
place.

Q.   Your note goes on to say that
"She has a combination of Ehlers-Danlos and
excessive femoral anteversion, which on the
right measures +24 degrees."

And that information is taken from the CAT scan that we just looked at?

A. That's correct.

Q. Your note says "excessive femoral anteversion."

What is the normal range of anteversion?

A. Normal is approximately 15 degrees.

Q. In connection with total hip replacement, what types of complications or concerns are presented by a patient with excessive femoral anteversion?

A. With total hip replacement?

Q. Yes.

A. There may be instability.

Q. Your next note says, "On the MRI, there's very deficient anterior capsule from her three hip scopes in Florida."

What does that refer to?

A. She's had three hip arthroscopies, and as a consequence, if the capsule was cut when the operation was done, if it wasn't repaired or if it was repaired but it didn't heal, then the

capsule may not be intact.

Q. And in this case when you noted "...there's a very deficient anterior capsule," is that another way of saying the capsule was not intact?

A. Correct.

Q. You note in the next paragraph, "I think she needs more stability rather than less."

What does that refer to?

A. Often these types of cases are puzzling because there may be elements of both instability and impingement, and sometimes it's difficult to figure out what is the main problem, what needs to be treated to remedy the situation.

Q. And here, because of her instability and impingement, your clinical experience indicated that she needed more stability?

A. Correct.

Q. And what is the reference to, "Joseph Lipman, our engineer, did a range of motion analysis"?

What does that refer to?

A.   Joe Lipman is one of the engineers with the biomechanics department here at the hospital, and I've done a number of -- I've done a good bit of work with him in the past where if we want further information to help us to make a decision, we can take the CT scan and put it through a range of motion analysis to see what's occurring, where it's impinging.

Q.   What is the data or output from that range of motion analysis?  Is there a computer printout or is there a report?

A.   It's usually, I'll sit down with him and look at the results and he'll put it through a range of motion and we'll see what it looks like.

And I think in this case we saw if anything improved by removing some of the rim, which would have been the other option, if we were concerned with impingement and over-coverage.

Q.   Is Mr. Lipman still on the biomechanics department here?

A.   Yes.

Q.   The next note says,

"Interestingly, she seems to impinge more with extension external rotation, with a lesser trochanter against the ischium."

What does extension external rotation refer to?

A. That's the hip moving in extension and external rotation, the femur.

Q. Okay. Was that an observation you made based on the range of motion analysis or based on your exam?

A. It's hard to tell on exam because you're not looking at it directly, but this was based on the CT, range of motion analysis.

Q. The next paragraph indicates that you called Jodi Rouviere and suggested that she see Dr. Kelly and Dr. Sink to get other opinions.

Did Dr. Kelly and Dr. Sink have, at that time, a particular focus in terms of total hip replacement?

A. I don't recall if they were recommending hip replacement at that point.

Q. What was the reason you wanted Jodi Rouviere to see Drs. Kelly and Sink?

A.   Just to give other opinions as to get the best treatment option.

Q.   There wasn't anything particular from the hip preservation conference that wanted you to see Drs. Kelly or Sink?

A.   At this point, Dr. Sink had not seen the patient.  Just looking at the notes and radiographic studies, we thought she may benefit from non-arthroplasty procedure such as a -- it's called a surgical hip dislocation where you actually open up the hip joints, see where it's impinging, and remove any bone that may be causing painful impingement.

Q.   Okay.  Going back to your 5/2/12 note, the last paragraph, there's a reference here to, "She had two injections."

And were those both hip -- right hip injections?

A.   It doesn't say specifically, but I would imagine because we were focusing on the right hip at this time.

Q.   It says, "The second one gave her pain from chest to the knees, and she

required a couple of days in the hospital

until she got the black fluids out of her

system.  I was not quite following the

connection with the injection.  I told her

I had never heard of that reaction."

When you say here you "never

heard of that reaction," were you referring

to the pain and the black fluids?

A.  Just the severity of how she

responded to the injection.

Q.  Okay.  All right.  The next entry

in your office visits note --

MR. WALKER:  Why don't we take

five minutes at this point?

MR. EATON:  Off the record.

THE VIDEOGRAPHER:  The time right

now is 9:19 a.m., and we are off the

record.

(Recess is taken.)

THE VIDEOGRAPHER:  The time right

now is 9:27 a.m.  We are back on the

record.

BY MR. EATON:

Q.  Dr. Buly, looking at Exhibit 8,

and now we're on page 6 of your office

notes for the visit dated June 11th, 2012.

Do you have that?

A.    Yes.

Q.    There is a reference here in the first paragraph to knee problems, that her knee goes out.

And you state, "I cannot imagine that the kneecaps were completely out of the groove from what she's describing with these latest episodes."

What does that refer to, "completely out of the groove"?

A.    Meaning whether the kneecap completely came off the front of the femur or partially.

Q.    In addition to treating Mrs. Rouviere for her right hip pain, were you also treating her for knee pain?

A.    No, not specifically.

Q.    Okay.  Your note goes on to say, "The hip continues to bother her.  She's saying now that it is now not so much in the front of the hip, it is more in the back.  When I have her show me where it is, it does not seem to be the back of the hip

joint or greater trochanter."

What are you referring to there?

A.    Just trying to ascertain where her pain is coming from.

Q.    On examination, in the next paragraph, you note that "the left hip has more external than internal," just what you saw on the last visit.

You're referring to rotation there?

A.    Rotation of the femur, yes.

Q.    Then you note that "The right hip has about 40 degrees internal and 30 external."

What is that in relation to?

A.    It's just describing what the range of motions is of the hip.

Q.    And is that 40 degrees internal and 30 external, is that an excessive range of motion?

A.    Yes.

Q.    You attribute that to her Ehlers-Danlos Syndrome in part?

A.    She has maybe slightly more rotation than normal, internal a little

more, and that's typically seen if femoral anteversion is higher than normal.

Q. Okay. All right. The next reference on page 7 of the addendum is to a note from June 28, 2012.

Do you have that?

A. Yes.

Q. It says, "The patient saw Dr. Sink on June 12th, 2012. His evaluation is that he does not feel that any joint-preserving operation is going to work for her due to the combination of Ehlers-Danlos and approaching grade 4 cartilage loss in the front of the joint both on he head and socket."

What's the reference here to "joint-preserving operation"? What does that refer to?

A. This whole time we were trying to figure out if there was an alternative to total hip replacement. We try to preserve the hip, if possible, and hip replacement if it's not salvageable.

Q. You were trying to exhaust all options to avoid or prevent doing a total

hip replacement?

A.   Correct.

Q.   And what's a "grade 4 cartilage loss in the front of the joint both on the head and socket," what does that refer to?

A.   Grade 4 means the cartilage has worn away down to exposed bone.

Q.   Is that cartilage loss due in part to Ehlers-Danlos Syndrome or due to some other condition?

A.   It can be a variety of things, not necessarily Ehlers-Danlos Syndrome.  So other conditions, impingement, excessive anteversion those are all things that can cause cartilage loss.

Q.   And all those things contributed, in your opinion, to cartilage loss in Mrs. Rouviere?

A.   Yes.

Q.   The next paragraph, you referenced Dr. Foo, F-o-o.

Who is Dr. Foo?

A.   She was the radiologist who read the MRI report that we've discussed.

Q.   Okay.  She noted there was a

deficient anterior capsule, which you talked about earlier, and grade 4 cartilage loss.

Q. Do both of those conditions lead to or contribute to impingement?

A. They don't cause impingement.

Q. But they're related to impingement?

A. Well, impingement can cause cartilage loss.

Q. Is impingement more likely with a deficient anterior capsule?

A. Depending on what type of impingement you are talking about. If the capsule is deficient anteriorly and the rotation is excessive, it can give posterior impingement, yes.

Q. Was that the type of impingement that you saw in Mrs. Rouviere?

A. The impingement seemed to be related to the instability, but we also wanted to make sure there wasn't impingement from her over-coverage of the socket also.

Q. The next paragraph, you state

that you went over the options with her. You said, "The only thing that I think would work for joint preservation would be to probably do a surgical dislocation or an anterior arthrotomy and putting some sort of capsule graft, but even that would have to be combined with a microfracture or some cartilage grafting procedures."

So that would be the type of procedure to avoid total hip replacement?

A. Correct.

Q. That type of procedure, is that common or is that more complicated?

A. I don't know what you mean by is it "common."

Q. Well, that doing a surgical dislocation or anterior arthrotomy and combining it with microfracture.

A. Well, it's certainly not as common as a total hip replacement.

Q. You go on to state, "With her Ehlers-Danlos, there's no guarantee that that would not just stretch out again."

And when you say "that," you're referring to the hip preservation

procedure?

A. The capsule.

Q. You say, "I'm not thrilled with the idea of a replacement. She has very good range of motion. She is at high risk for dislocation."

That's because of her Ehlers-Danlos?

A. Yes.

Q. The next paragraph says, "If she is completely disabled by the pain, she really would like to go with a replacement."

At that point did Mrs. Rouviere tell you that she wanted to proceed with a hip joint replacement?

A. I believe -- I don't recall if it was on this exact day where she thought about it.

Q. You state here that "The risks and benefits were discussed with the patient."

A. Yes.

Q. "We may have to use a constrained implant like the Biomet Freedom, a modular

dual mobility device by Stryker, which allows a bigger head and more stability."

And that's what you were referring to earlier, the larger head allows for more stability?

A. Yes.

Q. In discussing the risks and benefits with Mrs. Rouviere, did you -- or is it common for you to show the patient the actual components you're going to use?

A. I usually almost always do. I don't recall if we did on that day or not.

Q. Do you typically show the patient or give the patient any product literature from a manufacturer or that SHS has generated?

A. We don't have product literature available for patients.

Q. Okay. So in this case, you didn't provide Mrs. Rouviere product literature from DePuy or Stryker, correct?

A. No. That's correct.

Q. I don't think I asked you this earlier. I'm sorry.

The difference between the

constrained implant and the MDM or dual mobility, what is the difference?

A. A constrained implant is where the femoral head locks into the acetabular component.

Q. And the advantage of a constrained implant is what?

A. Much harder to dislocate.

Q. The disadvantages?

A. It's more likely to impinge and range of motions restricted.

Q. Then with a dual mobility, what are the advantages of a dual mobility device?

A. A large head.

Q. It helps with stability?

A. The larger the head, the more stable. Two centers of rotation.

Q. Which means what?

A. In a conventional hip replacement, the ball moves on the socket so it has one center of rotation. With a dual mobility, you have a smaller head, ceramic head within a larger polyethylene head. And then the larger polyethylene can

move on the acetabular component so it provides an even better range of motion.

Q. And that acetabular component is cobalt chrome?

A. It's a composite. The shell is titanium and the inner lining is cobalt chrome.

Q. What are the disadvantages of the dual mobility?

A. The disadvantage is you have a cobalt chrome to titanium interface which could be a potential source of corrosion. You may have very low levels of cobalt and chrome generated in the hip. And we don't have as much information long term regarding how long a large polyethylene head is going to last compared to a conventional total hip replacement.

Q. Thank you.

The last sentence on the June 28th record says, "In fact, after her last arthroscopic surgery, her surgeon said that with the arthritis changes that are present in the hip, he feels that she's going to need a replacement as well."

So you were referencing that the three prior arthroscopies that she had?

A. Yes.

Q. And she told you that that surgeon also told her she would eventually need a total hip replacement?

A. Correct.

MR. ROUVIERE: Object to the form.

