Carlos Miguel Alvarado, M.D.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No: 1:18-cv-4814-AJN

---------------------------------------x

JODI ROUVIERE, Individually and
ANDRE ROUVIERE, her husband,
Individually,

                    Plaintiff,

v.

DEPUY ORTHOPAEDICS, INC.
DEPUY PRODUCTS, INC.,
DEPUY INTERNATIONAL, LIMITED,
JOHNSON & JOHNSON, INC.,
and JOHNSON & JOHNSON SERVICES,
INC., and STRYKER CORPORATION,
STRYKER SALES CORPORATION, and
HOWMEDICA OSTEONICS CORPORATION,
d/b/a STRYKER ORTHOPAEDICS,

                    Defendants.
---------------------------------------x

          Friday, January 17, 2020
      Videotaped Deposition of CARLOS MIGUEL
ALVARADO, M.D., a non-party witness, held at the
Baptist Health South Florida, 8950 N. Kendall Drive,
Suite 407W, South Miami, Florida 33176, commencing
at 8:33 a.m., on the above date, before Karen Schmieder,
Certified Shorthand Reporter and Notary Public.
                    - - -
          GOLKOW LITIGATION SERVICES
      877.370.3377 ph  |  917.591.5672 fax
              Deps@golkow.com

Carlos Miguel Alvarado, M.D.

APPEARANCES:


   LAW OFFICES OF ANDRE A. ROUVIERE

   Attorneys for Plaintiffs

        BY:  ANDRE A. ROUVIERE, ESQ., PRO SE

        4070 Laguna Street

        Coral Gables, Florida  33146

        Phone:  305.774.7000

        Email:  Andre@rouvierelawfirm.com


   BARNES & THORNBURG LLP

   Attorneys for Defendants DePuy Orthopaedics,

   Inc., DePuy Products, Inc., DePuy

   International, Limited and Stryker Corporation

   and Stryker Sales Corporation

        BY:  JOSEPH G. EATON, ESQ.

                -and-

           J.T. LARSON, ESQ.

        11 South Meridian Street

        Indianapolis, Indiana  46204

        Ph. 317.236.1313

        Email:  Joe.eaton@btlaw.com

                JTlarson@btlaw.com

Carlos Miguel Alvarado, M.D.

APPEARANCES:

GIBBONS, P.C.

Attorneys for Defendants Howmedica Osteonics

Corporation

    BY:  PAUL E. ASFENDIS, ESQ.

    One Pennsylvania Plaza, 37th Floor

    New York, New York  10119-3701

    Phone:  212.613.2067

    Email:   Pasfendis@gibbonslaw.com


FALK, WAAS, HERNANDEZ & SOLOMON, P.A.

Attorneys for the Witness Carlos Alvarado, M.D.

    BY:  DAVID J. EMAS, ESQ.

    135 San Lorenzo Avenue, Suite 500

    Coral Gables, Florida  33146

    Phone:  305.447.6500

    Email:  Demas@falkwaas.com


ALSO PRESENT:

    MR. BOB RATINER, Paralegal

    Rouviere Law Firm


    MR. CHARLES CARPENTER, Videographer

    Golkow Litigation Services

Carlos Miguel Alvarado, M.D.

INDEX

Testimony of CARLOS MIGUEL ALVARADO, M.D.

EXAMINATION BY MR. EATON          Page    8

EXAMINATION BY MR. ASFENDIS          Page 136

E X H I B I T S

FOR DEFENDANT          DESCRIPTION          PAGE

No. 47 Carlos M. Alvarado, M.D. Curriculum          11
       Vitae

No. 48 Medical Records          12

No. 49 Miami Orthopedics & Sports Medicine          46
       Institute Office Note, dated 6/13/2016,
       Bates JR:CA:000010, 00214, 00215

No. 50 Xray          54

No. 51 Xray          56

No. 52 Final Report Orthopedic Office Clinic          56
       Note, Bates JR:CA:000026, 000182, 000183

No. 53 Hospital For Special Surgery Operating          66
       Room Record, Bates JR:HSS:000038

No. 54 Color photograph          71

No. 55 Baptist Hospital Surgical Pathology          75
       Report, 1 page

Carlos Miguel Alvarado, M.D.

                    E X H I B I T S

FOR DEFENDANT          DESCRIPTION                PAGE

No. 56 Color photograph                           81

No. 57 Orthopedic Office Clinic Note Final        82

       Report, Bates JR:CA:000031, 000174

No. 58 Quest Diagnostics Report, Bates            85

       JR:CA:000032

No. 59 Orthopedic Office Clinic Note Final        86

       Report, Bates JR:CA:000079-81

No. 60 Orthopedic Office Clinic Note Final        87

       Report, Bates JR:CA:000034, 000172

No. 61 Orthopedic Office Clinic Note Final        90

       Report, Bates JR:CA:000037, 000169,

       000170

No. 62 Orthopedic Office Clinic Note Final        93

       Report, Bates JR:CA:000041, 000163

No. 63 Orthopedic Office Clinic Note Final        94

       Report and Addenda, Bates JR:CA:000044,

       000158, 000159, 000160

No. 64 One page document, Bates                  102

       JR:BHOM:000688

No. 65 Discharge Summary, Bates                  104

       JR:BHOM:000559 - 561

No. 66 Baptist Hospital Surgical Pathology       105

       Report, 2/21/2017, one page

Carlos Miguel Alvarado, M.D.

                    E X H I B I T S

FOR DEFENDANT          DESCRIPTION                    PAGE

No. 67 Orthopedic Office Clinic Note Final      107

        Report with Addenda, Bates

        JR:CA:000052, 000139, 000140

No. 68 Quest Diagnostics Report, Bates          107

        JR:CA:000053

No. 69 Orthopedic Office Clinic Note Final      108

        Report with Addenda, Bates

        JR:CA:000055, 000136, 000137

No. 70 History and Physical Report and          111

        Consultation Notes, Bates

        JR:SMH:01366-368

No. 71 Orthopedic Office Clinic Note Final      117

        Report with Addenda, Bates

        JR:CA:000066, 000116 - 117

No. 72 Orthopedic Office Clinic Note Final      121

        Report with Addenda, Bates

        JR:CA:000068, 000110 - 111

                    * * * * * *

Carlos Miguel Alvarado, M.D.

THE VIDEOGRAPHER:  We're now on the video record.  My name is Charles Carpenter.  I am a videographer for Golkow Litigation Services.  Today is Friday, January 17, 2020.  The time is 8:34 a.m.

This video deposition is being held at Baptist Health South Florida, 8950 North Kendall Drive, Suite 407 West, in Miami, Florida, in the matter of Jodi Rouviere, et al vs. DePuy Orthopaedics, et al.  This is for the U.S. District Court, Southern District of New York.

The deponent is Carlos Alvarado, M.D.

Would counsel now state their appearance for the record.

MR. ROUVIERE:  For the plaintiff Jodi Rouviere, Andre Rouviere.

MR. ASFENDIS:  Paul Asfendis for Howmedica Osteonics Corp.

MR. EMAS:  David Emas on behalf of the nonparty Carlos Alvarado, M.D.

MR. EATON:  Joe Eaton on behalf of defendant DePuy Orthopaedics, Inc.

MR. LARSON:  J.T. Larson on behalf of DePuy Orthopaedics, Inc.

Carlos Miguel Alvarado, M.D.

THE VIDEOGRAPHER:  The court reporter Karen Schmieder will now swear in the witness.

Whereupon,

CARLOS MIGUEL ALVARADO, M.D.,

having been first duly sworn by the notary public, was examined and testified as follows:

\*\*\*\*\*\*

EXAMINATION

BY MR. EATON:

Q.   Good morning.

A.   Good morning.

Q.   State your full name for the record, please?

A.   Yes, Carlos Miguel Alvarado.

Q.   And what's your current business address?

A.   Oh, boy.  You're asking me a tough question right off the bat.

Q.   Sometimes --

MR. EMAS:  Doctor, here.

A.   Oh, sure.  One of my offices is 6200 Southwest 77nd Street.  But since I have to tell the truth, that's my old office, and I'm going to give you my new address right here.  Sorry about that.  My CV needs to be updated.

Carlos Miguel Alvarado, M.D.

Office.  All right, 8950 North Kendall Drive, Suite 602 East Tower, Miami, Florida 33176, USA.

Q.   Great, thank you.

A.   Yeah.

Q.   And what's the name of the practice that you're with now?

A.   I'm a partner in Miami Orthopedic and Sports Medicine Institute, and we are a portion of about Baptist Medical.

Q.   Dr. Alvarado, we met before the deposition.  My name is Joe Eaton.  I'm going to take your deposition today.  I represent DePuy Orthopaedics.

A.   All right.

Q.   Have you had your deposition taken before?

A.   Yeah.

Q.   How many times?

A.   Just once.

Q.   Okay.  And what was the nature of that matter?

A.   Similar.  I was a treating physician, a patient involved in a lawsuit.

Q.   What was the nature of the procedure --

Carlos Miguel Alvarado, M.D.

A.    I don't even remember.

Q.    -- do you remember?

A.    No.

Q.    Do you remember who the components were manufactured by?

A.    Oh, well, they weren't suing the company. They were suing someone else, and it was an accident type thing.

Q.    All right.  So you've been through this once, but let me go through the ground rules very briefly.  I'm going to ask you a series of questions.

A.    Um-hmm.

Q.    If at any point in time you don't understand my question or need me to -- let me start over.

If you don't understand my question, I want you to ask me to rephrase it or repeat.  If you don't ask me to rephrase or repeat the question, I am going to assume that you understand it.  Is that fair?

A.    Sure.

Q.    It will be important that you wait until I finish my question, and then I'll make sure I wait until you finish your answers so the court

Carlos Miguel Alvarado, M.D.

reporter can get down an accurate transcript.  Do you understand that as well?

A.    Sounds good.

Q.    All right, great.

Dr. Alvarado, you were kind enough to bring your CV today.  I'll mark that as Exhibit 47.

(Exhibit 47 marked for identification.)

Q.    And is this CV up to date?

A.    Yes, for the most part, except I changed offices a couple months ago, so I need to update my office address on there, which you see with the place -- the previous address I just gave you.

Q.    All right.  And separate from your CV, you showed us two binders that you brought to the deposition today --

A.    Yep.

Q.    -- can you just describe for us?

A.    These are just my notes, office notes, operative notes, you know, in dealing with this case.

Q.    And then what's the other binder?

A.    Legal paperwork associated with case and correspondence.

Carlos Miguel Alvarado, M.D.

MR. EMAS:  So I'll make that easier.  It looks like that was from my office.

THE WITNESS:  Right, I don't even know what that is.

MR. EMAS:  This is the binder that has everything from the link that J.T. sent to me, correspondence.

BY MR. EATON:

Q.   So relating to the lawsuit and correspondence between Dr. Alvarado and the plaintiff, Mrs. Rouviere?

A.   Sounds good, yes.

Q.   Is that right?

A.   Yes.

Q.   Did you review that material --

A.   This stuff?

Q.   -- in preparation for the deposition?

A.   No, no.  I'm here to talk about my notes, the surgery and that's about it.

Q.   Let's go ahead and mark the binder as a group exhibit -- not that one, your materials.

A.   Sure.

MR. EATON:  We'll mark this as Exhibit 48.

(Exhibit 48 marked for

Carlos Miguel Alvarado, M.D.

identification.)

BY MR. EATON:

Q.   I'll just have you confirm for the record this Exhibit 48 includes your office notes, operative reports and diagnostic materials, is that correct?

A.   Yes.

Q.   Great, thank you.

When is the last time that you spoke with Jodi Rouviere?

A.   Well, probably been about four months now, three months.  My last office visit -- I guess I can give you the exact date here.  August 1st, 2019 when I saw her in my office was the last time we spoke.

Q.   Have you had any texts or email communications with Mrs. Rouviere since that time?

A.   Umm, I don't know.  Let me check. Emails, no.  Yes, she updated me on October 18th, that she was having a surgery unrelated to any of her orthopedic issues, and I wished her luck.

Q.   Did you speak with Jodi Rouviere or her husband, Andre Rouviere, who is representing her in the lawsuit about the deposition today?

A.   Yes.

Carlos Miguel Alvarado, M.D.

Q. When was that?

A. They contacted -- his -- he and his firm contacted my office saying that they wanted a brief meeting, which that was scheduled and that was on Thursday -- yeah, Thursday, just a phone conference.

Q. Last Thursday?

A. No, this week, a couple days ago.

Q. Okay.

A. And then we spoke briefly yesterday, just saying we'll see you tomorrow, and I said I'll see you then.

Q. Okay.  Who participated in the phone conference last Thursday?

A. Just me and then I believe his partners at his -- it was on the phone, so I didn't catch their names, but.

Q. And what did you discuss?

A. Just that there would be -- you were going to ask me questions.  They were going to be here as well.  And I told him I have my own legal representation too, and they'll be here as well.

Q. Right.

A. And saying that I'm here as a witness to, you know, as a treating physician, and I said yep,

Carlos Miguel Alvarado, M.D.

agreed.

Q.   Did they discuss with you any of their theories about the DePuy Summit stem or the Stryker components?

A.   No, no.  I will say that that was, you know -- listen, I've been treating Jodi for -- since 2015, so obviously, there's been conversation about implants.  There's been conversation about pathology.  There's been lots of conversation.

But I will say that, you know, since her last surgery with me, where she doesn't have anything in there anymore --

Q.   Right.

A.   -- we don't really talk about that anymore.  It's more of how she's doing in her current status.

When we spoke on the phone on Thursday and then the brief conversation last night, no, there wasn't any discussion about theories.  I don't -- with all due respect, I don't need theories from nonmedical or non-metallurgists or professionals that are versed in.  I respect Andre, obviously, you know, and Jodi, and I appreciate all of their research and thoughts on the subject.  But that's why I get paid; I come up

Carlos Miguel Alvarado, M.D.

with my own ideas.

Q.   And I appreciate that.  We'll get into that later.

A.   Um-hmm.

Q.   Let me ask it a different way.  Did Andre or Jodi ask you to give any testimony or opinions about the --

A.   No.

Q.   -- design of the products, how the products are manufactured, the warnings of any of the components?

A.   No.

Q.   Okay.

A.   No one has asked me to do that.

Q.   All right, thanks.

All right, let's go through your CV, Dr. Alvarado.

A.   Sure.

Q.   Exhibit 47.

A.   Um-hmm.

Q.   All right, so going back through as quickly, your educational background, your CV confirms that you graduated, an undergrad from the University of Chicago in 2003, a B.S. in chemistry and a B.A. in biochemistry?

Carlos Miguel Alvarado, M.D.

A.    Yeah.

Q.    And then University of Michigan Medical School, graduated in 2008?

A.    Correct.

Q.    Okay.  All right, and then after medical school did you have a fellowship?

A.    Well, next comes residency, sir.

Q.    Okay.  So --

A.    So residency was at New York University Hospital for Joint Diseases.  And then I was the -- following that I was the executive chief resident at NYU Hospital for Joint Diseases.  Following that I was a fellow of adult reconstruction at Brigham and Women's Hospital Harvard combined orthopedic program.  And then I came down here.  I've been here -- this is my sixth year of practice down here.

Q.    Okay.  Going back to your residency at NYU, did you specialize in any particular area as part of your residency?

A.    Yes, orthopedics.

Q.    Okay.  Any subspecialties in orthopedics?

A.    You don't subspecialize in residence. You subspecialize in fellowship, so I'm not sure how to answer that question.

Carlos Miguel Alvarado, M.D.

