```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                        Docket #18-cv-04814
ROUVIERE, et al.,                   : LJL-SDA

                   Plaintiffs,      :

  - against -                       :

DEPUY ORTHOPAEDICS, INC., et al.,   : New York, New York
                                      April 28, 2021
                   Defendants.      :
                                      TELEPHONE CONFERENCE
----------------------------------- :

                    PROCEEDINGS BEFORE
         THE HONORABLE JUDGE STEWART D. AARON,
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:         DAMIAN & VALORI LLP
                        BY:  MELISSA DAMIAN VISCONTI, ESQ.
                        1000 Brickell Avenue, Suite 1020
                        Miami, FL 33131
                        305-371-3960

                        LAW OFFICES OF ANDRE A ROUVIERE
                        BY:  ANDRE A. ROUVIERE, ESQ.
                        4070 Laguna Street
                        Coral Gables, Florida 33146
                        305-774-7000


Transcription Service : Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service
```

APPEARANCES - CONTINUED:

```
For Defendant            GIBBONS P.C.
Howmedica Osteonics:     BY:  PAUL EDWARD ASFENDIS, ESQ.
                         One Pennsylvania Plaza, 37th Floor
                         New York, New York 10119
                         212-697-6555


For Defendant Depuy      BARNES & THORNBURG
Orthopaedics, Inc.:      BY:  JOEL T. LARSON, JR., ESQ.
                              JOSEPH G. EATON, ESQ.
                         11 South Meridian Street
                         Indianapolis, Indiana 46204
                         317-231-7729
```

<u>INDEX</u>

<u>**E X A M I N A T I O N S**</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| **Exhibit**<br><u>**Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | **Voir**<br><u>**Dire**</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                    PROCEEDINGS              4
 2           HONORABLE STEWART D. AARON (THE COURT):   Good
 3    afternoon.  This is Magistrate Judge Aaron.  This is the
 4    matter Rouviere against Howmedica Osteonics Corp. et al,
 5    18-cv-4714.  This line is being recorded.  If I could have
 6    the parties identify themselves, please, starting with the
 7    plaintiffs?
 8           MS. MELISSA VISCONTI:   Good afternoon, your Honor.
 9    Melissa Damian Visconti and Andre Rouviere on behalf of the
10    plaintiffs.  Ms. Rouviere, one of the plaintiffs, is also
11    on the line.
12           MR. PAUL ASFENDIS:   Good afternoon, Paul Asfendis
13    for defendant, Howmedica Osteonics Corp.
14           MR. JOEL T. LARSON, JR.:   Good afternoon.  This is
15    J.T. Larson from Barnes & Thornburg on behalf of Depuy
16    Orthopaedics, Inc.
17           MR. JOSEPH G. EATON:   Joe Eaton on behalf of Depuy
18    Orthopaedics, Inc.
19           THE COURT:  Thank you.  Good afternoon.
20           The purpose of this call is to address the
21    plaintiff's motion filed on March the 31st at ECF 287.  In
22    that motion plaintiffs are seeking to modify the Scheduling
23    Order to permit the submission of supplemental expert
24    reports and also to sanction Howmedica for alleged
25    discovery misconduct.  I have reviewed the parties'
```

```
 1                    PROCEEDINGS                    5
 2   submission, and I have a few questions for the plaintiffs,
 3   a few questions for the defendants, and then I was going to
 4   open the floor up, first, to the plaintiffs for them to
 5   waive any issues they wish to raise or emphasize any issues
 6   they wish to emphasize, again, keeping in mind that I have
 7   read everything that's been submitted.  And then I'll open
 8   the floor to each of the defendants for whatever comments
 9   they wish to make with the same understanding that they --
10   no one should feel like they need to say something that's
11   in the papers because I've reviewed everything.
12           So first for the plaintiffs -- and every time I
13   hear a beep that it sounds like somebody is leaving the
14   line, I just want to be sure that -- Ms. Visconti, are you
15   still on with us?
16           MS. VISCONTI:  I am, yes.
17           THE COURT:  All right, and I still have counsel
18   for both defendants still on the line, am I right?
19           SEVERAL:  Yes, your Honor.
20           THE COURT:  Okay, so for the plaintiffs, are you
21   claiming that Howmedica acted intentionally in withholding
22   material information from you?
23           MS. VISCONTI:  Well, they certainly knew they had
24   the information, and they certainly intentionally did not
25   tell us.  If you're asking whether I am arguing that they
```

```
 1                    PROCEEDINGS              6
 2  did that for some nefarious purpose, I simply just can't
 3  get into their heads.  But did they knowingly obtain
 4  materials without telling us and knowingly hold onto them
 5  for over a year without telling the plaintiff?  Yes,
 6  certainly.
 7            Is that your question?  I'm not sure I -- go
 8  ahead.
 9            THE COURT:  Yes.  And I'm going to obviously ask a
10  similar question to Howmedica.  But before I do that, are
11  you claiming that Depuy did anything wrong here, whether
12  intentional or not, vis-à-vis these slides, these recuts?
13            MS. VISCONTI:  So I don't know that Depuy
14  intentionally did anything wrong here.  It looks -- again,
15  I don't know what's in their heads, but they should have
16  informed Howmedica, when they provided Howmedica a copy of
17  their authorization, that there was an obligation to
18  provide everyone a copy of whatever it was that they
19  obtained.  Was that intentional or an oversight?  I
20  honestly -- that's not really the point that we're trying
21  to make here.  I don't know.
22            THE COURT:  Well, so Depuy, when they received the
23  information from Baptist Hospital, they immediately sent a
24  link to both Mr. Rouviere as well as counsel for Howmedica.
25  So I guess I'm having difficulty understanding -- and maybe
```

