UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
JODI ROUVIERE, et al.,                                            :
                                                                  :
                                 Plaintiffs,                      :
                                                                  :
                                                                  :          18-cv-4814 (LJL)
                     -v-                                          :
                                                                  :          OPINION AND ORDER
DEPUY ORTHOPAEDICS, INC., et al.,                                 :
                                                                  :
                                 Defendants.                      :
                                                                  :
------------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED: 09/17/2021               │
└─────────────────────────────────────┘
```

LEWIS J. LIMAN, United States District Judge:

This is a product-liability case involving hip replacement components.  In 2012, Plaintiff Jodi Rouviere ("Rouviere") had a hip replacement surgery.  Her doctor implanted a device that combined components made by two companies.  Rouviere alleges that some of these components impinged on other of the components, releasing toxic metal debris into her body.  Rouviere and her husband sued the two companies that made the components of the hip replacement device—DePuy Orthopaedics, Inc. ("DePuy") and Howmedica Osteonics, Corp. (also known as "Stryker").  The Rouvieres now object to a ruling by Magistrate Judge Aaron concerning the scope of their engineering expert report.  That objection is overruled.  DePuy also moves for summary judgment.  That motion is granted.

## BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 statements.  They are undisputed unless otherwise noted.  *See* Dkt. Nos. 182, 227, 262.

Jodi Rouviere injured her hip in a kitchen fall around 2009.  Dkt. No. 227 ¶ 1.  She had several hip surgeries over the next few years.  *Id.* ¶ 3.  In 2011, Rouviere was diagnosed with

Ehlers-Danlos Syndrome, a rare connective tissue disorder that causes structural weakness in muscles, eyes, heart, skin and other tissue. *Id.* ¶¶ 4–5.

Because of her condition, Rouviere could not find a surgeon in her hometown of Miami that was comfortable operating on her. *Id.* ¶ 6. So Rouviere traveled to New York to meet with Dr. Robert Buly at the Hospital for Special Surgery. *Id.* ¶ 7. Rouviere was in pain at the time and had difficulty walking. *Id.* ¶ 8. After getting a second opinion, Dr. Buly advised Rouviere to undergo a total right hip replacement surgery. *Id.* ¶ 9. Rouviere agreed.

The hip joint consists of a ball-and-socket mechanism. The ball sits at the top of the thighbone, or femur. The socket (or acetabulum) is inside the pelvis. The ball rotates in the socket, giving the hip a wide range of motion. During a hip replacement surgery, these hip joints may be replaced by metal, plastic, or ceramic parts to recreate the ball-and-socket mechanism. *See id.* ¶¶ 19–20. At Rouviere's surgery, both the ball and the socket were replaced with artificial components. *Id.* ¶ 13.

Before the surgery, Dr. Buly explained to Rouviere that there were several types of components that could be used in the implant. Dr. Buly also explained that he would make those choices during the surgery. *Id.* ¶¶ 12, 14. Rouviere agreed to rely on Dr. Buly to determine which components to use. *Id.* ¶ 14. Dr. Buly also warned Rouviere of the risks involved in her surgery, though the parties dispute the exact nature of the warnings. Rouviere underwent the hip replacement surgery in August 2012, performed by Dr. Buly. *Id.* ¶ 13.

At the surgery, Dr. Buly tested various components and ultimately implanted a device that contained five parts, from two different manufacturers:

1. To create the ball, Dr. Buly first implanted a "Summit" titanium stem made by DePuy. *Id.* ¶¶ 15, 60. The bottom half of the stem was placed inside the femur, while the "neck" protruded out from the femur. *Id.* ¶ 20.

2.  At the tip of the neck, Dr. Buly attached a "Biolox Delta" ceramic head made by DePuy. *Id.* ¶¶ 15, 63. The below picture shows these two components (the two-tone grey stem and the pink head) inside a femur. *Id.* ¶ 20.



3.  Dr. Buly then covered the ceramic head with a polyethylene insert made by Stryker.

4.  To create the socket, Dr. Buly first implanted a round titanium shell into the pelvis. This part was made by Stryker.

5.  Finally, Dr. Buly placed a round cobalt-chrome liner inside this shell. This part was also made by Stryker.

In the years after her surgery, Rouviere experienced chronic hip pain, dislocations, and other serious health problems. *Id.* ¶¶ 33–38, 40. In 2016, Rouviere underwent surgery with Dr. Carlos Alvarado in Miami. At the surgery, Dr. Alvarado observed that the Stryker acetabular components were impinging upon the DePuy stem and had created a notch in the neck of the stem. *Id.* ¶ 39. Dr. Alvarado also discovered grayish brown tissue in the surrounding area. *Id.* Rouviere underwent three more surgeries in 2016 and 2017, culminating in Dr. Alvarado removing the components that Dr. Buly had implanted five years earlier. *Id.* ¶ 43.

## PROCEDURAL HISTORY

The Rouvieres filed suit in May 2018. They amended their complaint in October of that year. *See* Dkt. No. 26. They later voluntarily dismissed their claims against all defendants but two: DePuy and Stryker. Dkt. No. 52.

The Rouvieres' theory of the case is that the DePuy titanium stem impinged with the Stryker cobalt-chrome liner, releasing toxic metals into Jodi Rouviere's body.  Those metals caused various ailments in Rouviere, including metallosis.  In the complaint, Rouviere asserts product-liability claims against DePuy and Stryker under theories of negligence, strict liability, and breach of express and implied warranties.  Her husband, Andre Rouviere, also asserts a claim for loss of consortium.[1]

This matter was assigned to Magistrate Judge Stewart D. Aaron for general pretrial purposes.  At the expert discovery phase, Judge Aaron ordered the Rouvieres to make their expert disclosures by September 21, 2020.  *See* Dkt. No. 128.  Three days before that deadline, the Rouvieres informed Judge Aaron that their engineering expert had suddenly withdrawn, and they asked for more time to find a replacement expert.  *See* Dkt. No. 154.  Judge Aaron denied that request on the ground that the Rouvieres' bare-bones letter did not make the requisite showing of good cause.  *See* Dkt. No. 157.  The Rouvieres then scrambled and found a second engineer expert in time for the deadline.

The second engineering expert completed a report for the Rouvieres.  This report opined almost exclusively on Stryker's components, saying virtually nothing about DePuy.  *See* Dkt. No. 188-1.  Stryker moved to disqualify the Rouvieres' second expert on the ground that the expert had worked for Stryker in another litigation.  Judge Aaron granted Stryker's motion to disqualify, but he allowed the Rouvieres additional time to find another replacement engineering expert.  Judge Aaron's order specified that this third engineering expert could opine "regarding

---

[1] Andre Rouviere is a practicing lawyer in Florida.  He represented himself and his wife through most of this litigation, though he is now joined by co-counsel.

the same scope of subject areas as were covered by the [disqualified second expert]." Dkt. No. 193 at 6.

The Rouvieres found a third engineering expert, Dr. John Jarrell.  By this time, DePuy had already filed its motion for summary judgment, which rested in large part on the absence of expert testimony about DePuy's products.  Dr. Jarrell's report remedied this deficiency by opining extensively about DePuy's products.  *See* Dkt. No. 230-5.  DePuy then asked Judge Aaron to strike the DePuy-related portions of the Jarrell report.  Judge Aaron granted the motion. Judge Aaron explained that, because the second engineering expert had opined solely on Stryker's products, the replacement engineering expert was likewise limited to opining only on Stryker's products.  *See* Dkt. No. 232.  Judge Aaron later denied the Rouvieres' motion for reconsideration, and the Rouvieres filed an objection to this Court.  *See* Dkt. Nos. 266, 267.

After DePuy's summary judgment motion was fully briefed, the Rouvieres asked Judge Aaron to reopen expert discovery due to Stryker's failure to disclose certain discovery materials. Judge Aaron granted the motion in part, allowing two of the Rouvieres' experts (Dr. Francis Gannon, a pathologist and immunologist, and Dr. Sol Bobst, a toxicologist) to supplement their previous expert reports.  *See* Dkt. No. 296.  But Judge Aaron denied the Rouvieres' request to allow their engineering expert to file a supplemental report.  The Rouvieres do not object to this order.  Instead, they have filed a motion asking this Court to augment the summary judgment record with Dr. Gannon's and Dr. Bobst's supplemental reports.

In sum, three matters are before this Court: (1) the Rouvieres' objection to Judge Aaron's striking of the DePuy-related opinions in the Jarrell report, (2) the Rouvieres' motion to supplement the record, and (3) DePuy's motion for summary judgment.

