**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JODI ROUVIERE and ANDRE ROUVIERE,<br><br>    Plaintiff,<br><br>    v.<br><br>DEPUY ORTHOPAEDICS, INC. n/k/a MEDICAL DEVICE BUSINESS SERVICES, INC. and HOWMEDICA OSTEONICS CORPORATION d/b/a STRYKER ORTHOPAEDICS,<br><br>    Defendants. | Case No.: 1:18-cv-04814-LJL-SDA |

**BRIEF IN SUPPORT OF DEFENDANT HOWMEDICA**
**OSTEONICS CORP.'S MOTION FOR SUMMARY JUDGMENT**
**DISMISSING THE AMENDED COMPLAINT BASED ON**
**STATUTE OF LIMITATIONS**

**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York 10019-3701
(212) 613-2000

*Attorneys for Defendant*
*Howmedica Osteonics Corp.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ........................... 2

      A.    Jodi Rouviere's Medical History and August 2012 Total Hip
            Replacement .................................................................................. 2

      B.    Timing of Ms. Rouviere's Claimed Injury and Post-Injury Course ........... 3

      C.    Relevant Procedural History ........................................................ 4

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ..................................................................................................... 6

    I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED BY NEW YORK'S
         THREE-YEAR PERSONAL INJURY STATUTE OF LIMITATIONS. .............. 6

      A.    The claimed injuries began in 2012. ........................................ 8

      B.    Additional evidence of pre-May 31, 2015 injuries ................... 10

         i.    Evidence of Injury in late 2012 and 2013 ................... 11

         ii.    Evidence of Injury in 2014 .......................................... 13

         iii.    Evidence of Injury in 2015, before May 31st ............... 13

      C.    Plaintiffs' claims are time-barred regardless of whether CPLR
         §214-c applies. ......................................................................... 14

      D.    The "Unknown Cause" exception of CPLR §214-c(4) does not
         apply .......................................................................................... 17

    II.    PLAINTIFFS' CLAIMS FOR IMPLIED AND EXPRESS
         WARRANTIES ARE TIME-BARRED. ......................................... 24

    III.    ANDRE ROUVIERE'S DERIVATIVE LOSS OF CONSORTIUM
         CLAIM MUST BE DISMISSED. .................................................. 25

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress and Co.*,
  398 U.S. 144 (1970)..............................................................................................6

*Aetna Life & Cas. Co. v. Nelson*,
  67 N.Y.2d 169 (1988) ..........................................................................................7

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................6

*Baker v. Stryker Corp.*,
  770 Fed. Appx. 12 (2d. Cir. 2019)..........................................................7, 16, 17, 24

*Bank United, N.A. v. Merritt Envtl. Consulting Corp.*,
  360 F.Supp.3d 172 (S.D.N.Y. 2018)......................................................................6

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
  752 F.2d 523 (2d Cir. 1985)..........................................................................11, 21

*Blanco v. Am. Tel. & Tel. Co.*,
  90 N.Y.2d 757 (1997) ..........................................................................................7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..............................................................................................5

*Diaz v. Johnson & Johnson*,
  2021 WL 3087633 (W.D.N.Y. 2021) ..................................................................18

*Ferreri v. McGhan Med. Corp.*,
  1997 WL 580714 (S.D.N.Y. 1997)......................................................................16

*Frye v. United States*,
  293 F. 1013 (DC. Cir. 1923) ..............................................................................21

*Galleta v. Stryker Corp.*,
  283 F. Supp.2d 914 (S.D.N.Y. 2003)............................................................16, 24

*Galliard v. Bayer Corp.*,
  986 F. Supp. 2d 241 (E.D.N.Y. 2013) ................................................................18

*Giordano v. Market Am., Inc.*,
  15 N.Y.3d 590 (2010)..........................................................................................21

*Griffin v. Garratt-Callahan Co.*,
　74 F.3d 36 (2d Cir. 1996) .................................................................................25

*Guaranty Trust Co. v. York*,
　326 U.S. 99 (1945) ...........................................................................................6

*Guisto v. Stryker Corp.*,
　293 F.R.D. 132 .......................................................................................7, 17, 24

*Kilmer v. Flocar, Inc.*,
　212 F.R.D. 66 (N.D.N.Y. 2002) .........................................................................7

*Kronos, Inc. v. AVX Corp.*,
　81 N.Y.2d 90, 595 N.Y.S.2d 931 (1993) ...........................................................7

*Martin v. Edwards Labs.*,
　60 N.Y.2d 417 (1983) ........................................................................................7

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986) ...........................................................................................6

*Peckham Materials Corp. v. Raima Corp.*,
　1995 WL 422158 (S.D.N.Y. 1995) ...................................................................11

*Perciballi v. Ethicon, Inc.*,
　2021 WL 810339 (E.D.N.Y. 2021) .....................................................................7

*Quinn v. Syracuse Model Neighborhood Corp.*,
　613 F.2d 438 (2d Cir. 1980) ...............................................................................6

*Schrader v. Sunnyside Corp.*,
　297 A.D.2d 369, 747 N.Y.S.2d 26 (2d Dep't 2002) .........................................24

*Schwartz v. Osteonics Corp.*,
　1999 WL 425892 (2d Cir. 1999) ............................................................6, 15, 16

*Sologub v. City of N.Y.*,
　202 F.3d 175 (2d Cir. 2000) ...............................................................................6

*Stuart v. Am. Cyanamid Co.*,
　158 F.3d 622 (2d Cir. 1998) ...........................................................................6, 7

*Wetherill v. Eli Lilly & Co. (In re N.Y. County DES Litig.)*,
　89 N.Y.2d 506 (1997) ................................................................................15, 16

*Whitney v. Quaker Chemical Corp.*,
　1997 WL 354928 (N.Y. 1997) ..........................................................................17

**Statutes**

N.Y. U.C.C §2-725 .......................................................................................................24

N.Y. U.C.C. §2-725(1) ...............................................................................................24

**Rules**

CPLR §202 ...................................................................................................................7

CPLR §214 ...................................................................................................................7

CPLR §214 .................................................................................................................24

CPLR §214(5) ..............................................................................................................7

CPLR §214-c ...................................................................................................... *passim*

CPLR §214-c(2) ..........................................................................................................15

CPLR §214-c(4) .................................................................................................. *passim*

Fed. R. Civ. P. 56 ....................................................................................................5, 6

Local Rule 56.1 ..........................................................................................................10

## PRELIMINARY STATEMENT

Plaintiffs' Complaint is time-barred by New York's three-year personal injury statute of limitations.  Plaintiffs assert medical device products liability claims arising out of an August 14, 2012 right total hip replacement surgery in which Plaintiff, Jodi Rouviere, was implanted with certain prosthetic hip components made and sold by Howmedica Osteonics Corp. ("HOC") and DePuy Orthopaedics, Inc. ("DePuy").  Ms. Rouviere alleges that shortly after implant surgery in August 2012, she began to experience pain and instability in her right hip, as well as immunological and neurological symptoms, such as fatigue, nausea, headaches, vision impairment, weakness, and dizziness/vertigo.  Plaintiffs and their experts attribute these symptoms to impingement (*i.e.*, direct contact) between the DePuy titanium femoral stem and the HOC cobalt chrome MDM® liner component during Ms. Rouviere's normal use of her hip, and metal debris (predominantly titanium) generated as a result of the component impingement.