BY MR. EATON:

Q. The next note is your page 8 of Exhibit 8, the office visit. It's dated August 13th, 2012.

"The patient returned for a follow-up visit. Scheduled for right hip replacement tomorrow."

Under "Plan," it says, "We went over the postoperative regimen."

And that's talking about the restrictions after the surgery?

A. Yes.

Q. You state, "I'm thinking either using a Biomet constrained or Stryker MDM, modular dual mobility, to prevent dislocation."

That's what we just talked about, correct?

A. Correct.

Q. "The procedure was discussed with the patient."

And when you say "the procedure was discussed with the patient," you went through the risks and benefits of this type of procedure with these components, correct?

A. I probably reviewed what we had discussed earlier, risks and benefits and trying to select implants that would be the most stable.

Q. Mrs. Rouviere's Ehlers-Danlos Syndrome, did you discuss that one of the complications from a total hip replacement in a patient with Ehlers-Danlos Syndrome is that she could continue to have impingement?

A. Yes. We talked about impingement and dislocation because if the implant impinges, it may dislocate. It may force the head to come out.

Q. Do you recall, were there any

other specific risks or issues that you addressed with Mrs. Rouviere because of her Ehlers-Danlos Syndrome heading into the total hip replacement surgery?

A.   Not other than the ones we discussed already.

Q.   Did you discuss with Mrs. Rouviere the impact of activity level after the surgery or the complications with her activity level after this type of surgery?

A.   We usually do that with patients. I can't remember specifically, you know, eight years ago exactly what was discussed in terms of activities afterwards, but she didn't seem to be extremely active based on her limitations by Ehlers-Danlos.

Q.   Like with Mrs. Rouviere, you never guarantee the functional life of any component or implant --

MR. ROUVIERE:  Object to the form.

BY MR. EATON:

Q.   -- that you utilized; is that right?

A. We don't guarantee how long an implant can last.

Q. There's numerous factors that could impact the length of an implant in an individual patient, correct?

A. Correct.

MR. ROUVIERE: Object to the form.

BY MR. EATON:

Q. Did you tell Mrs. Rouviere that the implants would last 15 years?

A. I can't remember specifically. We tried to give an estimate based on bone quality, how active they are, what we know about the wear of implants that are currently available.

We can cite historically how long implants would last. And we try to give a reasonable estimate based on their activity, their age, how long an implant may last.

Q. Certainly not a guarantee of useful life, correct?

A. I'm sorry?

Q. You certainly didn't make any

guarantees about the useful life of the implants?

MR. ROUVIERE: Object to the form.

A. Well, we give an estimate of how long we think an implant should last.

(Defendants' Exhibit 79, DePuy Summit Stem "Design Rationale and Surgical Technique" brochure, Bates-stamped DEPUY_ROUVIERE_0000001 through 24, marked for identification, as of this date.)

BY MR. EATON:

Q. I'm handing you what's been marked as Exhibit 79, which is the Summit Stem "Design Rationale and Surgical Technique" brochure.

This is a document that you've seen in the past in your clinical practice?

A. I may have seen it sometime in the past. I don't recall precisely when and where.

Q. You're generally familiar with Surgical Technique brochures like this that have information on the use of the products

and potential warnings and complications for use of products?

A.    I would imagine they exist, yes.

Q.    Okay.  If you go to the last page of the Summit Stem Surgical Technique brochure, there is a summary there regarding indications, contraindications, warnings, and precautions, and adverse events.

Do you see that?

A.    Yes.

Q.    Under "Adverse Events," it references:  "The following are the most frequent adverse events after hip arthroplasty:  Change in position of the components, loosening of components, wear or fracture of components, dislocation, infection, peripheral neuropathies, and tissue reaction."

Do you see that under "Adverse Events"?

A.    Yes.

Q.    Those are all adverse events that you were aware of in connection with the use of a Summit stem and other implants

well before August of 2012?

MR. ROUVIERE: Object to the form.

BY MR. EATON:

Q. Correct?

A. These adverse events can occur with any total joint replacement.

Q. You knew that based on your clinical experience since 1994?

MR. ROUVIERE: Object to form.

A. Yes.

Q. And these are just some of the adverse potential adverse events that you discussed with Mrs. Rouviere prior to surgery, correct?

MR. ROUVIERE: Object to form.

A. We discussed potential complications. I can't recall how detailed and specifically each item.

Q. Okay. And the items that you do warn about, that -- you provide those warnings or convey those risks based on your clinical experience, not based on product literature from DePuy or other manufactures, correct?

MR. ROUVIERE: Object to form.

A. Yes, it's based on my experience.

(Defendants' Exhibit 80, DePuy document Bates-stamped DEPUY_ROUVIERE_0000057 through 67, marked for identification, as of this date.)

BY MR. EATON:

Q. I'm handing you what's been marked as Exhibit 80, which is a copy of the Instructions For Use, the IFU, for the Summit stem.

This is obviously a blown-up or larger version of the package insert that we were referring to earlier.

Do you recall that testimony?

A. Yes.

Q. And if you go to -- I'm going to use the Bates numbers on the bottom right. It's 61.

(Document review.)

Q. Under "Modular femoral heads and acetabular components..."

Do you see that?

A. Yes.

Q. It says, "...a DePuy metal or ceramic modular femoral head is to be used with the DePuy femoral stem component."

And that's what you did in this case?

A. Correct.

Q. You used today DePuy Summit stem with a DePuy ceramic head?

A. Yes.

Q. Under "Caution," it says, "In USA, ceramic heads are not approved for use with metal inserts."

What does that refer to?

A. I'm not sure what they mean by "metal insert," unless they're referring to -- there is a little modular titanium ring that you can put on as a spacer between the Morse taper connection and the ceramic head.

Q. Prior to --

A. Or I don't know if you're talking about using a ceramic head on a metal liner.

Q. Okay. Prior to Mrs. Rouviere's surgery, had you utilized DePuy's ceramic

head with an MDM cobalt chrome liner and titanium shell?

A. Yes.

Q. If you go to the next page, Bates page 62, under "Caution," that second bullet, it says, "Implants and trial components from different manufactures or implant systems should never be used together."

Do you see that?

A. Yes.

Q. And here you used a DePuy stem with a ceramic head.

So those implants were from the same manufacturer, correct?

A. Correct.

Q. Okay. There is a reference in the medical records from Dr. Alvarado, the revising surgeon, to mismatch.

What does "mismatch" mean to you based on your clinical experience?

MR. WALKER: Do you have any idea what that means?

THE WITNESS: I have no idea what he's referring to.

BY MR. EATON:

Q. Okay. I didn't know if "mismatch" was a term of art.

A. I can't tell you.

Q. All right. I didn't either, but I just was asking if you had heard that before. Thanks.

If you go to page 63, there in the middle of the page, it says, "Caution: The following conditions singularly or concurrently tend to adversely affect the fixation of hip replacement implants."

And there are several items listed there.

Six is "allergic reaction to implant materials."

Have you had patients who have had allergic reactions to implant materials?

A. Yes.

Q. How do you confirm an allergic reaction?

A. It's extremely difficult to do with certainty. There are reports of patients having allergy to either cobalt or

chrome. And the best way that can be done is a test called a leukocyte migration test where the patient's white cells are tested with cobalt and chrome metals. There is a group in Chicago that has become quite adept at doing that test.

Q. Have you ever utilized a MELISA test, M-E-L-I-S-A, all caps, to assess if a patient is having an allergic reaction?

A. No.

Q. Have you heard of that type of allergy test before?

A. I'm not familiar with that acronym.

Q. Okay. In your clinical experience, have you ever had a patient who had an allergic reaction to titanium?

A. I'm not aware of it, no.

Q. Going back to the IFU, on No. 8 there, it says, "Tissue reactions to implant corrosion or implant wear debris."

That is a possible complication from the use of these components, correct?

A. Correct.

Q. And you knew that well before you

ever read or saw this IFU, correct?

A. Yes.

Q. On the bottom of 63 to 64, it says, "The functional life expectancy of prosthetic hip implants is at present not clearly established. The patient should be informed that factors such as weight and activity levels may significantly affect wear."

Do you see that?

A. Yes.

Q. And that's consistent with what you testified earlier that you advised Mrs. Rouviere of your best estimate of the functional life of implants --

MR. ROUVIERE: Object --

BY MR. EATON:

Q. -- based on numerous factors; is that right?

MR. ROUVIERE: Object to form.

A. Correct.

MR. EATON: André, if you can wait until I'm done with the question.

MR. ROUVIERE: I'm sorry. You hesitated right at the end before you

finished the last word, so...

MR. EATON: Thanks.

BY MR. EATON:

Q. And then Bates 65, there is a section on adverse events and complications. It says, "The following are generally the most frequently encountered adverse events and complications in hip arthroplasty."

It says, No. 7, "Tissue reactions: Osteolysis and/or implant loosening caused by metallic corrosion, allergic reactions, or the accumulation of polyethylene or metal wear debris or lose cement particles."

Do you see that?

A. Yes.

Q. And again, Dr. Buly, those were all complications you were aware of based on your clinical experience well prior to August of 2012, correct?

A. Correct.

Q. The next section of adverse events and complications under "Intraoperative," No. 6, "Subluxation or

dislocation of hip joint due to implant size or configuration selection, positioning of components and/or muscle and fibrous tissue laxity."

Do you see that?

A.   Yes.

Q.   And laxity is the same thing that you referred to as hypermobility?

A.   Correct.

Q.   And again, this complication is something you knew based on your clinical experience well prior to August of 2012?

MR. ROUVIERE:  Object.

A.   Repeat the question.

Q.   This type of complication, subluxation or dislocation due to the items listed in No. 6, those are all things you knew based on your clinical experience prior to August of 2012?

MR. ROUVIERE:  Object to form.

A.   Yes.  That's why we discussed that prior to surgery.

Q.   And when you say "that," that's why you discussed those complications with the patient prior to surgery?

A.    Yes.

Q.    I'm going to hand you what has been previously marked as Exhibit 9, which is your operative record, I'm sure you have in your chart.  It's dated August 14th, 2012.

Do you have that now?

A.    Yes.

Q.    The operative record notes that you had two PAs assisting you during Mrs. Rouviere's procedure?

Do you see that?

A.    Yes.

Q.    Do you know if there were any sales reps in this procedure?

A.    There usually are, but I can't recall specifically if there was during the operation.

Q.    Do you recall any discussions with either DePuy or Stryker, a sales representative, prior to Mrs. Rouviere's surgery?

A.    I'm sorry.  Repeat the question.

Q.    Prior to Mrs. Rouviere's surgery, do you recall having any specific

discussions about her procedure with either a DePuy sales rep or a Stryker sales representative?

A. Only if it had occurred during the operation that day.

Q. You would not have had discussions with those sales reps prior to the surgery, correct?

MR. ROUVIERE: Object to form.

A. Correct.

Q. Going to your operative record, at the bottom under "Indications," you essentially summarized here what you've already testified to; that you discussed a number of different options with the patient and noted there were concerns that those other options may not work because of her..." it says "regular Danlos," it's supposed to say "Ehlers-Danlos," correct?

A. Correct.

Q. Then you note, "Doing a hip replacement with Ehlers-Danlos is a concern as well, since the patient does have excellent range of motion, and plans were made to use either constrained socket or

the largest head available for stability."