Q.   All right.  And let me ask it a different way.  Did you participate in any research projects or clinical trials relating to any particular type of component?

A.   You know, I have several publications, but none of them are mechanical studies on components, no.

Q.   And for your residency, who did you train under; who was your supervisor so to speak?

A.   Well, the chairman of the program is Dr. Joe Zuckerman.  Head of the residency at the time was Dr. Ken Eagle.

Q.   Okay.  And then your residency was, your CV confirms, through -- from 2008 through 2013?

A.   Yes.

Q.   During your residency did you have an occasion to treat patients with Ehlers-Danlos Syndrome or similar connective tissue disorder?

A.   Yes.

Q.   And on how many occasions?

A.   I don't know.

Q.   Is that something that you saw frequently, or was it rare?

A.   It is a rare disorder to start.  So yes, uncommon.

Carlos Miguel Alvarado, M.D.

Q.   And again, just focusing on your residency, what were the issues or complications with Ehlers-Danlos Syndrome and total joint replacement?

A.   The Ehlers-Danlos Syndrome is a connective tissue disorder resulting in increasing elasticity of soft tissue and connective tissue. The resulting complication after joint replacement is instability, specific to hip replacements, dislocation.

Q.   What about subluxation, is that a potential complication?

A.   That's a continuum.  It's the same, yeah. Subluxation is what happens right before you dislocate.

Q.   All right.  Can you have subluxation without dislocation?

A.   Of course.

Q.   Yeah.  Again, during your residency were you involved in revision surgeries of patients with Ehlers-Danlos Syndrome?

A.   I don't recall.  I was involved in a lot of revisions.

Q.   Right.  All right, and then moving to -- you referenced your fellowship was in total joint

Carlos Miguel Alvarado, M.D.

replacement and adult reconstruction at Brigham and

Women's Hospital Harvard Medical School?

        A.    Um-hmm.

        Q.    That was for a year?

        A.    Correct.

        Q.    And again, was there any particular focus

of the fellowship?

        A.    Adult reconstruction.

        Q.    And during that time period in your

fellowship, did you treat patients with

Ehlers-Danlos Syndrome?

        A.    Once again, adult reconstruction is joint

replacement in adults.  So I don't recall the

details of the 500 odd cases I did that year, but a

significant percentage of them were revisions.  And

so the long answer to -- short answer is I don't

know.

        Q.    All right.  And you mentioned 500, is

that how many cases or surgeries did you work on

during that fellowship?

        A.    Um-hmm.

        Q.    About 500?

        A.    Something like that.  I don't recall the

exact number, somewhere around 4, 5 hundred.

        Q.    Is that both primary and revision

Carlos Miguel Alvarado, M.D.

surgeries?

A.   Correct.

Q.   And with your fellowship, who did you train under?

A.   Dr. Dan Estok, E-S-T-O-K, is the head of the fellowship, and the chairman of the department is Tom Thornhill.

Q.   During both your residency and your fellowships -- fellowship, you were involved in discussing the risks and benefits of primary and revision hip arthroplasty with your patients?

A.   Yes, yes.

Q.   And can you just generally identify for us the types of risk that you would disclose with those patients leading into surgery?

A.   Yeah.  So risk of -- I'm assuming you want me to focus on hip replacement here?

Q.   Yes, thanks.

A.   Risk of hip replacement surgery: Infection, bleeding, blood clots, need for blood transfusion, leg length discrepancy, dislocation, pain at the surgical site, stiffness, medical complications due to anesthesia, neurovascular injury.  And those are typically the risks disclosed associated with joint surgery,

Carlos Miguel Alvarado, M.D.

specifically hip replacement.

Q.    And what about the need for further surgery?

A.    Um-hmm, isn't that in there?  It should be if it's not.

Q.    And what about fracture?

A.    Yeah, that's in there too.

Q.    Did -- as part of the risk did you discuss, depending on the type of component, wear debris, whether poly or metal?

A.    Well, you see, metal kind of fell out of vogue, so that's not something I would discuss all that much at this point.  So most patients aren't using cobalt-chrome.  But yes, that is also a risk, much lower now than in the past, that's still a risk.

Q.    During your residency and fellowship were you involved in either primary or revision surgeries where you utilized a DePuy Summit stem?

A.    Yeah.

Q.    And do you still use the DePuy Summit stem today?

A.    No, I use DePuy ACTIS.  I use that for my primary total hips and I -- that's all you asked, that's all I give you.

Carlos Miguel Alvarado, M.D.

Q.    Well, how about for a revision, what's your typical --

A.    Depends on the case.  Typical, a Zimmer product.  For complex revisions I've used Stryker in the past, also Restoration Modular stem.  I've used DePuy in the past, but typically for revisions I use that.

Q.    Going back to your residency and fellowship, did you also utilize the Stryker MDM components?

A.    Yeah.

Q.    And do you still use those today?

A.    I prefer the Zimmer Dual Mobility at this point, but yes I've -- I've used the Stryker Dual Mobility construct many times.

Q.    And all of the components come with what's typically referred to as a product insert or instructions for use, an IFU, you're familiar with that?

A.    Sure.

Q.    All right, and the IFU includes contraindications, risks and potential adverse complications, is that right?

A.    Sure.

Q.    And you don't actually need the product

Carlos Miguel Alvarado, M.D.

insert or IFU to know for a particular patient all

of the potential risks of the component, is that

fair?

A.    That's fair.

Q.    It's based on your experience.  You don't

necessarily rely on the IFU; it's there if you need

it, is that fair?

A.    Sure.

Q.    And in your past work have you had the

opportunity to review the IFU for the DePuy Summit

stem at some point in time?

A.    I mean, I'm sure I've seen it.  I don't

recall.

Q.    And same question for the Stryker MDM

products, have you seen the product insert or IFU

for those products?

A.    I've seen lots of packing and lots of

inserts, but I can't regurgitate it word for word

certainly.

MR. ASFENDIS:  Wait, so was that a

yes?

A.    Yes.

Q.    If you ever had a question about

potential complications or contraindications you

could go back to the product insert for that

Carlos Miguel Alvarado, M.D.

information for a particular component?

A.   You could.

Q.   What would you typically do?

A.   Go to the peer-reviewed literature, unbiased.

Q.   With respect to the DePuy Summit stem IFU, do you recall that it provides warnings and information about potential subluxation due to laxity in joints?

A.   I just told you that I don't remember, you know -- I know about subluxation laxity in joints, but I don't recall your IFU.  So if you ask me to state words off the IFU, I don't know.

Q.   And based on your experience, you wouldn't necessarily need the IFU; you know based on all of your primary revision surgeries that subluxation due to laxity or dislocation due to laxity is a potential complication?

A.   Correct.

Q.   What's osteolysis?

A.   Osteolysis is local damage to the bone around an implant typically due to polyethylene liner debris, historically.  More recently we can see some osteolysis due to metal ion debris.  But it's an umbrella term describing damage to bone

Carlos Miguel Alvarado, M.D.

around an implant for several different reasons.

Q.   There is wear debris with virtually every component that you utilize in a total hip arthroplasty, is that fair?

A.   The potential for wear debris, sure.

Q.   That could either be with the metal components or with the poly components, is that right?

A.   Yes, but -- yes, that's accurate.

Q.   All right, going back to your CV, you indicated after your fellowship then you came to Miami?

A.   Yes.

Q.   And your CV indicates that you're currently employed with Baptist Health South Florida, but as you've stated earlier, you're with Miami Orthopedic Institute?

A.   Right.  Baptist Health South Florida owns Baptist Medical Group who owns Miami Orthopedic Sports Medicine Institute.  So I still work for them.

Q.   And you started in September 2014?

A.   You got it.

Q.   Since that time on average how many primary hip arthroplasty surgeries do you do a

Carlos Miguel Alvarado, M.D.

year?

A.   I do four to five hundred cases a year, a hundred of which are revision, the rest are primaries, give or take a couple here.

Q.   Right.  And talking about your practice from September 2014 to the present, other than Jodi Rouviere, what's your estimate of how many patients you've treated that have EDS?

A.   Well, Ehlers-Danlos, she's the only one.

Q.   Okay.

A.   Connective tissue disorder, probably a couple more, but once again, it's not a super common problem.  Number two, arthritis in Ehlers-Danlos is not, you know, we see joint subluxation, but we don't see a ton of joint replacement.  They are -- there's written up in the literature, but it's a case series usually.

Q.   And with Ehlers-Danlos Syndrome is there also joint pain and instability?

A.   Yes, they can, certainly.

Q.   And are there a higher rate of surgical complications with patients with Ehlers-Danlos Syndrome?

A.   Are we talking about hip replacement here?

Carlos Miguel Alvarado, M.D.

Q.   Yes.

A.   Yes.

Q.   And again going to your CV, you're currently a member of the American Academy of Orthopedic Surgeons?

A.   Yes.

Q.   And then your CV includes your publications?

A.   Um-hmm.

Q.   And were those publications all done in connection with your residency or fellowship, or have you had any since you started practicing?

A.   Yeah, there's been a few since practicing, but most of those done were -- most of those were done during my academic years, um-hmm.

Q.   Do any of your publications involve a patient with Ehlers-Danlos Syndrome?

A.   No.

Q.   Okay.  Do any of your publications involve patients with metallosis?

A.   I don't know if that paper ever got published.  No.

Q.   And what --

A.   I mean there's a couple of textbook chapters that talk about, you know, perioperative

Carlos Miguel Alvarado, M.D.

complications.  I don't recall if I wrote about metallosis in those, but I don't think so.  No papers strictly pertaining to metallosis, no.

Q.   Any published peer-reviewed literature relating to patients with trunnionosis?

A.   Trunnionosis, no.

Q.   With metallosis or trunnionosis have you separately done any kind of independent research, case reports, anything of that nature?

A.   Published literature?

Q.   Yes.

A.   No.

Q.   Do you have any unpublished work in progress relating to metallosis or trunnionosis in patients?

A.   No.

Q.   And your CV lists numerous posters, oral video presentations.  And again same question, any of those presentations involve Ehlers-Danlos Syndrome, metallosis or trunnionosis?

A.   No.  Mostly surgical technique stuff.

Q.   And what is, based on your experience and training, what is metallosis?

A.   I'll give you, you know, once again, we haven't talk about the case at all.  So I'm happy

Carlos Miguel Alvarado, M.D.

to give you a small, but you have your own experts that talk to you about metallosis.

Q.   Yeah, just based on your clinical experience?

A.   Metallosis is a buildup of cobalt-chromium ions usually in the local soft tissue which results in salts which destroy local soft tissues and bone.  It happens 17 to 20 percent of the time on metal-on-metal implants.

Trunnionosis much less common, about 1 percent maybe.  But the true number of trunnionosis is hard to say, because it's hard to diagnose.  But it's the same phenomena, an adverse reaction to -- in local tissue from metal ion debris.

Q.   And based on your clinical experience, that metal ion debris is cobalt-chrome?

A.   It can be.  And that is certainly the most destructive we see in local tissue, but you can get metal debris from any type of metal.

Q.   Based on your clinical experience have you seen patients prior to Jodi Rouviere who had metallosis from metal particles other than cobalt-chrome?

A.   Yeah, you see titanium debris.  Titanium

Carlos Miguel Alvarado, M.D.

debris -- it's not nearly as toxic to local tissues, but it can be if it gets severe enough, and you will see a buildup in the tissues.  It's usually fairly easy to recognize one from the other, because one causes brown staining, the other one causes black staining, so.

Q.    So the brown staining is caused by which?

A.    Cobalt-chrome.

Q.    And the black staining is caused by?

A.    Titanium.

Q.    With titanium, if you have a black-stained tissue, that doesn't automatically equate to damaged or destroyed tissue, is that fair?

A.    No.  Not automatically, no.  But you know, if you're seeing staining in the tissue then you know you've got some issue enough with the implant, and there is potential for there to be, you know, damage to the tissue.

You know, like I said, titanium is much more tolerated by local tissue, but it's still not a favorable sign.  It's not the goal.

Q.    Are you, based on your clinical practice, are you familiar or aware of any published peer-reviewed literature linking titanium debris

Carlos Miguel Alvarado, M.D.

and pseudotumor or metallosis?

A.   No, we don't see pseudotumor titanium debris that I'm aware of.

Q.   And you mentioned the cobalt-chrome -- cobalt-chrome ion levels.  Based on your clinical experience what is the typical ion level that you've seen that equates with some kind of damage or metallosis?

MR. ROUVIERE:  Objection.  That calls for an opinion of an expert.  He's not here as an expert today.  He's here as a treating physician.

A.   That's hard to say.

MR. EATON:  All right, that's a speaking objection.

Q.   But I qualified it, Doctor, by saying based on your clinical experience, what have you seen?

A.   Well, you can see discomfort or issues with any level of ions really.  And this is an argument that we have at our conferences and is still being kind of dredged out in the literature.  When I first started it was seven.

Q.   Seven?

A.   And now the most recent publications it's

Carlos Miguel Alvarado, M.D.

probably somewhere around two.  So every year it kind of gets lower.  And what we still don't know is what is -- you know, how much cobalt-chrome do people want in their blood?  You know, probably zero parts per million, but we're still figuring that out.

But right now it is published in the best available peer-reviewed literature is when it gets over 2, 2.5, that's when we start to get a little worried.  But anyone that has implant that has any risk for cobalt-chrome levels and complains of pain, regardless of the ion level, you can use it, but you still need to take it seriously, work it up.  And usually that requires an MRI scan to look for some fluid, in my practice, in my...

Q.   All right.  And in your clinical practice have you seen a patient with cobalt-chrome levels less than 1 where you still had a diagnosis of metallosis?

A.   Just one.

Q.   And who is that?

A.   Miss Rouviere.

Q.   Okay.  So other than Miss Rouviere, you haven't had a patient that's had metallosis with cobalt-chrome levels less than 1 --

Carlos Miguel Alvarado, M.D.

A.    Yeah.

Q.    -- is that correct?

A.    Correct.

Q.    In your clinical practice, separate from Miss Rouviere, have you had patients who had a titanium allergy?

A.    So this is a difficult question to answer.  How do we diagnose a titanium allergy?

Q.    I was going to ask you how would you diagnose that?

A.    I don't know.  So right now our best tests -- so we used to do skin patch testing, which was found to be inaccurate.  We got reactions from just about anyone if you really look close on skin patch testing.

So then we started doing a leucocyte transformation test, which is a blood test to try to look for specific reactions.  It's a send-out.  We don't do it here in the lab.  There's one lab in Wisconsin that we can send blood to to be evaluated for that.  And even that it's unclear, you know, what's a true allergy and what's not.  Because if you look at the best available literature, once again, post-joint replacement, 20 percent of patients may demonstrate reaction on

Carlos Miguel Alvarado, M.D.

blood test or on skin patch test and have no symptoms.

So what's the diagnosis of an allergy?  I don't know.  You know, if they -- if they have implants and are having a significant amount of pain and every possible diagnosis has been ruled out, then either you stop listening to your patients or you try to figure something else out.

So to answer your question, I don't know.  Certainly titanium -- and obviously, I do 500 of these a year, so I still believe in titanium.  I put in a lot of titanium joints.  In our teaching it's an inert metal that doesn't really result in a biologic reaction.

Q.  All right.

A.  But is that true for a hundred percent of everybody?  I don't know.

Q.  Is it fair to say that titanium hypersensitivity or allergy is rare?

A.  Absolutely.  Absolutely.  I would say metal hypersensitivity or allergy is rare, not just titanium.  Titanium super rare, metal rare.