```
 1                      PROCEEDINGS              7
 2  you can enlighten me -- as to why it is that you think
 3  Depuy is at fault.
 4          MS. VISCONTI:  Okay, wait.  I want to make sure
 5  that I'm understanding here.  So, really, our argument is
 6  that HOC is at fault here, right, that HOC, who used
 7  Depuy's authorization or Depuy's law firm's authorization
 8  to obtain these records.  So, really, what we're saying is
 9  if anyone's at fault here, it's HOC.
10          Now, Depuy permitted it to happen.  I don't know
11  that Depuy understood the extent of what happened.  It is
12  Depuy's claim -- and I have absolutely no reason to believe
13  that it's not true -- that they did not know that HOC had
14  actually obtained materials.  And I believe what you're
15  referring to is, yes, at various points the Rouvieres were
16  made aware, certainly, of correspondence with the
17  hospitals.  But on the particular correspondence we're
18  talking about that's relevant here, they were -- what it
19  tells us is recuts were available, right, not HOC has
20  requested and obtained three slides, you know, on such-and-
21  such a date and they were sent to this law firm.  That,
22  nobody knows.  Depuy doesn't claim that they knew it, we
23  certainly didn't know it.  The only thing we possibly could
24  have known, based on the documents that HOC is submitting,
25  is there were -- recuts could have been requested, and you
```

```
 1                    PROCEEDINGS                 8
 2  could have paid $35 to get them.
 3           THE COURT:  And the plaintiffs never asked for
 4  them, right, from Baptist Hospital?
 5           MS. VISCONTI:  The plaintiffs did not request --
 6  we didn't know -- correct, we did not ask for more recuts
 7  to be done.  The plaintiffs were aware of the original
 8  slides.  Those were the first cuts.  All the plaintiffs
 9  were aware was that there was this block of tissue that
10  remained there.  And, yes, it's -- of course, everyone
11  knows it's possible or should have known that it was
12  possible to go back and say, "Hey, you know, we think that
13  there's a need for more cuts."  We didn't ask for those
14  because we had three slides.  We were not aware that any
15  others had been done, and we didn't initiate a process to
16  get more slides.
17           THE COURT:  But plaintiffs were aware that they
18  could have, is that fair?
19           MS. VISCONTI:  Sure.  I mean, were they actually
20  aware?  You know, I think at a certain point they were,
21  sure.  They're not denying that they should have known that
22  there was the possibility to go back and ask for more
23  recuts if they wanted them.
24           THE COURT:  Okay.  So for the defendants -- and
25  I'll leave it to, you know, whether -- Howmedica or Depuy
```

```
 1                        PROCEEDINGS              9
 2  or perhaps both can answer this question for me, because
 3  I've been studying the events of late October 2019 and
 4  early November 2019.  So piecing together what happened
 5  here, a paralegal from Gibbons P.C., if I'm pronouncing her
 6  name correctly, Sheva Konsari, on October the 28th, 2019,
 7  sends a fax to the hospital, Baptist Hospital, and says,
 8  "Thank you for speaking with me on Friday.  As per our
 9  conversation, attached is an authorization to obtain tissue
10  samples from the 11/11/16 and 2/16/17 surgeries.  Please
11  let me know if you need anything else."  And that fax,
12  which is attached as part of ECF 287-1, the first page of
13  it in the upper left-hand corner says page 1 of 4.  And
14  then as part of ECF 287-1, there's only three pages from
15  that fax that are included.
16          And then what comes next that's relevant to the
17  issue before me is that on October 31st, 2019, three days
18  later, Baptist Hospital doesn't send a fax to Sheva Konsari
19  but rather responds directly to Barnes & Thornburg, who's
20  counsel for Depuy, and says, "Further to your fax dated
21  October 28, 2019," and it wasn't Depuy's fax or Barnes &
22  Thornburg's fax; it was in fact Gibbons' fax, it was
23  somebody from Gibbons.
24          So piecing it together, what I surmise is that the
25  missing page from that fax was the May 2019 letter that was
```

```
 1                    PROCEEDINGS              10
 2  sent -- that existed from Barnes & Thornburg; it's at
 3  ECF 291-2 at page 10.  There's a To Whom It May Concern
 4  letter from Laura Wolverton, a paralegal at Barnes &
 5  Thornburg, to the Keeper of Records at Baptist Hospital.
 6  And the person at Baptist Hospital looked at who had
 7  sent -- under whose cover the authorization was sent and
 8  therefore sent the October 31 response, again, not to
 9  Howmedica's counsel but instead to Depuy's counsel.  I'd
10  like the lawyers for both Howmedica and Depuy to comment on
11  what I just said and tell me whether they think I got it
12  right; and if not, how I got it wrong.  And, again, I leave
13  it to whoever wants to speak first.
14            MR. ASFENDIS:  I suppose I'll go first.  This is
15  Paul Asfendis for Howmedica.  And so thanks for the
16  opportunity.  And I guess just to your point, also, because
17  it's about this issue, the plaintiffs have made an
18  allegation here that we have done something.  And
19  Ms. Visconti says she doesn't know whether it's nefarious.
20  But if you read their papers, they say it's nefarious, and
21  they say that we did something that was underhanded.  And,
22  Judge, it is complete, completely, categorically false.
23            And so what I also want to mention is plaintiffs,
24  when they represented in their reply papers that we,
25  Howmedica, somehow went rogue and did this and didn't even
```