**LEGAL STANDARDS**

District courts may designate a magistrate judge to hear and decide a pretrial matter that

is "not dispositive of a party's claim or defense."  Fed. R. Civ. P. 72(a).  For such nondispositive

matters, the district judge "must consider timely objections and modify or set aside any part of

the order that is clearly erroneous or is contrary to law."  *Id.*  "This standard of review is highly

deferential, and magistrate judges are afforded broad discretion in resolving nondispositive

disputes[;] reversal is appropriate only if their discretion is abused."  *Pugh-Ozua v. Springhill*

*Suites*, 2020 WL 6562376, at *3 (S.D.N.Y. Nov. 9, 2020) (cleaned up).

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is

material if it "might affect the outcome of the suit under the governing law."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "An issue of fact is genuine if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *WWBITV, Inc. v.*

*Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (cleaned up).  In determining whether there

are any genuine issues of material fact, the Court must view all facts in the light most favorable

to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

"On summary judgment, the party bearing the burden of proof at trial must provide

evidence on each element of its claim or defense."  *Cohen Lans LLP v. Naseman*, 2017 WL

477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986)).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir.

2008).  "In that event, the nonmoving party must come forward with admissible evidence

sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Id.*  To

survive a summary judgment motion, the opposing party must establish a genuine issue of fact

by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and by

demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

At the outset, the Court addresses the issues that shape the summary judgment record.

First, the Rouvieres' objection to Judge Aaron's order limiting the scope of Dr. Jarrell's report is

overruled.  Dr. Jarrell's opinions about the alleged defects in DePuy's products are thus not in

the summary judgment record.  Second, the Rouvieres' motion to update the summary judgment

record with supplemental reports by Drs. Gannon and Bobst is granted.  These two supplemental

reports will be considered as part of the summary judgment record.  But the Rouvieres' request

to file additional briefing is denied because the Gannon and Bobst reports are not particularly

relevant to the pending motion for summary judgment.

Turning to DePuy's motion for summary judgment, the lack of expert testimony specific

to DePuy dooms the Rouvieres' defective-design claims.  And the Rouvieres do not defend their

claims for defective manufacture and breaches of express or implied warranties, so those claims

are abandoned.  Finally, summary judgment is granted for DePuy on the failure-to-warn claims

because the Rouvieres have adduced no evidence as to proximate causation.  While a reasonable

juror could find that DePuy failed to adequately warn Dr. Buly about the risk of impingement,

there is no evidence to support the Rouvieres' contention that additional warnings would have

led Dr. Buly to do anything differently.

## I.    The Rouvieres' Objection to the Order Striking Parts of the Jarrell Report

As detailed above, the Rouvieres' second engineering expert was disqualified after he

had rendered a report and DePuy had moved for summary judgment.  Judge Aaron allowed the

Rouvieres to replace this expert with a third expert—Dr. Jarrell—but specified that Dr. Jarrell could testify only "regarding the same scope of subject areas as were covered by the [disqualified second expert]."  Dkt. No. 193 at 6.  When Dr. Jarrell furnished a report that contained opinions on defects in DePuy's products—opinions that were absent from the Rouvieres' earlier expert report—DePuy moved to strike those opinions.  Judge Aaron granted the motion, excluding the DePuy-related portions of the Jarrell report.  The Rouvieres moved for reconsideration, which Judge Aaron denied.  The Rouvieres now object both to the original ruling and to the ruling on the motion for reconsideration.

As explained below, the objection is likely untimely.  And even if it were timely, it is overruled on the merits.  Judge Aaron's order striking Dr. Jarrell's DePuy-related opinions was neither clearly erroneous nor contrary to the law.

A.      **Timeliness**

Rule 72 requires that all objections to nondispositive orders by a magistrate judge be filed before the district judge "within 14 days after being served with a copy" and that "[a] party may not assign as error a defect in the order not timely objected to."  Fed. R. Civ. P. 72(a).  Judge Aaron struck the DePuy-related portions of the Jarrell report on November 24, 2020.  *See* Dkt. No. 232.  The Rouvieres did not file an objection within 14 days.  Instead, they filed a motion for reconsideration before Judge Aaron.  Judge Aaron denied that motion on December 19, 2020. *See* Dkt. No. 266.  The Rouvieres then filed an objection before this Court on January 4, 2021— 41 days after Judge Aaron's original order.  DePuy thus argues that the objection is untimely.

The key question is whether the filing of a motion for reconsideration before the magistrate judge affects Rule 72's 14-day deadline to file an objection before the district judge.

This question can be broken down into two subsidiary questions:  First, if a party asks the magistrate judge to reconsider a ruling, does the filing of the motion for reconsideration extend

8

Rule 72(a)'s 14-day deadline to file an objection before the district court?  And second, if the answer to the first question is no, such that the magistrate judge's original order was not timely objected to, does a timely appeal of the reconsideration decision bring up both the original order (which was not timely objected to) and the reconsideration decision (with was timely objected to), or only the latter?  The Second Circuit has not weighed in on these issues, and courts throughout this district and throughout the country have reached opposite conclusions.[2]

Starting with the first question and the underlying statute, the Federal Magistrates Act provides that "a judge may designate a magistrate judge to hear and determine" certain pretrial matters, and that "[a] judge of the court [*i.e.*, a district judge] may reconsider any pretrial matter under [this provision] where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  28 U.S.C § 636(b)(1)(A).

---

[2] *See David v. Weinstein Co.*, 2020 WL 4042773, at *5 n.2 (S.D.N.Y. July 17, 2020) (collecting cases for the proposition that "a motion for reconsideration filed directly with the magistrate judge is procedurally defective") (cleaned up); *Graham v. City of New York*, 2010 WL 3034618, at *1 n.1 (E.D.N.Y. Aug. 3, 2010) (collecting cases for the proposition that a timely motion for reconsideration tolls Rule 72's 14-day clock); *Manhattan Constr. Co. v. Phillips*, 2011 WL 13214354, at *4 (N.D. Ga. July 29, 2011) (collecting cases from throughout the country).

Building on this statute, Federal Rule of Civil Procedure 72 provides that:

> When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

Fed. R. Civ. P. 72(a).

Rule 72's linear chronology appears to make no accommodation for motions to reconsider.[3] The chronology begins when the magistrate judge issues "a written order stating the decision" on a pretrial matter. Next, a party may object to "the order" within 14 days of being

---

[3] There is some disagreement over whether magistrate judges have the power to field motions for reconsideration at all, since Local Civil Rule 6.3 addresses motions for reconsideration but does not specify whether this mechanism applies only to district judges or also to magistrate judges. *Compare, e.g.*, *Koehler v. Bank of Bermuda Ltd.*, 2003 WL 466206, at *1 (S.D.N.Y. Feb. 21, 2003) ("Unlike motions for reconsideration of district judges' orders, provided for by Local Civil Rule 6.3[], there is no provision in the governing statute or the rules of procedure for motions for reconsideration to be made to magistrate judges.")*, with Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, 2020 WL 1480465, at *2 n.1 (S.D.N.Y. Mar. 26, 2020) ("[N]othing in the text of Local Civil Rule 6.3 suggests that it is inapplicable to orders issued by magistrate judges.") (cleaned up). But while this district's Local Civil Rules are not entirely clear on this issue, the Court agrees with the many district and magistrate judges who have held that magistrate judges have the power to field motions for reconsideration of their prior rulings. The Local Civil Rules, by their terms, "apply in all civil actions and proceedings governed by the Federal Rules of Civil Procedure." Local Civil Rule 1.1. They do not draw a distinction between those civil actions in which a district court judge is acting and those before a magistrate judge pursuant to authority delegated by the district court. For example, the rules regarding electronic service and filing of documents, Local Civil Rule 5.2; the service and filing of motion papers, Local Civil Rule 6.1; orders on motions, Local Civil Rule 6.2; and motion papers, Local Civil Rule 7.1, apply equally regardless of whether "the Court" in question is the district court judge assigned to the case or a magistrate judge exercising authority pursuant to a delegation from the district court. Thus, it is procedurally proper under Local Civil Rule 6.3 to ask a magistrate judge to reconsider his or her prior ruling. And indeed, magistrate judges in this district routinely entertain and decide motions for reconsideration under Local Civil Rule 6.3, as Judge Aaron did here. *See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2019 WL 3738623, at *2 n.2 (S.D.N.Y. June 13, 2019) (collecting cases).