As will be demonstrated below, New York's three-year personal injury statute of limitations applies to this action and began to accrue when the injury first occurred, which happened when Ms. Rouviere first began to experience any of the symptoms claimed to have been caused by her hip implants.  Based on Ms. Rouviere's well-documented medical history, her pleadings, testimony and expert disclosures, it is clear that the statute of limitations began running in August or September 2012, when she first developed symptoms, and expired in August or September 2015.  Plaintiffs did not file their Complaint until May 31, 2018, *nearly six years after* her injury first occurred and nearly three years after the statute of limitations expired.  Therefore, Plaintiffs' claims are time-barred, and the Amended Complaint should be dismissed in its entirety with prejudice.

As further demonstrated below, even if the Court applies New York's discovery rule, which applies only to cases of latent injury from exposure to toxic substances, the outcome would be the

same.  Specifically, the "discovery" referred to in the statute, NY Civil Practice Law & Rules ("CPLR") §214-c, is discovery of the *injury*, which under New York law happened when Plaintiff first became aware of symptoms, not discovery of the *cause* of the injury, i.e., when Ms. Rouviere or her doctors linked her injury to her hip replacement components.  CPLR §214-c is also inapplicable for other reasons, which are fully explained in Sections I(C) and (D), *infra*.

Finally, in the event the Court analyzes Plaintiffs' breach of warranty claims under contract principles and applies the four-year warranty statute of limitations found in New York's Uniform Commercial Code, such warranty claims are untimely because the four-year Uniform Commercial Code statute of limitations begins to run from date of delivery of the goods, which in a medical device case occurs no later than the date of implant, or in this case, August 10, 2012.  Therefore, the four-year statute of limitations for breach of warranty expired on August 10, 2016, long before Plaintiffs filed their Complaint on May 31, 2018.

Because Ms. Rouviere's claims are time-barred, the derivative loss-of-consortium claim asserted by her spouse, Andre Rouviere, is also subject to dismissal.  Accordingly, the Amended Complaint should be dismissed in its entirety with prejudice.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    Jodi Rouviere's Medical History and August 2012 Total Hip Replacement

In July 2009, Jodi Rouviere injured her right hip in a kitchen mishap at her home. (Exh. A, Deposition of Jodi Rouviere ("JR Dep.") at 68:21-69:12[1]; Joint Statement of Facts[2] ("JSOF"), ¶1) Over the next few years, Ms. Rouviere underwent multiple arthroscopic procedures on her right and left hips. (Exh. A, JR Dep., 75:21-25; 80:25-81:8; 84:1-5; JSOF, ¶2)  Shortly after her third

---

[1] All referenced exhibits are attached to the accompanying Declaration of Paul E. Asfendis.

[2] This refers to the Joint Statement of  Undisputed Material Facts submitted in support of the instant motion.

arthroscopic hip procedure, Ms. Rouviere was given a likely diagnosis of Ehlers-Danlos Syndrome, a connective tissue disorder, by Deborah Barbouth, M.D. (Exh. A, JR Dep., 85:16-86:20; 91:16-92:14; JSOF, ¶3)  After failure of conservative treatment, on August 14, 2012, Ms. Rouviere underwent a right total hip replacement surgery at the Hospital for Special Surgery in New York, performed by Dr. Robert Buly. (Exh. B, Aug. 14, 2012 Operative Report; JSOF, ¶4) During that surgery, Dr. Buly implanted a DePuy titanium femoral stem and ceramic head, as well as a Stryker (i.e., HOC) MDM® liner (made from cobalt chrome), polyethylene insert,[3] and titanium acetabular cup.  (Exh. B, Aug. 14, 2012 Operative Report; JSOF, ¶5)

### B.      Timing of Ms. Rouviere's Claimed Injury and Post-Injury Course

According to Jodi Rouviere's Interrogatory Responses, the injuries from the device began "upon implementation" (i.e. "implantation").  (Exh. C, JR Interrogatory Responses, No. 9; JSOF, ¶6) ("The device caused injury upon implementation, physiological instability, toxicity, and toxic result over time.")  Ms. Rouviere asserts that on multiple occasions in September 2012, as a result of the hip implants, she experienced "extreme dizziness and vertigo," as well as nausea and vomiting, which are documented in an Emergency Room visit on September 11, 2012.  (*See* Exh. D, Jodi Rouviere Declaration, filed at ECF No. 233-19, ¶8; Exh. E, Andre Rouviere Declaration, filed at ECF No. 233-21, ¶9; Exh. M, Sandhouse Records, pp. 285-286; JSOF, ¶7)

According to the Amended Complaint, "Post-operatively, Ms. Rouviere's "MDM®X3®" ADM/MDM System, "The Restoration®" ADM/MDM System failed. [B]y by the beginning of 2013, she experienced pain and loss of range of motion."  (ECF No. 26, Amended Complaint, ¶209; JSOF, ¶9)  Additional fact and expert evidence demonstrating that Ms. Rouviere's claimed injury occurred at or shortly after her August 2012 implant surgery is set forth in Section I(A) and

---

[3] The MDM® X3 polyethylene insert is referred to in the operative report as a "polyethylene head."

(B), i*nfra.*

On November 11, 2016, Ms. Rouviere underwent a partial right hip revision surgery to remove and replace the MDM® liner and insert, as well as the DePuy femoral head.  The revising surgeon, Dr. Carlos Alvarado, observed that the DePuy titanium stem had impinged upon the MDM cobalt chrome liner resulting in a notch in the neck of the titanium stem.  He observed "a significant amount of grayish brown soft tissue consistent with metal debris," which he stated was indicative of "metallosis."  (*See* Exh. F, November 11, 2016 Operative Report; Exh. G, November 13, 2016 Discharge Summary; JSOF, ¶19)

Ms. Rouviere underwent two additional revision surgeries in February 2017 and May 2017, respectively, to remove and replace various components in her right hip.  (Exh. A, JR Dep., 180:6-11; 189:14-18; 192:22-193:2; JSOF, ¶21)  Ultimately, in October 2017, at Ms. Rouviere's request, Dr. Alvarado performed a Girdlestone procedure in which all of the hip components were removed. (*Id*., 203:1-5; JSOF, ¶22)

### C.   <u>Relevant Procedural History</u>

Plaintiffs filed this lawsuit on May 31, 2018 against DePuy International, Limited, DePuy Orthopaedics, Inc., DePuy Products, Inc., Johnson & Johnson Services, Inc., Howmedica Osteonics Corp., Stryker Corporation and Stryker Sales Corporation.  (ECF No. 1)  On October 19, 2018, Plaintiffs filed the operative Amended Complaint against the same entities alleging that Ms. Rouviere was injured as a result of component impingement between the HOC MDM® liner and the DePuy Summit Stem.  (ECF No. 26, Amended Complaint; ECF No. 227, Plaintiffs' Response to DePuy Statement of Material Facts, ¶45.) Plaintiffs asserted five causes of action against HOC, including Negligence (Count V), Strict Products Liability (County VI), Breach of Express Warranty (Count VII), Breach of Implied Warranty (Count VIII) and Loss of Consortium (County IX).  (*Id.*)