When you reference here "doing a hip replacement with Ehlers-Danlos as a concern," was there something specific you were referring to here?

A. The same items we've already discussed, the hypermobility and the increased risk of subluxation or dislocation.

Q. If you go to page 2 of the operative record, the second paragraph, there is a reference to Vicryl sutures.

Do you see that?

A. Yes.

Q. Did Mrs. Rouviere ever indicate to you that she had allergic reactions or a reaction to Vicryl sutures?

A. Not that I'm aware of.

Q. The next paragraph, you note, "There was more wear on the socket than on the head, but the head was already starting to show signs of wear with osteophyte formation."

What are osteophytes?

A. Bone spurs.

Q. The cartilage wear you note was "most noticeable along the anterior superior portion of the acetabulum."

Was that a surprise finding or was that consistent with the imaging leading up to surgery?

A. That was consistent with the MRI scan.

Q. The next paragraph you note, "The femoral was quite small, accommodating only a number 1 stem."

Is that the smallest stem you can use?

A. On this system, yes.

Q. You go on in that paragraph to note that "A trial reduction was performed with a Biomet head on the trunnion. However, because of her hypermobility, there intended to be impingement."

Where was the impingement that you note here?

A. I can't recall specifically. It may have been in both flexion, as well as extension and external rotation.

Q. And was the impingement the

components hitting each other, or was the impingement just one of the components hitting part of the anatomy?

A. It was the components hitting each other.

Q. So in the last paragraph, then you removed the Biomet cup and went with the larger Stryker MDM head with a Trident cup, correct?

A. Correct.

Q. You note, "The range of motion was excellent with the Stryker MDM and there was now no impingement"?

A. Correct.

Q. And the next paragraph you note that the liner -- "The cobalt chrome liner was placed in the shell."

That is the MDM cobalt chrome liner, correct?

A. Correct.

Q. Okay. And you used -- the Delta DePuy ceramic head was compressed into the large polyethylene head, and that was placed into the liner, correct? ^ Quote?

A. Correct.

Q.   Then you note that the ceramic head, which is now in the large polyethylene head, was placed on the trunnion and impacted. ^ Quote?

So you placed that ceramic head on the DePuy stem, correct?

A.   Um-hmm, correct.

Q.   And you impacted to engage the ceramic head on to the femoral component?

MR. ROUVIERE:  Object to form.

A.   Correct.

Q.   In your clinical experience, does that impaction cause at times marks, impaction markings on the inside of the ceramic head?

A.   I'm not aware that that occurs.

Q.   Have you seen in revision surgeries when you remove a ceramic head, that there is impaction marks from when the head is originally impacted onto the trunnion?

A.   I don't recall impaction marks. There may be some slight metallic staining.

Q.   Okay.

A.   I'm not aware of impact marks.

Q. You then state that "The hip was reduced with similar range of motion and stability findings."

You confirmed that there was no impingement, and range of motion was excellent, and there was no instability, correct?

A. Correct.

MR. WALKER: I wonder if you are done with that? I have to make a phone call. It will be about five minutes.

MR. EATON: We can go off the record, sure.

THE VIDEOGRAPHER: The time right now is 10:06 a.m. We are off the record.

(Recess is taken.)

THE VIDEOGRAPHER: The time right now is 10:15 a.m. We are now back on the record.

BY MR. EATON:

Q. Dr. Buly, I'm going to hand you what's been marked as Exhibits 81 and 82.

(Defendants' Exhibit 81, Implant Sticker Record, Bates-stamped

JR:HSS:000042, marked for

identification, as of this date.)

(Defendants' Exhibit 82,

Operating Room Record, Bates-stamped

JR:HSS:00038, marked for

identification, as of this date.)

BY MR. EATON:

Q.   And these are -- this Exhibit 81

is a copy of the implant stickers, correct?

A.   They are implant stickers, yes.

Q.   And you have the original, I saw,

of the implant stickers in your file,

correct, in your chart?

A.   Yes.

Q.   It says "implant sticker record"?

A.   Yes.

Q.   All right.  And you have a

procedure --

A.   This one doesn't say it.

Q.   It does not.  The one in your

chart says "implant sticker record"?

A.   Correct.

Q.   And you have a procedure where

your team, your surgical nurse, whomever it

is, will open the component box, pull the

sticker off of that box and place it on the

implant sticker record so you have

confirmation of the exact component that

you used during the surgery, correct?

A.   Correct.

Q.   And then the Exhibit 82 is your

operating room record, which also confirms

the product item, the manufacturer and the

lot number and the site, which here was the

right hip, correct?

A.   Correct.

Q.   Now Exhibit 81, there isn't an

implant sticker for the DePuy ceramic head,

but it is identified on Exhibit 82 where it

says "BIOLOX Delta ceramic," correct?  The

bottom there?

A.   Correct.

Q.   Thank you.

Did Jodi Rouviere ever raise

concerns with you prior to the surgery

about metallosis or metal-related

conditions or diseases?

A.   Not that I'm aware of.

(Defendants' Exhibit 83,

Discharge Summary for J. Rouviere,

Bates-stamped JR:LM:00050 through 51, marked for identification, as of this date.)

BY MR. EATON:

Q. I'm handing you what has been marked as Exhibit 83, which is your discharge summary, which is dated August 17th, 2012, correct?

A. Yes.

Q. And what specific restrictions did you place on Mrs. Rouviere after this surgery?

A. Well, we allow full weight bearing, but we have what's called total hip precautions, meaning, we stress the importance of avoiding too much flexion, squatting, bending over activities that might cause the hip to dislocate.

In addition, because I wanted to be extra careful with her Ehlers-Danlos, I also prescribed a brace to also help limit her range of motion during the healing process.

Q. And was that brace to be worn 24/7 or just for certain hours a day?

A.   I think we would typically allow it to be removed for showering, things like that.

Q.   I want to hand you what's been marked as Exhibit 10, which is the rest of your office notes.  This -- Exhibit 10 starts on page 9.  It's dated 9/24/12.

Do you have that?

A.   Yes.

Q.   This was the first time that you saw Mrs. Rouviere after the surgery, correct?

A.   Correct.

Q.   It says "She is thrilled, smiling, and very happy."

You go on to note that "She said she's been able to walk without pain for the first time in years."

Correct?

A.   Correct.

Q.   Which was one of the primary purposes of the joint replacement surgery that you did on Mrs. Rouviere, and that was to relieve her chronic pain?

A.   Correct.

Q. Under "Impression," you note that "We could not use a Biomet constrained. The patient had far too much motion. And even with the 36-millimeter head on a Biomet Freedom, it was going to impinge."

That refers to the impingement that you observed during the procedure, correct?

A. Correct.

Q. Then you say, "I think this was a much better option."

You're referring to the Stryker MDM?

A. Correct.

Q. Then you note on her plan that "She's going to use the brace for another month or so."

A. Yes.

Q. Then you note, "We went over risk and benefits."

What were those specific risks and benefits that you discussed on September 24th?

A. What are you referring to?

Q. I'm sorry. Under "Plan," it

says, "We went over risk and benefits."

Were there specific risks that you were concerned about?

A.   No.  We started to allow the patient to increase her activities, but the -- for example, we don't allow patients to do sports or any activity like that until they're at least three months out.

Q.   Okay.

A.   So we usually talk about coming off the more rigid restrictions at the six-week point.  Increasing activities, but not a full release.

Q.   Okay.  And it says, "We'll see her when she's a year out."

So you planned to see her in September of 2013?

A.   Correct.

Q.   Okay.  On the next page, page 10, the next visit is about three months later, December 17th, 2012.

It says, "She was doing pretty well.  She was here at the end of September.  Then she started getting pain on the left side when her hip was going

out."

So that was not the hip that you had operated on, correct?

A.   Correct.

Q.   Then she notes -- you note here in the record, "With the right one, she gets a little pain and full extension."

And then on your exam, it says, "Motion is terrific as before on the right. I do not feel any instability."

Then you go on to note, "Minimal impingement with a lateral type of pain."

Can you describe the "minimal impingement" that you were referring to there?

A.   That would be in the left hip. Pain with activities, like flexing the hip in an inward rotation.

Q.   Okay.   "No minimal impingement during the exam on the right hip at this point."

A.   What are you referring to?

Q.   Where it says "Examination," you noted the minimal impingement is on the left side.

You did not observe that on the right side; is that correct?

A. No.

Q. Okay. Then on the next page, page 11, this is dated December 19th, 2012. And you reference now that -- the MRI of the left hip.

And is Dr. Potter in HSS, in your group?

A. Yes.

Q. In the last paragraph, it notes that "She saw a specialist in Florida who wants to try prolotherapy to try to tighten up the hip."

What is prolotherapy?

A. Prolotherapy, I'm not very familiar with it, but it's where different injections are done, and sometimes they're just sucrose injections, where they try to stimulate healing by injecting various substances.

Q. And you note, "I encouraged her to try to do as much physical therapy as possible and keep it strong."

The physical therapy -- strike

that.

What was the purpose of the physical therapy in the right hip at this point about four months postsurgery?

A. It takes almost a year for any total hip to plateau, so if we think it's necessary, physical therapy, along with strengthening the hip, can help the situation.

Q. Do you know at this point in December of 2012 if Mrs. Rouviere was going to physical therapy for the right hip?

A. I don't recall.

Q. The next entry, page 12, April 29th, 2013, patient returns for follow-up visit. Your note says, "She states that her hips are still dislocating, but I stressed that she may be feeling subluxation or tendon snapping."

What's that reference mean?

A. Sometimes patients will say that their hip is dislocating or popping out, and it's not specifically occurring. It may be a tendon around the hip that's snapping that gives a physical sensation

that something is going out of place.

Q. Then you note a couple sentences later, "She is still having back pain."

Was the back pain related to problems with both hips or Ehlers-Danlos or something else?

A. It can just be going on concurrently with whatever is going on with the hips.

Q. In your clinical experience, do patients with Ehlers-Danlos Syndrome also experience back pain?

A. Well, it's a systemic disorder, so any joint can be involved, including the spine.

Q. Under "Examination," it says, "She's able to walk. Both hips have just a ton of motion."

And then you note here, "Flexion to 125 degrees. 50 internal, 70 external. 40 abduction and 30 adduction."

Is that the right hip?

A. Both hips.

Q. Then you note, "There is some clicking as we moved the hips."

What's the source of the clicking?

A.   Clicking can often be, again, with snapping tendons around the hip.  For example, a psoas tendon often will snap with different range of motion maneuvers.

Q.   You did the X-rays.  It says, "Implants are well fixed on the right."

Correct?

A.   Correct.

Q.   Then under "Plan," it says, "She tried to do aqua therapy in a group but did not feel it could be done.  She said she cannot afford to do individual therapy."

Do you recall Mrs. Rouviere telling you that she was trying to get a pool heater paid for to use her pool as an aqua therapy?

A.   I don't recall that.

Q.   Do you recall her telling you that she was not doing physical therapy at this point in time?

A.   I don't recall at this point.

Q.   Is April 29, 2013, the last visit that you had with Mrs. Rouviere as a

patient?

A. Yes.

Q. Did you receive any medical records after April 2013 from Mrs. Rouviere about her treatment?

A. Yes. An email was sent.

Q. I'm going to hand you what was previously marked as Exhibit 28.

Is that a copy of the email that you received from Jodi Rouviere?

A. Yes.

Q. Between April 2013 and this email on April 12, 2017, you had not had any connection or communication with Jodi Rouviere?