Q.  Titanium is super rare?

A.  Yeah.  Make sure we get that, super rare.

Carlos Miguel Alvarado, M.D.

Q.   In your primary and revision procedures since you've been in practice, have you utilized the DePuy BIOLOX ceramic head?

A.   Absolutely.

Q.   You still use that today?

A.   Every day.

Q.   Is there a particular application, a primary revision where you use the ceramic head?

A.   Well, BIOLOX kind of has a corner on the market, so every major company except for one uses BIOLOX, so I use it on every hip replacement for the most part.

Q.   And do you have a preferred manufacturer, DePuy or --

A.   I use DePuy on my primary hips.

Q.   And for your revision?

A.   Like I said, depends on the case.  But oftentimes Zimmer, sometimes Stryker, and on rare occasions Smith & Nephew, which is the one major company that does not use BIOLOX.  They manufacture their own metallicized ceramic.

Q.   The ceramic head itself does not create cobalt-chrome or titanium debris?

A.   No.

Q.   What's impingement?

Carlos Miguel Alvarado, M.D.

A.    Impingement is when you have moving parts hitting each other.

Q.    And what are -- in your experience what are the factors or causes for impingement in a primary or revision?

A.    Total hip?

Q.    Correct.

A.    Could be patient anatomy.  It could be implant position.  It could be implant choice. Sizing.  You know, there are many different types of impingement.  There's component impingement. There is soft tissue impingement.  There's bony impingement.  Impingement is a destabilizing force.

Q.    You said component impingement, how is that different than soft tissue impingement?

A.    Well, sometimes you bump two components and sometimes there's soft tissue in between them, and that's what's creating the impingement.

Q.    Okay.  What's the typical clinical manifestation for impingement in total hip?

A.    Depends on the patient.

Q.    Right.  In your experience what are some of the clinical manifestations that occur?

A.    Once again, depends on the patient. There are many different things, like I said, there

Carlos Miguel Alvarado, M.D.

are many different types of impingement. Usually we don't see component impingement unless there is a strange deformity or a weird situation or implant position.

Q. So the types of impingement that you gave us, component impingement is the one you see the least frequently in total hip?

A. Well, it's the one you try to see least frequently, because it's -- component position is what we control.

Q. All right.

A. I don't know what the -- I'm not sure if anyone can quote -- if they can, it's great, but in my review of literature I don't know -- I cannot recall ever seeing published the incidence of impingement after a primary total joint. It's just something that you know to try to avoid. As I said, it can be a destabilizing force.

Q. With all of your primary and revision surgeries the selection of the particular components is made by you as the clinician, correct?

A. Yes.

Q. You may consult other orthopedic surgeons or literature, but ultimately that decision is made

Carlos Miguel Alvarado, M.D.

by you, is that fair?

A.   Correct.

Q.   Okay.  There are manufacturer or sales representatives who are available to assist, but that's still ultimately your decision, fair?

A.   Correct.

Q.   Who is your, currently, your DePuy sales rep?

A.   Steve George.

Q.   And how about for Stryker?

A.   Jandy, I forget his last name.

Q.   Is your practice to have a sales rep in a procedure?

A.   Well, that's -- the hospital makes you do it.

Q.   Yeah.

A.   Personally I don't care if they're there or not, as long as the stuff is there.

Q.   Right.  When you say the stuff, the components that you're getting ready to use?

A.   Correct, sir.

Q.   And if you have a question about instructions or warnings on the product insert, would you refer to the product insert as opposed to going to a sales representative?

Carlos Miguel Alvarado, M.D.

A.    Yeah.  I mean if the sales representative is there, then you ask the sales rep, but you know, we know the rules.

Q.    Right.

A.    You know.

Q.    And when you say 'we know the rules,' it's your obligation as the surgeon to understand the warnings and risks and complications?

A.    Correct.

Q.    Even though all that information is contained in the product insert?

A.    Yeah.

Q.    I want to turn to your treatment of Jodi Rouviere.

A.    Great.  Sure.

Q.    We've already marked some of the records, so I'll do my best to keep this moving.  I may refer to exhibits that we've already used that there's new ones, and I'll give you a copy --

A.    Got it.

Q.    -- but feel free to refer to your original.

A.    No problem.

Q.    I'm going to hand you what's been previously marked as Exhibit 16.  Exhibit 16 is

Carlos Miguel Alvarado, M.D.

your 5/21/2015 consultation report with Jodi

Rouviere?

A.    Yep.

Q.    And was this the first time that you had

seen Miss Rouviere?

A.    Sure was.

Q.    And in the history of present illness you

summarize her prior surgery at New York Hospital

for Special Surgery.  And my question is where did

you get the information about the components that

had been implanted in 2012?

A.    Oh, well, the patient had her operative

report.

Q.    Do you know Dr. Robert Buly?

A.    I do not.

Q.    On the second page, under laboratory

values you've got chromium level .9?

A.    Yes.

Q.    And do you recall having any discussions

with Miss Rouviere about the chromium level .9 and

the significance or insignificance of that?

A.    I don't recall.

Q.    And on the third page under assessment

and plan --

A.    Yep.

Carlos Miguel Alvarado, M.D.

Q.    -- you note that on radiographs there does not appear to be any mechanical issue with prosthesis?

A.    Right.

Q.    Can you just explain what that means?

A.    So that means that looking at x-ray, implants appear to be appropriately positioned and sized.

Q.    And MRI does demonstrate a small fluid collection?

A.    Yes.

Q.    However, her chromium levels are normal?

A.    For someone with an implant.

Q.    Okay.  So the .9 that you noted on page two was normal for someone with metal-on-metal components --

A.    Well --

MR. EATON:  Let me strike that.

MR. ASFENDIS:  Just note my objection.

A.    Anybody that has --

Q.    Let me ask the question first.  Sorry.

A.    Sure.

Q.    You noted that her chromium levels were normal for someone that has components from a hip

Carlos Miguel Alvarado, M.D.

arthroplasty?

A.     Anybody that has a cobalt-chrome component, which she does, you will find some cobalt and chromium in the blood, once again.  And at .9 parts per million, that is not the level that tends to raise red flags.  That's why my note I say normal, normal for somebody that has a Dual Mobility hip.

Q.     Then you go on to state in assessment and plan:  The implant that she has, which is a Stryker titanium cup with an MDM head and liner, is not one associated with metal debris or metallosis?

A.     Not one typically associated.  I've seen it personally twice.  Usually that's done when the -- usually that occurs rather when the cobalt-chrome liner is not inserted properly, which it is a difficult liner to insert at times, or for some reason the liner is loose and moving.

But typically these Dual Mobility constructs are actually used in patients that have history of metallosis.  However, more recent literature, since 2015 there has been discussion at least at our conferences that maybe we need to rethink this as well.

So this is an evolving topic, and

Carlos Miguel Alvarado, M.D.

you know, with a time point, you know, from five years ago and now, obviously I'm a little bit older, the literature is a little bit older --

Q. Yeah.

A. -- and we have a slightly better understanding, you know.

I will still say that Dual Mobility constructs are typically not related with metallosis. But I think it is possible. I think more people are thinking it is possible.

Q. All right. And the Dual Mobility component that you utilize --

A. Well, that I -- I didn't do this surgery.

Q. No, I'm -- yeah.

A. That I --

Q. I was looking back in my notes, yeah. The Dual Mobility component that you currently use, does it have a cobalt-chrome liner?

A. There is only one. Every -- sorry. There is two commonly used Dual Mobility constructs, another one is just coming to market, but every Dual Mobility construct has cobalt-chrome.

Q. And the Dual Mobility has a large poly insert that you place the ceramic head in, is that

Carlos Miguel Alvarado, M.D.

right?

A.   Yeah, it's a ball in a ball.  You put a ceramic ball into a polyethylene ball.

Q.   Right.

A.   So it allows for a larger head.  The benefit of that is improved stability.

Q.   So when you say MDM head, you're referring to the poly ball --

A.   Correct.

Q.   -- portion of that construct, is that right?

A.   Yes.

Q.   Thanks.  Then you go on to state on your assessment and plan that you explained all of this to Jodi Rouviere, and then you said in addition this is not one of the recalled components?

A.   Correct.

Q.   And did you do some research to figure that out, or you knew based on your clinical experience?

A.   So there -- there is -- there was a recall on Stryker heads.  I think that just came out after that.  I don't remember if it was -- if I had been -- it's a plus ten head which I knew this wasn't it.

Q.  Right.

A.  So I don't remember if that is what I was thinking when I wrote that sentence, but I'll tell you right now that it's not a recalled implant, which is true today and it was true then.

Q.  All right, thank you.

MR. EMAS:  I'll take that one back, that exhibit.

THE WITNESS:  Thank you.  This exhibit.

MR. EMAS:  You keep that one.

BY MR. EATON:

Q.  If at any point in time when I hand you a record, if you want to refer to your file, please do so.

A.  Got it.  No problem.

(Exhibit 49 was marked for identification.)

Q.  I am going to hand you what's been marked as Exhibit 49, which is a June 13th, 2016 office note.  And here the complaint with Miss Rouviere is her right knee.

A.  Yes.

Q.  And then if you go to the second page, under impression -- well, let me ask you first, you

Carlos Miguel Alvarado, M.D.

treated Miss Rouviere for complications with her

right hip and her knee --

A.   Correct.

Q.   -- correct?

A.   Yep.

Q.   At the bottom of this document under impression on page two you note:  The patient appears to have some hip flexor pain most likely due to the fact that she has an MDM implant and probably has some draping of her interior musculature over that implant.  Can you explain what that means?

A.   So you can sometimes have soft tissue impingement onto the implant.  So what that means is you have a hip.  There's obviously moving parts over the hip.  The hip flexor tendon moves anterior to the hip.  She's a small woman.  A 42-millimeter head is fairly large, and if she has a 42-millimeter head -- I don't recall the size of the cup, but she has at least a 52-millimeter cup.  So sometimes if you have a larger implant, you can get some impingement on the moving hip flexor tendon over the front of the hip, which can be symptomatic.  Not always but it can.

Q.   All right.

Carlos Miguel Alvarado, M.D.

A.   But whenever I see a small patient with anterior hip pain in a reasonably well-positioned, well-fixed implant, and I don't have much other to go on, and I have hip flexor weakness on examination, that usually indicates hip flexor tendinitis and potentially can be due to soft tissue impingement on the implant.

Q.   Right.

A.   Not always but can be.

Q.   And then you go on in the note to say that you discussed this with the patient, but there isn't really much we can do about it other than revising her, but she's at significant risk of instability given her connective tissue disorder?

A.   Yep.

Q.   So did the connective tissue disorder play a role in that hip flexor pain?

A.   Well, I think the connective tissue disorder resulted in trying to improve the stability of the implant, and that indirectly played a role in her hip flexor pain.

THE WITNESS:  Thank you.

MR. EMAS:  No problem.

Q.   I hand you what's been previously marked as Exhibit 19.

Carlos Miguel Alvarado, M.D.

A.   Sure.

Q.   And this is an operative report and a manipulation and examination under anesthesia of the right hip.

A.   Right.

Q.   And if you look under indications, you indicate on the first page there that Miss Rouviere has worsening pain about the right hip and the etiology is unclear?

A.   Um-hmm.

Q.   And then you go on to discuss -- specifically you state:  I also discuss how given the fact that her source of pain was unclear, I was unable to provide any guarantee that I'd be able to improve the situation.

And it looks like in this procedure you were going in to look at the components and would potentially go in to revise them, but you were going to wait to see, is that fair?

A.   Yeah.  There was no -- so yes, I needed more information.  I mean you can see on my previous notes that I still don't know why this hip is bothering her, okay.  And I'll try to make that as clear as possible.

Carlos Miguel Alvarado, M.D.

And the reason for this manipulation under anesthesias was if you look at that first note that I wrote, I said what she's describing as a dislocation event, and I'm -- she's obviously feeling something. She's got physical manifestation of, you know, hip getting locked or being rotated at a strange angle, you know, obviously something is going on in the hip. But me, looking at it I didn't see any real issue, so what I wanted to do was move it around.

In that first note I said there is a phenomenon that can happen with these Dual Mobility implants where the big head can rotate pretty far, almost to the point where it can just about spin out. But it's not going to come out because it's so big.

Q. Right.

A. And I was afraid that that potentially was something that was going on. So what I wanted to do was take the hip through a range of motion to see if I under x-ray could see if there was some type of mechanical issue that I could pick up, and that's what we did.

Q. Okay. And on the second page you describe in detail taking the hip through a range

Carlos Miguel Alvarado, M.D.

of motion.  At the end of that first paragraph you note there was posterior impingement of the femoral neck on the rim of the acetabulum --

A.    Right.

Q.    Right.  And describe specifically what that means; what did you see?

A.    So when I took her -- let me just, it's been a couple years.

Q.    Sure.

MR. EMAS:  Take your time.

A.    No positioning of the femoral head at all from acetabulum.  I gently extend the hip as well. There was a posterior impingement of the femoral neck on the rim of the acetabulum; however, certainly the range of motion was an excellent physiological arc, and there was no anterior subluxation or threatening of the femoral head.

So that means while she's under anesthesia, when I take the leg off the side of the bed to extend the hip towards the floor, as I take her through an arc of motion, that neck of the implant will hit the rim of the cup in an extreme extended position.

But impingement, once again, that's, you know, impingement can happen.  You

Carlos Miguel Alvarado, M.D.

know, if you move anybody far enough, you're going to get something to hit, right? You look at the physiologic range of motion, so if it's an extreme that they are never going to get to, then you tend not to worry about it too much.

But then the other thing, recall what I said earlier, impingement is a destabilizing force. So impingement becomes dangerous when you hit, and then the implant begins to lever out. So if it causes subluxation or dislocation, then you need to do something about it.

In this particular case, as it says in my note, you know, it was, you know, a significant amount of extension before I saw impingement of that implant -- of those two implants rather.

Q. So what would be part of her normal gait that would get to that point where you saw impingement?

A. I -- it would have -- you know, I don't -- I didn't write down the angle --

Q. Right.

A. -- how many extension, and I don't recall. But a normal gait cycle does not require a significant amount of extension.

Carlos Miguel Alvarado, M.D.

Q.   Right.

A.   You got to have some, 10, 15, 20 degrees maybe tops, but.

Q.   And then you go onto to the next paragraph to note that:  I did not feel comfortable proceeding with any revision total hip arthroplasty as her etiology of pain was unclear.  The position of the implants appeared excellent.  The hip was very stable throughout physiologic arc with no signs of instability or mechanical failure.

So at that point you decided not to revise?

A.   Right.

Q.   Even though there was impingement on the femoral neck?

A.   Correct.

Q.   Okay.  And based on that manipulation under anesthesia were you able to glean any better understanding of the etiology of her pain?

A.   Yes.

Q.   What was that?

A.   Everything I thought so far was incorrect.

Q.   Right.  And what do you mean by that?

A.   Well, remember I said maybe there was a

Carlos Miguel Alvarado, M.D.

subluxation of the femoral head.  I did not see that.  Okay, so that was kind of my working diagnosis.  And since I could not recreate that event with her under anesthesia, I had to abandon that idea.

(Exhibit 50 was marked for identification.)

Q.   I am going to hand you what we've marked as Exhibit 50, which is essentially a screenshot the of MRI arthrogram?

A.   Yeah.  This is a x-ray.

Q.   Right.

A.   This is a intraoperative x-ray.

Q.   And this was taken during the procedure that you just described --

A.   Correct.

Q.   -- on 8/19/2016?

And this x-ray shows the head --

A.   Um-hmm.

Q.   -- and a pretty clear picture of the femoral stem and neck, correct?  Is that correct?

A.   Yes.

Q.   And on the femoral neck you can see an area that has essentially been gouged out?

A.   Yeah.

Carlos Miguel Alvarado, M.D.