```
 1                      PROCEEDINGS              11
 2  tell Depuy we were doing it, that was known to be false by
 3  the plaintiffs when they said it because there's an earlier
 4  email from Depuy's counsel to the plaintiffs' counsel
 5  explaining that, yes, we knew they were using the
 6  authorization to get records.  We might not have known or
 7  confirmed that they finally got those slides, the pathology
 8  slides, but we knew they were using it.
 9          And, you know, I don't know how much -- there is a
10  history here -- I don't know how much you want to hear;
11  but, I guess just relevant to what you had said, this was
12  not something where we just went on our own and reached
13  out.  We had said, you know, we think we should probably
14  get the pathology slides, so our paralegal contacted
15  Ms. Wolverton and said, you know, would you like us to make
16  the reach-out, because we'd like to get the slides.  And
17  every step of the way, every communication with Baptist
18  Hospital was -- they were kept apprised.
19          Now, you know, so as far as the actual confirming,
20  yes, they arrived at our office, no, that did not happen.
21  But there's nothing underhanded about that.  We just --
22  this was an expedient way to get the pathology slides
23  because we didn't yet have an authorization from the
24  plaintiffs.  We had -- there was no dispute that we were
25  entitled to those same records, to the same slides.  There
```

```
 1                    PROCEEDINGS              12
 2  was never an objection to providing the authorization.  I
 3  think there was a miscommunication about getting that
 4  authorization to us.
 5            I just heard a tone, so I don't know if somebody
 6  dropped off, but unless I'm --
 7            THE COURT:  Well, let's just, again, just to be
 8  sure, do I still have plaintiffs' counsel on the line?
 9            MS. VISCONTI:  Yes, sir.
10            MR. ANDRE ROUVIERE:  Yes, sir.
11            THE COURT:  All right, and do we still have
12  Depuy's counsel on the line?
13            MR. LARSON:  Yes, your Honor, yes.
14            THE COURT:  Okay.  So please continue.
15            MR. ASFENDIS:  Okay, and so basically, there's
16  this history here.  And there's no question this is not a
17  privacy issue.  It never has been about privacy or HIPAA,
18  which was mentioned in the latest, in the reply brief,
19  which is a -- they mention a regulation that provides to
20  healthcare providers, not to defendants in a litigation.
21  But plaintiffs themselves sent me personally a flash drive
22  with thousands [indiscernible] records on them, medical
23  records, a lot of them duplicative of the records we're
24  talking about from Baptist Hospital.
25            And so there's no issue here as far as privacy.  I
```

```
 1                        PROCEEDINGS                13
 2  don't believe there is an issue, that it should be an issue
 3  as far as what Depuy knew or did not know.  I only mention
 4  this because you asked the question and because the
 5  plaintiffs have made this allegation that we somehow went
 6  on our own and did this and went rogue.  And it is not
 7  true.
 8            THE COURT:  Okay.  I --
 9            MR. ASFENDIS:  So I have a lot more to --
10            THE COURT:  No, I just want to go back to my --
11  and I heard everything you said, and I want to go back to
12  my specific question; and that is do you believe that my
13  surmise that the fourth page of that fax that was sent to
14  Baptist Hospital enclosing the authorization had with it
15  the May 19 letter, and therefore, that's why Baptist
16  Hospital sent the response to Ms. Wolverton, who was the
17  one who signed that transmittal letter?
18            MR. ASFENDIS:  Oh, yes, I believe --
19            THE COURT:  And --
20            MR. ASFENDIS:  -- that is true.  Yes -- I'm sorry.
21            THE COURT:  Go ahead.
22            MR. ASFENDIS:  I was going to say I believe that
23  is accurate.  I think when our -- you know, the paralegal
24  at my office sends the authorization, she sent it with the
25  initial -- with Depuy's letter.  We had asked Ms. Wolverton
```

```
 1                      PROCEEDINGS              14
 2   to send us the letter and the authorization because Baptist
 3   wanted it.
 4         THE COURT:  Okay.  And let me ask Depuy's counsel:
 5   Do you have a similar belief or understanding as to that's
 6   what transpired?
 7         MR. LARSON:  Your Honor, to answer your question
 8   regarding the one-page directly, I do believe that that was
 9   Ms. Wolverton, the May 10th or May -- release that was that
10   one page that's missing from that document.  I don't have a
11   broader response to everything that Mr. Asfendis discussed,
12   but I'm happy to discuss it, if you'd like.
13         THE COURT:  Well, I don't think so.  Obviously,
14   I'm happy to hear whatever else each party would like to
15   say.  So I'm going to give each party an opportunity to do
16   that.
17         But let me ask Howmedica this question.  Exactly
18   why did you not produce the recut slides, the ones that
19   were received after you got -- you got this November 7,
20   2019, invoice that said path $105, and then it says, "The
21   slides will be released on receipt of your check in the
22   amount of $105."  That was sent to Sheva Konsari.  So you
23   then got the recuts, and I know they were kept somewhere in
24   the offices of Gibbons.  Please state for me, clarify for
25   me exactly why you did not produce those recut slides to
```