served a copy.  And finally, the district judge must consider timely objections and must modify or set aside any part of "the order" that is clearly erroneous or is contrary to law.  A plain reading of Rule 72 thus suggests (a) that motions to reconsider filed before the magistrate judge have no bearing on the 14-deadline to file objections before the district court and (b) that an objection before the district court addresses only the order that was served within the preceding 14 days and does not bring up for appeal any earlier orders not timely objected to.

The language of Rule 72 is in stark contrast to its closest analogue, Rule 4 of the Federal Rules of Appellate Procedure.  *Cf. Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").  Rule 4 provides that a notice of appeal from a district court judgment must be filed within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(1)(A).  But if a party files a timely postjudgment motion for reconsideration, *i.e.*, a Rule 59 motion filed no later than 28 days after entry of judgment or a Rule 60 motion also filed no later than 28 days after entry of judgment, the rule provides that "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." Fed. R. App. P. 4(a)(4)(A).  As the Second Circuit explained, when a litigant files a timely motion for reconsideration, it "toll[s] the time to file a notice of appeal

regarding the underlying order until decision of the motion for reconsideration." *Lora v. O'Heaney*, 602 F.3d 106, 110 (2d Cir. 2010).[4]

      This approach with respect to appeals to the courts of appeals is rooted in sound policy. Federal statutes discourage piecemeal appeals. *See Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 8 (1980). As a general matter, only a final judgment may be appealed to the court of appeals. *See* 28 U.S.C. § 1291 (allowing appeal only from "final decisions" of district courts); *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982) ("[T]he policy of Congress embodied in [28 U.S.C. § 1291] is inimical to piecemeal appellate review of trial court decisions . . . ."). In the context of postjudgment motions, "judicial efficiency is improved by postponing appellate review of the judgment until the District Court has had an opportunity to dispose of all motions that seek to amend or alter what otherwise might appear to be a final judgment." *Weyant v. Okst*, 198 F.3d 311, 314 (2d Cir. 1999) (cleaned up). Given the length of time of most district court proceedings and the length of time necessary for an appeal to be briefed and decided, it would make little sense to require a second appeal for the order on the timely motion for reconsideration. It is far more efficient and consistent with the just, speedy, and inexpensive determination of every action to extend the time for noticing an appeal until after the motion for reconsideration is decided and for the court of appeals then to consider both the underlying judgment and the order on the motion. *See id.*; *see also Osterneck v. Ernst &*

---

    [4] Many courts refer to this mechanism as "tolling," but that term is a misnomer. Tolling refers to the *pausing* of a time period. Federal Rule of Appellate Procedure 4, by contrast, *resets* the 30-day time period. *See* 16A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3950.4 (5th ed.) ("Courts often refer to [Federal Rule of Appellate Procedure 4's] re-starting effect as 'tolling,' . . . but readers should bear in mind that unlike, say, the 'tolling' of a statute of limitations, Rule 4(a)(4)'s 'tolling' (when it applies) re-starts the appeal time period from scratch.").

*Whinney*, 489 U.S. 169, 177 (1989) ("Our conclusion that a postjudgment motion for discretionary prejudgment interest is a Rule 59(e) motion also helps further the important goal of avoiding piecemeal appellate review of judgments.").

The philosophy of the Federal Magistrates Act and Rule 72 is different.  The delegation pursuant to Section 636(b)(1)(A) is for pretrial matters and non-dispositive matters only.  28 U.S.C. § 636(b)(1)(A).  The rule contains the unusual injunction directing the judicial officer to conduct the required proceeding "promptly."  Fed. R. Civ. P. 72(a).  Absent consent, as well as an order of the court, a magistrate judge may not order the entry of judgment, conduct a civil trial, or decide a dispositive motion.  28 U.S.C. § 636(c)(1).  Those matters are for the district judge.  For that reason, because the magistrate judge's orders power is limited to pretrial matters such as the evidence that will be discoverable and that thus will form the basis of a trial or dispositive motion, and because the district judge alone has the power to enter final judgment resolving the case and into which all pretrial matters will be merged, Rule 72 not only requires that the nondispositive matter be addressed "promptly," but also *encourages* speedy interlocutory appeals.  Any order can be challenged in the district court on the grounds that it is "clearly erroneous or contrary to law," 28 U.S.C. § 636(b)(1)(A), a standard different from that used by the court of appeals to review district court discovery orders, but such appeal must be taken within 14 days.  The failure to file an objection within 14 days waives the right of a party to assign the magistrate judge decision as error.  The rule thus vests control in the district court judge, and not in the parties or in the magistrate judge, as to the timing of briefing on and a decision with respect to a pretrial nondispositive matter.  In other words, Rule 72 embodies a policy preference for speedy decisions and quick appeals to district courts rather than drawn-out motion practice before the magistrate judge.  Until an appeal has been taken to the district court

judge, the nondispositive discovery matter will not be finally settled. So the filing of a motion for reconsideration, by the plain terms of Rule 72, has no effect on the 14-day deadline to file an objection before the district court.

Turning to the second question—whether the timely objection to a denial of reconsideration brings up the underlying order—the jurisprudence regarding Federal Rule of Appellate Procedure 4 again provides guidance. Under Rule 4, when a litigant files an *untimely* motion for reconsideration, it "[does] not act to toll the time for appealing the underlying order." *Lora*, 602 F.3d at 110. In such a case, "[t]he notice of appeal [is] timely only with respect to the ruling on the motion for reconsideration." *Id.* In other words, "[b]y negative implication, Rule 4(a)(4)(A) suggests that failure to file a timely motion for reconsideration, combined with the failure to file a timely appeal of the substantive ruling, will put consideration of whether the substantive ruling was erroneous beyond the reach of an appellate court." *Id.* If the motion for reconsideration was *not* timely filed, the resulting appeal can cover only the motion for reconsideration—which is reviewed very deferentially—and not the underlying order. *See id.*; *see also "R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 122 n.5 (2d Cir. 2008); *Wall v. Constr. & Gen. Laborers' Union*, 2009 WL 230122, at *1 (2d Cir. Feb. 2, 2009).

The same logic applies to motions for reconsideration filed before magistrate judges. If a party chooses to file a motion for reconsideration instead of a Rule 72 objection—as the Rouvieres did here—and that party later files an objection to the reconsideration decision, that objection brings up only the reconsideration decision, not the underlying order. In other words, the sole issue before the district court is whether the magistrate judge erred in denying reconsideration—and not whether the magistrate judge erred in his or her initial decision. This conclusion flows from the text of Rule 72, which gives a party 14 days to object to "the order" of

the magistrate judge and requires the district judge to modify or set aside any part of "the order" that is clearly erroneous or is contrary to law.  In the context of a motion for reconsideration, "the order" is the reconsideration order (which is reviewed very deferentially), not the underlying order which was not timely objected to.  A contrary rule would render meaningless Rule 72's 14-day deadline, since a party that misses the 14-day deadline would be able to simply file a motion for reconsideration and get in through the backdoor.

It may be argued that this rule imposes costs on both parties and the courts, forcing parties to concurrently file *both* an appeal before the district judge *and* a motion for reconsideration, and causing the filing of Rule 72 objections where a motion to reconsider would have sufficed.  *See Fox Indus., Inc. v. Gurovich*, 2005 WL 2456896, at *2 (E.D.N.Y. Oct. 5, 2005) ("[I]t would make no sense for a District Judge to decide an appeal pursuant to Rule 72(a) while the order in question was still under consideration by the Magistrate Judge, who might change all or some of the order on reconsideration.").  Those concerns are overstated.  Where a party seeks reconsideration before a magistrate judge, the same or similar briefing will also support the appeal before the district court judge.  After all, to obtain reconsideration, a party must establish *both* that the magistrate court judge overlooked factual matters or controlling decisions, *and* that, as a result, the magistrate judge's original order was in error.  Although the standards on Rule 72 review are somewhat different from those on reconsideration, the underlying question remains the same—whether the magistrate judge's determination was "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A).

No persuasive argument has been made that a requirement that a party both brief an appeal and brief a motion for reconsideration will impose inordinate costs on litigants.  And as to the courts, any burden on the district judge and the magistrate judge can be easily addressed.  A

party that wishes to seek reconsideration before the magistrate judge can ask the district judge to extend the time to file a Rule 72 objection until after the motion for reconsideration has been resolved.  *See, e.g.*, *Miles v. Wal-Mart Stores, Inc.*, 2007 WL 2230383, at *1 (W.D. Ark. July 31, 2007) (granting motion to extend time to file Rule 72 objections until after resolution of motion to reconsider).  If the party does not make such a request, the district court can suspend the Rule 72 briefing if the motion for reconsideration appears to have any merit or if the issue is better addressed by the magistrate judge in the first instance.  In either event, the burden on the courts from the filing of a placeholder Rule 72 objection is de minimis, if any.