On December 10, 2018, Plaintiffs voluntarily dismissed their claims against incorrect defendants, Stryker Corporation and Stryker Sales Corporation. (ECF Nos. 43, 44)  On January 7, 2019, HOC filed an Answer to the Amended Complaint denying the allegations and asserting, among others, an affirmative defense based on expiration of the applicable statute of limitations. (ECF No. 54)

On September 21, 2020, Plaintiffs disclosed reports of the following expert witnesses: Francis H. Gannon, M.D., Sol Bobst, Ph.D., Jan William Cohen Tervaert, M.D. Dan Bagwell, and an engineering expert who was later disqualified.  (ECF No. 158)  On November 9, 2020, Plaintiffs disclosed engineering expert, John Jarrell, Ph.D.  (ECF No. 212)

On September 17, 2021, the Court granted summary judgment to DePuy Orthopaedics, Inc., based on Plaintiffs' failure to disclose a liability expert against DePuy.  (ECF No. 318)  The Amended Complaint was dismissed against DePuy in its entirety, leaving HOC as the only remaining defendant.

Depositions of experts were completed on January 21, 2022.  On February 17, 2022, the Court and remaining parties had a conference to discuss scheduling of *Daubert* and dispositive motions.  HOC indicated that it intended to make several *Daubert* motions and a summary judgment motion on various grounds, several of which were related to the Daubert motions, as well as one discrete ground: statute of limitations.  After discussion, the Court directed HOC to file a summary judgment motion based only on statute of limitations by March 18, 2022.  The Court indicated that HOC's *Daubert* and other summary judgment arguments would be preserved pending the outcome of the statute of limitations summary judgment motion.

## LEGAL STANDARD

Summary judgment is appropriate where, as here, there exists no dispute of material fact and judgment is warranted as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*,

477 U.S. 317, 323-24 (1986).  In deciding a motion for summary judgment, the court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub v. City of N.Y.*, 202 F.3d 175, 178 (2d Cir. 2000).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157 (1970).  The non-moving party then has the burden of coming forward with specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56.  To meet this burden, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[M]ere conclusory allegations or denials" are not sufficient to defeat a motion for summary judgment. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).  A genuine issue of fact only exists when sufficient evidence is tendered favoring the non-movant such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Here, the undisputed facts overwhelmingly demonstrate that Plaintiffs' claims are barred by the statute of limitations, and thus, HOC is entitled to summary judgment as a matter of law.

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS ARE TIME-BARRED BY NEW YORK'S THREE-YEAR PERSONAL INJURY STATUTE OF LIMITATIONS.

In diversity actions, New York federal courts "must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998) (*citing Guaranty Trust Co. v. York*, 326 U.S. 99, 108-09 (1945)). *See also Schwartz v. Osteonics Corp.*, 1999 WL 425892 (2d Cir. 1999) (applying New York's statute of limitations to a diversity action); *Bank United, N.A. v. Merritt Envtl. Consulting Corp.*, 360 F.Supp.3d 172, 184 (S.D.N.Y. 2018) (same).  Accordingly, "New York courts generally apply New York's statute of limitations,

even when the injury giving rise to the action occurred outside of New York." *Stuart*, 158 F.3d at 627.[4]

Under New York law, a plaintiff must file a personal injury action within three years of the accrual of that cause of action for it to be deemed timely. *See* N.Y. CPLR §214(5). "A cause of action accrues for purposes of CPLR 214 'when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court.'" *Blanco v. Am. Tel. & Tel. Co.*, 90 N.Y.2d 757, 767 (1997) (quoting *Aetna Life & Cas. Co. v. Nelson*, 67 N.Y.2d 169 (1988)). "In cases involving the malfunction of medical devices 'implanted or inserted into the human body,' the statute of limitations 'runs from the date of the *injury resulting from the malfunction*.'" *Baker v. Stryker Corp.*, 770 Fed. Appx. 12, 14 (2d. Cir. 2019) (*quoting Martin v. Edwards Labs.,* 60 N.Y.2d 417, 422 (1983)) (emphasis in original). *See also Perciballi v. Ethicon, Inc.*, 2021 WL 810339, *4 (E.D.N.Y. 2021) (holding that the three-year personal injury statute of limitations begins to run "when the product first injured the plaintiff"); *Guisto v. Stryker Corp.*, 293 F.R.D. 132, 135 ("For implants the time period is three years from the date of injury resulting from malfunction…"); *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934 (1993) (it is the date of injury, "rather than the wrongful act of defendant or discovery of the injury by plaintiff," that is the relevant date for marking accrual).

Here, Plaintiffs filed their original Complaint on May 31, 2018. *See* ECF No. 1. For Plaintiffs' claims to be timely, Jodi Rouviere's claimed injuries cannot have occurred before May

---

[4] An exception to this general rule, New York's "borrowing statute," CPLR 202, applies where a non-resident plaintiff sues upon a cause of action that arose outside of New York, and provides that the shorter limitations period between New York and the plaintiff's resident state must apply. *See Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998). *See also Kilmer v. Flocar, Inc.*, 212 F.R.D. 66, 70 (N.D.N.Y. 2002) ("non-New York State residents always face the shorter statute of limitations as between New York and the accrual state.") New York's borrowing statute is inapplicable here where the cause of action arose in New York, but even if it did apply, it would result in application of New York's three-year statute of limitations, which is shorter than the four-year statute of limitations of Florida, Plaintiffs' home state. It should also be noted that this Court has already applied New York law to Plaintiffs' products liability claims in this case in its Decision on DePuy's summary judgment motion. (*See* ECF No. 318, p. 25.)

31, 2015.  However, the evidence demonstrates conclusively that Jodi Rouviere's claimed injuries and related symptoms began in 2012 and continued repeatedly thereafter.