A. Correct.

Q. Do you know if you responded to this email?

A. I believe my nurse Elaine did. It's not clear to me whether she was going to be coming up to see us or not.

Q. And you have not seen Mrs. Rouviere again since April of 2013, correct?

A. Correct.

Q. Have you had any telephone conversations with Mrs. Rouviere or her husband André?

A. No.

Q. Did you do any research or follow up with her treating physician after you received this email?

A. No. Again, I thought they would be coming up for an evaluation.

Q. There is a reference in the third paragraph where she says, "I have since learned that I did have chromium and arsenic in my blood at this time."

Have you ever seen any of her, any of Jodi Rouviere's cobalt chromium blood tests?

A. No.

Q. What would be the source of arsenic in connection with implants?

A. I'm not aware that arsenic is used in any orthopedic implants.

Q. Near the bottom it says, "I did find in my research that the following parts were recalled and they did match my stickers below."

Do you know if any of the components that you implanted were ever recalled?

A. Not that I'm aware of.

Q. Then the email includes a couple photographs taken apparently during her revision surgery.

Did you make any observations or have any discussions with your nurse or anyone else about what those photographs show?

A. With my nurse, yes.

Q. And what was that?

A. That there certainly appears to be a metallic staining within the hip joint.

Q. Do you know based on your observation, your clinical experience, the source of that metallic staining?

A. It must be from the orthopedic implants. I don't know what else would cause it.

Q. Do you know if the staining is from cobalt chrome or titanium?

A. I don't know.

Q.   I'm handing you what was previously marked as Exhibit 16.  This is --

          MR. WALKER:  Have you ever seen this before?

          THE WITNESS:  No.

BY MR. EATON:

Q.   This is a consultation report from Dr. Alvarado dated May 21st, 2015.

          You've never seen this record, correct?

A.   Correct.

Q.   If you turn to the second page.

          MR. ROUVIERE:  What number is that?  I'm sorry.

          MR. EATON:  Previously marked as 16.

          MR. ROUVIERE:  Okay.

BY MR. EATON:

Q.   Under "Laboratory Values," it says "chromium level .9."

          Is .9 a chromium level that is a level of concern based on your clinical experience?

          MR. WALKER:  I actually am not

going to let him testify about a

document he's never seen nor the

findings in it.

MR. EATON: I'm just asking his

opinion based on his clinical

experience.

MR. WALKER: I know. He's only

here to tell you about the facts of

this case.

MR. EATON: You're going to

instruct him not to answer, Paul?

MR. WALKER: Yeah.

MR. EATON: I just got some basic

questions about this. There's only

three more questions.

MR. WALKER: Well, try them out

and I'll see what I think about them.

BY MR. EATON:

Q. All right. The next page, the

third page. In the third sentence, it

says, "She is now describing instability

and laxity of the hip joint."

And then it says, "However on

radiograph, there does not appear to be any

mechanical issue with the prosthesis."

Do you see that?

A.   Right.

Q.   That indicates that the components were aligned and well fixed, correct?

MR. ROUVIERE:  Objection to the form.

BY MR. EATON:

Q.   Is that what that means to you?

MR. ROUVIERE:  Calls for speculation.

A.   I can't answer for his evaluation.

Q.   All right.  It goes on to say, "However, her chromium levels are normal."

And then later on, it says, "In addition, this is not one of the recalled components either."

So that's consistent with your recollection that these were not recalled components that you implanted?

MR. ROUVIERE:  Objection to form.

MR. WALKER:  Well, I'll let him say that that is what he said before.

A.   I don't recall that there's been

any recall of these implants.

Q. Okay.

MR. EATON: I have a couple more
and we'll be done.

BY MR. EATON:

Q. I show you what's been previously
marked as Exhibit 50 and 51.

MR. WALKER: Where are these
from?

MR. EATON: These are images
taken by Dr. Alvarado during an
August 2016 surgery.

BY MR. EATON:

Q. I just want to ask you a couple
questions about these. Look at Exhibit 51.

Does that X-ray, based on your
clinical experience, show impingement?

A. There appears to be impingement,
yes.

Q. That's impingement between the
stem into the cup or liner, correct?

A. Yes.

Q. And Exhibit 50 shows the same
components and a kind of a gouge or
indentation in the stem.

Do you see that?

A. Yes.

Q. In your clinical experience, have you seen impingement which leads to a gouge or an indentation in the femoral stem?

A. Yes.

Q. And that impingement that would lead to a gouge like that in the femoral stem can be caused by numerous factors, including hypermobility or laxity?

A. Correct.

MR. ROUVIERE: Objection to form.

MR. EATON: That's all the questions I have.

THE WITNESS: Thank you.

MR. EATON: Thank you for your time.

MR. ASFENDIS: I know we have to move along, so I will not be too long here. Give me a minute.

I just need to mark two exhibits, and we'll go through them very quickly.

(Defendants' Exhibit 84, Stryker document entitled "Howmedica Osteonics Restoration ADM and MDM Liner,"

Bates-stamped STRROUV00000001 through 10, marked for identification, as of this date.)

(Defendants' Exhibit 85, Stryker document entitled "MDM X3 Modular Dual Mobility Acetabular System - Surgical Technique," Bates-stamped STRROUV00000129 through 150, marked for identification, as of this date.)

EXAMINATION BY

MR. ASFENDIS:

Q. Good morning, Doctor. My name is Paul Asfendis. I represent Stryker Howmedica Osteonics Corp.

I have a few follow-up questions. I had a long outline here and most of it is all crossed out because Joe had already asked the questions.

I'd like to show you what has been marked as --

MR. ASFENDIS: What is the next --

MR. EATON: 84.

BY MR. ASFENDIS:

Q. -- as Exhibit 84, please. I just

ask you to take a quick look at that.

(Witness complies.)

MR. WALKER:  Have you seen these before in your life?

THE WITNESS:  Perhaps in the past.

BY MR. ASFENDIS:

Q.   That was going to be the question.

Is this something that you've seen in the past?

A.   Possibly, but I don't recall specifically.

Q.   Similar to the DePuy IFU, is this something that you may have looked at, at some point in the past, but it's not something that you reviewed before every surgery?

A.   That's correct.

Q.   Okay.  This will seem a little repetitive, but I want to read some sections and go through them for the record.  I am going to read you the first paragraph.

"The advancement of partial and

total hip replacement has provided the surgeon with the means of restoring mobility and reducing pain with the use of implanted prosthetic devices.  While these devices have proven to be largely successful in obtaining these goals, they are manufactured from metal, plastic, or other biomaterials.  Any partial or total hip replacement system, therefore, cannot be expected to withstand the same activity and loads of normal healthy bone.  The system will not be as strong, reliable, or durable as a natural human hip joint and does not have an infinite lifetime.  The surgeon must warn patients about device limitations."

Have I read that accurately?

A.   You've read that accurately from what is what's printed on here.

Q.   Okay.  Is that something you agree with, what I just read?

A.   Yes.

Q.   Okay.  And then taking you down to B1, I'll just read:  "As the loads on the prosthesis increase, the chance a

patient will suffer adverse reactions, such
as failure of fixation, loosening,
fracture, and dislocation of the device,
and can lead to a decreased service life."

      Again, is that accurate to your
knowledge?

A.   Yes.

Q.   Reading the next paragraph, No.
2, "The prosthesis will not restore
function to the level expected with normal
healthy bone, and the patient should not
have, and should be disabused of,
unrealistic functional expectations."

      Again, correct and it's something
that is accurate?

A.   Yes.

Q.   Just taking you to page 4, under
the section "Adverse Effects," and it's
under No. 2, it says, "Although rare,
sensitivity/allergic reactions to the
materials in the implant have occurred in
patients following joint replacement.
Implantation of foreign material in tissues
can result in immune responses and in
histological reactions involving

==macrophages and fibroblasts."==

Again, is this something you were aware of in 2012?

A. Yes.

Q. And this, what I've read so far, this is something that you're aware of independently, correct, outside of the IFU?

A. Yes.

Q. Same thing for No. 4, I'll just read it, "Dislocation and subluxation of implant components can result from improper positioning or migration of the components. Muscle and fibrous tissue laxity can also contribute to these conditions."

Again, same question: Something that you were aware of in 2012?

A. Yes.

Q. That's accurate?

A. Yes.

Q. And, again, independent of the IFU?

A. Yes.

Q. And just one more, No. 6, it says the following: "Singularly or in combination can lead to and/or cause

decreased range of motion, improper

selection or positioning of components,

femoral impingement and/or periarticular

calcification."

Again, something that you were

aware of in 2012?

A.   Yes.

Q.   And, again, that is accurate, to

your knowledge?

A.   Yes.

Q.   And you were aware of it

independent of the IFU, correct?

A.   Yes.

Q.   I'll just take you -- ask you to

take another quick look at the next

exhibit, which is Exhibit 85, which I'll

represent to you is a Surgical Technique

for the MDM system at issue in this

litigation.

And I don't have specific

questions, but, again, I will just ask you,

similar to what you were asked with DePuy,

is this something that you have seen in the

past?

A.   Yes.

Q. Do you actually recall seeing this? You answered that very -- expressly?

A. Yes, this one (indicating).

Q. Why does this one stand out in your memory?

A. I just seem to remember it.

Q. Pardon?

A. I just seem to recall seeing it in the past.

Q. And, again, something that you would have seen and reviewed prior to the August 2012 implant surgery?

A. Yes.

Q. Okay. And I know you were asked before, as far as these adverse effects and the various risks of surgery, whether it's something that you understood based on your clinical experience, and you testified that that was correct.

Is it also correct that these are also things that you understand based on your review of medical literature as it sort of progresses to the present?

A. Can you rephrase your question?

Q. Yes.

Do you keep abreast of the medical literature in total hip arthroplasty?

A.   Yes.

Q.   Okay.  And, again, some of these effects that we've talked about and risks, these are -- you are aware of these risks not just from your clinical experience but also from some of the literature, correct?

A.   Correct.

Q.   Okay.  Now you mentioned when we discussed earlier, when you discussed some of the disadvantages of the MDM, one of them was potential corrosion at the interface.

You're not aware of corrosion at that interface occurring in this case with Mrs. Rouviere, are you?

A.   I'm not -- I'm not aware of what happened.

Q.   If there was corrosion at the interface, that is something you would expect the revising surgeon to see, correct?

A.   If it were significant enough, I

would imagine the surgeon would see that

only if the cobalt chrome liner is removed.

If it's not removed, you may not see that.

Q.   Understood.

And this is just something you

testified earlier.  Again, I'm bouncing

around because I'm not using my outline

anymore.  I'm just trying to do some

follow-up questions.

You had testified that you

understood that tissue reactions to implant

corrosion or to wear debris was a possible

complication for use with the DePuy

components.

And what I want to ask is, that's

true for any components, correct?

A.   Any component can cause wear,

debris, and tissue reaction.

Q.   I think you said you were not

aware or you didn't recall whether a sales

rep was present for the August 2012 surgery

from either DePuy or Stryker, correct?

A.   I don't recall specifically, no.

Q.   If a sales rep or reps were

present, they would not actually be in the

sterile operating field, correct?

A. That's correct. They're outside the enclosure.

Q. And just the last thing I wanted to ask you about was, your initial visit -- and if you want to refer to Exhibit 10, you can do that -- I'm sorry, Exhibit 8, you can do that.

A. What is the date?

Q. That would be April 4, 2012.

(Document review.)