Q.    All right, and is that where the impingement was taking place?

A.    Correct.

Q.    And the area of the femoral neck that had the gouge in it, had you seen in your clinical experience an indentation or gouge that significant?

A.    Not in a hip that was only a couple years old.

Q.    But that -- I'm going to call it an indentation wasn't significant enough to revise the stem?

A.    In a 45-year-old well-fixed implant and no clear -- no.

Q.    All right.  And that indentation was caused, as you described it, by the shell or head coming down onto the femoral neck?

MR. ASFENDIS:  Note my objection to form.

A.    Well, probably it's the neck coming up to the --

Q.    Right.

A.    -- coming up to the acetabular component as the shell stays stationary.

Q.    So as the --

Carlos Miguel Alvarado, M.D.

A.   In the swinging motion of the lower extremity moving, there must have been some impingement -- which we did see and document in our exam under anesthesia.  But once again, at the time I didn't see any instability.  Given the patient's young age, radiographic appearance and still unclear etiology of pain, I made the clinical decision that revision surgery, which would require removal of implant, potential bone loss, things of that nature, was still a hard sell for me.

(Exhibit 51 was marked for identification.)

Q.   And Exhibit 51 is again the same x-ray --

A.   Yep.

Q.   -- and that depicts the femoral neck coming into contact with the shell, correct?

A.   Correct, yeah.

Q.   And at that time you knew, based on your experience, that the femoral stem was titanium; it was not cobalt-chrome, correct?

A.   Um-hmm.

Q.   You have to respond.

A.   Yes.  Yes.  Sorry about that.

(Exhibit 52 was marked for identification.)

Carlos Miguel Alvarado, M.D.

Q.   I show you what's been marked as Exhibit 52, which is a copy of your final report from your clinic notes, dated October 18th, 2016.

A.   Not sure what illicit metallosis is. That looks like a dictation error there.

Q.   All right, that was going to be my first question --

A.   I think --

Q.   -- I had not seen that before.

A.   -- what I said was Ehlers-Danlos, and they have -- the computer --

Q.   Got you.

A.   -- heard me say.  If only I had a human there that could type it.

Q.   Right.

A.   So thank you for doing that.

Q.   So the first entry should say 44-year-old female with history of Ehlers-Danlos Syndrome?

A.   You got it.

Q.   All right.  In this note you describe that you took Miss Rouviere to the ER and that you didn't see any signs of instability or subluxation. And you just described them for us, correct?

A.   Yes.

Q.   Okay.  You go on to say that she's now

Carlos Miguel Alvarado, M.D.

been suffering from worsening pain and worsening ability to ambulate over the past year.  And then you discussed with her the options of surgical intervention and describe the risk of the procedure?

A.   Yeah.

Q.   Including leg length discrepancy, instability with frank dislocation, infection, medical conditions, neurovascular injury, fracture and continued pain?

A.   Right.

Q.   Those were at least some of the risks that you disclosed with her.

And then the next -- and your understanding was she understood and acknowledged those risks?

A.   Yes.

Q.   All right.  She consented to proceed with the surgery?

A.   Correct.

Q.   In the next paragraph I think that's theory, it says I do have a --

A.   Theory.

Q.   -- theory for what may be causing the modular head, which is large, as it moves back and

forth.  Can you explain to us kind of what your theory was at this point?

A.  So once again, you know the sentence before that says she has -- where is that sentence.  Oh, she's been referred for injection in hip flexor without any relief.  So what I was still thinking was that she was having impingement on hip flexor due to large femoral head and cup, which -- which sometimes can cause soft tissue irritation, inflammation or hip flexor tendinitis.

So I was still thinking that this large modular head could potentially be the source of her pain and also that feeling of instability.  Which is why at the time I go on to say:  We can change this for a 36-millimeter head and hopefully achieve stability and symptomatic improvement.

We had just gotten this dictation.  This is a new computer program we got, so there's all kinds of errors in it.

Q.  That's all right.

A.  Sorry about that.  But you can see the format of the note has changed.  Funny errors.  I apologize.

I think it's supposed to say CT scan of the knee as well as x-rays demonstrate

Carlos Miguel Alvarado, M.D.

appropriate position of the hardware.  Not sure why

it says knee.  We are talking about hips here.

Q.    Right.

A.    Sometimes we'll get a CT scan through the

knee to look at the version of the implant.  So a

CT scan through the knee demonstrates -- CT scans

as well as x-rays demonstrate appropriately

positioned hardware, including acetabular version

and femoral version.

Q.    So the positioning was appropriate?

A.    Yeah.

Q.    And then at the end you say:  We'll plan

on revision total hip arthroplasty removal of all

hardware?

A.    Once again --

Q.    At the very bottom.

A.    -- yeah, once again, I have attempted at

all costs to avoid any surgical intervention given

the patient's young age and fairly vague symptoms.

However, at this point she's confined to a

wheelchair and in significant pain and distress.

And then I had a lengthy

discussion with her family, as they were here to

proceed with the surgical intervention.  We'll plan

on revision hip arthroplasty, possible removal of

all hardware.  What I mean is to revise both components.

Q.   Right.

A.   Intraoperative cultures will be taken. I've explained to the patient if I do find infection, she may require further surgery at -- in the future.  She stated understanding and is ready to proceed.

Q.   All right.  I am going to hand you what's been previously marked as Exhibit 22.

A.   Yep.

Q.   Which is your operative note for November 11th, 2016.

A.   Yep.

Q.   Under technique you say:  upon opening the fascia saw a significant amount of grayish-brown soft tissue consistent with metal debris.

And you said earlier there's typically one is gray and one is --

A.   No, one is black, one is brown.

Q.   -- or black.  And what was this one?

A.   Gray.

Q.   So grayish-brown?

A.   Yeah.

Carlos Miguel Alvarado, M.D.

Q.   And was that consistent with --

A.   Not consistent with anything.

Q.   Okay.

A.   That's -- that is what is the theme of this case.

And typically I don't see tissue staining on the fascia, so this is basically outside the hip joint.  As you can -- I guess we'll talk about that later.

But you know, there was just -- this was a strange case.  Very difficult case.

Q.   I'm going to hand you what's been previously marked as Exhibit 23.

A.   Right.

Q.   Is that a photograph that you took during the procedure?

A.   Well, not me.  Those are my hands. Somebody in the OR took it, the picture for me.

Q.   Why did you take a photo?

A.   Intraoperative pictures are used commonly, especially in cases like this to document what I find.  And also to teach, in the event of writing a case report on this, which if I ever figure out what was going on, probably I will do.

Q.   Okay.

Carlos Miguel Alvarado, M.D.

A.   And also to teach my Fellows.

Q.   All right.  And the grayish-brown soft tissue that you note in your operative report, if you look at Exhibit 23 --

A.   Um-hmm.

Q.   -- without writing on it, can you point to us where that is?

A.   Right there (indicating).

Q.   Right underneath both of your thumbs?

A.   You got it.  So basically I am holding apart subcutaneous tissue, getting down to the fascia, and that's where I found the first encounter with this staining of the tissue.

Q.   And you concluded that was consistent with metal debris?

A.   I don't see what else would cause that.

Q.   You note:  In addition there was a significant amount of posterior structure which had been destroyed from the aggressive -- I think it's supposed to say --

A.   Yeah, sorry.

Q.   -- metal reaction.

A.   Let me see.

Q.   I was just going to ask you where in the picture the posterior -- if that's pictured?

Carlos Miguel Alvarado, M.D.

A.   Kind of.  So the posterior soft tissue structure is basically -- the patient is lying on her side, this is the back, this is the front. This is her soft tissue draped over the femur.  As you can see there's kind of a -- a divot down there.

Typically we would found muscular or at least the remnant of the short external rotator still attached to the bone there, muscles in the back of the hip.  And I didn't find that on her, which is typically found in patients with metallosis.  So that's the danger.  You get damage to the muscles as they attach to the femur, and as those erode away you start to see instability, pain, limp, and basically the function of the hip just goes downhill.

Q.   You note that you debrided the posterior structures, and then you sent those to pathology, right?

A.   Correct.

Q.   And at the bottom of -- going back to your operative note --

MR. ROUVIERE:  What number, please?

MR. EATON:  The operative note?

Carlos Miguel Alvarado, M.D.

Exhibit 22.

                    MR. ROUVIERE:  Oh, 22.

BY MR. EATON:

     Q.   At the bottom there it says:  The patient
had an MDM head with what appeared to be a DePuy
Summit stem?

     A.   Correct you.

     Q.   You said you disengaged the head and
inspected the trunnion, it did not show much wear.
However, inside the ceramic head, which looked to
be a Stryker head, what did you mean by that?

     A.   You know, at the time I was thinking that
it was a Stryker head on a DePuy stem, and that's
what I documented.  So that would be one company on
another company, which you're not supposed to do.

               But I'm five years older now.  I
don't know -- you know, so the BIOLOX head, it's a
pink head for both.  It's a BIOLOX head for both,
and there was a lot of etching inside that head, so
which means it's difficult to read the
manufacturer.  Because where you see the
manufacturer usually is inside the head along the
female part of the trunnion.  So at the time I was
thinking that could potentially could be one
explanation for this.  But now that I've done so

Carlos Miguel Alvarado, M.D.

many more DePuy and Stryker revisions.

And plus it was a 28 head in there.  So Stryker's MDM under 52 requires a 26 head, which is not all that common.  So I could see people being in a jam and putting a different company's head onto that with a 28 head that's fairly easily available.  So I don't know if I'm willing to stick by that statement at this point.

Q.   Okay.

A.   But at the time that's what I thought.  But I'm not sure.  Can't -- I can't be for certain.

Q.   All right.  And just to clear that up, I'm going to --

(Exhibit 53 was marked for identification.)

Q.   I'm going to hand you what I'm going to mark as Exhibit 53, which is the OR record -- I don't have copies of this one -- is the OR record from Dr. Buly's procedure where he identifies the implants?

A.   Yeah, so --

Q.   And can you see there that it says there's a BIOLOX Delta, made by -- the ceramic head--

A.   Yeah.

Carlos Miguel Alvarado, M.D.

Q.   -- is a DePuy ceramic head?

A.   Yeah, I agree with that.  I haven't seen this until now.

And at the time when I looked at that implant, once again there was a lot of etching on it, and I thought, man, did they put the wrong cup.  Because there was a mismatch of companies.

Q.   Right.  That would have been a what's referred to as an off-label use?

A.   Off-label use.  It's documented very well in the literature.  People do it.  I've done it.  A lot of people do it when you're in a tough case like this.  But the one thing that we try to do is make sure you put the same manufacturer head and trunnion.

So at the time I thought that was potentially the source of ion wear, because you would have -- even though it's supposed to be the same tapered trunnion, each house has their own maker.

Q.   Okay.

A.   So the more I've thought about this case, and, you know, with more experience comes a little bit more insight, and you know, five years down the road.  You know, I thought about this case, you

Carlos Miguel Alvarado, M.D.

know, and that initial explanation, I don't see me doing that.

Q. Right.

A. I don't see any -- anybody that I know doing that. I've heard of people doing that when stuff comes from say overseas when there are limited resources, but at a place like HSS I can't imagine them doing that.

You know, I was looking for an explanation here.

Q. Right.

A. But, you know, our stickers clearly show, and the Stryker 28 and the DePuy 28 looking at it with etching on the inside would be hard to tell one from the other.

Q. Okay, so the statement -- now that you've seen the actual operating room record with the implants listed from Dr. Buly, the statement at the bottom of your operative report that says there was a --

A. Yeah.

Q. -- a DePuy stem with a Stryker head, that wasn't correct?

A. Yeah, not correct in the sense that there was the right inner head on the right trunnion.

Carlos Miguel Alvarado, M.D.

Q.   Right.

A.   And I think that's an important point. And that was one thing that I had been thinking for awhile.  It was -- and I think I've gone back to revise -- not revise this note obviously, but in my own records say I'm not sure if that's really what's going on.

But it was certainly a Stryker MDM on a DePuy stem but with the appropriate inner head on the trunnion.

Q.   Right.

A.   And that's demonstrated once again here on this -- on these stickers.

Q.   Right.  So just to confirm, that was a DePuy Summit stem with a BIOLOX DePuy ceramic head?

A.   You got it.

Q.   Okay.

A.   That's what we're seeing here.

Q.   And if you go to the top of your next page, of the operative report, sorry -- page -- Exhibit 22, page two, you note based on that assumption that they were different, but that the DePuy stem was significantly damaged, and I think that was most likely the source of the metal appliance.

Carlos Miguel Alvarado, M.D.

And is -- that statement was also based on your assumption that they were mismatched?

A.    I think it's supposed to say metal ions, but yeah.

Q.    Instead of metal appliance -- metal ions?

A.    Yeah, metal ions, yeah.

Q.    And was that also based on your assumption that it was a different component on the --

A.    It was basically the assumption that the source of the ion was the trunnion.

Q.    Right.  And now that you've confirmed that they were not mismatched, what's your opinion on the source of the metal ions?

A.    Well, I think that probably they came from lots of different places.  So clearly there is some etching on the neck, which can deliver some metal debris there.  There is a cobalt-chrome liner in the cup, which can deliver some metal debris there.  The trunnion I'm sure is a source of some, but I don't know how significant that was in hindsight.

But once again, the overarching theme throughout was that this was a complex case, difficult patient, difficult surgical case.  And

Carlos Miguel Alvarado, M.D.

even now, five years later, I don't have a clear --

Q.   Yeah.

A.   -- source for her pain or for her -- for the failure of this implant.  But clearly it did just that.  I mean, it didn't work.  Unfortunately.

Q.   And when you said etching on the neck, you're talking about the indentation?

A.   Um-hmm.

Q.   Is that right?

A.   Yes.

(Exhibit 54 marked for identification.)

Q.   I hand you what's been marked as Exhibit 54.  This was a photograph that was produced by the plaintiffs, which is of the DePuy stem?

A.   Yeah.

Q.   And again, that shows the trunnion is the top, just so we are clear, correct?

A.   Correct.

Q.   And the etching on the neck is what you're pointing to is the indentation?

A.   You got it.

Q.   And the trunnion there appears --

A.   Yeah, we can see some crevice wear here. We can see a little bit of the etching from

Carlos Miguel Alvarado, M.D.

inserting the head, which would be a typical amount of wear.

Q.   And that would be typical of mating that trunnion to the ceramic head, correct?

A.   Yeah, I'd say this is probable a little more than normal, but not out of the realm of normal.

This damage down here is probably from extracting the stem.

Q.   And you're pointing to the opposite side of the indentation?

A.   Correct.

Q.   That's extraction marks?

A.   Um-hmm.

Q.   Okay.  All right, and going back to your operative report --

A.   Okay.

Q.   -- Exhibit 22.

A.   I got it, yeah.

Q.   So based on your note here, you decided to leave in the Summit stem?

A.   Yeah, so let's be a little clear here. This picture is from a different surgery.  This isn't from this surgery.

Q.   Correct.  I was just making sure when you

Carlos Miguel Alvarado, M.D.

say trunnion, that we had a depiction.

That picture, Exhibit 54, that's the stem that you left in during this procedure?