```
 1                     PROCEEDINGS              15
 2  the plaintiffs when you received them -- or to Depuy, for
 3  that matter.
 4           MR. ASFENDIS:  Yes, Judge, it honestly didn't
 5  cross my mind because there's no obligation that I'm aware
 6  of to disclose that or to produce them because all the
 7  parties were aware that there was this -- the Baptist, you
 8  know, said here's how much the slides cost and you can get
 9  them.  Any party could have gotten them.  We know
10  plaintiffs got their own set.  They got the originals and
11  certainly didn't supplement anything or disclose anything
12  until they decided to use them and we found out in their
13  expert reports.  And so that's why.  There was no
14  obligation that I was aware of to do it.  We were just
15  covering our bases, getting the slides because it's always
16  been our practice to just -- you know, if there's something
17  there, you get it in case of need.  I didn't know that it
18  would be needed.  I frankly didn't, you know, think it was
19  likely that it would be; but why not get the slides?  And
20  so that's why we didn't disclose them because I was not
21  aware of no obligation to do so.
22           Even Depuy's agreement with the plaintiff, I know
23  Depuy was circulating, of course, records anytime they came
24  in, the paper records, they were giving courtesy copies.
25  And to me, that's a lot different because we knew you can't
```

```
 1                      PROCEEDINGS                 16
 2   give a courtesy copy of slides.  You can just make the
 3   parties aware that they're available.  Anybody can get
 4   them.  We got our own.  We understood that they were
 5   duplicates.  Plaintiffs had the originals; they certainly
 6   didn't say anything to anybody.  And that was it.  And so
 7   that's why, Judge; it was nothing certainly nefarious, not
 8   trying to hide anything.  There was no point to.  We
 9   certainly hadn't made any -- had been reviewed or had any
10   decision or considered using them in the case.  It was just
11   getting them to have them in case of need at some point.
12             THE COURT:  So Ms. Konsari received these slides
13   and files them away.  Like, were these -- did she come and
14   say, "Hey, I got these slides; what should I do with them?"
15   Or what --
16             MR. ASFENDIS:  I think --
17             THE COURT:  -- what do you remember about what
18   transpired upon receipt by Ms. Konsari of these slides?
19             MR. ASFENDIS:  I think that was it.  My
20   recollection is that, that basically, hey, the slides came
21   in.  I said okay, you know, we'll keep them where you
22   normally keep anything, in a secure cabinet by her desk.
23   And, I mean, honestly, that was it.  That was what
24   transpired, and I didn't give it much thought, if at all,
25   frankly, after that.
```

```
 1                          PROCEEDINGS                    17

 2              Again, we understood -- we had the understanding

 3    that we had just obtained duplicate slides that, you know,

 4    weren't necessarily going to be used or just it was a

 5    matter of covering bases to get everything and that there

 6    was no obligation to tell anybody.  I didn't expect the

 7    plaintiffs to tell us that they had the originals.  I'm not

 8    saying that they did anything wrong by doing it.  I'm only

 9    pointing out the fact that they didn't tell us is not that

10    they did something wrong but it's that they did the same

11    thing.  So that's why I'm having a little trouble here, you

12    know.  I'm definitely being accused by the plaintiffs of

13    having done something underhanded or not disclosed.  Well,

14    neither did they.  And that's okay because I don't think

15    they had an obligation to do it.  And they had the

16    originals, Judge.  So that's, you know, a long-winded

17    answer, but I hope that answers your question.

18              THE COURT:  Okay.  So let me ask plaintiffs'

19    counsel, Ms. Visconti, I'm not soliciting additional

20    argument, but I did want to give each party, as I

21    indicated, an opportunity to make any -- emphasize any

22    points that they wished to emphasize.  So, Ms. Visconti,

23    I'll have you go first.

24              MS. VISCONTI:  Sure.  Thank you, your Honor.

25              So, again, as I've said throughout our papers and
```

```
 1                      PROCEEDINGS                18
 2   I say here again today, we're not coming in here and saying
 3   this was a big conspiracy or a big plot.  I don't even know
 4   if it was intentional.  What I'm saying is they had an
 5   obligation to disclose that they had obtained these
 6   tissues, and they didn't do it.  Now, was it intentional?
 7   Were they hiding it?  Or was it negligence?  At best, it's
 8   negligence.  Okay?
 9           But I think it's important for the Court to
10   understand that, you know, you just asked, okay, when the
11   slides came in, did Ms. Konsari -- you know, but you know,
12   hey, the slides are here; I'm going to stick them in this
13   locked cabinet.  And the response was most likely.  Right?
14   Don't forget that while they were in possession of these
15   slides, Dr. Gannon was deposed and asked a ton of questions
16   about what specimens he had reviewed.  So they're thinking,
17   right, it's out there, that there's specimens out there and
18   Dr. Gannon has reviewed them.  Then there's a hearing where
19   they protest that we will not send the slides, the original
20   slides that we disclosed to them that we had because we
21   disclosed Dr. Gannon's report within, like, a week of us
22   getting them.  Okay?  So there's no -- we didn't get slides
23   and not tell them about them.  Our, you know, the
24   plaintiffs obtained the original slides, provided them to
25   their expert, their expert prepared a report and indicated
```

Commented [JP1]: e

```
 1                    PROCEEDINGS                19
 2  that he had relied on these slides and that -- he
 3  discloses, right after we get the slides -- it's not like
 4  we're hiding them in a drawer [indiscernible due to barking
 5  dog].  Right?  And as soon as he discloses them, the
 6  defendants start pushing to get access to those slides.
 7  And there's actually a hearing about it, about how they
 8  should be able to review the same specimens that we did.
 9          So, again, it was on everybody's mind that these
10  slides -- that we're having this whole discussion about
11  access to slides.  How they failed to have the lightbulb go
12  off and remember that they had other slides sitting in a
13  drawer and not tell us is a little bit -- we'll just say,
14  you know, it goes to that negligence at best that I'm
15  saying.
16          I would also just make sure -- you know, you were
17  asking what -- I believe that Mr. Asfendis stated he didn't
18  think that there was any obligation to tell anybody, he
19  just didn't think of it.  And that's what we're really
20  talking about in our reports here.  Even if they had not
21  decided to actually use them so that they would have to be
22  disclosed in their initial disclosures, there were several
23  discovery requests that these would have fallen within.
24  They had them for a year and never updated or supplemented
25  the responses to their discovery requests to indicate that
```