At the same time, those concerns ignore the offsetting costs that the rule advocated by the Rouvieres would impose on "the just, speedy, and inexpensive determination of every action," that the Federal Rules of Civil Procedure are intended to accomplish.  Fed. R. Civ. P. 1; *see also Herbert v. Lando*, 441 U.S. 153, 177 (1979) ("[A]ll of the Federal Rules of Civil Procedure[] are subject to the injunction of Rule 1 that they be construed to secure the just, speedy, and inexpensive determination of every action.") (cleaned up); *Kerman v. City of New York*, 374 F.3d 93, 118 (2d Cir. 2004) (rejecting a construction of Rule 50 where the resulting procedure would be inconsistent with Rule 1's injunction).  The Rouvieres no doubt subjectively believed that their motion for reconsideration had merit, even though the magistrate judge decided otherwise. That is not always the case.  While a well-founded motion for reconsideration offers the judicial officer the opportunity to correct an oversight, a poorly founded motion imposes costs both on the judicial officer and on the opposing litigant.  It can amount to little more than a request for a redo.  *See Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 137 F. Supp. 3d 336, 338 (W.D.N.Y. 2015) (noting that "[motions for reconsideration] are, in general, not looked upon favorably" because "[a]ll too often, they represent little more than an attempt to reargue issues on which the movant

failed to persuade the court the first time around").  Moreover, in the hands of a crafty litigant, it can also be a tool to delay the inevitable, delaying discovery and delaying the final adjudication of the matter.  Far better to require the appeal and to require the appellant to explain—at least to the district court judge and perhaps also to the magistrate judge—why the issue should not be promptly resolved by the only court with the power to finally settle it.  To the extent that it discourages needless motions for reconsideration, the interpretation adopted by the Court may reduce the burden on the courts.[5]

In sum, the Rouvieres' objection to Judge Aaron's order of November 24, 2020 is overruled as untimely.  The Court will nevertheless review that order on the merits for two reasons.  First, because the Second Circuit has not clearly spoken to the timeliness issue, the Court addresses the merits in the alternative.  And second, because the merits of the underlying issue may be relevant to the evaluation of the Rouvieres' objection to Judge Aaron's denial of reconsideration, a discussion of the merits will aid the Court's analysis.  But, as explained below, the objection to the underlying order is overruled on the merits in any event.  The Rouvieres'

---

[5] Some district courts have adopted local rules extending Rule 72's 14-day deadline if a motion for reconsideration is filed.  For example, the local rules of the Northern District of New York provide that "[a] motion for reconsideration of a Magistrate Judge's determination of a non-dispositive matter shall toll the fourteen (14) day time period to file objections . . . ." N.D.N.Y. R. 60.1; *see also* D. Haw. R. 74.1(d) ("A reconsideration motion shall toll the time in which any objection must be taken from the magistrate judge's non-dispositive order . . . .").  It is worth noting that these local rules employ the "tolling" misnomer discussed above.  This word choice, read literally, yields odd results.  For example, suppose a magistrate judge issues a decision on January 1 and the losing party files a timely motion for reconsideration on January 13.  Because the filing of the motion only *paused* the 14-day clock, the losing party has only one day from the issuance of the reconsideration order to file an objection before the district court. *See Utica Mut. Ins. Co. v. Century Indem. Co.*, 2017 WL 1052719, at *10 (N.D.N.Y. Jan. 18, 2017) (holding that The Northern District of New York's local rule "did not reset the clock" when the motion for reconsideration was decided but that "the clock resumed running" from its previous place); *see also id.* (citing the Black's Law Dictionary definition of "toll" as "to stop the running of" a time period).

objection to Judge Aaron's December 19, 2020 order denying reconsideration—which was timely filed—is denied on the merits as well.

### B.      Whether Judge Aaron's Orders Were Clearly Erroneous or Contrary to the Law

Even if the Rouvieres' objection were timely, it would be overruled on the merits.  Judge Aaron's exclusion of Dr. Jarrell's DePuy-related opinions rested on Federal Rule of Civil Procedure 16(b)(4), which provides that "[a] schedule may be modified only for good cause and with the judge's consent."[6]  "The Rule 16(b)(4) 'good cause' inquiry is primarily focused upon the diligence of the movant in attempting to comply with the existing scheduling order and the reasons advanced as justifying that order's amendment."  *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 79 (S.D.N.Y. 2012).  The burden of demonstrating good cause rested with the Rouvieres.  *Id.*

The Rouvieres make two primary arguments:  First, that Judge Aaron erred in concluding that the Jarrell report exceeded the scope of the disqualified expert's report.  And second, that even if the Jarrell report exceeded the scope of the disqualified expert's report, Judge Aaron

---

[6] Judge Aaron's exclusion of the DePuy-related portions of the Jarrell report could also have been framed as a sanction under Rule 37(c)(1), which allows a court to exclude evidence that was not timely disclosed "unless the failure was substantially justified or is harmless."  This would be a much closer call under Rule 37(c)(1), since "preclusion of evidence" under Rule 37 is a "harsh remed[y] and should be imposed only in rare situations."  *Update Art, Inc. v. Modiin*, 843 F.2d 67, 71 (2d Cir. 1988).  But the parties did not raise Rule 37 before Judge Aaron, and Judge Aaron ruled solely under Rule 16.  *See* Dkt. Nos. 220, 222, 223, 232.  The Rouvieres' brief before this Court states that they "agree that the Magistrate Judge analyzed the issue pursuant to Rule 16 as a modification of a scheduling deadline, and therefore, a determination of whether the Magistrate Judge erred in his analysis is based on Rule 16," but nonetheless asks the Court to also consider Rule 37.  Dkt. No. 286 at 10.  The Court declines that invitation.  It would frustrate the purpose of delegation of pretrial nondispositive matters to a magistrate judge if a party could withhold from the magistrate judge's consideration a rule that the party later argues is dispositive of an issue.  If allowed, the losing party could then always obtain de novo review by asserting a new legal theory to the district court.  The Rouvieres made no Rule-37-based argument to Judge Aaron.  The Court's opinion therefore rests solely on Rule 16.

erred in declining to reopen expert discovery to allow Dr. Jarrell to add new opinions.  Neither of

these arguments succeed.  The Jarrell report expressed opinions well beyond those expressed in

the disqualified expert's report, and Judge Aaron's denial of the Rouvieres' request to reopen

expert discovery was not erroneous or contrary to the law.

      *1. The disqualified expert did not opine on any defects in DePuy's products.*  The

disqualified expert's report focused almost exclusively on Stryker, not DePuy.  For example,

while the disqualified expert's report analyzed the warnings accompanying Stryker's products, it

said nothing about DePuy's warnings.  *See* Dkt. No. 188-1 at 11.  And the "Opinions" section of

the report speaks entirely of Stryker's defects in design, manufacture, and warning.  *Id.* at 11–12.

In fact, it blames *Stryker* for the impingement of the DePuy stem.  *See id.* at 12 ("The Stryker

MDM Liner System was designed to impinge between the neck of the stem and the rim of the

liner.").

      To be sure, the disqualified expert made scattered references to DePuy:  He stated that he

was hired to examine the DePuy and Stryker products.  *Id.* at 2.  He stated that he reviewed the

DePuy and Stryker components.  *Id.* at 4–5.  He observed that the DePuy stem was dented.  *Id.* at

8.  And, most significantly, he opined that the Stryker liner impinged with the DePuy stem,

resulting in metal debris.  *Id.* at 8, 9–10, 12.  But the disqualified expert expressed no opinions

on whether DePuy's products were defectively designed, defectively manufactured, or contained

insufficient warnings.

      *2. Judge Aaron reasonably ordered that the replacement expert's opinions be limited to

defects in Stryker's products.*  Judge Aaron's disqualification opinion said that the new expert

could opine "regarding the same scope of subject areas as were covered by the [disqualified

second expert]."  Dkt No. 193 at 6.  And since the only subject areas opined on by the

disqualified expert related to Stryker's liability, Judge Aaron's order is best understood as limiting the replacement expert's opinions to Stryker's liability.