A.    **The claimed injuries began in 2012.**

Among the injuries claimed by Ms. Rouviere in this action include "physiological instability," pain, swelling, inflammation, adverse tissue reaction, necrosis, pseudotumor, "metallosis" and toxicity resulting from metal debris generated by her hip components, as well as lack of mobility of the hip.  (*See* ECF No. 26, Amended Complaint, ¶¶127-128; Exh. C, JR Interrogatory Responses, No. 9; JSOF, ¶23)  In addition to instability, which would have been present since implantation, her disclosed experts identify local and systemic injuries caused by metal debris released from her 2012 implants, including chronic fatigue, nausea, headaches, weakness, dizziness/vertigo, cognitive impairment, hip and other joint and muscle pain, tachycardia[5], "dry eyes/blurred vision, and other immunological and neurological symptoms. (*See* JSOF, ¶24; Exh. H, Tervaert Expert Report, pp. 3, 5-7; Exh. L, Tervaert Dep., 89:18- 91:4, 132:11-14, 133:2-12; 134:9-18; Exh. I, Frank Gannon Expert Report, p. 1; Exh. J, Bobst Expert Report, pp. 2-3; Exh. K, Bobst Deposition, pp. 74:13-75:21; Exh. S, Jarrell Report, p. 8, ¶¶13-14) [6]

It is indisputable based on Plaintiffs' discovery responses and expert reports that Ms. Rouviere's claimed injuries began upon or shortly after implantation in August 2012.  By Ms. Rouviere's own admission in her interrogatory responses, her injuries began "upon implementation" (i.e., implantation), which occurred in August 2012.  (Exh. C, JR Interrogatory Responses, No. 9; JSOF, ¶6)  In fact, Plaintiffs' entire theory of medical causation is founded upon the instability and impingement of Ms. Rouviere's hip replacement, which began at the time of

---

[5] Tachycardia occurs when the heart rate increases to over 100 beats per minute.

[6] HOC refers to Plaintiffs' expert's reports and testimony because Plaintiffs are bound by them in this action, however, HOC expressly reserves the right to file *Daubert* motions challenging Plaintiffs' experts.

implantation, and various symptoms caused by the metal debris generated by impingement, which began shortly after her 2012 implant surgery.   For example, her treating immunologist and disclosed expert in this case, Dr. J.W. Cohen Tervaert, based his medical causation opinion on the premise that Ms. Rouviere began exhibiting symptoms of her claimed injury in 2012, shortly after her implant surgery.   He states in his expert report that at his examination of Jodi Rouviere on April 30, 2019, Ms. Rouviere "mentioned that she suffered from fatigue since 2012.  The problems started after hip implantation…"  (Exh. H, Tervaert Expert Report, p. 3; JSOF, ¶25)  He made this point even more clearly at his deposition wherein he supported his diagnosis of ASIA (Autoimmune Syndrome Induced by Adjuvants), and his opinion that ASIA was caused by the metal debris from the device components implanted in August 2012, by pointing out that Ms. Rouviere's ASIA symptoms began shortly after implant surgery in 2012.  (Exh. L, Tervaert Dep, 132:11-14) ("[W]hat happened is that in 2012 the hip implants were placed, she started to develop all the symptoms that are compatible with ASIA."); 134:9-18 ("When I saw her, she mentioned that it [chronic fatigue] started in 2012…after the hip implant.") (*See also*, JSOF, ¶¶26-27) Dr. Tervaert also relied on the fact that her symptoms began in 2012 after her implant surgery as a basis for him to rule out the subsequent components implanted in 2016 or 2017 revision surgeries as a potential cause of her symptoms.  (*Id*. at 133:2-12) ("As mentioned, her ASIA symptoms started in 2012. The trigger can't be in 2016 or 2017.") (*See also* JSOF, ¶27)

Similarly, Plaintiffs' expert toxicologist, Dr. Sol Bobst, also relied on Ms. Rouviere's injuries having first occurred in 2012 as support for his causation opinion.  He opined in his expert report, "Exposure to metals from medical device degradation is likely to have begun in 2012 following her first surgery."  (Exh. J, Bobst Expert Report, p. 3; JSOF, ¶28) He also stated in his report, "*Since her first surgery*, she has experienced neurological and immunological symptoms."

(Exh. J, Bobst Expert Report, p. 3) (emphasis added)

Notably, in sworn Declarations in response to DePuy's Rule 56.1 Statement of Facts in support of its motion for summary judgment, Plaintiffs disputed that Ms. Rouviere initially did well after her August 2012 implant surgery, pointing out that on multiple occasions in September 2012, she experienced "extreme dizziness and vertigo," as well as nausea and vomiting, and even went to the Emergency Room on September 11, 2012 as a result of these symptoms. (Exh. D, JR Declaration, filed at ECF No. 233-19, ¶8; Exh. E, AR Declaration, filed at ECF No. 233-21, ¶9.) On September 12, 2012, Ms. Rouviere also complained to her osteopath, Dr. Mark Sandhouse, of dizziness and vomiting for the past two days. (Exh. M, Sandhouse Records, at 285-286; JSOF, ¶7). Plaintiffs and their experts claim these symptoms were caused by the August 2012 hip implants.

Based on the above, there can be no credible dispute that the injury claimed in this action began shortly after the implant surgery in 2012, a position that Plaintiffs and their experts consistently have taken throughout the litigation. Based upon the 2012 onset of injury, under the applicable New York statute of limitations, Plaintiffs' Complaint had to have been filed within three years of the start of those symptoms, *i.e.*, by sometime in August or September of 2015. However, Plaintiffs' Complaint was not filed until May 31, 2018, nearly six years after the injury, and therefore their claims are time-barred.

**B.    Additional evidence of pre-May 31, 2015 injuries**

Even without the evidence of accrual in August or September 2012, the claims would still be time-barred. Based on the May 31, 2018 filing of the Complaint, the critical date for purposes of analyzing the timeliness of Plaintiffs' claims is May 31, 2015. Specifically, Ms. Rouviere's symptoms would have had to start on or after May 31, 2015 in order for the Complaint to be timely. However, the record is replete with evidence of the very symptoms of injury claimed by Plaintiffs

in this action occurring repeatedly well before May 31, 2015.  Below are examples of just some of the evidence that has been established on the issue.[7]

### i.    Evidence of Injury in late 2012 and 2013

In **November 2012**, Ms. Rouviere complained to her osteopath of increasing right hip pain, as well as "searing, shooting pain down the right hip."  (Exh. M, Sandhouse Records, pp. 269-270; JSOF, ¶8)

According to the Amended Complaint itself: "Post-operatively, Ms. Rouviere's "MDM®X3®" ADM/MDM System, "The Restoration®" ADM/MDM System failed. [B]y **the beginning of 2013**, she experienced pain and loss of range of motion."  (ECF No. 26, Amended Complaint, ¶209; JSOF, ¶9) (emphasis added).  This assertion in Plaintiffs' Amended Complaint is a judicial admission that Ms. Rouviere's injury occurred no later than the beginning of 2013. *See Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 752 F.2d 523, 528-29 (2d Cir. 1985) (holding that a party's assertion of fact in a pleading is a judicial admission binding on that party); *Peckham Materials Corp. v. Raima Corp.*, 1995 WL 422158 (S.D.N.Y. 1995) (refusing to allow plaintiff to introduce evidence contradicting facts alleged in the Complaint). Even ignoring the 2012 accrual evidence and accepting early 2013 as when accrual of the statute of limitations began, Plaintiffs' Complaint would have to have been filed by early 2016 to be timely- it was not.

Also, consistent with the Amended Complaint, Ms. Rouviere stated in her interrogatory responses that she saw a doctor in **March 2013** regarding vision problems, eye pain, sinus pressure and headaches, all symptoms which she blames on her 2012 implants. (Exh. C, JR Interrogatory Responses, No. 2, and attachment to Responses, p. 34)

---

[7] Other examples abound in the medical records, but those records are extensive, and it would not serve the interests of brevity or efficiency to cite to and attach each and every one.