Q. You were asked questions about this visit based on the record.

I wanted to ask you, do you have specific recollection of this visit?

A. Yes.

Q. Do you know, was Mr. Rouviere present with Mrs. Rouviere at this the visit?

A. Yes, he was there.

Q. As far as Mrs. Rouviere's pain at this time, was she in a lot of pain?

A. Yes.

Q. She described it as a 9 out of 10, correct?

A.   Correct.

Q.   Was this consistent, her being in a lot of pain, consistent with all of your visits leading up to the surgery; she was always in a lot of pain?

A.   Correct.

Q.   Was she able to walk unassisted?

A.   Yes.

Q.   How about without any assistive device?

A.   Well, it depended on the situation.  She reported that it's very difficult to walk, wasn't using a cane, but sometimes her pain was severe enough that it would require the use of a wheelchair.

Q.   Do you recall, was she using crutches when she was in your office or a wheelchair?

A.   Let me take a look at my notes.

(Document review.)

A.   I describe her gait, but I don't say whether she was using crutches at the time.

Q.   You do mention she can barely walk at this point.

Do you see that?

A.   Yes.

Q.   Is that your own observation?

A.   That was what she reported to me.

Q.   Okay.  So this patient, just to sort of recap, it was grade 4 cartilage loss?

A.   Correct.

Q.   She had ongoing impingement issues with the natural hip?

A.   Yes.

Q.   A deficient capsule as well, correct?

A.   Correct.

Q.   Which could lead to instability because the capsule is not strong enough to contain the joint, correct?

A.   Correct.

MR. ROUVIERE:  Object to form.

BY MR. ASFENDIS:

Q.   And all in the setting of Ehlers-Danlos Syndrome, so hypermobility, hyperlaxity, correct?

MR. ROUVIERE:  Form.

A.   Correct.

Q.   And she could barely walk at this time, correct?

A.   Correct.

MR. ROUVIERE:  Object to form.

BY MR. ASFENDIS:

Q.   This was not a healthy hip.  Can we agree on that?

A.   Well, if it were a healthy hip, we wouldn't be operating.  We wouldn't be doing a total hip replacement.

Q.   And in your opinion, surgery total joint replacement was the best option for this patient, correct?

A.   In my opinion, yes.

Q.   Is that still your opinion today?

A.   Yes.

Q.   Last question is:  When you take the patient through the range of motion during the surgery, that range of motion testing, you're taking her through normal range of motion, correct?

A.   As much as we can obtain on a table.  So we try to make sure that it's not dislocating, because if there is an a lot of impingement, it will dislocate.  But

we also look for any subtle amounts of impingement. So we try to see if the neck is hitting the rim with extension external rotation, if there is any impingement in flexion, and also how much internal rotation you can get with the hip flexed 90 degrees. And with hers it was what we call 90/90. At 90 degrees of flexion, she had 90 degrees of internal rotation, which shows a lot of stability, and which is sort of what you would expect with an MDM liner giving even more stability.

But there was, at the time of surgery, no obvious impingement that we could see. And if there is, we try to do something to change it to make sure it's not going to occur.

Q.   Understood.

Give me 30 seconds.

A.   Okay.

MR. WALKER:  You did say that was the last question.

MR. ASFENDIS:  I did, didn't I? And I might be actually telling the truth.

(Off the record.)

MR. ASFENDIS:  That was the last question.  Thank you again for your time.

MR. ROUVIERE:  Take a five-minute break?

MR. EATON:  Yes.

THE VIDEOGRAPHER:  The time right now is 10:54 a.m.  We are off the record.

(Recess is taken.)

THE VIDEOGRAPHER:  The time is 11:00 a.m.  We are back on the record.

EXAMINATION BY

MR. ROUVIERE:

Q.   Dr. Buly, good morning.

A.   Good morning.

Q.   Dr. Buly, you are familiar with each of the components you placed in Jodi Rouviere at the time you placed them in, correct?

A.   Yes.

Q.   All right.  You first put in the Summit stem by DePuy?

A.   Yes.

Q. Do you know what the Summit stem is made of?

A. Yes. It's made of titanium alloy.

Q. Okay. Are there any other chemicals or elements inside that stem besides titanium alloy?

MR. EATON: Object to form.

A. It's usually -- it may be chemically pure titanium, or it may have small amounts of other metals, but I'm not 100 percent sure which metals.

Q. And you indicated in your testimony that the Summit stem comes with a Porocoat coating?

A. Yes.

Q. What is in the Porocoat coating?

A. I believe it's titanium with an HA coating, hydroxyapatite coating.

Q. What is a hydroxyapatite, do you know?

A. It's a bone mineral.

Q. Would you be surprised to find out that there's chromium cobalt inside titanium --

MR. EATON: Object to form.

BY MR. ROUVIERE:

Q. -- inside hydroxyapatite?

MR. EATON: Object to form.

MR. ASFENDIS: Note my objection.

A. Well, if there is, I don't know to what extent.

Q. Well, would you agree that you get your information from the companies that sell it to you as to what might be in their product?

A. Sometimes it comes from that. Sometimes it come from literature.

Q. Okay. Well, what has -- let me strike that.

Where do you get your information from the representatives from DePuy, from their sales reps?

MR. EATON: Object to form.

A. It might be from literature. It might be from sales reps.

Q. Well, what literature from DePuy have you reviewed that you're aware of that identifies what the elements are in each of the products that they have you -- or they

sell to you?

A. I can't recall where that came from.

Q. Okay.

A. These are implants that I have been using for many years, and I can't remember how I initially determined the composition.

Q. What have you been told about the hydroxyapatite?

MR. EATON: Object to form. Vague.

A. Nothing specifically.

Q. Are you aware -- have you ever been told it contains arsenic?

MR. EATON: Object to form.

A. I am not aware of that.

Q. If you were aware of that, would it change your position on whether or not you would implant that in the patient?

MR. EATON: Object to form.

MR. WALKER: Don't answer that.

MR. ASFENDIS: I'll object to form.

MR. WALKER: That is asking for

an opinion question.  That's not what he's doing here.

(Instruction not to answer.)

BY MR. ROUVIERE:

Q.   Dr. Buly, the next item that you installed was the BIOLOX head by DePuy?

MR. EATON:  DePuy.

A.   Yes.

Q.   You indicated that that is a product that you routinely used, and it seems to be your head of choice, so to speak.

A.   Yes.

Q.   Would that be correct?

A.   Correct.

Q.   Are you aware of what the makeup of the BIOLOX ceramic head includes?

A.   Yes.

Q.   What is it?

A.   My understanding, it's a composite of the aluminium oxide and zirconium oxide.

Q.   Are you aware that it also includes chromium?

A.   I'm not aware of that.

Q.   If you were aware of that, would that affect your choice to use that item?

MR. EATON:  Object to form.

MR. WALKER:  Don't answer that.

(Instruction not to answer.)

BY MR. ROUVIERE:

Q.   Would that affect the warnings that you would give the patient before you implanted it into the patient?

MR. EATON:  Object to form.

MR. WALKER:  He's not here to answer those kinds of questions.  He's here to answer factual questions.  He's answered it.

MR. ROUVIERE:  Counsel, I agree with you it's factual, but he's the factual -- he's the implanting surgeon and part of his case has to do with warnings.  And the question is, would he give certain warnings under certain situations in this case.

MR. WALKER:  He'll tell you what warnings he did give, why he gave them, and I think he's already said that, but he'll say it again if you ask what

warnings did he give, why did he give them. But he's not going to answer what if you had known this, that, or the other thing, would you have done something else. That is too speculative and not his purpose here. But you can ask him what he did say and why he said it, although I think that's already on the record but...

BY MR. ROUVIERE:

Q. Okay. Dr. Buly, you have been provided by both counsel the IFUs that are provided with the products that you installed in Mrs. Rouviere.

You remember discussing that with them?

A. I'm sorry, repeat the question.

Q. I'm going to show you what I marked as Exhibit 79. If you go to that.

(Document review.)

Q. You indicated that you've read through this IFU from DePuy?

MR. EATON: That is the surgical techniques brochure.

MR. ROUVIERE: Okay. I'm sorry,

this is the IFU?

MR. EATON: Yes.

MR. ROUVIERE: I apologize. I had the wrong document. It would be Item No. 80.

MR. EATON: Exhibit 80.

(Document review.)

A. I can't recall specifically reading this; or if I did, when.

Q. Would there be information that you have knowledge of that is not provided in this IFU as far as the warnings?

Are there warnings that you would give to a patient that you don't see inside this IFU? Please take your time to read it.

MR. EATON: Object to form.

A. Well, I don't quite understand the question.

Did we talk about things other than what's included in here?

Q. Yes, that is the question.

A. I don't know. I have a distillation of things that we talk to patients about. It's a combination of what

we're using, the risks of surgery, what types of activities they can do afterwards. But, point by point, I can't tell you everything we talked about is in here or not.

Q.   Okay.  As for the Stryker IFU, the same question.

MR. EATON:  84.

MR. ROUVIERE:  No. 84.

MR. ASFENDIS:  Note my objection to form.

(Document review.)

MR. WALKER:  What is the question?

BY MR. ROUVIERE:

Q.   The question is, same question, is there anything in here -- is there anything in there that, after looking at it, that you think -- strike that.

Is there anything not in here, as far as by way of warnings, that you are aware of in looking through this, that is omitting a warning that you would expect to see in an IFU?

MR. ASFENDIS:  Object to form.

MR. WALKER: That, he won't. He will tell you what generally he gives -- what warnings he gave to your wife. He will do that and you can compare them with what's in the IFU.

But I think his warnings are going to cover a lot more stuff because he's talking about anesthesia and infections and all sorts of things. It's up to him to tell you.

MR. ROUVIERE: Yeah, I was going to say --

MR. WALKER: And I thought I was too. I agree with you. So I was testifying there and I wasn't supposed to do that.

But if you ask him what warnings generally speaking he gave your wife, I believe you were there, but he will tell you that.

BY MR. ROUVIERE:

Q. Well, let's change positions for a second.

Dr. Buly, do you remember a meeting you had with myself and Jodi

regarding what implants you were going to

place into Jodi after we had made the

decision to receive a complete total hip

replacement?

A.   Well, my chart has a number of

references that we discussed implants.

Q.   Do you recall Jodi having any

concern about a metal-on-metal?

If you recall, back in 2012, that

was kind of the height of metal-on-metal

issues that were going on.

Do you recall her having concerns

about metal-on-metal?

MR. EATON:   Object to form.

Assumes facts not in evidence.

Speculation.

MR. WALKER:   You can answer.

MR. ASFENDIS:   Same objections.

A.   I don't recall that we discussed

metal-on-metal implants.  I don't recall if

I was still using them at that point.  I

stopped using them somewhere around that

time.

Q.   You stopped using metal-on-metal

implants?

A.   Yes.

Q.   Why?

MR. EATON:  Object to form.

MR. WALKER:  Yeah, if he didn't use them here, it's really not germane.

MR. ROUVIERE:  This is discovery deposition, and I'm allowed to ask the doctor.

MR. EATON:  You're improperly soliciting expert opinion.

MR. ASFENDIS:  Yeah.  For the record, too, I've got an objection to any of these questions that are asking hypotheticals or asking opinions.

BY MR. ROUVIERE:

Q.   Doctor -- strike that then.

Doctor, is an impingement a type of metal-on-metal interaction between an implant?

MR. EATON:  Object to form.