A.   Right.

Q.   All right.  And what were the components then that you replaced?

A.   I took out the Dual Mobility construct from the cup, which is the cobalt-chrome liner; the head off the trunnion and replaced it with a polyethylene liner, and a 36-millimeter plus 5 head.

Q.   And that was a --

A.   And that was a DePuy implant with a titanium sleeve on the trunnion.

Q.   So you put back in a DePuy ceramic head, just larger, 36-millimeter?

A.   A 36-millimeter but no polyethylene head on top of it.  So we actually downsize -- which was the worry from the get-go, that she was at risk from instability.  You downsize from a 42 to a 36 but is a single mono head as opposed to the Dual Mobility head.

Q.   Right.  And you put a titanium sleeve over the top of the Summit stem, correct?

A.   You got it.  Yes.

Q.   And what was the purpose of that?

A.   Well, very common to do that in revision, just to protect the trunnion.  If there was any say crevice wear down to the trunnion, now you've got a clean surface that's mated to the ceramic head.

Q.   Okay.  I am going to hand you what's been previously marked as Exhibit 20, which is labeled final report, and again this relates to your November 11th, 2016 revision surgery.

A.   Yeah.

Q.   And I just had one question on this document.  You note:  All studies including MRI, CT, bone scan, labs have all been negative.  However, on physical exam patient is exquisite pain with range of motion, difficulty with ambulation, for the last several months has been in a wheelchair.  This is very strange as she at baseline is very healthy and active.  She does have some underlying baseline medical issues, specifically Ehlers-Danlos.

I just wanted to ask you, when you say this was very strange, the strange part was that her imaging and scans were all normal or negative, but she still had complaints of pain?

A.   Yeah.  So the strange part was I had no

explanation for her clinical presentation.

Q.   Okay.

A.   And my normal, you know -- I guess I am glossing over things.  There was a small fluid collection in MRI.  And there was a, you know, a slightly elevated metal ions on lab, but once again all of them were within acceptable range for her history of hip replacement.

(Exhibit 55 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 55.  This is the pathology report --

A.   Yep.

Q.   -- with the tissue that you sent after the procedure.  And it says tissue from right hip?

A.   Um-hmm.

Q.   All right.  And what was the conclusion from pathology regarding that tissue?

A.   Pigment deposition, papillary hyperplasia, fibrosis and fibrin deposition.

Q.   And what's that mean?

A.   So what that means is that they saw scar tissue.  Fibrin is scar tissue.

MR. ROUVIERE:  We're missing one. Is there one exhibit that you did not have a copy

Carlos Miguel Alvarado, M.D.

of for everybody.

MR. RATINER:  54.

MR. ASFENDIS:  Yes, there was one. It was like a knee.

MR. ROUVIERE:  No, we don't have this.

MR. RATINER:  52 was the final report, right.

MR. ROUVIERE:  Yeah, we got lost on numbers when you didn't hand us one.

MR. RATINER:  I think that this one Exhibit 52 was the final report.

THE WITNESS:  52 is final report which is --

MR. EATON:  53 is one I handed -- it's that.

THE WITNESS:  -- an office note, which you should have.

MR. EATON:  It says 53 on it.

THE WITNESS:  52 is my office note.

MR. EATON:  52 is the office note.

MR. ASFENDIS:  What's the Bates number on the bottom right?  Let's do that.

MR. ROUVIERE:  Is 53 this?

Carlos Miguel Alvarado, M.D.

MR. EATON: Let's go off the record.

THE WITNESS: 54.

THE VIDEOGRAPHER: It's 11:07 a.m., and we're off the record.

(Discussion off the record.)

THE VIDEOGRAPHER: 11:13 a.m. We're back on the record.

BY MR. EATON:

Q. Dr. Alvarado, I am going to go back to Exhibit 55. I think you were just answering that when we had a break.

So the pathology report, can you again just explain what that means under final diagnosis?

A. So what they saw was pigment deposition, papillary hyperplasia and fibrosis. So scar tissue with pigmentation. This is not a great pathology report from -- I don't know if I'm allowed to say that.

But what I'm -- what I -- you look for is lymphocytic infiltration if we are looking for a metal reaction, right, which is a microscopic diagnosis. And I don't really see any discussion of that. You know, grossly you'll see pigmented

Carlos Miguel Alvarado, M.D.

deposition and fibrosis and fiber deposition, but what they're describing is scar tissue basically.

Q.   But nothing in this path report --

A.   Nothing in this path tells me that there's metallosis.

Q.   And the -- we looked at your x-ray and the impingement that you saw on August 19th, and then you -- in the operative -- in the operation on November 11, 2016 you saw the same thing, correct?

A.   Right, correct.

Q.   Is the Ehlers-Danlos Syndrome related to the impingement or the moving of the femoral neck into the shell?

A.   Yeah, indirectly.  But her Ehlers-Danlos, it's a hypermobility phenomenon.  And the fact that she's able to bring her leg into that position to actually make it impinge is probably due to her hypermobility.  So in most patients you would get a stopped motion due to soft tissue constraints prior to impingement of those implants.  In her, she just can continue to move, and that's -- that's what Ehlers-Danlos is.  Hypermobile joints and hyperelastic soft tissue.

Q.   And going back to the trunnion and confirming that it was a DePuy Summit stem mated

Carlos Miguel Alvarado, M.D.

with a DePuy ceramic head --

A.   Yes.

Q.   -- later on there's references to trunnionosis, and is it fair, based on what you've seen, she didn't have evidence of trunnionosis?

A.   She didn't have evidence of catastrophic trunnion wear.  The reality is -- I talk about this in the OP note.  Let me just be as accurate as possible here.

Q.   You're looking for your operative note?

A.   Got it.

Q.   That's Exhibit 22.

A.   So what I said at the time:  The head was disengaged, and I inspected both the trunnion, which did not show much wear; however, the inside of the ceramic head, which looked to be a Stryker head -- which we now have amended that statement -- did show significant damage, potentially could be the source of metal ions.  It says appliance, but metal ions is what I meant.

Q.   Right.

A.   So you know, she had some wear to the trunnion.  I don't know how much wear, and there isn't a clear guideline for how much trunnion damage results in trunnionosis.  I mean

Carlos Miguel Alvarado, M.D.

trunnionosis is still something that we are
defining.

It wasn't certainly at the point
where I thought the trunnion was at risk of
fracture or mechanically compromised, because
that's an indication to remove the stem.

Q.   Okay.  And the notation there was that
you saw marks on the inside of the ceramic head?

A.   You got it.  Etching.  I think I said
etching on the inside of the ceramic head.

Q.   And how is the etching different from the
mating marks when the ceramic head is placed on the
stem?

A.   You'll see some mating marks certainly,
but there was a fairly notable etching on the
inside of the head.  Could it have -- you know, I
don't -- I don't think that it mechanically damaged
the trunnion obviously.  I already said that.  But
the etching inside of the head could have been just
from standard at insertion.  At the time I noted
it, so I must have thought it was significant.

Q.   Just so we are --

A.   Clear.

Q.   -- clear about exactly what we are
talking about --

A.   Yeah.

Q.   -- I do not have copies of this.  This is a photograph produced by the plaintiffs of the -- this is Exhibit 56.

(Exhibit 56 was marked for identification.)

MR. ROUVIERE:  Can you hold it up so we can see it?  Okay.

BY MR. EATON:

Q.   I am going to hand you what's been marked as Exhibit 56.

A.   Yep.

Q.   Which I will represent to you is a photograph of the DePuy --

A.   Yep.

Q.   -- ceramic head with the MDM insert that was produced by plaintiffs --

A.   Yep, that's it.

Q.   -- which is I'll also represent to you that was the head that was removed at the November 11th, 2016 surgery?

A.   Sure looks like it.  Yep.

Q.   Okay.  And the marks, the etching is that the black that you see --

Carlos Miguel Alvarado, M.D.

A.    Yep.

Q.    -- in Exhibit 56?

And to be clear, that marking could be from head insertion as well?

A.    Could be.

Q.    All right.  Thank you.

A.    Yep.

(Exhibit 57 was marked for identification.)

Q.    I'm going to hand you now what's been marked as Exhibit 57, which is a follow-up final report and clinic note --

A.    Yep.

Q.    -- dated December 1st, 2016.

Here under assessment/plan it says:  Allergy to metal.  And what did you mean by that?

A.    Well, that is a computer-generated heading.  Whenever we insert a new problem into the computer, automatically a heading comes up to dictate a plan for it.

So since once again, given my intraoperative findings, her lack of a formal diagnosis, the working diagnosis at the time was metallosis, which there as of recently is an ICD10

Carlos Miguel Alvarado, M.D.

code for it in the last year and a half, but in 2015 there was no code for metallosis. So what the computer puts in is metal sensitivity.

Q. And when you opened the capsule, and we looked at the photograph that was taken intraoperatively, did you see any actual metal particles or debris?

A. No. You -- you see fluid and you see tissue staining. The particles that cause the damage are not -- you can't see them unless something very weird is going on. You know, we are talking about ions.

Q. Okay. So if Mrs. Rouviere testified that you told her you saw metal debris in the capsule, she would be mistaken?

A. Well, she would not be -- maybe I did a poor job of explaining what I mean by that. But if I tell someone that I saw metal debris, what that means is that I see the tissue staining and the evidence of metal debris.

Q. Right.

A. You can't see metal debris with your eyes.

Q. Right.

A. It's a microscopic diagnosis. Or you can

Carlos Miguel Alvarado, M.D.

infer that it's there given the clinical findings upon opening the joint.

Q.   And your note goes on to say that metal ion levels were ordered as the patient's intraoperative findings are consistent with metallosis, which you just said?

A.   Um-hmm.

Q.   And the patient is very concerned about ion levels.

What do you recall about when you first saw Jodi Rouviere and her concern about metallosis or ion levels?

A.   I mean she was concerned about her hip. It wasn't working.

She had a working knowledge of metallosis, I think to my recollection.  I'll be honest, if it's not documented in my note, I mean I don't recall the details of our face-to-face conversation, so I'd have to go off what I said there.  Her chief complaint was hip pain, subluxation or these -- what she was describing as dislocation events, but mostly just pain.

Q.   Okay.  Back when you first started your clinical practice, would it be uncommon for a patient to raise metallosis with you before that

Carlos Miguel Alvarado, M.D.

was diagnosed?

A.   You know, the problem is you can't watch TV after 7:00 p.m.  You can't watch Dateline without seeing a commercial for metallosis.  I think I get more calls from patients to ask me if they have metallosis based on no other -- so no, it wouldn't be uncommon.

The reality is down here -- I don't know if the problem is Indianapolis or New York, there's a billboard:  Do you have this hip? Call me.  You know, it's not an uncommon question.

(Exhibit 58 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 58, which is the lab work for Jodi Rouviere that you had ordered for cobalt and chromium.

A.   Yes.

Q.   So for cobalt it says .6 --

A.   Yep.

Q.   -- and then for chromium it says less than .2?

A.   Correct.

Q.   So it was below the detection level?

A.   Right.

Q.   And again, .6 it says H here, which means

Carlos Miguel Alvarado, M.D.

it's out of the range of normal for this lab?

A. Yes.

Q. All right. Still below the 2.2 that you referenced earlier?

A. Yeah, it's still below but raises clinical red flags certainly.

But at this point we have removed the cobalt-chrome from the hip joint, right. We've taken out the cobalt-chrome liner, and we've replaced that with ceramic and ultrahigh molecular weight polyethylene. So the clinical importance to me was I just wanted to make sure this number was trending down, which it -- which it is.

(Exhibit 59 was marked for identification.)

Q. I hand you what's been marked as Exhibit 60 --

MR. ASFENDIS: Actually aren't we on 59?

(Discussion off the record.)

BY MR. EATON:

Q. Dr. Alvarado, I am going to hand you what's now been marked as Exhibit 59.

A. Great.

Q. I'll represent to you that that is your

Carlos Miguel Alvarado, M.D.

clinic note.  The highlighting is not yours.  It is copied that way.

A.   Yeah.

Q.   This is dated December 6, 2018?

A.   Yep.

Q.   And these are out of order, so I'm going to -- we will get back to them.

A.   Do you want me to give this back to you?

Q.   Yes, we'll get back to that.  Sorry, that's the wrong year.

(Exhibit 60 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 60, which is December 19th, 2016.

A.   Got it.

Q.   All right, and this is, again, a clinic note from you dated December 19th, 2016.

Under assessment it says:  Is concerned because she has some cutaneous manifestations of unclear origin.

A.   Yep.

Q.   What does that refer to?

A.   She was having a rash basically, you know, itching, rash, and it was fairly generalized.

Q.   And you note the patient is very

Carlos Miguel Alvarado, M.D.

concerned about possibility of metallosis and has done a lot of research on her own.  Do you remember Miss Rouviere providing you with any literature or other information that she had done in her research?

A.    Certainly we talked about lots of things. I don't recall any specific literature.  And she would text me or email me at times websites and things like that.

I -- but you know, as we discussed in my office and as I've said here, I go to peer-reviewed literature, and that's what I like to base clinical decisions on.

Q.    You're not basing clinical decisions on patients' research, fair?

A.    No, no, no.  I think it's important that patients are their own advocate and speak up for how they feel.  And if they want to educate themselves, I absolutely support it and I'm happy when they do that.  Certainly sometimes it adds time to my clinic and a little bit more work for me.  But you know, I won't pretend to be the smartest guy ever and know everything there is to know about anything.

Q.    Yeah, right.

Carlos Miguel Alvarado, M.D.

A.   And I'm happy for any source that's going to improve my clinical practice.

Jodi would send me stuff, it was pertinent, it was pertinent and certainly to her experience.  But you know, there's not a lot of clinical decisions that I'm going to base off of, you know, level 4 evidence, which is -- most of that stuff is just people's opinions.

Q.   Right, okay.  And looking back at Exhibit 60 you note the cobalt -- in the middle of that first paragraph -- cobalt and chromium levels were checked and both were .6?

A.   Oh.

Q.   And I just wanted to make sure --

A.   I misspoke there.

Q.   -- it was only the cobalt that was .6?

A.   Right.

Q.   And you note at the bottom there her metal levels have been checked and are improving rapidly?

A.   Yep.

Q.   Did you have an earlier baseline chromium or cobalt level?

A.   No.  I mean I apparently I thought I did, because that's what I said in my note.  I don't

Carlos Miguel Alvarado, M.D.

recall.  I think we had that .9 preop level, because we checked.  She had levels when she first was admitted to Doctors Hospital.  So she went from .9 to .6 in about a month.

Q.   That's the reference to improving rapidly?

A.   You got it.

Q.   All right, thank you.

(Exhibit 61 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 61.  This is a copy of your office clinic note, dated December 29th, 2016.  And you note in the first sentence:  Patient's revision was done for metallosis.

A.   Right.

Q.   Right.  And was the revision done for other reasons as well?

A.   No, the revision was done for pain.

Q.   Right.

A.   So as we've said over and over, I wasn't sure what was going on.  The intraoperative findings compelled me to agree that metallosis potentially could be the source of her pain.  I think it was.  I still think it was.

Carlos Miguel Alvarado, M.D.

Q.   Okay.

A.   But certainly the normal indicators --
labs, MRI scan -- were less exciting.

Q.   And the etching or indentation on the
DePuy Summit stem that you noted earlier, that
etching wasn't related to any product defect or
product failure in the stem?

A.   I don't know.

Q.   All right.

A.   I mean clearly there was an etch, etching
or a gouge.  And we've already demonstrated on
x-ray that it came from impingement on the cup.
But I'm not age expert on metal, you know.