```
 1                        PROCEEDINGS              20
 2   they had them.
 3            So, you know, I don't think that the issue here is
 4   was there some nefarious plan to hide evidence.  I think
 5   the issue here is they obtained material relevant --
 6   materials here and didn't tell anybody about them.  I'm
 7   putting aside how they went about it.  You know, it isn't
 8   okay to use somebody else's authorization -- but I'm
 9   putting that aside.  The fact is not how they got them; the
10   fact is they obtained material evidence and failed to tell
11   anybody about it.  And that evidence, as it turns out,
12   happens to be, again, material; and that's really why we're
13   here.
14            We're here for two reasons.  One, we want to make
15   sure that nobody's going to object if Dr. Gannon, our
16   expert, wants to opine and discuss what it is that he saw
17   in these slides.  In an abundance of caution, we considered
18   that to be potentially a new opinion, which you know we're
19   sensitive about because we've already run into this issue
20   about, you know, the allegation that we disclosed expert
21   opinions after the deadline.  So we want to make sure that
22   [indiscernible] can talk about and discuss and opine
23   regarding this information without objection.  Does that
24   require modification of the Scheduling Order to permit them
25   to do so?  We were doing that in an abundance of caution.
```

Both defendants claim that there's nothing different or new

here, so possibly what we're requesting is possibly moot

because -- as far as that first thing that we're

requesting -- because they're saying there's nothing new

here.  So if that's the case, we should be permitted to let

Dr. Gannon opine regarding what he saw on these slides, and

then any other experts to also discuss how Dr. Gannon's

opinion, you know, just opine based on all of that

information.  And if they're not going to object, again,

the first part of our request here may very well be moot.

Maybe we don't need to modify the Scheduling Order.

          But, secondly, there is the absolute clear

violation of discovery obligations.  The sanctions are

mandatory.  We're here because we couldn't --

          THE COURT:  Well, let me just push back on the

sanctions are mandatory.  So you're relying upon 37(c)(1),

and 37(c)(1), the mandatory part says, If a party fail --

and I'm not reading all of the words because I'm leaving

out words that aren't necessary -- if a party fails to

provide information as required by Rule 26(a) or (e), the

party is not allowed to use that information to supply

evidence on a motion, at a hearing or a trial unless the

failure was substantially justified or harmless.  It then

goes on, in addition to or instead of this sanction, the

```
 1                      PROCEEDINGS            22
 2  Court on motion after giving an opportunity to be heard, A,
 3  may order payment of the reasonable expenses, including
 4  attorney's fees caused by the failure -- I'm going to skip
 5  B, which is informing the jury -- and, C, may impose other
 6  appropriate sanctions.  So where is it in Rule 37(c) that
 7  it's mandatory that I sanction -- assuming you're right,
 8  assuming there's been some sort of violation of the
 9  rules -- that it's mandatory that I sanction Howmedica?
10           MS. VISCONTI:  So, under the first provision that
11  you read of (c)(1), it is mandatory that there is a
12  sanction.  Normally, that sanction would be, as you said,
13  that they would not be able to use the discovery material
14  that's at issue.  The "may" part, I would submit, is if
15  that original sanction doesn't fit, if it's not a fitting
16  sanction for what happened, then the Court may, in place of
17  that original option, use monetary sanctions or some other
18  appropriate sanction.
19           What's happening here is we are not arguing that
20  because they did not disclose this evidence, they,
21  Howmedica, should not be permitted to use this evidence.
22  That is not a fitting sanction for what happened here.  So
23  we are asking the Court you then can use your discretion to
24  go into, to dip into the "may" and replace the original
25  mandatory sanction with a more fitting sanction, which we
```

```
 1                    PROCEEDINGS              23
 2  would submit would be both monetary because we're here
 3  because they would not agree to just let us supplement
 4  these reports and do what needed to be done as a result of
 5  their discovery violations.  And, frankly, you know, one
 6  thing that the defendants are concerned about -- and I
 7  think it's as valid concern -- we need to go back and now
 8  revisit this whole -- these pending motions regarding the
 9  exclusion of an expert on the grounds that the expert
10  didn't find evidence or didn't opine, you know, didn't give
11  opinions based on a lack of evidence that we now are
12  telling you are in these specimens that have been sitting
13  in that locked cabinet for a year.  So there --
14           THE COURT:  All right, so, Ms. Visconti, I'm going
15  to bring you back to my question.  It sounds like you're in
16  agreement with me it is not mandatory that I impose
17  sanctions on Howmedica is prefatory; it is -- the word is
18  "may," I may do that but I am not required to do that.  Do
19  you agree?
20           MS. VISCONTI:  Not entirely, your Honor.  It is
21  mandatory that sanctions are imposed; it's just that the
22  sanctions that are mandatory don't fit.  So, yes, then I
23  would say it may, the Court may impose alternative
24  sanctions.  So I sort of agreement, but other than that
25  very first part.
```