A closer look at the disqualification order makes clear that the replacement report could cover only Stryker, which Judge Aaron refers to as "Howmedica."  It provides that:

> No later than November 9, 2020, Plaintiffs may serve an expert disclosure by an alternate engineer expert regarding the same scope of subject areas as were covered by [the disqualified expert].  The deposition of any such expert shall be completed no later than December 9, 2020.  Any expert disclosure by *Howmedica* addressed to opinions offered by Plaintiffs' alternate engineer expert shall be served by January 14, 2021 and the deposition of such *Howmedica* expert shall be completed no later than February 12, 2021.

*Id.* (emphasis added).  If, as the Rouvieres argue, the replacement report could opine on both Stryker and DePuy, Judge Aaron would have provided for responsive disclosures by *both* of these defendants.  But Judge Aaron provided for responsive disclosures by Stryker only, a clear indication as to the permissible scope of the replacement expert.  The Rouvieres did not file an objection to this order.  And even if they had, this limitation by Judge Aaron was reasonable given the scope of the disqualified expert's report.  *See Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 784 (6th Cir. 2003) (affirming district court order that a substitute expert not deviate from the prior expert's conclusions as a "sensible compromise" that allowed the replacement of an expert "without unfairly surprising [the other party] with unexpected new opinions").

*3. Dr. Jarrell's report exceeds the scope of the disqualified expert's report.*  Dr. Jarrell's report opines extensively about DePuy's liability, far exceeding the scope of the disqualified expert's opinions.  For example, the disqualified expert said nothing about manufacturing defects in DePuy's products, while Dr. Jarrell opines that "the DePuy Summit femoral stem with Biolox head is defective."  Dkt. No. 230-5 at 8.  The disqualified expert offered no opinion about the

warnings that accompanied DePuy's product, while Dr. Jarrell opines that "[t]he DePuy [instructions for use] lacks sufficient [w]arnings." *Id.* ¶ 18.  No reasonable reader of the Jarrell report can conclude that it covers "the same scope of subject areas as were covered by the [disqualified expert]."  Dkt. No. 193 at 6.  By opining on DePuy's liability, the Jarrell report contravened Judge Aaron's order.

The Rouvieres argue that the scope of retention was the same for the two experts. *Compare* Dkt. No. 188-1 at 2 (disqualified expert's mission statement)*, with* Dkt. No. 230-5 ¶ 2 (Dr. Jarrell's mission statement).  But Judge Aaron's disqualification order did not permit the Rouvieres to submit a new expert report from a new expert with the same "scope of retention." The scope of the disqualified expert's retention was so broad as to cover anything that could potentially be relevant to the case.  The disqualified expert was retained "to evaluate the explanted hip protheses systems manufactured by DePuy Orthopedics and Stryker Orthopedics to determine if the components were defective in either their manufacture, design and/or failure to adequately warn."  *See* Dkt. No. 188-1 at 2.   Under the Rouvieres' argument, Dr. Jarrell could have offered literally any opinion potentially relevant to the case under Judge Aaron's order with respect to either DePuy or Stryker, regardless of whether it bore any relationship to the scope of opinions offered by the disqualified expert.  Judge Aaron's order was not that expansive.  It said that the new expert could opine "regarding the same scope of subject areas as were *covered by* the [disqualified second expert]."  Dkt No. 193 at 6 (emphasis added).  The best reading of this sentence is that it refers to the subject areas that the disqualified expert actually covered, not to subject areas that the disqualified expert *could have* covered under the scope of his retention. Judge Aaron's order sought to mitigate the effect of the disqualification of the Rouvieres' expert. It was not an invitation for the Rouvieres to redo their expert report from scratch.

*4. Judge Aaron reasonably concluded that the Rouvieres had not shown good cause for their request for an extension.* Judge Aaron also reasonably concluded that the Rouvieres "failed to make a showing of good cause for their failure to offer the DePuy-related opinions by the September 21, 2020 deadline." Dkt. No. 232 at 5. The Rouvieres did not explain why their first expert mysteriously withdrew. Nor did they explain why the disqualified expert failed to opine on DePuy. Nor did they seek additional time when they realized (or should have realized) that the disqualified expert did not opine on DePuy. Only after their expert was disqualified—and after DePuy had moved for summary judgment—did the Rouvieres seek to add DePuy-related opinions.

Judge Aaron had patiently extended many discovery deadlines leading up to that point. In granting a final extension, Judge Aaron had warned the parties that "[a]ny discovery not taken in the time periods set forth herein shall be deemed to be waived." Dkt. No. 128 at 4. Judge Aaron's denial of yet another request for an extension was justified. *See Reynolds v. Sealift, Inc.*, 311 F. App'x 422, 426 (2d Cir. 2009) (finding no error in magistrate judge exercising discretion to refuse to extend discovery for submission of expert report); *see also Frydman v. Verschleiser*, 2017 WL 1155919, at *2 (S.D.N.Y. Mar. 27, 2017) (same); *Ritchie Risk-Linked Strategies*, 282 F.R.D. at 79 ("A party seeking to reopen expert discovery must show that the tardy submission of its desired expert report was not caused by the party's own lack of diligence.").

*5. Judge Aaron's denial of reconsideration was neither clearly erroneous nor contrary to the law.* The Rouvieres' briefs do not specifically object to the reasoning in Judge Aaron's order denying reconsideration, focusing almost solely on Judge Aaron's underlying order. The Rouvieres' motion for reconsideration rested on the argument that DePuy's counsel had made a misrepresentation to Judge Aaron about the disqualified expert's relationship with DePuy. Judge

Aaron rejected this argument, finding that DePuy's counsel did not make a misrepresentation and that, in any event, (a) the Rouvieres could have sought an extension to offer DePuy-related opinions and (b) the Rouvieres knew or should have known of the disqualified expert's relationship with DePuy at the time that they served the disqualified expert's opinion. The Rouvieres offer no reason (other than the ones already discussed) to disturb any of these conclusions. Thus, to the extent that the Rouvieres object to Judge Aaron's December 19, 2020 order denying reconsideration, the objection is overruled for the same reasons discussed above. *See In re Palermo*, 2011 WL 446209, at *4 (S.D.N.Y. Feb. 7, 2011) ("The standard for reconsideration under Local Civil Rule 6.3 is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked— matters, in other words that might reasonably be expected to alter the conclusion reached by the court.") (cleaned up).

In sum, the Rouvieres' objection is overruled on the merits even if it were timely. Dr. Jarrell's DePuy-related opinions are thus excluded from the record.

Though this result is harsh, it is not unfair. At the end of the day, the Rouvieres are left in the exact same position that they were in before the disqualified expert was disqualified: They have expert testimony on Stryker's liability but not on DePuy's. The disqualification of their expert gave the Rouvieres an opening to retroactively plug the holes in their disqualified expert's report. Judge Aaron rejected that gambit, placing the Rouvieres in the exact same position that they were in on September 21, 2020, when they timely filed their expert disclosures.

## II.   The Gannon and Bobst Reports

After expert discovery closed (and after issuing the order to strike), Judge Aaron allowed the Rouvieres to disclose supplemental reports by Dr. Gannon and Dr. Bobst, on the ground that important information had been inadvertently withheld by Stryker during fact discovery. *See*

Dkt. No. 296.  The Rouvieres disclosed these additional reports, and now seek to augment the summary judgment record with these two supplemental reports.  That motion is granted.  The two supplemental reports will be considered as part of the summary judgment record.

In the same motion, the Rouvieres also ask for additional briefing on DePuy's motion for summary judgment.  That part of the motion is denied.  DePuy's motion for summary judgment does not turn on the testimony of Drs. Gannon and Bobst, since DePuy does not raise issues of pathology, immunology, or toxicology in its briefing.  DePuy's summary judgment papers do not challenge the narrative that Jodi Rouviere was injured by metal debris in her body.  DePuy instead focuses on the lack of evidence that DePuy's product was defective or that DePuy failed to warn Dr. Buly of potential risks.  Neither of these issues are addressed by the Gannon and Bobst reports, which focus on whether and how the metal debris caused Jodi Rouviere's injuries. DePuy's motion for summary judgment is fully briefed, and additional briefing is not needed.

## III.   DePuy's Motion for Summary Judgment

Having addressed the breadth and content of the summary judgment record, the Court turns to DePuy's motion for summary judgment.  After setting forth the general principles of products liability under New York law, the Court concludes as follows:  First, the lack of expert testimony dooms the Rouvieres' defective-design claims.  Second, the Rouvieres have abandoned their claims for defective design, defective manufacture, and breach of express or implied warranties.  Third, there is a genuine dispute about the adequacy of DePuy's warnings but DePuy is nevertheless entitled to summary judgment because the Rouvieres have adduced no evidence that DePuy's insufficient warnings proximately caused Jodi Rouviere's injury.  And fourth, Andre Rouviere's loss-of-consortium claim is not viable as a standalone claim.  Summary judgment is therefore granted to DePuy on all of the Rouvieres' claims against it.