At her deposition, when asked how her health was in the **middle and later part of 2013**, Ms. Rouviere testified that her decline became even worse as 2013 progressed.  She testified:

> A:    Hmm. 2013 is I feel like when I started to see the most decline starting to happen.  So I feel like toward the middle to the end of 2013 is when I started to, you know, see more of a decline.
>
> Q:    And when you say more of a decline, can you be more specific?
>
> A:    More pain, more instability, less function.
>
> Q:    In which body part?
>
> A:    In my hip.
>
> Q:    All right. Which one?
>
> A:    The right.  I was -- 2013 -- 2013 I was receiving a lot of effects.  I was receiving effects from starting with -- let me think. Hold on.  Like upon exertion my heart would start beating harder.  I – taking, you know, it was taking a lot -- it was taking a lot for me to do the normal things that I was doing.  Exertion was exhausting for me.  My body was tiring.

(Exh. A, JR Dep., 135:8-136:1; JSOF, ¶10)

She also confirmed at her deposition that in **October 2013**, she treated with a neurologist, Dr. Brad Herskowitz, complaining of headaches, heaviness in her arms and legs, itching on her face and head, urinary urgency and hesitancy, and feeling like she had slowed down in general- all symptoms which Ms. Rouviere and her experts claim were caused by the 2012 implants.  (Exh. A, JR Dep., 141:4-24; JSOF, ¶11)  She also continued to have hip pain in around October 2013, another symptom of the injury claimed by Ms. Rouviere in this action. (*Id*. at 142:4-7; JSOF, ¶11)

Also, actual treatment records from Ms. Rouviere's osteopath, Dr. Mark Sandhouse, from **mid- to late 2013** reveal that she complained of instability and pain in her right hip and displacement of the hip on multiple occasions, symptoms which she attributes to her hip implants. (JSOF, ¶12; Exh. M, Sandhouse records: May 13, 2013 (displacement), May 29, 2013 (displacement); July 10, 2013 (right hip prosthesis bothering her, unstable and causing paresthesias

down the right leg); July 17, 2013 (right hip externally rotated); August 19, 2013 (right femur out); September 11, 2013 (right hip feels out, "grinding"; right hip externally rotated); November 4, 2013 (right hip is "horrible"; pain radiates down past thigh))

### ii.    Evidence of Injury in 2014

Ms. Rouviere also exhibited symptoms of her claimed injury in 2014.  For example, in her interrogatory responses, she states that in **February 2014** she visited a neurologist, Dr. Simon Starosta-Rubenstein, because she was concerned with her "functional neurological decline." (Exh. C, JR Interrogatory Responses, No. 2, and attachment to Responses, p. 30; JSOF, ¶13)

On **June 27, 2014**, she complained to her physical therapist of, among other things, vertigo, dizziness and lightheadedness, blurred and double vision, vision flashes and halos, tinnitus, nausea and vomiting, shaking episodes, tremors, changes in appetite, changes in sleep patterns, poor coordination, numbness in her right leg, chronic pain, joint pain, muscle pain at rest, hoarseness, speech difficulty with pain, weakness in legs and arms, and heart palpitations.  (Exh. N, Healy Physical Therapy records, pp. 2-5; JSOF, ¶14)  Again, Plaintiffs and their experts claim that these symptoms were caused by her 2012 hip implants.

### iii.    Evidence of Injury in 2015, before May 31st

On **May 17, 2015**, Ms. Rouviere was admitted to Doctor's Hospital because of recurring episodes of instability of the right hip.  The admission record notes that in addition to right hip pain, for the past eight months (*i.e.,* since at least September 2014) Ms. Rouviere had been "having problems with temperature regulation, tremors, blurred vision, cognitive impairment, dizziness and gaited instability." (Exh. O, Doctor's Hospital Records; JSOF, ¶15)  It is notable that at this time, she even suspected that her problems stemmed from metallosis relating to her hip implants.

13

*See* JSOF, ¶15; Exh. P, "Jodi Rouviere Medical"[8], filed at ECF No. 233-16, at 160) ("My hip mispositions again.  I cannot walk and am in excruciating pain. I am admitted to Doctor's Hospital (Coral Gables, FL) for 6 days of testing as I believe my unstable hip and neurological symptoms could be relational [sic] to metallosis.")

According to the Amended Complaint, blood testing performed in May 2015 demonstrated "highly elevated Chromium level of 0.9 [mcg/L], Arsenic of [mcg/L] 5…Plaintiff has no source of exposure to chromium and cobalt and other metals that would account for her elevated blood levels of chromium or cobalt and other metals other than the subject product."  (ECF No. 26, Amended Complaint, ¶¶210, 217; JSOF, ¶16)  These blood test results were received on **May 18, 2015**.[9]  (*See* Exh. P, "Jodi Rouviere Medical" at 161; Exh. Q, Blood Test Results)

Jodi Rouviere further testified that on **May 21, 2015**, she went to see Dr. Alvarado, an orthopedic surgeon, because her hip had "displaced a lot of times" and would get stuck, and also because she "was having so many systemic issues at the time..." (Exh. A, JR Dep., 148:4-149:8)

Although it is clear that the three year statute of limitations began to accrue in August or September 2012 for the reasons previously discussed, the above evidence of pre-May 31, 2015 injury onset only further demonstrates that Plaintiffs' claims are untimely.  Any one of the above instances from 2012, 2013, 2014 and 2015 would alone be sufficient to start the statute of limitations running, and in every instance would result in Plaintiffs' action being untimely.

**C.**     **Plaintiffs' claims are time-barred regardless of whether CPLR 214-c applies.**

In 1986, New York enacted CPLR §214-c, which allows for a discovery period with regard

---

[8] "Jodi Rouviere Medical" is the title of an approximately 438-page document provided by Ms. Rouviere which includes medical records and various notes Ms. Rouviere made regarding her medical history through April 2019.

[9] Although HOC takes issue with Plaintiffs' interpretation of Ms. Rouviere's reported blood metal levels as "highly elevated," it is notable that Plaintiffs clearly *believed* that the reported levels were highly elevated and were related to the 2012 hip implants.

to the accrual of the statute of limitations in actions to recover damages for personal injury caused by the "latent effects of exposure" to any substance.  *See* CPLR §214-c.  As explained by the New York Court of Appeals, this rule was enacted to overcome a line of decisions holding that toxic tort injuries occur- and therefore the claims accrue- on "impact" or exposure, even though symptoms of the resulting illness may not be manifested for a long time thereafter.  This often resulted in claims being barred before the individual even manifested symptoms of the illness.  *See Wetherill v. Eli Lilly & Co. (In re N.Y. County DES Litig.)*, 89 N.Y.2d 506, 513 (1997).  In such cases, CPLR §214-c(2) provides that the date upon which such an action must be commenced "shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier."  Importantly, the Court of Appeals has made clear that "discovery of the injury" means "discovery of the manifestations or symptoms of the latent disease that the harmful substance produced" (*Wetherill*, 89 N.Y.2d 506, 514), *not discovery of the cause*.  Specifically, the Court explained:

> …the only reasonable inference is that when the Legislature used the phrase "discovery of the injury" it meant discovery of the physical condition and not, as plaintiff argues, the more complex discovery of both the condition and the nonorganic etiology of that condition.