MR. ASFENDIS:  Object to form.

A.   Impingement just means one part is hitting another.  Whether it's native bone or whether it's an implant, it means the two things are striking each other.

Q. So if the acetabular cup comes into contact with the femoral head, would that be a metal-on-metal connection? Excuse me, femoral stem?

MR. ASFENDIS: Object to form.

MR. EATON: Object to form.

BY MR. ROUVIERE:

Q. I'll repeat the question.

If an acetabular cup impinges against a metal femoral stem, would that be a metal-on-metal connection?

MR. EATON: Object to form.

MR. ASFENDIS: Object to form.

MR. EATON: Vague. Calls for speculation.

A. That could be a metal-on-metal impingement, yes, if the metal and the stem is contacting the metal of the shell.

Q. Okay. And you saw what was Exhibits 50 and 51, which was represented to you as an X-ray of the hip that you placed into Jodi Rouviere?

A. Yes.

Q. And on Exhibit 51, what does that X-ray looked like to you?

MR. EATON: Object to form.

Vague.

MR. ASFENDIS: Object to form.

A. It appears as if there's impingement.

Q. Okay. And if there is impingement between the, it appears to be the metal liner, excuse me, metal cup and the metal stem, that would be a metal hitting metal in that picture, correct?

MR. ASFENDIS: Object to form and foundation.

MR. EATON: Object to form.

A. Knowing that those components are made out of metal, I would have to say that that would be a metal-on-metal impingement.

Q. Okay. And, Doctor, you testified when you did the surgery with Mrs. Rouviere that the thing you checked for the most or one of the things that you did is that you assured that the components that you had placed were not impinging when you completed the surgery --

A. Correct.

Q. -- is that correct?

A.   Correct.

Q.   So you actually made a point of putting in the prosthesis that you felt was appropriate, and you looked by testing that they were not impinging?

A.   Correct.

Q.   So at the time that you completed your surgery with Mrs. Rouviere, the prosthesis that you had placed in there were not impinging on Mrs. Rouviere based on your placement?

A.   Correct.

Q.   Okay.  And if your placement remains correct, going forward, what would be some of the reasons why it would then impinge?

A.   Because.

MR. EATON:   Object to form.

A.   What you see at surgery does not reproduce what goes on in life.

Q.   Okay.

A.   The patient is in a different position.  When they're under anesthesia on a table, the spine, the pelvis assume different positions in relation to the

body. So it's the best estimate we can get at surgery is by putting it through range of motion, seeing if there's impingement.

But when the patient is awake, sitting, standing, the pelvis, spine, assume different positions and can change the position of the component in relation to the femur -- the position of the cup and in relation to the femur.

Q. Now, going back to that, were you involved in the creation of a better table to use during surgery to assure a better idea that what you're doing with the patient is going to reflect more accurately what the patient is going to do when he's out walking?

A. No, I have not been involved.

Q. Are you aware of any table that has designed to do that?

MR. EATON: Object to form.

MR. ASFENDIS: Object to form.

A. There's a variety of different tables out for use in total hip replacement and different positions, whether it's posterior or anterior. So, yes, there are

a variety of different tables.

Q. Is there a reason why you did not use a metal-on-metal with Jodi?

A. Because a metal-on-metal would have even less range of motion than the MDM did and would be even more likely to impinge. With the cup size that was used, it would require a 36-millimeter metal head. With this MDM, we were able to use a 42-millimeter head, which is even bigger.

Q. Well, doesn't the MDM give even a greater range of motion?

A. But more stability. So the bigger the head, the more stability, the less likely it's going to impinge.

If you wanted to restrict range of motion, you can use the constrained liner, but that's sort of a guaranteed disaster in this situation because you know it's going to impinge even at surgery.

MR. ROUVIERE: One minute.

BY MR. ROUVIERE:

Q. You observed the photographs of Dr. Alvarado's surgery which showed what you indicated appeared to be metallosis?

A.   Correct.

MR. ASFENDIS:  Note my objection to form.

BY MR. ROUVIERE:

Q.   What medical issues would you expect to see in the patient who has metallosis?

MR. ASFENDIS:   Note my objection to the term "metallosis."

MR. EATON:  Same objection.

MR. WALKER:  Let's hear the question again, I'm sorry.

BY MR. ROUVIERE:

Q.   What are the symptoms that he would expect to see if there was metallosis?

MR. WALKER:  He's not here to answer that.

BY MR. ROUVIERE:

Q.   Dr. Buly, Jodi came back to you postsurgery not doing well with the hip.

Do you recall that?

MR. WALKER:  Well, several visits --

MR. EATON:  Object to form.

MR. ROUVIERE: The last visit --

MR. WALKER: -- some said she was doing great.

You want him to go to the last visit, he will.

BY MR. ROUVIERE:

Q. At the end of treatment that you were providing postsurgery to Jodi, do you recall if she was doing well or not?

MR. WALKER: Take a look at the last visit, if you would.

(Witness complies.)

A. Well, at that point, she felt that her hips were dislocating, both the right and the left, and it did not appear that the hip had completely dislocated. That usually requires a trip to the emergency room to have hip relocated. But also having trouble with her spine, continuing to use a brace, wheelchair at times. So that was the assessment we had at her last visit.

Q. During that last visit, did it ever occur to you that she might be impinging or having metal debris being put

into her body?

MR. ASFENDIS: Objection to form.

MR. EATON: Same objection.

MR. WALKER: You can answer that.

A. I was not aware that there was any impingement causing metal debris at that time.

Q. What signs would you have looked for to see if there was impingement occurring when she came to see you in April of 2013?

A. If there was clinical suspicion, one can do an MRI scan. If there was any metal debris in the joint, it should appear on an MRI scan.

Q. What symptoms would you be looking for if she was suffering from metallosis?

A. Sometimes metallosis can be completely painless. There may be pain; there may not be. Sometimes patients have metallosis and can be completely asymptomatic with it.

Q. Are there any other symptoms that they could have that you might recognize?

MR. EATON: Object to form. Speculation.

MR. ASFENDIS: Same objection.

MR. WALKER: You can ask him if there were signs and symptoms when he saw her the last time. That's fair enough. You want to ask him that?

MR. ROUVIERE: Sure.

BY MR. ROUVIERE:

Q. Was there any symptoms that you observed that would be consistent with metallosis or metallosis allergy or a foreign body reaction, any of those things, when you saw her last?

MR. ASFENDIS: I'm just going to object to form and foundation to, again, based on the term being used --

MR. ROUVIERE: That is a speaking objection. Either object to the form or --

MR. ASFENDIS: Form and foundation.

A. There is nothing that I saw clinically that you could specifically implicate metallosis, because she had pain

in numerous joints, the spine, the other hip which had no joint replacement. So I didn't see anything clinically that I could attribute to metallic debris in the joint.

Q. Okay. Doctor, if you were looking for metallosis, what symptoms would you be looking for?

MR. WALKER: He just answered the question that he's really here to answer, which is when he saw the patient, did he think she had metallosis, what did he do to look for it, what signs and symptoms did she have. That's what he's here to talk about.

BY MR. ROUVIERE:

Q. In the photograph of the surgery from Dr. Alvarado, you indicated that the tissues appeared to you to be suffering from metallosis, correct?

MR. EATON: Object to form. That's not what he said.

MR. ASFENDIS: Object to form.

BY MR. ROUVIERE:

Q. It was metal staining; is that

right?

A. There appears to be metallic staining on the photograph that I looked at.

Q. And have you had patients in the past that have metallic staining like that before?

MR. EATON: Object to form.

MR. ASFENDIS: Objection.

BY MR. ROUVIERE:

Q. That you've observed yourself?

MR. WALKER: Have you seen metallic staining in your life, sir?

THE WITNESS: Yes.

A. Yes.

Q. Okay. And do you recall what systemic issues those patients were having when you -- that you observed when you observed the metallic staining in those patients?

MR. WALKER: No, he's not going --

MR. EATON: Object to form.

MR. ASFENDIS: Objection.

MR. WALKER: He can't testify

about other patients.  He just can't.
It just doesn't make any sense here.

BY MR. ROUVIERE:

Q.   Your relationship with the sales reps, do you recall one way or the other whether there was a sales rep in the surgery for Jodi Rouviere?

A.   I believe I've already answered that.  I can't recall specifically.  We often have sales reps there, but I can't remember eight years later if there was a rep in the room that day or not.

Q.   Do you recall prior to the surgery if you even consulted with a rep?

A.   Not that I recall.

Q.   Okay.  When you received the email from Jodi with all the information about she claimed happen to her with the picture of the metal staining, did you file a MAUDE report?  Did you report it?

MR. EATON:  Object to form.

A.   I had not seen the patient back.

Q.   So the information that was provided to you that there was a problem and that there was metallosis or metal

staining and based on what she provided to you was not sufficient enough to issue a report that there's been a complaint about?

A. All I have was an email --

MR. ASFENDIS: Wait.

Object to form.

MR. EATON: Object to form.

MR. WALKER: I would really think if you're going to have any reporting, it would have been done by the doctor in Florida.

BY MR. ROUVIERE:

Q. Well, I'm asking did you make a report or not? That is a yes or no question.

MR. EATON: Object to form.

A. As I stated, I hadn't seen the patient back, so I -- it doesn't make sense for me to initiate something on an operation that I didn't do, that I didn't observe myself.

Q. Okay. Let's talk about Jodi's hypermobility.

Have you ever seen any document that actually diagnosed her with EDS versus

just a collagen disorder of any sort?

MR. EATON: Object to form.

A. I went with the information provided to me by the patient, and it certainly seemed to be consistent given her history of joint pain and instability in multiple joints.

Q. You indicated that certain stems you use in particular for anteversion or more -- if there is more anteversion, you would choose one stem over another, correct?

A. Correct.

Q. And you indicated that Jodi had extreme anteversion?

A. I did not say that.

MRS. ROUVIERE: Excessive.

BY MR. ROUVIERE:

Q. What was your description of Jodi's anteversion?

A. Higher than normal.

Q. And you indicated, I believe, that in situations where there's higher than normal anteversion, you sometimes used the S-ROM stem?

A.   Yes.

Q.   Okay.  In this particular case, what was the reason that you did not use the S-ROM versus the Summit stem?

A.   It's a risk-benefit analysis. The S-ROM is not a one-piece stem; it's a two-piece stem with a modular junction. So, yet, another potential source of metallic debris.  We tend to use it if there is no other option.

During surgery, I do a range of motion analysis.  I look at the combined anteversion of the cup and the stem.  If -- her femoral anteversion, I think, was +24 degrees, which is slightly higher than normal, but certainly not excessive, so the S-ROM stem was not warranted in this situation.

Q.   Okay.  If you would look at the exhibit with the letter from Jodi to you with the photographs.  I don't know what number it was.

MR. EATON:  It's previously marked as Exhibit 28.

BY MR. ROUVIERE:

Q. Doctor, looking at the photograph which included which you indicated is metal wear staining --

A. We assume is metal debris, yes.

MR. ASFENDIS: Objection to form.

BY MR. ROUVIERE:

Q. Okay. Do you see in there in that photograph any pseudo tumor around the tissue?

MR. EATON: Object to form.

MR. ASFENDIS: Object to form, too.

A. It's a little hard to tell. I see grayish-black material, but on this, I can't really tell what this is.

MR. WALKER: "This" being the photograph on the second page.

MRS. ROUVIERE: That's the one that's cleaned.