Q.   And --

A.   I -- I didn't see any product -- there
was no outward signs of the stem crumbling or
falling apart, other than that area of damage where
we got impingement on extreme extension.

Q.   All right.  And that impingement is a
risk of total hip arthroplasty?

A.   Impingement --

MR. ROUVIERE:  Object, calls for
an expert opinion.

BY MR. EATON:

Carlos Miguel Alvarado, M.D.

Q.   In your clinical experience is impingement a risk of this type of surgery?

MR. ROUVIERE:  Same objection, still asking for an opinion.

BY MR. EATON:

Q.   You can answer.  It's based on your clinical experience.

A.   Impingement can happen.

Q.   Okay.  Going back to Exhibit 61 --

A.   Yep.

Q.   -- you note:  She's walking comfortably. Have her still using her wheelchair for long distances.  It says labs have been within normal limits?

A.   Yeah.

Q.   And demonstrate all metal levels are trending down, and that's the .9 to .6 for cobalt?

A.   Yeah.

Q.   Okay.

A.   Yeah, in the HPI it says ambulating today.  Patient states her pain is moderate.  She's ambulating today in a wheelchair, which that doesn't make a lot of sense.  But she was in a wheelchair at home with walker, very limited with walking distance.  So I thought that she was

Carlos Miguel Alvarado, M.D.

walking without pain, but clearly it was still at a very limited amount.

(Exhibit 62 was marked for identification.)

Q. I hand you what's been marked as Exhibit 62, which is another clinic note, dated January 26th, 2017. And there's a complaint of numbness of right lower extremity. And you noted that there was an x-ray of the spine and pelvis. You reviewed them and they were unremarkable --

A. Yeah.

Q. -- hardware still in place and well positioned?

A. Well, I think the most important thing on this note is that probable cause by metal -- by prosthesis pressing against femoral nerve after dislocation. So the patient had a dislocation, which was the concern from the start.

Q. Right.

A. So she had an anterior hip dislocation, a high anterior hip dislocation. You know, I put it back in, but her hip came out. So if your hip pops out, it can press against some things, it can press against some neurovascular structures and probably what was causing that numbness down the leg.

Carlos Miguel Alvarado, M.D.

Q.   Okay.

(Exhibit 63 marked for identification.)

Q.   I hand you what's been marked as Exhibit 63.  This is an office clinic note, final report, dated February 9th, 2017.  You note on the assessment patient continues to complain of an unstable hip?

A.   Yep.

Q.   And then you note:  We will also run a heavy metal lab screen, since last labs were inconclusive.  Do you know what that refers to?

A.   Well, that -- there was still something that was concerning to everybody, so we'll just check the levels again and make sure they're going in the right direction.

Q.   Okay.  And then on the third page is your addendum?

A.   Yep.  Oh, yeah, a long one.

Q.   I had a few questions about this.  It says the patient does have history of Ehlers-Danlos, which causes some soft tissue laxity.  In addition, given her metallosis, further soft tissue damage around the hip was suffered.

My question is, the soft tissue

Carlos Miguel Alvarado, M.D.

laxity that you reference here, was that also within the hip capsule?

A.   So it is the hip capsule.

Q.   Okay.

A.   The hip capsule, it's the anterior ligaments.  It's everything -- you know, all the ligaments and tendons around the hip that provide inherent stability under normal circumstances are not normal.

Q.   Okay.  You go on to note that the cup positioning is appropriate for a posteriorly placed as acetabular component anteversion 20 degrees, abduction 40 degrees?

A.   Um-hmm.

Q.   And you note that that's appropriate placement?

A.   Correct.

Q.   And then you go on to state:  I think she is impinging posteriorly resulting in anterior subluxation events.  What did you mean by that?

A.   Well, basically what I've already showed.  That when you bring the hip into extension that femoral neck hits the rim of the cup.  The difference is now we've got a 36 standard head instead of that 42-millimeter Dual Mobility that is

Carlos Miguel Alvarado, M.D.

not quite as stable.  So now when that neck hits the head we are seeing frank dislocation, which we already saw.

Q.  Okay.  And would the impingement be in the same area on the femoral -- on the Summit stem?

A.  You know we changed the head, so not -- not -- potentially it could be at a slightly different location but same concept.

Q.  And you note that the alternative now is to go to a constrained liner?

A.  Yeah.

Q.  You say there are some fallbacks in this treatment plan; however, she is fairly young, and the possibility of wear on the constrained liner is significant.  What's the wear specifically you were referring to there as a risk?

A.  So constrained liner is the liner that locks the head into the cup, all right.  And it -- there's a lot of stress at the junction between the liner and the cup, so it can wear out faster than say an unconstrained liner which doesn't have those forces working at that interface.

Q.  And you note here in your addendum that you described some of the risk of the constrained liner and the revision that you were contemplating,

which includes loosening of the implant, implant

wear, fracture, recurrent dislocation, need for

further surgery in the future, neurovascular injury

and medical complications; is that right?

A.    Sounds about right.

Q.    Implant wear, is that poly wear?

A.    Poly wear is certainly the most common

form of implant wear we see.  But the other -- the

other issues with the trunnion and, you know, the

remainder of the implant still exists.  But

certainly polyethylene wear in the setting of

constrained liners and once again failure of that

constrained interface is what I was referring to.

Q.    And the discussion you had at this point

was to most likely take out the DePuy stem to match

it with a Stryker constrained liner that you were

putting in?

A.    Um-hmm.

Q.    Is that right?

A.    Yeah.

Q.    Yeah.

A.    I mean you can switch the cup.  So I

switched the liner and still marry it as long as

it's the right size.  But I forget -- I forget

which surgery I took the stem out.  I'd have to

Carlos Miguel Alvarado, M.D.

review my notes.

Q.   Yes, let's talk about that one.  I hand you what was previously marked as Exhibit 24, which is your February 17th, 2017 operative report.

A.   Um-hmm.

Q.   And on the -- on findings on the second page you said there was significant wear on the trunnion.  And again, that wear that you observed in this surgery is the same DePuy Summit stem --

A.   You got it.

Q.   -- on the 36-millimeter ceramic head?

A.   Yes, sir.

Q.   Okay.  And the notching on the neck, if we go back to -- sorry, go back to Exhibit 54, that's a picture of --

A.   Yep.

Q.   -- the Summit stem and the notching?

A.   Yeah.

Q.   And this was the surgery where you removed the Summit stem, correct?

A.   You got it.

Q.   You go on to state in your findings: There does not appear to be any areas of metallosis or metal debris, other than a slight darkly colored area of tissue lateral to the shoulder of the

Carlos Miguel Alvarado, M.D.

femoral stem?

A.    Yeah.

Q.    So exactly where --

A.    Where is that?

Q.    Where is that located?

A.    All right, so if you stick this stem inside of the femur, this was where the greater trochanter is, the lateral aspect of the femur, the tissue in between, the greater trochanter and the stem is what I'm talking about.

Q.    All right, thank you.  You go on to state:  No purulence, no fluid collections.  What does that mean?

A.    No purulence means no pus, no visual signs of information.  And no fluid collections mean just that.  I didn't open up the joint and see a bunch of fluid this time.

Q.    You say the fascia did have a fairly strange appearance?

A.    Yeah.

Q.    Did not appear as normal scar but rather rubbery in nature.  I assume this is associated with her underlying Ehlers-Danlos Syndrome.

And what specifically did you mean there when you say 'a fairly strange appearance'?

A.   That's what I mean.

Q.   When you say strange, was it color --
discolored?

A.   No, it was -- it was a pale color that
fascia typically is.  Fascia is typically a shiny
white.  But it almost looks like a canvas
leather -- a stretched canvas and even feels like a
stretched canvas.  So as you cut it, it's thick.
It has give, and as you cut it, it tends to pull
away a little bit.

And in her situation it was a
rubbery white color with a very compliant as
opposed to being this taut canvas.  As I cut it, it
doesn't fall away from the incision.  It was like a
rubber.  It was interesting.

Q.   Okay.  Is that something in your clinical
experience you had seen before?

A.   No.  No.

Q.   And later on down on your description of
operative procedure you note that the femoral head
was removed.  It was in good condition.  Other than
the one area of slight flare, most likely due to
the previous documented dislocation?

A.   Yep.

Q.   Okay.  And the hip stem had slight wear

Carlos Miguel Alvarado, M.D.

on the trunnion.  That's the femoral stem?

A.   You got it.

Q.   And it says:  Also would not treat.  The femoral neck appeared to be due to posterior impingement?

A.   Yep.

Q.   I think you're referring to the indentation?

A.   The notch, yeah.

Q.   Okay.  And slight wear on the trunnion is not unusual?

A.   No.

Q.   If you go to the next page, for this procedure you implanted a Stryker Restoration Modular stem?

A.   Yep.

Q.   And that's a two-part or two-component stem?

A.   Yes.

Q.   And then you also implanted a Stryker LFIT femoral head?

A.   Yes.

Q.   And is that a poly head?

A.   Hold on.  Yeah, it was a constrained liner with a Stryker constrained liner with a 22

Carlos Miguel Alvarado, M.D.

plus 3 head.  So 22.  That would be a cobalt-chrome head.

Q.  The LFIT --

A.  LFIT, where are you seeing that?  I'm not sure.

Q.  That's on the -- yeah, I'm sorry.  Let me just mark this, because it's not in your notes.

(Exhibit 64 was marked for identification.)

Q.  I am going to hand you what's been marked as Exhibit 64.

A.  Got it.

Q.  That is --

A.  Yeah, so a V40, 22 plus 3 head.

Q.  Sorry, let me ask you first.

So Exhibit 64, those are the implant stickers that are removed during the procedure, correct?

A.  Yeah.

Q.  And the sticker is taken off the box.  The box is opened and placed into the surgical arena, correct?

A.  Correct, yes.

Q.  And this, the stickers here confirm what you just said, you used a Stryker constrained

liner, a Stryker Restoration stem --

A.   Um-hmm.

Q.   -- and a Stryker LFIT V40 femoral head?

A.   You got it.

Q.   And the Stryker femoral head was cobalt-chrome?

A.   I believe so.  A 22-millimeter head are typically cobalt-chrome.

Q.   And based on your concerns of metallosis, what was your thinking of putting back in a cobalt-chrome head?

A.   The problem is there is no ceramic equivalent.  So we were in a tough spot where she's already failed the Dual Mobility head.  We talked about going back in with that, which was a failed experiment.  She failed a unconstrained standard ceramic head.

So the only way for me to keep this hip in place is to use some type of constraint.  22 heads only come in cobalt-chrome. So let's go to another company.  Zimmer, Freedom constrained liner only comes in cobalt-chrome. DePuy, they have a constrained head, and I would have had to rip out a well-fixed acetabular component to go there.  So it just -- I don't want

Carlos Miguel Alvarado, M.D.

to do that, but there's no other option.

Q. Right.

A. Or I could have put back in a Dual Mobility, which we talked about that. We talked about the options, and the problem was there just wasn't any other, you know, possible implant combo to completely avoid cobalt-chrome, given what she already had in there.

Q. Okay.

A. And what I had available to me.

(Exhibit 65 was marked for identification.)

Q. I hand you what's been marked as Exhibit 65, which is the discharge summary --

A. Yeah.

Q. -- from February 17, 2017. And you note there that the patient had a Dual Mobility cup in place?

A. Yeah.

Q. However, it had a diffuse stem married to a Stryker cup?

A. Yep.

Q. Most likely had transient mismatch, which resulted in this metal debris with soft tissue destruction. I just wanted to confirm that that

mismatch was just a mistake, based on your

assumption it was a different head on the stem?

A.   Yeah, I think I'm still not comfortable saying exactly where metal ions came from.  But my early assumption that it was -- that the fault was in a mismatched company head to trunnion is inaccurate.  And I think you've demonstrated that, and I agree 100 percent.

Q.   And I want to make sure when you said here transient mismatch here, that's what you're referring to?

A.   Yes.

Q.   All right, thank you.

MR. ASFENDIS:  That was it for that one?

MR. EATON:  Yes.

(Exhibit 66 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 66.  This is another path report from the February 17th, 2017 revision surgery.  And again, if you can explain to us, it says final diagnosis, what that means here on the path report?

A.   So I sent them a specimen.  It says pseudocapsule right hip, right femoral head liner

Carlos Miguel Alvarado, M.D.

and stem.  Final diagnosis of pseudocapsule says fibrovascular tissue with pigment.

Q.   What does that mean?

A.   Scar.

Q.   At least based on this path report, there's nothing consistent with metallosis?

A.   No, no.  This is -- well, and we didn't really see much -- you know, in the surgery it looked fairly clean.  Her issue on this one was instability.  And on the right femoral head and liner, you know, it says orthopedic hardware and that's not helpful for anybody.

Q.   Did the Rouvieres tell you they wanted to take possession of the components that you explanted?

A.   Yeah.

Q.   And was that true for each of the subsequent revision surgeries that we'll talk about?

A.   Yes.

Q.   Did they tell you why they wanted to take possession?

A.   It's not an uncommon thing.  I don't know.  I didn't -- I didn't search for the reason. But it's their stuff; they are allowed to have it.

Carlos Miguel Alvarado, M.D.

Q.   Right.

(Exhibit 67 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 67.  Exhibit 67 is your clinic office note, dated April 13th, 2017?

A.   Um-hmm.

Q.   So at this point under your assessment and plan, Mrs. Rouviere is -- it says that she feels more stable on her right hip.  She can't fully extend right hip during walking but has no pain when doing so.  So at this point her right hip is improving?

A.   Yeah.  Improving, um-hmm.  She was how far out from surgery here?

Q.   So surgery was on February 17th.  She's about a month post surgery?

A.   Yeah.  So she's still certainly within the kind of the shadow of her surgery but recovering.  Um-hmm.

(Exhibit 68 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 68.

A.   Yeah.

Carlos Miguel Alvarado, M.D.

Q.   Which is a lab panel, date collected May 12th, 2017.  So you had another metal test done, and it shows her cobalt was .9?

A.   Um-hmm.

Q.   And again, that's below the 2.2 that you indicated earlier was the guideline for where a problem may --

A.   Yeah, 2.5, and --

Q.   I'm sorry, 2.5?

A.   -- yeah, that's typically what we use as a red flag.

(Exhibit 69 was marked for identification.)

Q.   So her level, at least at this point, was below any kind of red flag or concern?

A.   Typically, yes.

Q.   All right, I hand you what's been marked as Exhibit 69.  This is an office clinic note, dated May 18th, 2017?

A.   Yep.

Q.   You say:  Was revised to constrained liner as patient at the time refused the MDM head?

A.   Right.

Q.   And what did you mean by that?

A.   Well, in our preoperative discussion, you

know, the tools at my disposal to improve stability would be to go back in with the head that she had at the start, right, with a change in the acetabulum -- or I'm sorry, with the femoral component or the step up in constrained is a constrained liner.  So you either go bigger to improve -- achieve stability, or you can lock it down with a constrained liner.  Given her failed experiment with the constrained liner we basically -- she had lost trust in that implant, also --

Q.   With the MDM head you mean?

A.   With the MDM head.  Also she had a significant amount of pain with that implant.  So when I said here are my options, she said I don't want to redo that.  So the next -- the other option is to do the constrained liner, which is what we did.

Q.   And your note goes on to say:  At this point has worsening pain.  Metal ions are trending up from .6 now to .9?

A.   Yeah.

Q.   So that cobalt level we just looked at .9 had trended up from the earlier .6.  And was the only source of cobalt-chrome the femoral head at

Carlos Miguel Alvarado, M.D.

this point?