```
 1                     PROCEEDINGS                24
 2          THE COURT:  Okay.  Again, you and I may be looking
 3  at different rules.  It says in addition to or instead of
 4  the sanction, I may impose money and other sanctions.  So
 5  it's "in addition to or instead of."
 6          MS. VISCONTI:  "Or instead of," correct.  I'm
 7  focusing on the "instead of," right.
 8          THE COURT:  Right.  But it's "may."  What I'm
 9  quarreling with you about is you're telling me I'm required
10  to do this, and I don't see a rules-based -- how that
11  position is rules based.  I'm a stickler to the rules.  I
12  follow the rules; I'm a rule follower, which is good, given
13  the position I'm in, because I'm required to follow the
14  rules.  And I want to follow the rules, and I'm not seeing
15  anything that makes it mandatory on me to impose sanctions
16  here.  And it doesn't sound like you're citing me to
17  anything that says I'm wrong.
18          MS. VISCONTI:  So I'm pulling this back up.  So my
19  point is that the only mandatory part -- I think we're in
20  agreement here; we're only splitting up at the end.  I
21  think we're in agreement, but under (c)(1), the party --
22  it's mandatory that the party would not be able to use the
23  information or evidence at issue unless the failure is
24  substantially justified or harmless, right.  I think we
25  agree that that's a mandatory provision.  I'm saying that
```

```
 1                    PROCEEDINGS            25
 2  the "in addition to or instead of" the sanction language,
 3  I'm asking the Court to interpret it as the Court has the
 4  discretion to replace the sanction that is not fitting, the
 5  mandatory sanction which doesn't fit.  It's your --
 6  absolutely your discretion to then impose an alternative
 7  sanction, which is in the rest of, you know, (1)(a), right.
 8            THE COURT:  And I agree with you about that.
 9  Again, I was just questioning the mandatory piece.
10            Okay, so what else -- obviously, again, I've read
11  your papers; I've read everyone's papers.  So this is a
12  message to all of you:  Don't feel you need to repeat
13  what's in your papers.  But, Ms. Visconti, before I turn
14  the floor over to Howmedica, do you have anything else?
15            MS. VISCONTI:  No, your Honor.  Thank you.  I
16  think we say it all in our papers.
17            THE COURT:  Okay.  So, again, Howmedica's counsel,
18  I obviously want to give you an opportunity to emphasize
19  whatever you want to emphasize.  But please keep in mind
20  that I have read the papers.  But go ahead.
21            MR. ASFENDIS:  Okay, so I will be brief, then,
22  because some of these issues are addressed in the papers.
23  I know the first one that Ms. Visconti raised was
24  Dr. Gannon.  You know, his report, he had used the original
25  slides, which again had not been disclosed up to that
```

```
 1                    PROCEEDINGS                  26
 2    point.  But, anyway, he had used those original slides.
 3            The motion practice that came out of that, as you
 4    know, Judge, was whether -- it wasn't -- there's no dispute
 5    whether you should all be working off of the same slides; it
 6    was the dispute as to plaintiff wanted to send them,
 7    Mr. Rouviere wanted to send them right to our expert, who
 8    hadn't even been disclosed yet.  He refused to send them to
 9    our office.  And that was all that was about.  So this
10    whole notion that, oh, we should have said something about
11    recuts since.  The recuts weren't even in the case.  The
12    recuts are duplicates.  And those slides that Dr. Gannon
13    reviewed, photographed, referred to specifically, those
14    were the slides in the case, which again had not been
15    disclosed.
16            And so the second thing that Ms. Visconti said as
17    far as there's all these discovery requests that would have
18    encompassed these slides -- and I'm not seeing them, and
19    I've been through their discovery requests in preparation
20    for this motion, and I still don't see them.  And I never
21    thought I -- [indiscernible] -- but am I missing something?
22    And they said no.  If you want pathology specimens, you ask
23    for pathology specimens.  There are a bunch of vague,
24    overbroad requests, most of them that say, you know -- that
25    end with if -- you know, that you intend to use at trial;
```

```
1                        PROCEEDINGS              27
2   but other ones that are just vague and overbroad that would
3   require us not just to produce slides but to reproduce
4   every single, you know, medical record regarding any of the
5   surgeries.  And we objected to those at the time, and that
6   is just overbroad.  I don't know of any document requests
7   that -- valid document requests that would encompass these
8   slides.
9           And so that leaves us with the Rule 26
10  disclosures.  And, again, those disclosures are, you know,
11  it's not -- you don't disclose every single thing that may
12  be relevant.  It's that you may use in support of your
13  claims or defenses.  And I won't repeat myself too many
14  times, but that was something that obviously had not
15  been -- had not been considered.  So there's that.  I
16  don't --
17          THE COURT:  Let me ask you this.  And, again, I'm
18  using ellipses here -- but there is a document request that
19  asks for any materials that evidence or document
20  plaintiff's hip surgeries.  Doesn't that encompass the
21  recuts?
22          MR. ASFENDIS:  That's the one that I was referring
23  to as wildly -- vague and wildly overbroad.  Could it?  I
24  suppose.  But it could encompass a lot of things that are
25  not intended by it.  It could encompass -- it would
```