###### A.    New York Law on Products Liability

"In accordance with a long-standing and evolving common-law tradition, a manufacturer of a defective product is liable for injuries caused by the defect." *In re New York City Asbestos Litig.*, 27 N.Y.3d 765, 786–87 (2016).  A product is considered defective if it "(1) contains a manufacturing flaw; (2) is defectively designed; or (3) is not accompanied by adequate warnings for the use of the product." *Id.* (cleaned up).

"In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way.  In contrast, in strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257 n.3 (1995).  Claims under the last category—failure to warn— can be "framed in terms of strict liability or negligence," but the two causes of action are "functionally equivalent." *In re New York City Asbestos Litig.*, 27 N.Y.3d at 87.

###### B.    The Defective-Design Claims

DePuy moves for summary judgment on the defective-design claims on the ground that— without Dr. Jarrell's DePuy-related opinions—the Rouvieres have adduced no expert testimony that DePuy's products were defectively designed.  In New York, defective-design claims must usually be supported by expert testimony as to the feasibility and efficacy of alternative designs. *See Nemes v. Dick's Sporting Goods, Inc.*, 2021 WL 739032, at *4 (S.D.N.Y. Feb. 23, 2021) (collecting cases); *see also Water Pollution Control Auth. of the City of Norwalk v. Flowserve US, Inc.*, 782 F. App'x 9, 15 (2d Cir. 2019) ("We agree with the district court that this is the type of complex case which requires an expert opinion as to defect and as to feasible alternative design.") (cleaned up).  The Rouvieres make no argument to the contrary, nor do they point to any non-expert evidence that the DePuy products were defectively designed.  Indeed, they make

no argument at all in defense of their defective-design claims.  *See Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) ("Having determined that the district court acted within its discretion in excluding [an expert's] testimony, the plaintiff has no evidence in the record to support his theory that the motor had a design defect which caused the accident or increased its severity. As a result, summary judgment was properly granted."); *Jackson v. Federal Express*, 766 F.3d 189, 197–198 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").  Summary judgment is therefore granted for DePuy on the Rouvieres' negligence and strict-products-liability claims (counts one and two) to the extent they are based on a defective-design theory.

### C.     The Defective-Manufacture Claims

"To prove the existence of a manufacturing defect, a plaintiff must establish that the product was not built to specifications or that it did not conform to the manufacturer's intended design."  *Minda v. Biomet, Inc.*, 182 F.3d 900 at *1 (2d Cir. 1999) (unpublished decision). Summary judgment is warranted because the Rouvieres' opposition brief does not point to any evidence of defective manufacture, nor does it defend the defective-manufacture theory of liability.  The Rouvieres have thus abandoned this claim by not responding to any of DePuy's arguments.  *See Jackson*, 766 F.3d at 197–198.  Summary judgment is therefore granted for DePuy on the Rouvieres' negligence and strict-products-liability claims (counts one and two) to the extent they are based on a defective-manufacture theory.

### D.     The Breach-of-Warranty Claims

DePuy moves for summary judgment on the Rouvieres' claims for breach of express and implied warranties.  DePuy argues (a) that both of these claims require an underlying design or manufacturing defect, and the Rouvieres have adduced no evidence of either; (b) that DePuy

made no express warranties to the Rouvieres; and (c) that the implied-warranty claim is time-barred.  *See* Dkt. No. 179 at 16–18.  The Rouvieres do not respond to these arguments and do not defend their breach-of-warranty claims in their opposition brief.  In fact, they include no discussion of these claims other than a recitation of their elements.  *See* Dkt. No. 233 at 41–43.  The Rouvieres have abandoned these claims.  *See Nemes*, 2021 WL 739032, at *13.  Summary judgment is therefore granted to DePuy on counts three and four.

### E.       The Failure-to-Warn Claims

The Rouvieres focus all of their energies defending the failure-to-warn claims.  As DePuy concedes, there is no bright-line rule requiring expert testimony for failure-to-warn claims.  *See Billiar v. Minnesota Min. & Mfg. Co.*, 623 F.2d 240, 246–47 (2d Cir. 1980).  DePuy makes three arguments in favor of summary judgment:  First, that it had no duty to warn.  Second, that even if it did have a duty to warn, it adequately warned Dr. Buly of the impingement risk.  And third, that, even if it did not adequately warn Dr. Buly, its failure to warn was not a proximate cause of Jodi Rouviere's injuries.  Each argument is discussed in turn.

#### 1.       Whether DePuy Had a Duty to Warn

A manufacturer has a duty to warn of any "latent dangers resulting from foreseeable uses of its products of which it knew or should have known."  *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297 (1992).  DePuy concedes that it had a duty to warn of dangers resulting from the use of *its* product.  But DePuy argues that it had no duty to warn of any dangers that stem solely from Stryker's products.  While DePuy is correct, it still does not warrant summary judgment in its favor.  That is because the Rouvieres' claim is that DePuy failed to warn of the impingement risk in *DePuy's* product, not just Stryker's product.

To determine whether there existed a duty to warn, "the court must settle upon the most reasonable allocation of risks, burdens and costs among the parties and within society,

accounting for the economic impact of a duty, pertinent scientific information, the relationship between the parties, the identity of the person or entity best positioned to avoid the harm in question, the public policy served by the presence or absence of a duty and the logical basis of a duty." *In re New York City Asbestos Litig.*, 27 N.Y.3d 765, 788 (2016).  One "major determinant" is "whether the manufacturer is in a superior position to know of and warn against those hazards." *Id.* at 790.  "[T]he existence and scope of a duty to warn are generally fact-specific," and "it is incumbent on the court . . . to decide whether an applicable legal duty exists" by "decid[ing] whether there is any proof in the record that might support the recognition of a duty to warn owed by the manufacturer to the injured party." *Id.* at 787 (cleaned up).

*Rastelli* is the key case here.  The defendant in *Rastelli* had manufactured a non-defective tire.  A downstream purchaser combined the tire with a defective rim.  The rim exploded, killing a person who was inflating the tire.  The New York Court of Appeals held that the tire manufacturer had no duty to warn about the rim.  The fact that the tire was "compatible for use with a defective product of the other manufacturer" was not enough.  *Rastelli*, 79 N.Y.2d at 298. There was no evidence that the tire manufacturer had created the dangerous condition, so it "had no duty to warn about the use of its tire with potentially dangerous multipiece rims produced by another where [the tire manufacturer] did not contribute to the alleged defect in a product, had no

control over it, and did not produce it." *Id.* Thus, DePuy is correct that it had no duty to warn of dangers that were solely attributable to Stryker's products.[7]

But DePuy is still not off the hook. *Rastelli* recognized that "where the combination of one sound product with another sound product creates a dangerous condition," then "the manufacturer of each product has a duty to warn." *Id.* Thus, even if DePuy had no duty to warn about Stryker's products, it still had a duty to warn of "latent dangers resulting from foreseeable uses of *its* products." *Id.* at 297 (emphasis added). The Rouvieres claim that DePuy should have warned about the risk of component impingement in the *DePuy* stem. In this respect, this case is different than *Rastelli*. There, the tire was not defective and did not cause the harm. Here, DePuy's stem allegedly *did* cause the harm by impinging with other components and releasing toxic metals. The alleged risk is thus with DePuy's product, arguably imposing on DePuy a duty to warn.

There is no genuine dispute that the DePuy stem became dented, which the Rouvieres attribute to impingement. Nor is there is a dispute that DePuy was aware of the risk of impingement—indeed, DePuy argues that it *warned* of impingement. And even if there is no evidence that the DePuy stem was defectively designed or manufactured (because the Rouvieres lack expert testimony on that front) the duty to warn applies even to non-defective products. A reasonable juror could find that DePuy had a duty to warn of this risk. *See Greenberg v. Larox,*

---

[7] The New York Court of Appeals has carved out an exception to the *Rastelli* rule, holding that manufacturers do have a duty to warn of dangers associated with a third-party product where "as a matter of design, mechanics or economic necessity, [the third-party product] is necessary to enable the manufacturer's product to function as intended." *In re New York City Asbestos Litig.*, 27 N.Y.3d at 778. But that exception does not apply here because the Stryker acetabular components are not "necessary" to the use of the DePuy stem. Indeed, DePuy makes its own acetabular components and recommends *against* pairing its stem with acetabular components from other manufacturers. *See* Dkt. No. 187-5 at 6.