*Id.*  The Court noted that defining discovery of the injury as discovery of the etiology of the symptoms would not only run contrary to legislative intent but would "depend on such fortuitous circumstances as the medical sophistication of the individual plaintiff and the diagnostic acuity of his or her chosen physician."  *Id.* at 515.

Therefore, in a case governed by CPLR §214-c, the statute of limitations runs from the date when the plaintiff *first manifests symptoms of the claimed injury*.  For example, in *Schwartz v. Osteonics Corp.*, 1999 WL 425892 (2d Cir. 1999), the plaintiff claimed to have suffered osteolysis

15

(dissolution or loss of bone) as a result of exposure to her hip implant. *Id.* at *1-2. Plaintiff claimed that her cause of action did not accrue until diagnosis by her surgeon of a failed hip replacement. *Id*. at *2. Citing to the New York Court of Appeals' holding in *Wetherill*, the Second Circuit Court of Appeals noted that the dispositive question "is when Mrs. Schwartz discovered 'the manifestations or symptoms of the latent disease' that her artificial hip produced." *Id*. at *3 (citation omitted). The Court determined that the date plaintiff admitted to having first experienced thigh pain, one of the symptoms of the osteolysis that her artificial hip produced, was the date that her cause of action began to accrue, not the later date that her surgeon actually linked her pain to the hip replacement. *Id*. The Court affirmed dismissal of the Complaint. *See also Baker v. Stryker Corp*., 770 Fed. Appx. 12, FN1 (2d Cir. 2019) (finding that plaintiff discovered his injury when he began to experience enhanced pain and choking sensations very soon after his implant surgery, not later when he formed the view that one or both of his implants was defective); *Galleta v. Stryker Corp*., 283 F. Supp.2d 914, 917 (S.D.N.Y. 2003) ("The three year limitations period runs from the date when plaintiff first noticed symptoms, rather than when a physician first diagnosed those symptoms, so the significant date is when plaintiff began experiencing symptoms, not when Dr. Zelicof diagnosed them."); *Ferreri v. McGhan Med. Corp*., 1997 WL 580714, *3 (S.D.N.Y. 1997) ("The relevant date for statute of limitations purposes is not when a plaintiff received the 'correct' diagnosis of her medical condition, but rather when a plaintiff discovered the medical condition.")

Also, for purposes of the timeliness analysis, it does not matter if a plaintiff alleges that symptoms worsened and changed over time. Rather, it is the onset of any manifestation or symptom of the alleged injury that is critical to the analysis. *See Ferreri*, 1997 WL 580714, *3 ("Under New York law, neither erroneous diagnoses or progressive deterioration of a plaintiff's

condition tolls the statute of limitations"), *citing Whitney v. Quaker Chemical Corp*., 1997 WL 354928 at *1 (N.Y. 1997) (neither "plaintiff's contention that his symptoms worsened and changed" nor incorrect original diagnosis makes the claim timely)).

Here, HOC submits that CPLR §214-c is inapplicable because the crux of Plaintiffs' claim is that a mechanical problem (component-on-component impingement), present from the date of implant, caused pain and instability in Ms. Rouviere's hip.  *See* Exh. C, JR Interrogatory Responses, No. 9 ("The device caused injury upon implementation, physiological instability…"). *See also, e.g., Baker*, 770 Fed. Appx. 12, 15 (2d Cir. 2019) (CPLR §214-c found not to apply where alleged defectively sized implants caused pain almost immediately after implantation); *Guisto v. Stryker Corp*., 293 F.R.D. 132, 137 (E.D.N.Y. 2013) (CPLR §214-c found not to apply where plaintiff claimed loosening of her device caused pain almost immediately after implant surgery).  But even if CPLR §214-c is found to apply here because of Plaintiffs' claims of exposure to metal debris generated by the impingement process, the Complaint would *still* be untimely because the statute of limitations began to run from the date that Ms. Rouviere manifested symptoms of the claimed injury, which, as detailed above, first occurred in 2012, shortly after implant surgery, and continued to occur repeatedly thereafter.

### D.    The "Unknown Cause" exception of CPLR §214-c(4) does not apply.

CPLR §214-c contains an exception which allows the statute of limitations to run from discovery of the *cause* of the injury.  However, not only is the exception inapplicable to this action, the exception would not save Plaintiffs' Complaint even if it were applicable.  CPLR §214-c(4), the "unknown cause exception," provides:

> where the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury, or when with reasonable diligence such injury should have been discovered, whichever is earlier, an action may be commenced or a claim filed within one year of such discovery of the cause of the injury; provided however, if any such action is

> commenced or claim filed after the period in which it would otherwise have been authorized pursuant to subdivision two [] of this section the plaintiff or claimant shall be required to allege and provide that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized and that he has otherwise satisfied the requirements of subdivisions two [] of this section.

N.Y. CPLR §214-c(4).

In other words, in a toxic exposure case, depending on when the cause of the injury is alleged to have been discovered, a plaintiff in New York may be able to timely file a complaint within one year after discovering the cause, but only if the plaintiff alleges and proves (1) that discovery of the cause occurred less than five years after discovery of the injury; and (2) that during the three year period after symptoms first began, the causal relationship between the condition and the harmful substance was unknown to "the relevant technical, scientific or medical community." Plaintiffs have not alleged either of these elements.  Regardless, under the established facts the "unknown cause" exception cannot save Plaintiffs' Complaint.

First, Plaintiffs have not pled the requisite facts to support application of the exception. The burden is on the plaintiff to allege requisite facts showing that the statutory exception applies. *See Diaz v. Johnson & Johnson*, 2021 WL 3087633, *4 (W.D.N.Y. 2021).  At least one court has referred to CPLR §214-c(4) as a "specific pleading requirement," and refused to apply that section where the plaintiff made no supporting allegations in the Complaint itself.  *See Galliard v. Bayer Corp.*, 986 F. Supp. 2d 241, 249 (E.D.N.Y. 2013) ("Plaintiff has made no such allegation here. Instead, the complaint alleges only that her own doctors remained uncertain of the cause of her skin condition, but states nothing about when the causal relationship was generally accepted in the medical community, such that an expert could have testified about it in New York courts.") (citation omitted).  Here, Plaintiffs have not pled that they discovered the cause of injury within

18

five years of discovering the injury (i.e., within five years of first manifesting symptoms), or that

a causal relationship between Ms. Rouviere's claimed injuries (metallosis, etc.) and metal debris

and ions from implants was unknown to the scientific and medical community.  Nor have they

alleged that they filed the Complaint within one year of discovery of the cause.  Absent specific,

supported allegations in the pleadings, CPLR §214-c(4) is inapplicable.