MR. EATON: It's improper for Mrs. Rouviere to comment.

MR. WALKER: It's improper about this but --

(Crosstalk.)

BY MR. ROUVIERE:

Q. Just so we're clear, the picture, when the patient was initially opened, the second --

MR. WALKER: You can't really say that, but you can ask about him the first picture, but you can't say what the --

(Crosstalk.)

BY MR. ROUVIERE:

Q. Well, the first picture seems to show the metal staining, correct?

A. Yes.

Q. And in that picture, are you able to identify if there are any pseudo tumors anywhere around the tissue in that?

MR. EATON: Object to form.

MR. ASFENDIS: Objection.

A. I can't tell.

Q. Okay. Now we talk about normal range of motion.

Going back to the range of motion that you talked about earlier, what's a normal range of motion in a hip?

A. Are you talking about a native hip or a replaced hip?

Q.   A native hip.

A.   A native hip has flexion to approximately 110 degrees, approximately 15 to 20 degrees of internal rotation, maybe 40 degrees, 30 to 40 degrees of external rotation.

Q.   And how about --

A.   About 30 degrees abduction, 20 degrees adduction.  Those are estimates.

Q.   And what is normal range in a prosthesis hip?

A.   It all depends on the situation.

Q.   How about the in the MDM that you used in this case, what is standard or expected range of motion?

MR. ASFENDIS:  Objection.

A.   You're talking about if you put the implants together, what is the range of motion?

MR. WALKER:  What is the result?

MR. ASFENDIS:  Same objection.

MR. ROUVIERE:  Yes.

A.   With a large head, it probably has quite a high range of motion.  I'm guessing maybe 125 degrees or more.

Q. Have you seen anything provided to you regarding the literature on the MDM as to what they indicate is their range of expected range ever motion?

A. I'm not aware of that document.

Q. Have you ever seen their advertisements where it indicates that they get increased range of motion over their other competitors?

MR. ASFENDIS: Note my objection.

A. I have not seen that.

Q. In your clinical experience, is there anything that tells you that the MDM gets an increase range of motion over other products that you've used?

MR. ASFENDIS: Note my objection.

MR. WALKER: Do you know one way or the other?

A. You know, with any implant, with any hip implant, the larger the head, the more range of motion it will have before the hip tries to impinge or dislocate.

So we try to go with the largest head that can be used safely to provide the most stability and the least chance of

dislocating after surgery.

Q.   In this case, what was the reason you chose the MDM over other products?

MR. EATON:  Objection.  Asked and answered.

MR. ASFENDIS:  Same objection.

MR. WALKER:  You're allowed to answer again.

A.   Again, we wanted to be able to relieve her pain and not sustain a dislocation after surgery.  So obviously we'd like to use the implant that has the most stability.

Q.   Doctor, you testified earlier that EDS can lead to impingement and that there are many other reasons that or circumstances that can lead to impingement.

Other than EDS, what are some of those on circumstances?

A.   Patients can have hypermobility without having EDS.  Patients can have poor musculature.  Patients can have polio and have extremely weak muscles.  People can have neurologic defects, spinal cord injury and they just don't have the muscle power

to keep the joint stable.

Q. Doctor, are you aware of an ASIA test or ASIA foreign body condition?

MR. EATON: Object to form. Calls for speculation.

MR. ASFENDIS: Same objection.

A. ASIA is spelled A-s-i-a?

Q. Yes.

A. As in continent? I'm not aware of that test.

Q. Are you aware of foreign body -- what a foreign body reaction is?

A. Yes.

Q. Do you know what the tests are to determine whether or not someone is having a foreign body reaction?

MR. ASFENDIS: Note my objection.

MR. EATON: Same objection.

MR. WALKER: Yeah, he's not here to talk -- to give a tutorial on all aspects of orthopedic surgery, but you can surely ask him about whether he thought there was a foreign body reaction at the times that he saw her.

MR. ROUVIERE: Well, I think

we're --

MR. WALKER: I am having difficulty following that.

BY MR. ROUVIERE:

Q. The question is, Doctor, I'm asking if you know what the indications for a foreign body reaction are. Because once I've obtained what you believe they are, then I want to ask you if you saw them in Jodi.

So the question is, what are -- and I think this is a fair line of questioning -- is are you aware of what the symptoms of a foreign body reaction are?

MR. WALKER: Well, why don't you ask him the question the other way around? Ask him if he saw any foreign body reaction on her and then ask him how he determined that. It's got to go with what he saw.

MR. ROUVIERE: Understood. But I have to have a baseline of what he knows. We have to have a baseline of what the doctor knows before I could ask him if saw it in this patient.

MR. EATON: We were shut down about asking questions about medical treatment and medical records after Dr. Buly stopped treating her, so that should apply to plaintiff as well.

MR. ROUVIERE: Not necessarily, because it could when he saw her in the first --

MR. EATON: Then you should ask him about when he saw her, not six years later, which is what you're referring to.

MR. ROUVIERE: That is what I'm asking her.

MR. EATON: No, you're not.

MR. WALKER: If you ask him --

MRS. ROUVIERE: I'm sorry --

MR. ASFENDIS: Yeah, we have do have to put something on the record because Mrs. Rouviere --

(Crosstalk.)

MRS. ROUVIERE: You know what? I am a pro se litigant, and just because -- I'm sorry, but just because that he is representing me as well, I have not

given up my pro se rights.  I am still a pro se litigant and I have the right.

MR. ASFENDIS:  You have the right to be here as long as you do not obstruct and you are not permitted --

MRS. ROUVIERE:  I have the right. I'm not obstructing.  I have the right to ask.

MR. ASFENDIS:  -- to speak on the record, only your counsel is.

(Crosstalk.)

MR. ROUVIERE:  She's talking to me.  She is trying to discuss with me.

MR. WALKER:  We haven't gotten in the way of that.

MRS. ROUVIERE:  Thank you.

MR. WALKER:  So if you want to ask him about a foreign body reaction when he saw the patient --

BY MR. ROUVIERE:

Q.  Well, my first question is, Doctor, what is your understanding of what a foreign body reaction is?

MR. EATON:  Object to form.

MR. WALKER:  I'm going to object

to that. Ask him in context of when he saw the patient, and then ask him why you came to that conclusion whether there was or wasn't, and he'll tell you.

MR. ROUVIERE: I'm sorry, but I think I'm allowed to ask the doctor first if he understands what a foreign body reaction is and what's his understanding of it. I think that is a fair question. He can tell me, "I don't know."

MR. EATON: You're asking it in a vague context. And we know you're referring to a medical record from 2019.

MR. ROUVIERE: You may know that. He doesn't know what I'm referring to.

MR. EATON: Well, ask him if that's what he saw while he treated her.

(Crosstalk.)

MR. WALKER: He doesn't know it. That's the point.

MR. ROUVIERE: Can we take a

five-minute break, please?

MR. WALKER: Yeah, but I have to tell you --

MR. ROUVIERE: We're getting up on 12 o'clock.

THE VIDEOGRAPHER: The time right now is 11:37 a.m. We are off the record.

(Recess is taken.)

THE VIDEOGRAPHER: The time now is 11:45 a.m. We are back on the record.

BY MR. ROUVIERE:

Q. Dr. Buly, at the beginning of this deposition, counsel asked you about metallosis and what was metallosis and you gladly answered the question, so I'm going to ask you some other questions regarding metallosis as well.

What, in your conversations with the representatives and the sales reps from DePuy, did they discuss with you as far as metallosis goes and any concerns about metallosis back in 2012 when you were putting this into Jodi?

MR. EATON: Object to form. Calls for speculation.

MR. ASFENDIS: Okay.

A. I don't recall any conversation with reps about this specific case.

Q. Okay. Do you recall specifically recall any conversations about, with the reps, about metallosis?

MR. EATON: Same objection.

MR. ASFENDIS: Objection.

A. Regarding any metallosis in any case?

Q. Well, in general, there was an issue about metallosis, there were concerns about metal-on-metal at the time with the metal-on-metal hips.

A. Yes.

Q. What were the conversations you were having with the representatives from DePuy regarding those issues?

MR. EATON: Objection. Compound. Vague. Calls for speculation.

MR. ASFENDIS: I'll object as well.

MR. WALKER: Do you remember any

conversations with DePuy?

THE WITNESS:  Anytime during my career, yes.

BY MR. ROUVIERE:

Q.  Okay.  What were the conversations about?

MR. EATON:  Same objection.

A.  What can happen with a metal-on-metal implant.

Q.  Okay.  And what could happen with a metal-on-metal implant?

MR. EATON:  Calls for speculation.

MR. ASFENDIS:  I'll object, too.

A.  Metallosis can occur.  Patient can react to the metal particles.

Q.  And how would a patient react to the metal particles?  Did they tell you?

MR. EATON:  Object to form.  Did the sales reps tell him?

MR. ROUVIERE:  Yes.

MR. WALKER:  That's what he asked.

MR. EATON:  Calls for speculation.

A.   I don't recall the sales rep
telling me anything about it.  Some of it
we learned on our own.  There's literature.
There is our own experience.  It's a
distillation of all these different things.

Q.   That I understand, Doctor, but my
questions are, you indicated you had
conversations with the representatives from
the company.  So if it wasn't the sales
rep, what other individuals from DePuy did
you have conversations with about
metallosis?

MR. EATON:  Object to form.

A.   It could be anybody that works
for DePuy.  Again, over my 25-year career,
if I had discussions with other people
about metallosis, yes.

Q.   Okay.

A.   Not only with DePuy, but with
other companies.

Q.   Isn't it true you had
conversations with representatives from
Stryker about metallosis?

MR. ASFENDIS:  Objection.

A.   Yes.

Q.   Okay.   And in your experience, does metallosis only occur on metal-on-metal hips?

MR. EATON:   Object to form.

MR. ASFENDIS:   Objection.

A.   No, it doesn't occur just with metal-on-metal hips.

Q.   And your knowledge about the metallosis in each of the particular companies and the issues that they had, did you get majority of that information directly from the company as to what they told you?

MR. EATON:  Objection.  That's vague and ambiguous.  Calls for speculation.

MR. ASFENDIS:  Objection.

MR. WALKER:  I think he's asked and answered it, but I'll let him do it again.  I think he said it's amalgam, but I'll let him answer.

A.   Again, we are talking about my entire career, and you get information from a variety of sources; from your clinical experience, from the literature, to talking

to surgeons, to talking to reps, to going
to meetings.  It's a constellation of
things that comprises your knowledge, your
database.

Q.  Okay.  Did you have any
conversations with either of these lawyers
prior to today's deposition?

MR. ASFENDIS:  Objection.

A.  Which lawyers you're referring
to?

Q.  Mr. Eaton.

MR. EATON:  Asked and answered.
That's the first question I asked.

A.  There are several attorneys in
the room so...

MR. WALKER:  He means any of the
ones for the defendants.

A.  No.  We met today for the first
time, and I've never had any communication
with either of them.

Q.  And that's the lawyer from
Stryker as well?

A.  Right.

Q.  Do you know if your lawyer had
conversations with these lawyers about this

case?

MR. WALKER:  Well, whether I did or not is not part of this litigation, nor part of his knowledge base.

A.  I'm not aware.

Q.  Now you did speak to DePuy's -- when you had your conversations with DePuy about metallosis, what did they tell you about it?

MR. EATON:  Object to form. Vague, calls for speculation.  Asked and answered.