A.   The only obvious source, yep.

Q.   Later in that same paragraph you state that:  I think one of the issues was the cup was anteverted in order to provide her with maximal stability?

A.   Um-hmm.

Q.   And certainly not a level of anteversion I think is inappropriate.  However, given her flexibility, she has impingement posteriorly and now had anterior instability.

So she's having that same impingement problem?

A.   Well, this was a discussion from the -- you know, this was kind of the synopsis from the start.  Previously that was -- that was -- she doesn't have instability anymore, but now she has limited range of motion.

Q.   Yeah.

A.   That's the side effects of a constrained implant is that it only bends so much.  So it has, depending on the company, a 70 to 110 degree arc.  And Stryker's constrained liner usually maxes out about 90 degrees.  So cup position kind of gets you at your starting point.  And that's in the previous

Carlos Miguel Alvarado, M.D.

note where I said she's having trouble extending the leg much, that's because she's maxing out, right.

Q. Yeah. You go on to state: While the constrained liner certainly does resolve this issue, it still puts her at risk of metal ion debris?

A. Um-hmm.

Q. And then you go on to note that: The most reasonable construct would be -- this is what you said earlier -- a well-positioned acetabular component with a Dual Mobility femoral head?

A. Yeah.

Q. Okay. And then you note this would also minimize any chance of metal ions?

A. Yeah.

(Exhibit 70 was marked for identification.)

Q. Exhibit 70 is a copy of your consultation notes in connection with the revision surgery that you were planning. And if you go to the second page, the first paragraph there you note: Given her young age, I've tried to hold off on surgery at every possible interval --

A. Um-hmm.

Carlos Miguel Alvarado, M.D.

Q.   -- however, with her current quality of life the patient is very unhappy.  I had lengthy discussion about treatment options, including continued observation versus a Girdlestone versus revision of acetabular.

So this is one of the first times you've referenced the Girdlestone.   What do you mean?  Explain the Girdlestone procedure.

A.   The Girdlestone is removal of all implants from the hip, leaving it basically empty.

Q.   And is that typically done on more elderly patients?

A.   It's not typically done on anyone. Historically it was used for management of bad infections, sometimes in the setting of significant fracture.  But it's a -- it's not something that's typically done all that much, which is why there was a lot -- there was a lot of discussion.

Q.   Right.

A.   You know, the problem was all -- at this point we had tried several different combinations of implants.  Her systemic -- systemic symptoms, pardon me, it's difficult, hasn't really improved. We had small honeymoon periods after surgery when say there was a bulk debridement of the soft tissue

Carlos Miguel Alvarado, M.D.

in the area, but then a couple months later we'd be in the same spot.

Q.   Okay, and down at the bottom of that page you note:  The patient has requested removal of all metal implants, specifically cobalt-chrome implants.  This will require removal of the constrained liner.

So here you were removing the constrained liner, going back to the MDM --

A.   Well, the problem is MDM still has cobalt-chrome, so we would have to go back to a primary head, and that has already proven to fail on her.  And given her underlying medical issues, specifically the Ehlers-Danlos, you know I think the likelihood of that construct being successful was very small.  And we talked about that, too.

Q.   Okay.  But that small likelihood of success was better than proceeding with the Girdlestone at this point?

A.   In my mind, yes.

Q.   Okay.  I show you what has previously been marked as Exhibit 25, which is your operative report from May 23rd, 2017.  And you note here what you just confirmed, that the plan in this surgery you removed the constrained liner, revised the

Carlos Miguel Alvarado, M.D.

acetabular component and went back to the MDM liner?

A.   Yes, correct.

Q.   You implanted a -- on the second page it says a 54-millimeter titanium revision cup?

A.   Yep.

Q.   And then under description of operative procedure you note that:  The acetabular component did demonstrate some signs of posterior impingement --

A.   Right.

Q.    -- which had been noted previously, however there were no signs of metal debris?

A.   Yeah.

Q.   So just so we're clear then, like what you found in the November 2016 surgery, here the acetabular component again was impinging with the Stryker Restoration stem?

A.   Yeah, so this -- this wouldn't be impingement on the acetabular component per se.  It would be impingement on the plastic extension.  So the liner, the way it works is it sticks out beyond the rim of the cup and locks around the ball.  So it sticks out about 5 millimeters, so that's where you're going to hit.  And that's why the flexion --

Carlos Miguel Alvarado, M.D.

flexion/extension is limited.

Q.   And so where you say there's some signs of posterior impingement, just making sure I know which component that is.  That's on the Restoration stem, at least the proximal portion that you removed?

A.   Yeah, you might see some -- I don't recall what it looked like.  Let me just read my note here.

Okay, usually what I do is take the hip through range of motion before removing any implants to see if I can identify a kinetic issue with the implant.  So if it impinged, that's when I'd see it.  But once again, with this construct of a Res mod on a constrained liner, it wouldn't -- it wouldn't be femoral neck on cup.  It would be femoral neck on constrained liner, so that's metal with plastic, which probably isn't going to gouge anything out in the metal.

Q.   Okay.

A.   Though you might see it with your own eyes.  You take the hip through range of motion, and she felt it and described it in her first follow-up visit in which she said I can't extend my leg all the way.  So yeah, that's hitting back

Carlos Miguel Alvarado, M.D.

there, which is typical of constrained liner.

That's why patients hate them, they can't move all

that much, but that's what keeps their hip in place

without popping out.

Q.   And then you revised or replaced the

proximal or top portion of that --

A.   Correct.

Q.   -- MDM Restoration stem?

A.   Yes.  And the cup.

Q.   And the cup.  The impingement that you

noted here, again was that at least in part due to

the Ehlers-Danlos Syndrome?

A.   No.  I mean no, this impingement here is

impingement on the -- so I'm not talking about any

functional.  I'm just talking about purely taking

the hip through range of motion.  And once again,

impingement is common in the setting of a

constrained liner.

Q.   Okay.

A.   You know, that's a result of just the

geometry of the implant.  In order to lock that

head down, you have to grab it.  In order to grab

it, you have to build something that comes out of

the cup and closes around it.  So that's just a --

it's a result of the geometry of the construct.

Carlos Miguel Alvarado, M.D.

(Exhibit 71 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 71.  This is another office clinic note.  This one is dated August 10th, 2017.

A.   So this was after --

Q.   So this is --

A.   -- the second -- the third surgery?

Q.   -- just about three months after the third revision?

A.   Got it.

Q.   So the operative note we just looked at was May 23rd, 2017.

A.   Yep, thank you.

Q.   So under assessment plan, it says: Patient labs review for metal allergy showing elevated cobalt levels, however certainly within normal limits.

A.   Um-hmm.

Q.   On examination the hip itself moves quite nicely without any pain.  The source of this patient's overall anxiety, discomfort, chills is very unclear.

And when you say anxiety, discomfort and chills, what did you mean by that?

Carlos Miguel Alvarado, M.D.

A.    Just her subjective complaints.  So if you look back to the history of the present illness -- let me see.  Patient feels today not well.  She feels a decline with her body sensitivity and is being tested for metal sensitivity to confirm and rule out -- and rule that out.

So basically what she was telling me was that she was having chills, pain.  She complained of a subjective rash at times, weakness, anxiety.  A lot of things that typically as a hip and knee surgeon, you know, I don't see in my patient population.

Q.    And you go on to note that:  The patient is currently undergoing workup for metal allergies, including titanium which is exceedingly rare?

A.    Yes.

Q.    Did you later confirm that the titanium level in her blood was a non-detect?

A.    I don't recall the lab workup.  I know we did a send-out on several times to a lab to test specifically for metals.  I don't recall what the level was.

Q.    I'm going to show you what's been previously marked as Exhibit 30, which is lab work

Carlos Miguel Alvarado, M.D.

from Body Science.  It's a MELISA allergy test?

A.   Yeah.

Q.   And those cobalt, chromium and titanium were all nonnegative?

A.   Nonreactive.  Yeah.

Q.   And I am going to show you what was previously marked as Exhibit 31.  This is a titanium blood level test from September 1st, 2017, and does it -- it confirms non-detected?

A.   It sure does.  Yep.

Q.   Then you go on here, Dr. Alvarado, to talk about the difficulty with the Girdlestone. And I just want to understand a little bit more about your discussions with Mrs. Rouviere, and specifically what did you share with her about her patient health moving forward after a Girdlestone?

A.   So firstly, I talked about a Girdlestone in her situation, which is a patient with Ehlers-Danlos.  And I said I didn't know how she would do with it.

Girdlestones have been around a long time.  And I've seen patients with them go on to live happy, healthy productive lives.  In fact, they can walk just fine.  It takes awhile, and what has to happen is a very robust ball of scar around

Carlos Miguel Alvarado, M.D.

that hip, stabilizing the position of the hip, basically sticking it to the side of the pelvis. There's no ball, there's no socket. You remove all that.

So in patients that develop standard scar tissue, after about a year they can usually start to walk on it, things like that. Usually it's with a notable leg length discrepancy, meaning the leg is a lot shorter. So they need a specific shoe buildup to equalize the legs. And typically there's not a ton of range of motion, but you know, people can get by. They figure out how to do all kinds of stuff.

In her situation, with Ehlers-Danlos and what I've seen intraoperatively with the way her body develops scar, I was worried. And I said that several places in my note. Because it is a difficult recovery, and you do have to rely on the body to scar in if it's going to be a functional limp. If the body doesn't scar in, if the top of the femur doesn't scar in and it remains highly immobile, it can also be a source of discomfort.

It can be disconcerning when you feel the bone moving against the other bone. It is

Carlos Miguel Alvarado, M.D.

certainly not -- I've never experienced it, but I imagine it's fairly uncomfortable.  And in the best circumstances it would take probably about a year before she's -- before this Girdlestone is mature and ready to attempt a weight bearing on it.

Prior to that usually patients are managed in a brace, which she's been put in the past and did not like.  Most people don't like that brace.  We usually put them in a brace just to provide them with some sense of stability.  And we do protective or gentle weight bearing that usually requires a walker or some type of assistive device or something of that nature.  So it's not an easy road.

Q.   Yeah.

(Exhibit 72 was marked for identification.)

Q.   I hand you what's been marked as Exhibit 72.  This is a clinic note, dated September 14th, 2017.  And if you go to the third page, this is a follow-up to the discussion that you just had.

You state here:  Patient has been evaluated by multiple allergists, and we have not been able to isolate any specific metal sensitivities.

Carlos Miguel Alvarado, M.D.

A.    Um-hmm.

Q.    With regard to her metal ion levels, she still does have slight elevation in her cobalt and chromium levels.

At this point you had at least confirmed that there were negative MELISA tests and non-detect on titanium, correct?

A.    You got it.  Yes.

Q.    Patient has also been evaluated by multiple other medical professionals, including a toxicologist.  I've had the pleasure of having several phone conversations with her.

Did you have any phone conversations with the toxicologist referred to here?

A.    Yeah.

Q.    And who was that?

A.    I don't recall, I'll be honest.

Q.    Male or female?

A.    It says her, so --

Q.    Okay, I didn't know if that was Jodi or the toxicologist?

A.    No, the toxicologist.  Yeah, we -- you know, it was someone that had reviewed her labs.  I don't recall if Jodi actually saw -- had a clinic

visit with this person, but I basically gave her

the same information that I gave you, which is her

clinical history and what I saw.

Q.   You go on to note:  Jodi's wish at this

point is to have removal of this hip implant that

she feels that the metal ions shed from the implant

are causing systemic damage.

You didn't make a determination or

a conclusion about whether or not her symptoms at

the time were related to metal ions, correct?

A.   I mean at the time -- there is one other

that I think is a notable piece of information

here.  And we've seen all her blood tests and we

see her metal ion levels.  But just on her basic

CBC, just her basic lab tests that I'm sure that's

in this pile of papers somewhere, on every test she

had very significant eosinophilia.  Eosinophilia,

which we see only usually in patients that are

atopic, which means hypersensitive to begin with or

that are experiencing some type of allergic

reaction.  And I never got an explanation for why

she had this.

But as we trended labs after, you

know, after removing metal components, this

improved.  So this is all hindsight now.  And when

Carlos Miguel Alvarado, M.D.

I wrote this, clearly I was on team keep your hip.
I mean that's what I do every day.  I use lots of
companies, including yours, every single day, and I
believe in it with my whole heart.

Q.   Right.

A.   But in this case I don't know what the
heck was going on.  And we had tried just about
everything, to the point where I understood and
was -- as I go onto say, she's an adult, an
intelligent woman of sound mind, who is telling me
this is what's causing her problem.  Now every
single moment of my training is to go against what
she's telling me.

Q.   Right.

A.   All of my labs, except for this
eosinophilia, are aligned with your hip's fine.
But she's sitting in front of me telling me that's
not the case, and I believed her.

Q.   And in the next note you say:  While I
have been able to identify any concrete evidence of
the patient's subjective reports are quite
troubling.  I think that's supposed to say while I
have not been able to identify?

A.   Correct, yeah.

Q.   So while I have not been able to identify

Carlos Miguel Alvarado, M.D.

any concrete evidence, the patient's subjective

reports are troubling.

And the subjective reports are

what you identify earlier, weakness, chills,

shaking, is that right?

A.   Um-hmm.

Q.   Yes?

A.   Pain.  Yes, pardon me.  Yes.

Q.   Later on you note what you just testified

to, is that you informed her I could not predict

how her soft tissues would perform given the fact

she has a history of Ehlers-Danlos?

A.   Correct.

Q.   And you discussed all those risks with

Mrs. Rouviere and Mr. Rouviere, and they decided to

proceed with the Girdlestone, correct?

A.   That's correct.

Q.   I hand you what's been previously marked

as Exhibit 27.

A.   Okay.

Q.   This is your operative report from

October 3rd, 2017.  In the middle of that first

page you say:  Patient was concerned for

re-emergence of a metal allergy.  I explained this

was fairly unlikely, given the fact that she had a

Carlos Miguel Alvarado, M.D.

titanium stem, and only one area of cobalt-chrome

was the liner for the MDM head?

A. Yep.

Q. And you explained that to her?

A. Yes.

Q. You go on to state:  She was examined --

evaluated by multiple doctors, including

allergists, psychiatry, toxicology, and the

prevailing thought was she may in fact be having an

adverse reaction to the -- it says medical, I think

that's supposed to say metal -- however, it was

difficult to get any concrete proof of this.

A. Yes.

Q. Is that accurate?

A. That's accurate.

Q. I go back to Exhibit 59, which we marked

earlier.

A. Yep.

Q. This is a follow-up note, a clinic note,

dated December 6th, 2018.  And you note there that

she continues to have some pain.  However, still

very happy with her decision as all of her systemic

issues due to the metal ions have resolved

completely per the patient's report.

So she reported to you that those

Carlos Miguel Alvarado, M.D.

subjective complaints that we talked about earlier

had resolved?

A.   Yes.

Q.   Okay.  Have you had any meetings or

telephone conferences with any of the scientists or

physicians that Mrs. Rouviere has talked to over

the last three years?

A.   Other than the documented discussions

with the toxicologist -- granted I didn't document

the details of that.  I don't really recall them

either -- I have not.  Nothing formal.

Q.   All right.

A.   No.

Q.   Okay.

A.   I think I did speak to -- no.  Nothing

pertaining to the hip.  I spoke to one spine

doctor, but that's all.

Q.   Do you remember who that was?

A.   No.

Q.   Okay.  I'm going to hand you what's been

previously marked as --

A.   Oh.

Q.   Go ahead.

A.   She sent the implant I think to a lab in

the U.K.  And I don't recall if I actually spoke

Carlos Miguel Alvarado, M.D.

with anybody, but I think I was included on some

emails back and forth.