```
 1                    PROCEEDINGS                28
 2  encompass all -- we would have to reproduce all of her
 3  records.  What I suspect and what I think is not
 4  unreasonable is that that request was not asking for -- was
 5  probably asking for records that we would have had through
 6  our sales representatives who were at the surgery.  That's
 7  just my speculation, but reading that request, you know,
 8  "would evidence the surgeries," I -- reading that and
 9  giving them the benefit of the doubt, it's still wildly
10  overbroad.  And in some worlds could it encompass, you
11  know, pathology slides?  Sure.  And it could also encompass
12  a lot of other things that we wouldn't be required to be
13  reproducing or producing to plaintiffs.  It just doesn't
14  make sense in that context to me.  But that's the one that
15  I mentioned when I said that it was vague and overbroad.
16            THE COURT:  Okay.
17            MR. ASFENDIS:  As far as --
18            THE COURT:  All right --
19            MR. ASFENDIS:  Yeah, and I won't be too much
20  longer, but I do -- as far as the whole sanctions question,
21  again, there are some elements that have to be met.  And
22  none of them are met, in my opinion.  But obligation to
23  timely produce I don't think is there.  Culpable state of
24  mind, so in other words, knew that we were doing something
25  wrong or violating rules, it's obviously not there.  And
```

```
 1                     PROCEEDINGS              29
 2  the, quote/unquote, "missing evidence would be relevant to
 3  a party's claim or defense," and, again, that comes back to
 4  this issue.  These slides are duplicates, for all intents
 5  and purposes.
 6          There is nothing in this case that the plaintiffs
 7  have put forth, other than really Ms. Visconti's lawyer's
 8  arguments in the reply to say, well, you know, could slides
 9  possibly be different; yeah, you know, it's possible.  But
10  that's -- if you look at Dr. Nelson's declaration -- I'm
11  sure you have -- it's highly unlikely.  Recuts are the
12  standard of care in the medical field.  This is what
13  facilities rely on when -- you know, they don't send out
14  originals for clinical second review; they send out recuts.
15          And so in this case it's ironic but I think the
16  best evidence of the sameness of these -- the recuts to the
17  original is the defendants' own supplemental report.  And,
18  again, you know, I know your Honor's aware of it, so I
19  won't repeat the point, but plaintiffs say that -- you
20  know, he just says in his letter responding to us that, you
21  know, basically, sorry about this unfortunate mix-up.  I
22  don't know what that means.  Plaintiffs' counsel says in
23  their reply that it's just illustrative, that the photos
24  are just illustrative.  But it's more than just a mix-up.
25  He didn't just use the wrong photos; he claimed those
```

```
 1                       PROCEEDINGS                30
 2   photos of original slides to be the recuts.  And even more,
 3   he didn't just attach them as illustrative; he actually
 4   specifically referred to those photos of the originals and
 5   pointed out specific characteristics in those photos of the
 6   tissue to show his, quote/unquote, "new findings."  And,
 7   you know, if there's a question about any mix-up, he even
 8   color-coded those photos to show exactly where on those
 9   photos the major differences were.  And the whole time he
10   was using the same slides from the first report.  So it is
11   completely a bogus report.  This is more than just a mix-
12   up.  You know, the biggest piece of evidence, the biggest
13   difference, significant difference to him was this one
14   photograph of all this, you know, large titanium debris.
15   And he used the photo of the original slides to show that
16   new, quote/unquote, "new" metal titanium debris.  But it
17   was always there.  That was -- that photo was from his
18   original report.
19            So I don't want -- I don't think we should get
20   lost, lose the big picture out of this.  All of this is
21   complete nonsense.  And plaintiffs' other experts, they
22   don't even respond or address the concerns about the other
23   experts in their reply.  These experts knew about these
24   issues.  They say that they would have done something
25   different, and they wouldn't have.  They were all aware.
```

```
 1                   PROCEEDINGS                31
 2   And I'm not going to, you know, repeat the substantive
 3   arguments, but I will point out that those were not
 4   addressed on the reply.  And I think that's -- that is
 5   significant.
 6            And, you know, I'll end it there, but if you have
 7   any specific questions in addition to what you've already
 8   asked, but this is not a case where discovery should be
 9   reopened in any way.  And there's certainly no basis for a
10   sanction award.  So thank you for the time.
11            THE COURT:  All right, lastly, again, I am not
12   soliciting but want to give an opportunity for Depuy's
13   counsel to emphasize any points that they wish to
14   emphasize.
15            MR. LARSON:  Thank you, your Honor.  This is J.T.
16   I will be very brief.  I just wanted to say plaintiffs'
17   motion -- and Ms. Visconti just went over this -- there are
18   four distinct forms of relief that they're requesting.
19   They want to serve a supplemental pathology report from
20   Dr. Gannon; they want to possibly change unspecified
21   deposition testimony from the pathology of Dr. Gannon; and
22   then what I want to focus on, they want to serve a
23   supplemental report from a disqualified expert who's been
24   disqualified for conflicts of interest in this case and/or
25   from Dr. Jerrell.  And that's the point that I want to
```

```
 1                    PROCEEDINGS                    32
 2  focus on just here at the end because it hasn't been
 3  addressed in this.
 4            Plaintiffs have to show good cause, your Honor,
 5  for each form of relief that they're requesting in this
 6  motion.  They've kind of taken this broad, sweeping
 7  proposition that if they can show good cause for anything,
 8  then each expert should be able to opine again on how this
 9  changes their opinions.  And that's just simply not how
10  Rule 16 works.
11            I'm not going to address everything; that's been
12  done in our papers, your Honor.  But I would just like to
13  briefly address the engineering.  Plaintiffs brush over
14  this point.  As Mr. Asfendis just said, they don't really
15  address it in their reply.  Ms. Visconti barely mentioned
16  it today at oral argument.  But we all understand what's
17  going on here with the pretext and the desire to redo
18  expert engineering opinions as it relates to Depuy and
19  failure to warn.  For the last six months plaintiffs have
20  been trying to reopen expert discovery and fix what they
21  perceive as an error and give failure-to-warn opinions as
22  they relate to Depuy.  To do that here, based on this new,
23  these discovered recuts, the disqualified expert and
24  Dr. Jerrell have simply just said, yeah, my opinions would
25  have been different had I seen this supplemental report.
```