*Inc.*, 673 F. App'x 66, 71 (2d Cir. 2016) (reversing grant of summary judgment because "the factual dispute over [the defendant]'s contribution to the danger arising from the joint use of its [product] with a [another manufacturer's product] bears on the issue of whether it knew about, and could reasonably foresee, this danger of malfunction and injury" and which, in turn, "affects whether [the defendant] had a duty to warn at all").  Viewing the evidence in the light most favorable to the Rouvieres, the Court cannot conclude, as a matter of law, that DePuy had no duty to warn of the risk of impingement associated with the DePuy stem.

### 2.   Whether DePuy Adequately Warned of the Risk of Impingement

DePuy next argues that, even if it did have a duty to warn, it has fulfilled that duty by adequately warning Dr. Buly of the risk of impingement.  A warning is adequate if it is "accurate, clear, consistent on its face, and . . . portrays with sufficient intensity the risk involved."  *Martin v. Hacker*, 83 N.Y.2d 1, 10 (1993).

Under the "learned intermediary" doctrine, DePuy's obligation was to warn Jodi Rouviere's doctor rather than Rouviere herself.  *See Bravman v. Baxter Healthcare Corp.*, 984 F.2d 71, 75 (2d Cir. 1993).  "This rule is based on the theory that the doctor is better able to explain the product's risks and benefits to the patient, who will then be in a position to make an informed decision as to whether or not to have a certain procedure."  *Minda v. Biomet, Inc.*, 1998 WL 817690, at *6 (E.D.N.Y. Feb. 5, 1998).  Thus, "where the warning given to the prescribing physician by the manufacturer through package inserts and other literature gives specific detailed information on the risks of the product, the manufacturer [can be] absolved from liability as a matter of law."  *Fane v. Zimmer, Inc.*, 927 F.2d 124, 129 (2d Cir. 1991) (cleaned up).  DePuy argues that it warned Dr. Buly of the risk of impingement, pointing to the instructions for use ("IFU") that accompanied the DePuy stem.

But there are genuine factual disputes about the adequacy of these warnings.  The IFU instructs surgeons that, before completing the surgery, "[r]ange of motion should be thoroughly checked for improper mating, instability, or *impingement* and corrected as appropriate."  Dkt. No. 227 ¶ 27 (emphasis added); Dkt. No. 187-5 at 8.  But this sentence does not appear in the "Warnings" section of the IFU but instead appears among the instructions on how to perform the implant surgery.  This sentence says nothing about the risk of impingement *after* the surgery. Nor does it say anything about the risk that impingement could create metal debris.  And besides, the Rouvieres argue that the unadorned word "impingement" could refer to either anatomical impingement—which occurs when the implant impinges on the patient's body—or component impingement, which occurs when one part of the implant impinges on another part of the implant.  DePuy's reply brief does not respond to this point or explain the difference (if any) between anatomical impingement and component impingement.  And while DePuy points to other warnings, none of those even mention impingement.  *See* Dkt. No. 187-5 at 7 (warning of "tissue reactions, osteolysis, and/or implant loosening caused by metallic corrosion, allergic reactions, or the accumulation of polyethylene or metal wear debris"); *id.* (warning of "[s]ubluxation or dislocation of the hip joint due to implant size or configuration selection, positioning of components and/or muscle and fibrous tissue laxity").

DePuy also argues that it warned Dr. Buly not to use the DePuy stem with acetabular components made by other manufacturers, pointing to the IFU warning that "[i]mplants and trials components from different manufacturers or implant systems should never be used together."  *Id.* at 6.  But this warning does not say why mixing and matching should be avoided, nor does it say that mixing and matching can lead to impingement.  This warning does not preclude a reasonable juror from finding that this warning was too broad and that the IFU did not sufficiently

communicate the risk of impingement. *See Moretto v. G & W Elec. Co.*, 20 F.3d 1214, 1223 (2d Cir. 1994) ("The ten-word warning in a 403-word letter in no way portrayed with sufficient intensity the risk involved to warrant taking this question from the jury."); *cf. Wu Jiang v. Ridge Tool Co.*, 764 F. App'x 43, 45 (2d Cir. 2019) (affirming grant of summary judgment where "[t]he warnings clearly and emphatically alerted users to the dangers of using the vacuum to collect flammable dust").

In sum, the Court cannot find that any of these warnings were adequate as a matter of law. When viewed in the light most favorable to the Rouvieres, a reasonable juror could find that these warnings were not "accurate, clear, [and] consistent on its face" as to the risk of component impingement and metal debris or did not "portray[] with sufficient intensity the risk involved." *Martin*, 83 N.Y.2d at 10. A reasonable juror could likewise find that the warning about impingement pertained only to anatomical impingement and thus did not warn of "the precise malady incurred." *Alston v. Caraco Pharm., Inc.*, 670 F. Supp. 2d 279, 284 (S.D.N.Y. 2009) (cleaned up); *cf. Maxwell v. Howmedica Osteonics Corp.*, 713 F. Supp. 2d 84, 95 (N.D.N.Y. 2010) (granting summary judgment to manufacturer of knee replacement device because package insert warned of the device's nickel content).

"The adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (cleaned up). Such is the case here.

### 3.   Whether the Allegedly Deficient Warnings Proximately Caused Jodi Rouviere's Injuries

Having concluded that there is a genuine dispute over whether DePuy's warnings were deficient, the Court turns to the issue of proximate causation. At trial, Jodi Rouviere must "prove that [the] defendant's failure to warn was a proximate cause of [her] injury," which

includes "adducing proof that the user of a product would have read and heeded a warning had

one been given." *Sosna v. Am. Home Prod.*, 748 N.Y.S.2d 548, 549 (1st Dep't 2002); *see also*

*Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2d Cir. 1991). The Rouvieres proffer two theories of

proximate causation. First, that Dr. Buly would not have used the DePuy components had he

been adequately warned about the risk of impingement. And second, that more robust warnings

by DePuy would have led Dr. Buly to give Rouviere more detailed warnings, in which case she

would not have consented to the surgery. But, as explained below, neither of these theories is

supported by evidence in the record.

> **a.      Whether different warnings would have led Dr. Buly not to use the components at issue**

The Rouvieres' first theory of proximate causation is that an appropriate warning in the

IFU would have dissuaded Dr. Buly from using the components that he implanted in Jodi

Rouviere. This theory rests on three premises: (a) that Dr. Buly was not independently aware of

the impingement risk at issue; (b) that Dr. Buly read the IFU; and (c) that, had the IFU contained

a more robust warning, Dr. Buly would have done something different.

Even assuming that the first two premises are true, the Rouvieres proffer no evidence to

support the third premise—that, had Dr. Buly been given additional warnings about

impingement, he would have chosen different components or have recommended against the

surgery. Indeed, the Rouvieres do not even dispute that Dr. Buly was aware of the impingement

risk at the time of the surgery: DePuy's Local Civil Rule 56.1 statement states that "Dr. Buly

testified he was aware of [the risk of component impingement] at the time of the August 2012

total hip replacement surgery—particularly so in this case given Mrs. Rouviere's diagnosed

Ehlers-Danlos Syndrome." Dkt. No. 227 ¶ 26. Though the Rouvieres object to other portions of

that paragraph, they say nothing in opposition to the quoted language, let alone point to evidence in the record contradicting it.

Dr. Buly sat for two depositions, and the Rouvieres had ample opportunity to elicit facts that would "permit a jury reasonably to infer that a warning, reasonably required, would have been heeded." *Raney v. Owens-Illinois, Inc.*, 897 F.2d 94, 96 (2d Cir. 1990). But the Rouvieres point to no evidence, testimonial or otherwise, that Dr. Buly would have done anything differently. To the contrary: Dr. Buly testified that he planned to continue using the DePuy stem even knowing what he knows now. *See* Dkt. No. 316-1 at 280–89. The Rouvieres do not question Dr. Buly's credibility or recollection (except for a disagreement over the contents of Dr. Buly's pre-surgery warnings to Jodi Rouviere, which is not relevant here). Nor do the Rouvieres have any testimony or evidence, expert or otherwise, that a reasonable surgeon, having received additional warnings, would not have done what Dr. Buly did. There is simply no evidence that a warning—if it had been given—would have been so material or important that Dr. Buly would have heeded it or would have done something different.