     Moreover, the facts actually pled by Plaintiffs and argued by their experts indisputably rule

out application of CPLR §214-c(4) because they contend that the medical, scientific and technical

communities have long been aware that metal debris from prosthetic implants can cause pain,

adverse reactions/metallosis, and even in some instances, systemic issues similar to those

complained of by Ms. Rouviere.  Indeed, Plaintiffs' failure to warn claims in the Amended

Complaint are premised upon allegations that Defendants were aware before Ms. Rouviere's 2012

implant surgery that metal debris particles and ions shed from the devices could cause metallosis,

toxicity and other injuries and that Defendants should have warned of this in August 2012.  For

example, in Paragraph 88 of the Amended Complaint, Plaintiffs allege:

> Defendants have long been aware, including before Plaintiff's receipt of her
> Summit, that Summit Devices may result in metallosis, biologic toxicity,
> and high failure rate" and that the device components "when implanted,
> result[] [in] unsafe release of toxic metal particles and ions into hip implant
> recipients' tissue and bloodstream.  Plaintiff further alleges that Defendants
> were and continue to be aware that the metal particles from Summit Devices
> results in metallosis, tissue death and bone erosion.

(ECF No. 26, Amended Complaint, ¶88; JSOF, ¶29)  Plaintiffs similarly allege that HOC was "at

all relevant times" aware that the MDM® system "resulted in unsafe release of toxic metal ions

into the tissues and bloodstream of the recipients."  (*Id*. at ¶129; JSOF, ¶30).  In fact, pertinent to

what was known in the medical and scientific communities, Plaintiffs expressly alleged that

"[s]tudies published **prior to the Plaintiffs implant in 2012** have shown that exposure to

Titanium, Aluminum and other metals, hydroxyapatite and other coatings and textures applied can

cause severe inflammatory reaction secondary to wear particles and/or host immunological sensitivity." (*Id.* at ¶143 (emphasis added); JSOF, ¶31).

That Plaintiffs rely upon the fact that the medical, scientific and technical communities were long aware that metal debris from implants could cause adverse reactions and/or toxicity is also evident from the testimony of Ms. Rouviere's implanting surgeon, Dr. Buly, and from Plaintiffs' own experts. Dr. Buly testified to the following at deposition:

- He was aware well before August of 2012 that tissue reactions could be caused by metallic corrosion, allergic reactions, or the accumulation of metal wear debris (Exh. R, Buly Dep., 82:10-22)

- He was aware at the time of the August 2012 implant surgery that reaction to metal wear debris was a known risk in any total hip replacement. (*Id.*, 290:20-292:3)

- He was aware in August 2012 that metal debris or metal ions from hip replacement components could lead to adverse tissue reaction and metallosis. (*Id.*, 296:16-298:11)

(*See also*, JSOF, ¶32)

Plaintiffs' toxicology expert, Dr. Sol Bobst, cited studies from as far back as 1992 to support his opinion that Ms. Rouviere's local tissue reaction, as well as her neurological and systemic symptoms were caused by debris from her hip replacement device. He stated in his expert report:

> Debris-Mediated Osteolysis is a known issue that includes a spectrum of effects that include bone loss when an implant fails and releases metal debris into the surrounding tissue (**Clarke *et al* 1992**). Experimental studies *in vitro* evaluating the exposure of monocytes to Cobalt-Chromium nanoparticles and cobalt ions resulted in the release of THF-α, a likely mechanism related to the osteolysis (bone loss) in vivo (**Posada *et al* 2015**).[10] This is related to the known metal wear particles found in patients with metal hip replacements (**Doorn *et al* 1998**). The presence of metal ions in blood is also a recognized clinical indication used for evaluating the pathological impact of hip arthroplasty (**Campbell *et al* 2014**). A previous report in the literature of a patient that was implanted with a similar hip implant from the same manufacturer, around the same date and time as Ms.

---

[10] The referenced Posada article was first published in 2014, and then published in the *Toxicology In Vitro* journal referenced in Dr. Bobst's expert report in March 2015.

> Rouviere, experienced Cobalt levels in the blood (**Kao *et al* 2014**). Neurological symptoms have also been reported as systemic toxicity related to metal hip prostheses and Cobalt (**Bradberry *et al* 2014**).  Adverse effects on the immune system responding to the release of debris from hip replacements have also been documented (**Brown *et al* 2005**).  Cognitive symptoms have also been reported for patients that have received metal-on-metal hip prostheses that contain Cobalt. (**Mao *et al* 2011**). The presence of Cobalt has also been associated with immune response and osteo related pathology (**Queally *et al* 2009, Brock & Stopford 2003, Keegan *et al* 2007, Hart *et al* 2006**)…

(Exh. J, Bobst Expert Report, pp. 2-3; JSOF, ¶33)

In this same vein, Plaintiffs' biomedical engineering expert, Dr. John Jarrell, reported: "Reactions for metal on metal contact, wear debris and corrosion as it related to hip implants is known and documented in the scientific literature since at least 1975."  (Exh. S, Jarrell Expert Report, p. 34; JSOF, ¶34)[11]  He also opined that "[t]he risks from metal debris, are however well established in the scientific literature…" and cited a 1998 study as well as FDA guidance from 2004 in support.  (*Id*. at pp. 36-38)

Plaintiffs cannot credibly dispute their own repeated contention that the medical, scientific and technical communities were aware before Ms. Rouviere's August 2012 implant surgery of a potential causal link between metal debris from hip replacement components and the type of symptoms of which she complained after her August 2012 implant surgery.[12]  Plaintiffs have taken this position in their pleadings and through their experts and cannot now abandon that position in an attempt to evade the fact that their claims are time-barred.  *See, e.g., Bellefonte Re Ins. Co.,* 752

---

[11] Hon. Magistrate Judge Stewart D. Aaron previously authorized the redactions applied to this exhibit.  *See* ECF No. 241.  It should also be noted that Dr. Jarrell submitted a declaration to this Court which is essentially a sworn copy of his expert report.  *See* ECF No. 233-08.

[12] The standard for establishing the requisite community knowledge of a causal link for purposes of CPLR §214-c(4) is not a difficult one to meet.  The New York Court of Appeals has held that the test is one of general acceptance of the causal relationship in the relevant technical, scientific or medical community, *i.e.*, the same test used for admitting expert testimony about scientific principles under *Frye v. United States*, 293 F. 1013 (DC. Cir. 1923).  If testimony about the causal relationship would be admissible in New York courts, then the causal relationship is sufficiently established for purposes of CPLR §214-c(4).  *See Giordano v. Market Am., Inc.*, 15 N.Y.3d 590, 601-602 (2010).

F.2d 523, 528-29 (2d Cir. 1985) (a party's assertion of fact in a pleading is a judicial admission binding on that party).  Therefore, CPLR §214-c(4) cannot save Plaintiffs' Complaint.