BY MR. ROUVIERE:

Q.  What was your concern?

MR. EATON:  Same objection.

MR. WALKER:  Do you have anything else of substance that you know that you can, in addition to what you have said --

A.  Again, I can't give you any specifics.  Where this information comes from, as I mentioned, it's a global situation where you hear it from people that work for the company or you hear from other surgeons or you learn at meetings or

you read about it in journals. It's...

Q. Let's move on to another subject.

Going back to the prosthesis parts that were placed into Jodi Rouviere, you indicated that there is the Stryker metal cup, which has a Porocoat surface on the, I guess, the exterior site of it; is that correct?

A. It's porous coated, yes.

Q. And it is then paired up with a metal liner?

A. Correct.

Q. Made of chromium cobalt?

A. Yes.

Q. To your knowledge of implanting this, what is the purpose of having the second liner up against the cup, a metal-on-metal juncture like that?

MR. ASFENDIS: Note my objection.

A. Because titanium is excellent for bone ingrowth, so not all, but most uncemented implants have a -- are made of titanium because it's better for bone ingrowth. But titanium is not a good bearing surface. Titanium can generate a

lot of wear if it's part of the articulation, part of the rubbing part.

So when metal parts are used for the articulation, whether it's a total hip, a total knee, it's usually cobalt chrome.

Q. Okay.

A. It's a much harder metal.

Q. In Jodi's case, there were two articulations that you testified to. What are those? What were they?

A. A Delta ceramic head on highly crosslinked polyethylene and highly crossed polyethylene on a cobalt chrome liner.

Q. Okay. So there is polyethylene rubbing against cobalt chrome?

A. Yes.

Q. Are you aware of any adverse effects that the MDM hip has caused since you started using it back in 2012?

MR. ASFENDIS: Objection.

MR. WALKER: Well, you can only ask him up until the time he treated her.

MR. ROUVIERE: Why?

MR. WALKER: Because he's here to

talk about his treatment of her.

BY MR. ROUVIERE:

Q.   If you would look at Exhibit 50, please.  That was the X-ray.

Are you familiar with the term of "seating" on a hip?

A.   What is the term?

Q.   Seating, s-e-a-t-i-n-g, or malseating.

MR. EATON:  Are you saying "mouse"?

BY MR. ROUVIERE:

Q.   Mal, m-a-l, seating.  Malseating.

A.   I would take that to mean if a component is not nested inside another component properly.

Q.   Okay.  And let me ask you, if looking at Exhibit 50, you have it there?  If you don't have it, I'll get it.

MR. EATON:  It's not.

BY MR. ROUVIERE:

Q.   Does that appear as if it's nesting properly inside --

MR. ASFENDIS:  Objection to form and foundation.

A.   Yes, as far as I can tell.

MR. WALKER:  He said yes, as far as I can tell.

BY MR. ROUVIERE:

Q.   Okay.  It shows sign of malseating?

A.   No, it does not show signs of --

MR. WALKER:  You asked him if it was seated properly.

A.   It appears to be seated properly.

MR. ROUVIERE:  I still have my three minutes.

MR. WALKER:  We're giving you every second of it.

MR. ROUVIERE:  Thanks.

BY MR. ROUVIERE:

Q.   Doctor, do you recall reading in your notes, it's September of 2012, it would be the first time that Jodi came back postsurgery?

You indicate that she was smiling and saying that she was without pain?

Would it be normal for a patient to be without pain one month postsurgery?

A.   She was six weeks out at this

point and most patients are happy after total hip replacement.

Q. But are they pain-free?

A. Many are.

Q. Doctor, going back to the issue or discussion we were having before the break, you are aware what a foreign body reaction is, correct?

MR. ASFENDIS: Note my objection.

A. Yes.

Q. Okay. And when you saw Jodi postsurgery on any of the occasions that you saw her up and through April of 2013, did you observe anything that you would identify as a foreign body reaction?

A. No.

Q. What is your understanding of what a foreign body reaction is?

A. That's an extremely vague question. Foreign body reaction --

Q. What are the signs of a foreign body reaction?

A. Foreign body reaction can be a splitter on your finger. It can be a bullet. It can be anything --

Q.   Well, in terms of --

MR. EATON:  Don't interrupt him.

A.   It can be something that's not part of the body that's in the body and there's some type of reaction.  Any type of reaction, that would be a foreign body reaction.

Q.   Have you ever seen foreign body reactions to a hip implant?

A.   Of course.

Q.   Okay.  And what are some of the signs of foreign body reactions to the hip implant that you have observed?

MR. EATON:  Objection.

MR. ASFENDIS:  Objection.

MR. EATON:  Calls for speculation.

MR. WALKER:  Did you see any of them in this --

THE WITNESS:  I did not see any in this case.

BY MR. ROUVIERE:

Q.   I'm asking -- please stop changing my question, with all do respect.

MR. WALKER:  I'm the one.

Don't --

MR. ROUVIERE: I asked a question. I'm asking him to answer my question, not the question that you filter for me. Okay?

BY MR. ROUVIERE:

Q. What are some of the signs of foreign body reactions that you've seen in other patients that you recognize as foreign body reactions --

MR. ASFENDIS: Objection.

MR. EATON: Object to form.

MR. WALKER: Go ahead.

BY MR. ROUVIERE:

Q. -- to a hip implant?

A. It can be almost anything. It can be staining. It can be infection. It could be inflammation. It could be bone loss. A foreign body, depending on how the body reacts to it, can cause almost any type of reaction.

Q. Has either of the hip defendants here, their representatives, ever discussed with you the likelihood of foreign body reactions to their implants --

MR. EATON: Object to form.

BY MR. ROUVIERE:

Q. -- as part of your --

MR. ASFENDIS: Objection.

Q. -- discussion with them?

MR. ASFENDIS: Objection.

MR. EATON: Object to form.

A. Did either of these two?

Q. The representatives of -- how about any representatives from DePuy --

MR. ASFENDIS: DePuy.

Q. -- did they ever discuss with you foreign body reactions to their implants?

MR. EATON: Object to form.

A. Again, at some point during my career, the topic comes up. And who it comes from, where it comes from, hard to be specific on it. Again, it can be from reps, other surgeons, meetings, journal articles, and I can't tell you where specific items come from, but -- I'm not trying to be vague, but it's -- I think the question is somewhat vague.

Q. Are you aware of any tests for a foreign body reaction to -- that is beyond

just your clinical view of whether or not you see certain symptoms?

MR. ASFENDIS:  Note my objection to form.

A.   In other words, is there anything you do to look for a --

Q.   Any bloods tests or any kind of tests for foreign body reaction?

A.   Yeah, you can do blood tests. You can do MRI scans.  You can do X-rays.

Q.   What blood tests can you do for foreign body reaction?

MR. EATON:  Now or in 2012?

BY MR. ROUVIERE:

Q.   Well, are you aware of what you can do in 2012?  What could you do in 2012?

A.   Well, what type of foreign body reaction are you talking about?

Q.   Well, I guess it would be to a hip implant.

MR. ASFENDIS:  Objection to form.

A.   You can do an aspiration of the hip.  You can do a blood test.  You can do an MRI scan.  You can do an X-ray.

Q.   Okay.  And did you do any of

those on Jodi?

A. No, because I had no suspicion.

MR. ROUVIERE: It's 12:01. I'm going to make note that -- he's got to go now? If I have more questions, can I still --

THE WITNESS: I have patients scheduled, sorry.

MR. ROUVIERE: So technically, just for the record, I was given about 45 minutes to ask questions. The other parties were allotted another three hours and 15 minutes.

MR. ASFENDIS: For the record, I took less than 45 minutes.

(Continued on following page to include jurat.)

MR. WALKER:  You certainly did.

MR. ROUVIERE:  Thank you,

Dr. Buly.

THE WITNESS:  You're welcome.

(Time noted:  12:01 p.m.)

_____.

ROBERT BULY, M.D.

Subscribed and sworn to before me

this    day of           2020.

_____

C E R T I F I C A T E

STATE OF NEW YORK        )

                         : ss.

COUNTY OF WESTCHESTER    )


I, ANNETTE ARLEQUIN, a Notary Public within and for the State of New York, do hereby certify:

That ROBERT BULY, M.D. , whose deposition is hereinbefore set forth, was duly sworn by me, and that the transcript of such depositions is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of March, 2020.

_____

ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

I N D E X

WITNESS                                    PAGE


ROBERT BULY, M.D.
   MR. EATON                                8
   MR. ASFENDIS                            114
   MR. ROUVIERE                            129

QUESTIONS INSTRUCTED NOT TO ANSWER
             Page      Line


               110        4


    I N D E X   O F   E X H I B I T S

DESCRIPTION                                PAGE


Defendants' Exhibit 73,                     10
Deposition Notice


Defendants' Exhibit 74, Medical             11
Chart of Jodi Rouviere


Defendants' Exhibit 75, Doctor's            41
notes of Mrs. Rouviere of her
office visit on 4/2/12,
Bates-stamped JR UHMC 000163
through 165

I N D E X   O F   E X H I B I T S(Cont'd.)

DESCRIPTION                                PAGE

Defendants' Exhibit 76, MRI                 44
Report of Jodi Rouviere

Defendants' Exhibit 77, CAT scan            46
of the right hip, Jodi Rouviere,
Bates-stamped JR:SAND:00237
through 00239,

Defendants' Exhibit 78, Copy of             48
X-ray and medical advice dated
4/4/12, Bates-stamped
JR:SAND:00240,

Defendants' Exhibit 79, DePuy               73
Summit Stem "Design Rationale and
Surgical Technique" brochure,
Bates-stamped
DEPUY_ROUVIERE_0000001 through 24

Defendants' Exhibit 80, DePuy               76
document Bates-stamped
DEPUY_ROUVIERE_0000057 through 67

Defendants' Exhibit 81, Implant             90
Sticker Record, Bates-stamped
JR:HSS:000042

Defendants' Exhibit 82, Operating           91
Room Record, Bates-stamped
JR:HSS:00038

Defendants' Exhibit 83, Discharge           92
Summary for J. Rouviere,
Bates-stamped JR:LM:00050 through
51

I N D E X   O F   E X H I B I T S(Cont'd.)

DESCRIPTION                                    PAGE

Defendants' Exhibit 84, Stryker          109
document entitled "Howmedica
Osteonics Restoration ADM and MDM
Liner," Bates-stamped
STRROUV00000001 through 10


Defendants' Exhibit 85, Stryker          110
document entitled "MDM X3 Modular
Dual Mobility  Acetabular System
- Surgical Technique,"
Bates-stamped STRROUV00000129
through 150

ERRATA SHEET FOR THE TRANSCRIPT OF:

CASE NAME:  ROUVIERE V. DEPUY ORTHOPAEDICS

DATE:       FEBRUARY 21, 2020

DEPONENT:  ROBERT BULY, M.D.

Pg.  Ln.   Now Reads    Should Read    Reason

___  ___   _____     _____     _____

___  ___   _____     _____     _____

___  ___   _____     _____     _____

___  ___   _____     _____     _____

___  ___   _____     _____     _____

___  ___   _____     _____     _____

___  ___   _____     _____     _____

___  ___   _____     _____     _____

___  ___   _____     _____     _____

___  ___   _____     _____     _____

                        _____

                        ROBERT BULY, M.D.

SUBSCRIBED AND SWORN BEFORE ME

THIS____DAY OF_____   2020.

_____

(Notary Public)

MY COMMISSION EXPIRES:_____