Q.   Do you remember e-mailing with Dr. David

Langton?

A.   I don't recall, but I think he is the

metal specialist there in the U.K.

Q.   I'm going to hand you what's been

previously marked as Exhibit 43, and that's a

collection of emails between you and Jodi Rouviere.

A.   Yeah.

Q.   All right.  And is it -- and Exhibit 44

is a -- Exhibit 44 is a collection of your text

messages with Jodi Rouviere that's been produced?

A.   Sure.

Q.   So my first question is, is it common in

your practice to have this extensive email and

texts with a patient?

A.   Patients that have issues, yes, fairly

common.

Q.   All right.

A.   Yeah.

Q.   So if you look at Exhibit 44, the text

messages, on the second page there's a text that is

dated July 14th, 2017.  And here Jodi Rouviere

shares with you the conclusion of David Langton.

Carlos Miguel Alvarado, M.D.

Do you see that?

A.   Yes.

Q.   Okay.  She says this is what he said.  It seems quite clear what has happened.  The titanium stem has hit repeatedly against the outer edge of the cup --

A.   Um-hmm.

Q.   -- the titanium stem has worn away, released a lot of metal debris into your hip issues -- hip tissues.  This is not a product defect. This is a problem with the position of the implants.

A.   Um-hmm.

Q.   All right.  Did you talk with her about Dr. Langton's conclusion?

A.   Oh, yeah.

Q.   All right.  And did you agree with his conclusion?

A.   Yes and no.  I mean it's easy for someone sitting somewhere to look at an implant and say it's a problem with the implant but -- or it's a problem with the cup position.  But if you haven't actually seen the imaging studies, if you haven't examined the patient, then I would take any advice by a doctor that doesn't now do surgery, any

Carlos Miguel Alvarado, M.D.

surgical advice with a very large grain of salt.

Yes, there's etching on the implant.  We know that.  Yes, we saw evidence of titanium debris, cobalt-chrome debris.  But I don't think it was that simple.

Q.   Because you confirmed the position of the implants from Dr. Buly and then from your procedures was appropriate?

A.   Yeah.

Q.   Okay.  And then going to the emails, Exhibit 43 --

A.   Um-hmm.

Q.   -- there's a reference, I have a post-it there.  Mrs. Rouviere sent you a report from a Dr. Stephen Tower?

A.   Um-hmm.  Yeah.

Q.   Do you know who Dr. Tower is?

A.   Yeah, yeah.  I mean, he created quite a splash with a documentary that he was on.  And I spoke to him not formally.  It was at the American Academy of Orthopedics, must have been 2018 maybe, where he had a poster presentation on neurologic effects of metal ions basically, which is still a concept that is very new to us as a group of doctors.  Still something heavily argued over for,

Carlos Miguel Alvarado, M.D.

and he is probably one of the few guys around saying that this phenomenon exists.

Q.   Exists.

A.   And for that reason, you know, at conferences like the American Academy, it's not -- it's not -- it currently isn't an idea that a lot of people share, you know.

Q.   It's not necessarily generally accepted at this point?

A.   Correct.  You know, and the reason we came in, like said, it wasn't anything formal.  I was at the poster actually with my wife, who is an orthopedic surgeon, and I said holy cow, look at this.  And as I told you, I -- it's an ongoing problem -- that's not the right word, but I get a lot of texts from patients because I will share my personal information with them if I think they need it.  And so you know, not that my wife as an orthopedic surgeon has actually met Jodi and members of her family in the capacity of a doctor. So we're -- she's familiar that I'm treating her, and that it's a tough case.  And in that effect we were discussing the poster, and Dr. Tower was standing behind me.  And so then I said, oh, you know this patient.  You have been emailing or

Carlos Miguel Alvarado, M.D.

something to that effect.

Q.   Yeah, right.

A.   And he knew, and he says oh, you're Dr. Alvarado.  I said yes, I am.  And then I said --

Q.   Did you discuss her case at all?

A.   Just to the poster was there, so many of her symptoms, which you know, skin manifestations, anxiety, confusion, things of that nature, she complained of the same.

Q.   Yeah.

A.   So that's, you know, it wasn't an in depth discussion of the case.  It was -- it happened to be in earshot as I was looking at his poster that he published at the American Academy of Orthopedics.

Q.   And just to be clear, his poster was not a case report on Jodi Rouviere?

A.   No, no, no.  I believe -- if I remember correctly -- and please, this may not be correct, he had something around 20 patients with similar -- similar issues.

Q.   Okay.  Part of the email was Exhibit 37, which is a three-page report that Dr. Tower sent to Jodi Rouviere.  Did -- when you met with him, with Dr. Tower, did you discuss his findings at all?

Carlos Miguel Alvarado, M.D.

A.   No.

Q.   Okay.  If you go to the second page of that report.  When you received Dr. Tower's report from Jodi Rouviere, did you review it?

A.   I don't recall.  I mean if she gave it to me, then I read through it.  But I don't remember. I can't quote it for you, if that's what you're asking me.

Q.   No, just if you recall discussing it at all, if reviewing it and discussing it with Jodi?

A.   Yeah.

Q.   Did you discuss it with Mrs. Rouviere?

A.   I don't recall.

Q.   Okay.  The second page, the third full paragraph --

A.   Yeah.

Q.   -- he says:  It is possible that the titanium metallosis played a role in the problems at the hip, but with a degree of metal staining on your intraoperative photos and the damage noted on the photo of your femoral stem, I would not have expected it to cause systemic problems.

Do you agree with that statement?

A.   Once again, I've -- it was hard for me to believe anything from this case from the get-go.

Carlos Miguel Alvarado, M.D.

So yeah, all I have for me is the subjective complaints of my patient, and the -- and the now objective finding and that after removal of the stem those symptoms have it disappeared.

I would agree with that statement typically.  You know, typically I would.  Typically I would say titanium doesn't cause any systemic issues.  But here we are.

Q.   And other than Jodi Rouviere, have you had any patients since 2014 where titanium has caused the kind of nonspecific subjective symptoms that she had?

A.   No.

Q.   No?

A.   No, I have not.

Q.   In the paragraph above that he notes that:  EDS is a confounding factor, and I can think of no way to prove that metal debris had a major role in the problems of the hip.  You agree that EDS is a confounding factor here?

A.   I'm not an expert on EDS --

Q.   Based on your --

A.   -- but I wouldn't disagree with the guy that wrote the paper on it.

Q.   When you say 'the guy that wrote the

Carlos Miguel Alvarado, M.D.

paper on it' --

A.    (Pointing.) Dr. Tower.

Q.    Dr. Tower, okay.

You wouldn't disagree with him that EDS is a confounding factor here?

A.    Correct.

MR. EATON:  All right, off the record for a second.  Take a short break, and I think I'm done.

THE VIDEOGRAPHER:  11:35 a.m. We're off the record.

(Off the record.)

THE VIDEOGRAPHER:  The time is 11:39 a.m.  We are back on the record.

BY MR. EATON:

Q.    One follow-up question, Dr. Alvarado. The emails and texts with Jodi Rouviere, she refers to a lawsuit that she's filed against DePuy and Stryker?

A.    Um-hmm.

Q.    You're aware that she's filed a lawsuit?

A.    Yeah.

Q.    Have you --

A.    Other than that, I don't know anything about it.

Carlos Miguel Alvarado, M.D.

Q.   All right, so you haven't had any discussions with Jodi Rouviere or Andre Rouviere about the claims in their lawsuit?

A.   No.  I tried to make that as clear as possible from day one.  And to anyone who asks me, I would rather not be involved in any of this stuff.  I am happy to give my account in treating my patient, and that's about it.

MR. EATON:  Okay, all right. Thanks for your time today.  Appreciate it.

THE WITNESS:  Thank you.

EXAMINATION

BY MR. ASFENDIS:

Q.   Okay, good -- I think we are still morning, Dr. Alvarado.  I represent Howmedica Osteonics Corp.  I've just got a couple of follow-ups, and as I said, it should be five minutes or less, and I am going to try to stick to that.

In the November 2016 revision surgery, so that's the first revision surgery, did you notice any abnormal wear or significant wear on the MDM liner or insert components?

A.   No.

Q.   And you had mentioned way back at the

Carlos Miguel Alvarado, M.D.

beginning of the deposition that as far as modular

Dual Mobility systems, like the MDM, they can --

the only way there might be any issue with metal is

if they are not inserted properly or they come

loose, do you recall that?

A.   I said that in the cases I've seen with

metallosis in the situation of an MDM head, usually

it's an insertion problem with the liner.  I

definitely won't say that that's the only time that

we're going to see metal ion issues, because

anything is possible.

Q.   Understood.  So in this case though, when

you removed the MDM in November 2016, did you

notice or was there any finding that was not

inserted properly?

A.   So typically when it's not inserted

properly it's fairly loose at time of removal.  It

was not loose.  And then the other thing we'll say,

it's a taper, so it needs to be symmetric on the

cup when you put it into position.  And sometimes

you'll see it's skewed one way or the other, if

there's poor visualization when it's being put in.

I did not see that either.

Q.   Okay.  So as far as you can tell the MDM

was inserted and positioned properly, correct?

Carlos Miguel Alvarado, M.D.

A.   Correct, yes.

Q.   You yourself continued to implant Stryker MDM systems on occasion you said?

A.   Yep.

Q.   When is the last time you implanted an MDM?

A.   Two weeks ago.

Q.   Now, you had mentioned back in -- so for the May 2017, that's the third revision --

A.   Um-hmm.

Q.   -- that is the one where you took out the constrained liner and put in the Stryker MDM again.

A.   Got it.

Q.   You mentioned in the report metal ions, cobalt-chrome was trending upwards from .6 to .9?

A.   Correct.

Q.   Are you able to -- is there any clinical complaint or manifestation that you can attribute to that increase from .6 to .9?

A.   We have no idea what the numbers mean.

Q.   Okay.  The last thing is you had mentioned in connection with that same surgery, I think it was in the report, that using the MDM system would minimize I guess the source of metal ions.  Can you tell me what you meant by that?

Carlos Miguel Alvarado, M.D.

A.   It would -- it would allow for stability and remove the cobalt-chrome head.  So with the constrained liner we have a cobalt-chrome head, which we're trying to get rid of cobalt-chrome, right.  But with an all-ceramic head we ran into instability issues.

The Dual Mobility construct would allow us to have the larger head.  We would still have cobalt-chrome, but it would be in a liner as opposed to the, you know, the trunnion head interface, which we already know has been troublesome.

The cobalt-chrome shedding from the Dual Mobility liner is something that we talk about, but we haven't been able to really document it in the literature.  We have documented issues with metal head trunnion interfaces and just with metal heads in general where we could see shedded ions from those interfaces.

Q.   Now, with the MDM, the cobalt-chrome component, nothing articulates against that cobalt-chrome component, correct?

A.   Well, the polyethylene head, it's a hard on soft interface, so -- so the problems that we've had is with hard-on-hard, right, metal-on-metal.

Carlos Miguel Alvarado, M.D.

And there is a cobalt-chrome on titanium interface behind it, which is why it's very important to get that thing lined up properly.

Q.   And the cobalt-chrome titanium interface, that is static right, doesn't articulate?

A.   Right, doesn't.

Q.   It's just the hard on soft with the poly?

A.   Right.

Q.   Last question was, so going forward, if Miss Rouviere decides -- was able to find a hip replacement device that she would accept into her body or at least try, is her body still capable of going a -- undergoing a hip replacement procedure?

A.   Yes.

Q.   It is?

A.   It's not an easy one, but absolutely.

You know, the problem is we don't have any nonmetal hips, right.  There is one company in Europe that tried to manufacture it made out of gold, true story.  There has -- there are people that have looked at diamond interfaces believe it or not, because that's a nice hard on hard that doesn't create ion wear.  It's carbon. Obviously cost prohibitive.  There are other companies I think, you know, things in the works

Carlos Miguel Alvarado, M.D.

that potentially looking at nonmetal, but it doesn't exist yet.

So I think at some point if we can find something that works for her, yeah, I put hips back into people that have been fused surgically for over 20 years.  You can do it, it's just hard.

But I don't know if I'd be willing to start this dance all over again, unless we can prove to everybody involved that she doesn't have an allergy or some type of adverse reaction or something that her body is doing to this metal implant because of the risk of repeating an experiment that's already failed.

Q.   Well, but she still has hardware in the spine, correct?

A.   Yes.

Q.   Does the presence of the hardware in the spine and the fact that her subjective complaints have apparently resolved tell you that maybe she doesn't have this allergy?

A.   Well, not my area of expertise.  But she has a fusion plate, which is a much smaller volume of metal in a nonmobile joint, right.  So the likelihood of shedding ions from that, from a fusion plate on the front of the cervical spine is

Carlos Miguel Alvarado, M.D.

significantly lower.

We do see ion levels comparable to hip replacement in patients that have spine implants, but those papers are comparing disk replacement, which is a mobile bearing.  Not a static replaced plate.

When we look at titanium plates we don't tend to see any real debris, because they don't move.  If they are moving, then they've failed.

Q.   Understood.

MR. ASFENDIS:  Thank you for your time.  That's all I have.

I don't know if anyone else has any questions.

MR. ROUVIERE:  No questions.

MR. EMAS:  No questions.

MR. ASFENDIS:  Thank you again, Doctor.

THE WITNESS:  Thank you guys, appreciate it.

THE VIDEOGRAPHER:  This concludes the deposition.  The time is 11:48 a.m., and we are off the record.

MR. EMAS:  The Doctor will read

Carlos Miguel Alvarado, M.D.

and sign.

(Whereupon, the deposition of

CARLOS MIGUEL ALVARADO, M.D. concluded at 11:48

a.m.)

* * * * *

Carlos Miguel Alvarado, M.D.

C E R T I F I C A T E

     I, KAREN SCHMIEDER, a Certified Shorthand

Reporter, do hereby certify that, pursuant to

notice, the deposition of CARLOS MIGUEL ALVARADO,

M.D. was duly taken on January 17, 2020 at 8:35

a.m. before me.

     The said CARLOS MIGUEL ALVARADO, M.D. was

duly sworn by me according to law to tell the

truth, the whole truth, and nothing but the truth,

and thereupon did testify as set forth in the above

transcript of testimony.  The testimony was taken

down stenographically by me.  I do further certify

that the above deposition is full, complete and a

true record of all the testimony given by the said

witness.

                    *Karen Schmieder*
                    KAREN SCHMIEDER

                    Certified Shorthand Reporter

Carlos Miguel Alvarado, M.D.

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  It will be attached to your deposition.

It is imperative that you return the original errata sheet to the depositing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Carlos Miguel Alvarado, M.D.

                    ERRATA SHEET

  DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

      Witness:  CARLOS MIGUEL ALVARADO M.D.

   PAGE   LINE   CHANGE

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

   ____  ____  _____

       REASON:_____

Carlos Miguel Alvarado, M.D.

ACKNOWLEDGEMENT OF DEPONENT

          I, _____, do hereby

acknowledge that I have read the foregoing pages 1

through 142 and that the same is a correct

transcription of the answers given by me to the

questions therein propounded, except for the

corrections or changes in form or substance, if

any, noted in the attached Errata Sheet.

_____          _____

CARLOS MIGUEL ALVARADO, M.D.          Date

Subscribed and sworn to before me this

_____ day of _____, 20____.

My Commission expires: _____

_____

Notary Public