```
 1                    PROCEEDINGS              33
 2  That is unsupportable for at least two reasons that we
 3  address in the papers and I'll just briefly state here.
 4  The disqualified expert and Dr. Jerrell did not review
 5  Dr. Gannon's original report.  It is simply disingenuous to
 6  say that if opinions had been slightly different in the
 7  pathologist's report, my opinions would have been different
 8  when you didn't review the pathologist's original report.
 9  And, second, nothing in Dr. Gannon's supplemental report
10  would have affected the disqualified expert because she was
11  fully aware of these issues.  We've shown this in our
12  opposition brief, your Honor, which thank you for allowing
13  us to submit that one -- it was overlong.  But we've
14  addressed this at great length.  The disqualified expert
15  was fully aware of the component impingement that took
16  place between the titanium stem and the cobalt chromium
17  shell, and he took pictures of the component impingements,
18  he stated in his brief that it was, quote, "very clear."
19  He measured the gouge in the titanium stem itself.  He knew
20  it was titanium alloy.  He knew the -- he measured the
21  gouge and the volume of debris that was released.  It is
22  not believable that anything in the supplemental report
23  would have changed his opinions.
24           And, finally, your Honor, we respectfully request
25  that you look at this in light of the previous arguments
```

```
 1                     PROCEEDINGS                 34
 2   that plaintiffs have made to you over the last six months.
 3   At first plaintiffs told you that the disqualified expert
 4   actually did give opinions raised for failure to warn
 5   related to Depuy.  When that was rejected, plaintiffs told
 6   the Court that the disqualified expert only failed, you
 7   know, to give failure-to-warn opinions because he was
 8   secretly conflicted by Depuy.  And now the plaintiffs right
 9   now are reversing all of this and telling you that they've
10   been continuing to work with the disqualified expert behind
11   the scenes and now he can be trusted when he says his
12   opinions would have been different and he would have given
13   probably -- they haven't given us the supplemental report
14   yet -- but presumably, we all expect that it will contain
15   failure-to-warn opinions against Depuy.
16             This is not good-faith litigation; this is
17   plaintiffs trying to undo expert discovery because they
18   believe that Depuy is about to prevail on summary judgment.
19   And our motion's been pending for several months.  The
20   aggressive tactics that plaintiffs have displayed in this
21   lawsuit reached new heights last week when the Rouvieres
22   informed us that they intend to file a lawsuit against our
23   firms, against Howmedica and against the Gibbons paralegal
24   that you mentioned earlier.  Plaintiffs don't address any
25   of the engineering expert issues in their reply.  We
```

```
 1                        PROCEEDINGS              35
 2   anticipate and -- but they apparently don't want to waive
 3   them, either.  The rest of it's in the papers, your Honor,
 4   but I just wanted to make sure that I made that clear
 5   during oral argument.  Thank you.
 6            THE COURT:  All right.  So I thank everyone for
 7   the submissions, the argument.  I will issue a written
 8   opinion and order if not this evening then tomorrow.  I
 9   thank everyone for their time.  And this matter is
10   adjourned. Thank you.
11            MS. VISCONTI:  Your Honor, if I may?  This is --
12   hello?
13            THE COURT:  Is that you, Ms. Visconti?
14            MS. VISCONTI:  Yes.  But I don't know if everybody
15   else just left the line.
16            THE COURT:  Yes.  Hold on.  Do we have Howmedica's
17   counsel on the line?
18            MR. ASFENDIS:  Yes, I'm still here.
19            THE COURT:  Do we have Depuy's counsel on the
20   line?:
21            MR. LARSON:  I'm still here.
22            THE COURT:  Okay.  Very, very briefly,
23   Ms. Visconti.  Go ahead.
24            MS. VISCONTI:  Thank you.  I just want to say
25   that, as I said in my papers, I really don't appreciate
```

```
 1                    PROCEEDINGS                  36
 2  the -- I don't think it's necessary to have the personal
 3  attacks against Ms. Visconti asking to do all these things.
 4  So I want to make it clear we are not asking to reopen all
 5  of the expert discovery.  What we're asking for is very
 6  clear in our papers.  We just want to be able to submit
 7  this opinion, and we think that sanctions are warranted.  I
 8  don't know why there was a whole argument about the other
 9  pending motions; I'm not going to address that.  But,
10  again, just so that it's clear, we're not asking to reopen
11  all of the expert discovery in this case; we're just asking
12  if we can use Dr. Gannon's report and let everybody else
13  rely on it without objection.  And, yes, absolutely,
14  sanctions are warranted in this case.  That's it.  Thank
15  you very much, your Honor.  I appreciate the time.
16            THE COURT:  All right.  All right, thank you.
17  This matter is adjourned.
18            (Whereupon, the matter is adjourned.)
19
20
21
22
23
24
25
```

```
 1                                                    37

 2

 3                        C E R T I F I C A T E

 4

 5          I, Carole Ludwig, certify that the foregoing

 6   transcript of proceedings in the case of Rouviere et al v.

 7   Depuy Orthopaedics, Inc. et al, Docket #18-cv-04814-LJL-

 8   SDA, was prepared using digital transcription software and

 9   is a true and accurate record of the proceedings.

10

11

12                   *Carole Ludwig*

13   Signature_____

14                   Carole Ludwig

15   Date:    May 5, 2021

16

17

18

19

20

21

22

23

24

25
```