The Second Circuit has rejected the notion that New York has a "heeding presumption" under which a jury may "infer, whenever the facts show that a warning is required, that a warning would have been heeded." *Raney*, 897 F.2d at 95. Rather, "New York permits the trier to infer that a warning would have been heeded and thereby to conclude that the absence of a warning that was reasonably required to be given was a proximate cause of an injury." *Id.* But, as discussed above, the Rouvieres have proffered no facts that would allow a jury to make that inference without resort to speculation. *See id.* at 96 (collecting cases for the proposition that "in some circumstances it is not reasonable to draw an inference that a warning would have been heeded"); *see also Adeghe v. Janssen Pharms., Inc.*, 2017 WL 3741310, at *6 (S.D.N.Y. Aug.

30, 2017) (rejecting the heeding presumption in context of summary judgment).  This is especially true here, where the Rouvieres do not proffer a specific warning that DePuy should have included.  At most, the Rouvieres appear to be arguing that DePuy should have alerted Dr. Buly to the impingement risk.  But even if we presume that such a warning would have been heeded, in the absence of any evidence of what such a warning would have said and that it would have told Dr. Buly of anything significant he did not already know, the Rouvieres would still need evidence that Dr. Buly would have done something differently as a result.

At trial, the Rouvieres would bear the burden of proof.  Thus, at the summary judgment stage, DePuy can seek summary judgment by "point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  That is what DePuy did here.  This shifted the burden of production to the Rouvieres to "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Id.*  The Rouvieres have not done so with respect to proximate causation because there is no evidence upon which a reasonable juror could conclude that a different warning would have led to a different result.  *See Sosna*, 748 N.Y.S.2d at 549 ("[I]t remains plaintiff's burden to prove that defendant's failure to warn was a proximate cause of his injury and this burden includes adducing proof that the user of a product would have read and heeded a warning had one been given.") (cleaned up).

Jodi Rouviere concedes that she relied entirely on Dr. Buly to choose the components in her hip replacement device.  She proffers no basis upon which to dispute Dr. Buly's testimony that he was aware of the risk of impingement and that Rouviere had an elevated risk of impingement.  It is thus not enough to show that Dr. Buly may not have known of the exact magnitude of the impingement risk and that additional warnings would have informed Dr. Buly

of those risks.  Rather, the Rouvieres had to proffer testimonial, documentary, or expert evidence regarding the magnitude of the risk and how it differed from the risk of which Dr. Buly was aware or that would otherwise allow a reasonable juror to infer that Dr. Buly would have done something different had he received different warnings.  *See Adeghe*, 2017 WL 3741310, at *7 (granting summary judgment on failure-to-warn claim because the plaintiff "cites no direct evidence, such as the testimony from his doctors, that Plaintiff would not have been prescribed Risperdal in the same manner if the warning were more extensive . . . [n]or does Plaintiff adduce any evidence suggesting that a physician balancing the risks of Risperdal-induced gynecomastia against the benefits of Risperdal would conclude that Risperdal should not have been prescribed to Plaintiff").  There is simply no such evidence in the record, so the Rouvieres have not met their summary judgment burden of production as to this theory of proximate causation.

>   **b.    Whether different warnings by DePuy would have led Dr. Buly to give additional warnings to Rouviere, leading Rouviere not to consent to the surgery**

The Rouvieres' alternative theory of proximate causation is based not on Dr. Buly's choice of components but on Jodi Rouviere's choice to undergo the surgery.  The Rouvieres argue that additional warnings by DePuy would have resulted in additional warnings by Dr. Buly to Jodi Rouviere, and that, had she received these warnings, Rouviere would not have consented to the surgery.  This theory rests on three premises: (a) that Dr. Buly did not fully warn the Rouvieres about the risk of component impingement and the presence of toxic metals; (b) that, had DePuy given Dr. Buly more robust warnings, he would have in turn given more robust warnings to Rouviere about impingement, toxic metals, and metallosis; and (c) that, upon hearing those warnings, Rouviere would not have consented to the surgery.

Even assuming that the first premise is correct, the Rouvieres proffer no evidence as to the second premise—that additional warnings by DePuy would have led Dr. Buly to give

additional warnings to Jodi Rouviere.  As previously discussed, there is no evidence that additional warnings about impingement would have changed Dr. Buly's choice of components. The same lack of evidence applies to Dr. Buly's choice of warnings.  The Rouvieres point to no evidence that additional warnings from DePuy would have resulted in a different conversation between Dr. Buly and Jodi Rouviere concerning the risks of impingement.

The same result follows for the Rouvieres' claim that if DePuy had disclosed to Dr. Buly that the stem contained toxic metals, Dr. Buly would have relayed that information to Jodi Rouviere.  That is partially because Dr. Buly testified to the exact opposite:  When presented with the list of metals in DePuy's stem, he testified that this knowledge would not have affected his choice of components or his choice of warnings.  *See* Dkt. No. 316-1 at 280–89; *see also, e.g.*, *id.* at 282 (Question: "If you were aware in August of 2012 that trace amounts of lead, here 30 parts per million max, were permitted and in HA coating, would you have recommended a different stem for Jodi Rouviere?"  Answer: "No."); *id.* at 282–83 (Question: "If you were aware in August of 2012 that trace amounts of lead, again, 30 parts per million, were allowed in the HA coating, would you have given any different warning to Jodi Rouviere?"  Answer: "No.").[8]  It is also because there is nothing in the facts and circumstances or in the nature of the unwarned risk

---

[8] Because the Rouvieres have not adduced evidence as to the second premise of this proximate-cause theory, the Court need not address the third premise—that Rouviere would not have consented to the surgery had she been given additional warnings. The Rouvieres' brief states that, had Jodi Rouviere been made aware of the impingement risk or of the existence of toxic metals, she would not have consented to the surgery.  But neither statement is accompanied by a citation to the record.  *See* Dkt. No. 233 at 33, 41.  And while Jodi Rouviere submitted a detailed declaration about her pre-surgery discussions with Dr. Buly, nowhere in that declaration does she state that she would not have consented to the surgery had she been given additional warnings.  *See* Dkt. No. 231-13.  Rouviere's deposition testimony arguably says that she would not have consented to the surgery had she known of the risk of metal wear, but it does not say that she would not have consented to the surgery had she just been notified of the exact metal contents of the DePuy stem.  *See* Dkt. No. 316-6 at PDF pp. 329–32.

that could lead a jury to conclude that Dr. Buly would have given additional warnings.  In its Local Civil Rule 56.1 statement, DePuy states that "Dr. Buly testified that after reviewing these material specifications he would continue to use the DePuy Summit Stem and Biolox Delta ceramic head and that he did not see any reason to provide any new or additional warnings to his patients."  Dkt. No. 227 ¶ 65.  The Rouvieres' response points to no evidence undermining the veracity of Dr. Buly's statement, nor does it offer any evidence that a reasonable surgeon would have reached a different conclusion.

In sum, the Rouvieres proffer no evidence that additional warnings by DePuy would have led Dr. Buly to choose different components or to give additional warnings to Jodi Rouviere. Thus, while the Rouvieres have adduced evidence as to the inadequacy of DePuy's warnings, they have not met their burden to adduce evidence of proximate causation.  Summary judgment is therefore granted for DePuy on the Rouvieres' negligence and strict-products-liability claims (counts one and two) to the extent they are based on a failure-to-warn theory.

## F.      The Loss-of-Consortium Claim

Andre Rouviere's loss-of-consortium is derivative of Jodi Rouviere's claims.  Since DePuy is entitled to summary judgment on Jodi Rouviere's claims, it is entitled to summary judgment on the loss-of-consortium claim as well.  *See Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996) ("[S]ince none of Mr. Griffin's claims survive, Mrs. Griffin's derivative claims alleging loss of consortium must also be dismissed.").

## CONCLUSION

The Rouvieres' objection to Magistrate Judge Aaron's orders at Docket Nos. 232 and 266 is OVERRULED.  The Rouvieres' motion to supplement the summary judgment record is GRANTED insofar as it seeks to include the supplemental Gannon and Bobst reports in the

record but is DENIED insofar as it seeks additional briefing.  DePuy's motion for summary

judgment is GRANTED as to all claims against it.

The Clerk of Court is respectfully directed to close Docket Nos. 178 and 308 and dismiss

DePuy from this case.

SO ORDERED.

Dated: September 17, 2021
    New York, New York

_____
LEWIS J. LIMAN
United States District Judge