Even assuming *arguendo* that scientific knowledge of a potential causal link between metal debris from hip implants and some of the symptoms such as Ms. Rouviere experienced not been so long established, CPLR §214-c(4) would *still* be inapplicable for yet another independent reason: it would only extend the time to file a complaint one year from discovery of the cause of the injury.  In this case, the very latest that Plaintiffs can credibly be said to have discovered a causal link between Ms. Rouviere's claimed injury- tissue reaction and metallosis- and the metal from her August 2012 implants was November 11, 2016, the date that she underwent surgery to revise her femoral head and the MDM system.[13]

According to the operative report, when Dr. Alvarado performed revision surgery on November 11, 2016, he observed "a significant amount of grayish brown soft tissue consistent with metal debris.  In addition there was a significant amount of posterior structure which had been destroyed from the aggressive medical [sic., "metal"] reaction.  I went ahead and debrided the posterior structures further to remove all metal debris."  (Exh. F, November 11, 2016 Operative Report; JSOF, ¶19)  In the November 13, 2016 Discharge Summary, Dr. Alvarado notes, "Intraoperative evaluation demonstrated tissue changes consistent with metallosis."  (Exh. G, November 13, 2016 Discharge Summary; JSOF, ¶19)  Ms. Rouviere testified:

> Q: After this revision procedure, did you talk to Dr. Alvarado about his findings and what he did?
>
> A:  Yes.
>
> Q: And what did he tell you?

---

[13] HOC disputes that Ms. Rouviere's claimed injuries were caused by her hip implants, but Plaintiffs have so claimed, and so the analysis of when the alleged causal link could and should have been discovered is relevant.

A: He told me that he was surprised to find that I was covered in metallosis.

Q: And when he said covered in metallosis, was he more specific?

A: Yes. He said that when he opened up, he saw that there was a lot of metal debris in the tissue surrounding the joint, and that that was indicative of metallosis poisoning.

Q: And did he use the words metallosis – the word metallosis?

A: Yes.

(Exh. A, JR Dep., 168:10-22; JSOF, ¶20)

A: He also told me that I had pseudotumors that were consistent to the damage to the tissue.

Q: He used the word pseudotumors?

A: Yes.

(*Id.*, 170:9-12; JSOF; ¶20)

Based on the above, for purposes of the CPLR §214-c(4) analysis, discovery of the cause of Ms. Rouviere's claimed injury, tissue reaction/metallosis, can reasonably have occurred no later than November 11, 2016, when Dr. Alvarado observed tissue reaction consistent, in his words, with metallosis, and allegedly told Ms. Rouviere that she was "covered in metallosis" and that her tissue was indicative of "metallosis poisoning."  Based on this, even if CPLR §214-c applied and the other requirements of CPLR §214-c(4) had been met (*they have not*), Plaintiffs would have had one year from November 11, 2016, or until November 11, 2017, to file their Complaint, but they did not do so until May 31, 2018.

For these reasons, CPLR §214-c(4) does not apply and cannot save Plaintiffs' Amended Complaint from dismissal.  Plaintiffs' claims are untimely, and the Amended Complaint should be dismissed with prejudice.

## II.   PLAINTIFFS' CLAIMS FOR IMPLIED AND EXPRESS WARRANTIES ARE TIME-BARRED.

Plaintiffs' claims sounding in implied and express warranty seek damages for personal injury and therefore should be found to be time-barred pursuant to CPLR §214, which applies to actions for personal injury.  However, some courts have analyzed breach of warranty claims under New York's Uniform Commercial Code, which applies to breach of contracts for sale, and so HOC briefly addresses this statute.

New York Uniform Commercial Code §2-725 establishes a four-year statute of limitations for breach of warranty claims.  *See* N.Y. U.C.C. §2-725(1) ("An action for breach of any contract of sale must be commenced within four years after the cause of action has accrued.")  "For such claims, the statute begins to run when 'the product is placed in the stream of commerce or at the time of sale by the manufacturer.'" *Baker*, 770 Fed. Appx. 12, 15 (2d Cir. 2019) (*quoting Schrader v. Sunnyside Corp.*, 297 A.D.2d 369, 747 N.Y.S.2d 26, 28 (2d Dep't 2002)). In a case involving a prosthetic implant, the statute begins to run no later than when the prosthesis is implanted into the plaintiff.  *See Baker* at 15 ("Baker's breach of warranty claim accrued, at the latest, when the customized implants were implanted on August 22, 2006, after they had been sold by the manufacturer to the hospital."); *Galetta v. Stryker Corp.*, 283 F. Supp. 2d 914, 916 (S.D.N.Y. 2003) (dismissing claims or breaches of express and implied warranties "because the polyethylene implant had to have been delivered to the hospital where the operation was performed prior to the date of the operation…"); *Guisto*, 293 F.R.D. 132 (E.D.N.Y. 2013) (dismissing implied and express warranty claims as having expired four years from date of implant).

Here, the four-year statute of limitations for breach of warranty under the Uniform Commercial Code began to run, at the latest, on the date the products at issue were implanted into Ms. Rouviere, August 14, 2012.  The four year statute of limitations expired on August 14, 2016,

almost two years before Plaintiffs filed their Complaint, and so regardless of whether the Court applies the three-year personal injury statute of limitations or the four-year Uniform Commercial Code statute of limitations, the result is the same: Plaintiffs' warranty claims are time-barred.

## III. ANDRE ROUVIERE'S DERIVATIVE LOSS OF CONSORTIUM CLAIM MUST BE DISMISSED.

As this Court previously held in granting DePuy summary judgment on Mr. Rouviere's loss-of-consortium claim, "Andre Rouviere's loss of consortium claim is derivative of Jodi Rouviere's claims. Since DePuy is entitled to summary judgment on Jodi Rouviere's claims, it is entitled to summary judgment on the loss-of-consortium claim as well." ECF No. 318, Opinion and Order, 38 (citing *Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996)). This holds true for HOC as well. Since HOC is entitled to summary judgment on Jodi Rouviere's claims, it is entitled to summary judgment on Andre Rouviere's loss-of-consortium claim as well.

## CONCLUSION

For the reasons set forth above, summary judgment should granted to Defendant Howmedica Osteonics Corp. based on statute of limitations and the Amended Complaint should be dismissed in its entirety with prejudice.

Dated: New York, New York
        March 18, 2022

                            Respectfully Submitted,


                            **GIBBONS P.C.**

                            By:   */s/Paul E. Asfendis*
                                  Kim M. Catullo
                                  Paul E. Asfendis
                                  One Pennsylvania Plaza, 37th Floor
                                  New York, New York 10119
                                  Tel.:  (212) 613-2000
                                  *Attorneys for Defendant*
                                  *Howmedica Osteonics Corp.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2022, the foregoing document was electronically filed and served on the following counsel of record:

Robert Godosky, Esq.
Godosky & Gentile, P.C.
100 Wall Street, Suite 1702
New York, New York 10005

Andre Rouviere, Esq.
4070 Laguna Street
Coral Gables, Florida 33146

s/ Paul E. Asfendis
Paul E. Asfendis