UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| JODI ROUVIERE and ANDRE ROUVIERE, | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | Case No. 1:18-cv-04814-LJL-SDA |
| DEPUY ORTHOPAEDICS, INC. n/k/a MEDICAL DEVICE BUSINESS SERVICES, INC. and HOWMEDICA OSTEONICS CORPORATION d/b/a STRYKER ORTHOPAEDICS, | ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT HOWMEDICA OSTEONICS CORP.'S MOTION FOR SUMMARY JUDGMENT DISMISSING THE AMENDED COMPLAINT BASED ON STATUTE OF LIMITATIONS**

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………… i

INTRODUCTION…………………………………………………………………….1

PRELIMINARY STATEMENT……………………………………………………..… 1

RELEVANT FACTUAL HISTORY…………………………………………...……….. 3

        A.  JODI ROUVIER'S MEDICAL HISTORY………………………………….3
        B.  DEFENDANT'S EXPERT ANALYSIS…………………………………….

LEGAL STANDARD……………………………………………………………….7

ARGUMENT…………………………………………………………………………10


    1.  Plaintiff's Claims Are Timely Pursuant To New York State Law, Specifically CPLR 214-C

        a)  Defendant's own experts state that plaintiff's injuries which may have been present in 2013-2015 were separate and distinct from any injury related to the malfunctioning of the implant.........................................................................18

           i) Defendant experts attributed plaintiff's numerous injuries to causes other than the malfunction of the implant. .........................................................................22

           ii) Plaintiff's complex medical history does not lend itself to isolating a specific date prior to the revision surgery at which time the right hip was the primary injury resulting from the malfunction.....................................................27


        b)  The very nature of CPLR 214-c is a combined mixture of law and fact and that under the facts in this case, defendant cannot establish entitlement to summary judgment as a matter of law. …....................................................................28

    2.  Defendant Should be Estopped from Asserting a Statute of Limitations Defense and Plaintiff's Negligence, Strict Products Liability and Breach of Warranty Claims Should be Allowed to Proceed

        a) Stryker knowingly made numerous misrepresentations in its filings with the FDA and deceived both the FDA and the physicians using their product..................................31

        b) Stryker did not properly inform physicians or the public of recalls regarding the specific components of the MDM system implanted in Mrs. Rouviere..................................33

c) Breach of Warranty…………………………………………………………….35

CONCLUSION …………………………………………………………………………36

**TABLE OF AUTHORITIES**

*Baker v. Stryker Corp.*, 770 F. App'x 12, 14 (2d Cir. 2019) …………………………………..12

Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989)……….……………..…9

*Cabrera v. Picker Int'l, Inc.*, 2 A.D.3d 308, 770 N.Y.S.2d 302 (1st Dept. 2003)…………..…22

*Castiglione v. E.A. Morse & Co.*, 22 A.D.3d 934, 802 N.Y.S.2d 278 (3rd Dept. 2005)…...……22

*Cerqua v. Stryker Corp.*, 2012 WL 5506119 (S.D.N.Y. 2012)……………………….………23

*Cochrane v. A C & S, Inc.*, 1998 WL 642719, (S.D.N.Y. 1998)…………………………...…26

*Delaremore v. Zimmer, Inc.*, 2019 WL 5394566 (E.D.N.Y. 2019)………………...…………17

*Desenso v. Adria Labs*,  1998 WL 440432 (E.D.N.Y. 1998)…………………….………….13, 14

*Galletta v. Stryker Corp.*, 283 F.Supp.2d 914  (S.D.N.Y. 2003)……………………...………10

*Johnson v. Exxon Corp.*, 258 A.D.2d 946, 685 N.Y.S.2d 530 (4th Dept. 1999)…………..…..22

*Malone v. Ct. W. Devs., Inc.,* 139 A.D.3d 1154, 30 N.Y.S.3d 760 (3rd Dept. 2016)……….…..22

*Martin v. Edwards Labs*., 60 N.Y.2d 417, 469 N.Y.S.2d 923, 457 N.E.2d 1150 (1983)………. 11

*Matter of New York County DES Litig.*, 89 N.Y.2d 506, 514, 655 N.Y.S.2d 862  (1997)………13

Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985)); …………………………………………………………………………..………9

*O'Halloran v. 345 Park Co.,* 251 A.D.2d 260, 260, 675 N.Y.S.2d 55 (1st Dept. 1998)……...…22

*Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984)

*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); ……………………………………………………………………………..……9

*Ramseur v. Chase Manhattan Bank*, 865 F.2d at 465 ……………………………….…………9

*Whetherill v. Eli Lilly & Company (Matter of New York Cnty. DES Litig.)* 89 N.Y.2d 506, 678 N.E.2d 474 (1997) ……………………………………………………………………….13

*Whitney v. Quaker Chem. Corp.*, 90 N.Y.2d 845, 660 N.Y.S.2d 862, 683 N.E.2d 768 (1997Walter v. Blue Cross & Blue Shield United of Wis., 181 F.3d 1198, 1201 (11th Cir. 1999) ………………………………………………………………………………………11

Pioneer Inv. Servs. v. Brunswick Assocs. Ltd., 507 U.S. 380, 391 (1993) …………………..…..2

Advanced Estimating Sys., Inc. v. Riney, 130 F.3d 996, 997-98 (11th Cir. 1997) …………..…..2

Cheney v. Anchor Glass Container Corp., 71 F.3d 848, 850 (11th Cir. 1996) …………………..2

Anderson v. Liberty Lobby, 477 U.S. 242, 247-8 (1986); …………………………………..7, 8, 9

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)………………………………… ………..…..7

Heyman v. Commerce Industries Ins., 524 F.2d 1317, 1320 [2d Cir. 1975]………… …………..…7

Eastway Constr. v. NYC, 762 F.2d 243, 249 [2d Cir. 1985], cert. den. 44 U.S. 918 [1987] …….7

Weinstock v. Columbia Univ., 224 F.3d 33, 41 [2d Cir. 2000] …………………….……………7

DiCola v. Swiss Re Holding, 996 F.2d 30, 32 (2d Cir. 1993………………….……………………8

Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) ………………………………….…..8

Amnesty Am. v. Town of West Hartford, 361 F.3d. 113, 122 (2d. Cir. 2004); …………..………8

In re World Trade Ctr. Lower Manhattan Disaster Site Litig., No. 07 CIV. 1521, 2015 WL 13680287, at *1 (S.D.N.Y. 2015) …………………….…………………………………………8

Tolan v. Cotton, 572 U.S. 650, 651 (2014) …………………………………………….………8

Scott v. Harris, 550 U.S. 372, 378 (2007) (citations omitted); …………………………….8

Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 13 F.4th 247, 259 (2d Cir. 2021); …8

Jackson v. Fed. Exp., 766 F.3d 189, 192 (2d Cir. 2014.) …………………………..……………8

Bryant v. Maffucci, 923 F.2d 978-79, 982 [2d Cir. 1991]…………………………… ………..……9

Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829 (1985)…………...…….9

Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir.1984)…………………………………………….9

Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989)…………………...……….10

Galletta v. Stryker Corp., 283 F. Supp. 2d 914, 917 (S.D.N.Y. 2003)…………………………..10

Gaillard v. Bayer Corp., 986 F. Supp. 2d 241, 245–46 (E.D.N.Y. 2013) ………...………….10, 36

Gelber v. Stryker Corp., 788 F. Supp. 2d 145, 166 (S.D.N.Y. 2011) (applying N.Y. U.C.C. 2-725-2); ………………………………………………………………………………………...35

Orlando v. Novurania of Am., Inc., 162 F. Supp. 2d 220, 223 (S.D.N.Y. 2001)  ……..……….35

Viania v. Zimmer, Inc., No. 2017 WL 5714725, (E.D.N.Y. 2017) ……………………………35

Adickes v. S.H. Kress and Co ………………………………………………………………….36

Secondary Sources

Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/overwhelmingly    …………………………………………………9


Statutes

N.Y. UCC 2–725(2) ……………………………………………….…………….35

UCC …………………………………………………………………………….35

Fed. R. Civ. P. 56(a) ……………………………………………………...……….9

CPLR 214-c …………………………………..7, 10, 11, 12, 13, 15, 16, 20, 21, 22, 24, 25, 26, 27

CPLR 214-c(4)…………………………………… …………… …………….…24, 26

CPLR 214–c(2)………………………………… …………………………………26

Local Rule 56.1

## INTRODUCTION

Plaintiffs JODI ROUVIERE and ANDRE ROUVIERE (hereinafter collectively "plaintiffs") submit this Memorandum of Law in opposition to the motion by defendant HOWMEDICA OSTEONICS CORP. d/b/a STRYKER ORTHOPAEDICS (hereinafter "HOC") for summary judgment dismissing the amended complaint based on the applicable statute of limitations. Plaintiffs submit each of the material facts relevant to an analysis of the timeliness of plaintiff's commencement of this action and otherwise raised in their amended complaint and submitted in the Statement of Disputed Facts submitted herewith, establishes that this action was commenced timely. Alternatively, plaintiff avers that, from the evidence before this Court, there exist numerous material facts in dispute regarding the timeliness of the commencement of this action warranting denial of defendant's motion.

## PRELIMINARY STATEMENT

Plaintiffs filed a pro se complaint alleging causes of action sounding in negligence, strict products liability and breach of warranty and claims for loss of consortium on behalf of Mr. Rouviere on May 31, 2018. An Amended Complaint alleging the same causes of action was filed on October 19, 2018 (ECF No. 26), also pro se. Defendant HOC filed answer to the amended complaint (ECF No. 54) and discovery ensued.

Plaintiff, Andre Rouviere, attempted to file the initial complaint on May 21, 2018, and in fact, filed a Motion for Permission for Electronic Case Filing on May 1, 2018. (Exh. 1 – Motion and Order for Permission for Electronic Case Filing) which was ultimately granted on June 8, 2018. Plaintiff's complaint was rejected because he paid the fee with a personal check, which as a pro se party he thought would be appropriate. The check dated May 21, 2018 was returned. (Exhibit 2 – Check payable to Clerk of Court - SDNY) Mr. Rouviere even prepared a Civil Cover

- 1 -

sheet which was dated May 21, 2018 as he had been waiting for a response from his motion sent on May 1, 2018. (Exh. 3 – Civil Cover sheet ECF No. 2) After filing the motion for permission for Electronic Case Filing, Mr. Rouviere was under the impression that the clerk would advise him to electronically file the complaint. (See Exh. 4 -Andre Rouviere declaration.) Federal Courts have recognized that equitable relief due to excusable neglect can in certain circumstances be allowed. The Court should weigh several factors including the good faith efforts of the movant, the length of any delay and the prejudice to the opposing party. Any claim of prejudice by the defendant herein is questionable in that they did not seek this relief when they first could and would still, presumably be able to make the timeliness argument to the jury.

Excusable neglect is an equitable excuse, which permits the court to consider "all relevant circumstances surrounding the party's omission." See Walter v. Blue Cross & Blue Shield United of Wis., 181 F.3d 1198, 1201 (11th Cir. 1999) (internal marks omitted). A finding of excusable neglect "is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer." Pioneer Inv. Servs. v. Brunswick Assocs. Ltd., 507 U.S. 380, 391 (1993). Four factors inform the court's consideration of whether excusable neglect is shown: (1) the danger of prejudice to the opposing party; (2) the length of delay and its potential impact on judicial proceedings;(3) the reason for the delay and whether it was a matter within the moving party's control; and (4) whether the movant acted in good faith. Advanced Estimating Sys., Inc. v. Riney, 130 F.3d 996, 997-98 (11th Cir. 1997) (quoting Pioneer, 507 U.S. at 398). Primary importance should be given to "the absence of prejudice to the nonmoving party and the interest of efficient judicial administration." Cheney v. Anchor Glass Container Corp., 71 F.3d 848, 850 (11th Cir. 1996) (internal marks omitted). Ordinarily, it is said that factual negligence born of a

miscommunication or clerical error may constitute excusable neglect whereas legal error, such as an attorney's failure to review or understand the plain language of a rule, does not.

The plaintiffs submit that the defendant's motion for summary judgment based on statute of limitations must be denied in that it is factually deficient and does not establish as a matter of law entitlement to summary judgment. Further, it will be demonstrated that the defendant should be estopped from asserting statute of limitations defense in that HOC knowingly misrepresented the product both to the FDA and to the physicians who performed surgeries utilizing their device, including the surgeon who implanted the device in Mrs. Rouviere.

The question before this Court is two-fold: 1) when did plaintiff discover the injuries related to the hip implant and, 2) should the defendant be precluded from asserting the statute of limitations defense based upon the doctrine of equitable estoppel. It is submitted that the answer to both questions leads the Court to the same legal conclusion - the motion for summary judgment must be denied.

The defendant's recitation of the procedural history is accurate and need not be supplemented herein.

**RELEVANT FACTUAL HISTORY**

**JODI ROUVIERE'S MEDICAL HISTORY**

Mrs. Rouviere's medical history is complex and lengthy. In 2005, at the age of 33 she underwent a total vaginal hysterectomy as a result of uterovaginal prolapse with a cystocele and rectocele. A transvaginal sling was placed to lift her bladder. In 2006, she underwent a pelvic scraping for endometriosis.

She suffered a spontaneous knee dislocation in September 2009 and again in January 2010. (Exh. 5 Jodi Rouviere Deposition at ECF 316-6 74:19-75:11.)  In January 2009, Mrs. Rouviere

sustained an injury to her right hip which went undiagnosed until January 2010 when an MRA diagnosed a tear and detachment of the acetabular labrum of the right hip. Mrs. Rouviere continued to have pain in her right knee and right hip. She had her spine evaluated to rule out it being the cause of her hip pain. Mrs. Rouviere had complaints, on occasion, of a rapid heartbeat and fatigue.

Right after the surgery, Mrs. Rouviere continued to experience pain and instability in both of her hips. [Exh. 5 - JR Dep ECF 316-6 at 119:12-120:21, 122:25-124:21, 124:16-125:1, 125:15-126:4, Exh. 6 – Robert Buly Medical Records at Buly deposition Exh. 74:200-202; Exh. 7 - JR:MNG Medical records 0060[1]]

Mrs. Rouviere also presented to the ER with symptoms of vertigo. [Exh. 8 –Baptist Hospital at JR:BHOM:002240, 002234-002251] Mrs. Rouviere felt her neck had been "slipping" over the course of 2012 and in February 2013, she suffered a spontaneous dislocation of her cervical spine and experienced extreme nausea and vomiting, arm weakness, pain and irretractable symptoms. Following cervical fusion, Mrs. Rouviere did not have relief and was still having back pain. [Exh 5 - JR Dep ECF 316-6 127:20-131:08; Exh. 9 - Jodi Medical Record complete 2019[2] at pages 95-103, 110; Exh. 7 JR:MNG0060-61, Exh. 6 - Buly Records Depo Exh. 74:198-199, 12-18]

Mrs. Rouviere experienced neurological symptoms and a pounding headache from a system stress of emergency, heart pumping, head pumping, CSF leaks, fluid from CSF leaking from nose, eyes, ears [Exh. 5 - JR Dep ECF 316-6 40:2- 43:10]

Mrs. Rouviere's right shoulder was still dislocating, and she was having trouble holding up her head. Her symptoms became unbearable. She was unable to sit or stand, she had pounding

---

[1] Medical history written by Jodi Rouviere and exchanged with defendants.
[2] This is the complete 438-page document referred to in defendant's motion as Exhibit P "Jodi Rouviere Medical" and includes medical records and various notes as indicated by defendant in fn 8, page 14

headaches, tingling sensations in her head and face, ear ringing and sharp pains and major weakness in her arms and legs. She received a pain injection in her neck. Exh. 7 - JR:MNG0061

Mrs. Rouviere's left eye was sore (pain) and pressured, she was seeing multiples and experiencing loss of vision. [Exh. 9 - Jodi Medical Record complete2019:107-108]

"Neck symptoms still unbearable…unable to sit or stand and hold up the head…pounding pressure headaches, tingling sensations in head and face, ear ringing and sharp pains, major weakness in the arms and legs." [Exh. 9 - Jodi Medical Record complete 2019:112] Mrs. Rouviere experienced pain in her left eye and was experiencing ongoing and increasingly severe headaches and vision/eye issues. [Exh. 9 - Jodi Medical Record complete 2019:113, Exh. 7 - JR:MNG0060]

Mrs. Rouviere experienced a jaw subluxation/dislocation, severe sinus and facial pressure and pain, headaches, and head pumping. She could not hold up her neck or head and was completely debilitated. [Exh. 9 - Jodi Medical Record complete 2019:113-114, 121; Exh. 7 - JR:MNG0061]

Mrs. Rouviere suffered from severe low back pain. She reported a history of tremors or jerking movements, especially in the lower extremities, usually at night. [Exh. 9 - Jodi Medical Record complete 2019:123]

Mrs. Rouviere experienced new symptoms and pain in the back of her head along with dizziness, fatigue, sensitivity to light and noise, double vision, throbbing and pressure behind the eyes. Mrs. Rouviere felt "horrible" and was unable to sit up without incredible head banging and pressure to the top of her head, vomiting and nausea. She had fluid dripping from her nose and left ear, suffered weakness, slurred speech, was bedridden, required assistance for everything, and was unable to hold up her head and neck. [Exh. 10 – Dr. Ricardo Estape records JR:RE:00020] Other symptoms included: shaking, heart pounding, blurry vision, concaved vision, eyes twitching,

unbalanced and feeling of swaying and sinking, constricted pupils, eyes tearing, pain when thinking, limb pain, pain throughout arms and legs, feet flexion, bladder issues, tongue fluttering, difficulty regulating body temperature, tingling in the scalp and forehead, burning and pain across the occipital, trouble reading (ordering the letters), concentrating through a sentence, and finding syntax. She suffered memory loss, ringing and thundering in her ears, a frozen feeling in her right wrist, coughing and choking, anxiety, and a "LEVEL 10 PAIN JOLT" down her spine to her tailbone. [Exh. 10 – Dr. Ricardo Estape records JR:RE:00020; Exh. 9 - Jodi Medical Record complete 2019:131-136] In August 2014, Mrs. Rouviere suffered a painful left knee dislocation (Exh. 9 – Jodi Medical Record Complete 2019:137.)

She also had numerous other complaints "including bladder and urinary issues, knee dislocations/subluxations beginning in 2009 that required surgery, and constant hip pain along with a feeling that her hip was popping in and out, requiring a third party to help get it back "in"." [Exh. 9 - Jodi Medical Record complete2019 at p 2, 17, 91, 92, 95, 103, 110, 113 136, 137, 159, 248, 282, 284, 303, 318, 321 323, 325, 345. 355-356, 376, 426; Def Exhibit Buly 74:148-151].

From a procedure standpoint Mrs. Rouviere underwent breast implants and removal, neck fusion following a serious neck injury she suffered in 2013, requiring a long C3-C7 cervical fusion. Mrs. Rouviere had two more cervical/lumbar surgeries. She suffered from CSF brain fluid leaks and the related symptoms and consequences.

She did suffer from frequent dislocations to her joints including to her knees, hips, shoulders, thumbs and wrists, ribs, jaw, ankle, toes and neck due to generalized joint laxity and a hypermobility disorder called Ehlers Danlos Syndrome with "severe chronic pain (untreated)". [Defendant's Exh. M - Sandhouse Records, ECF 335-13) She was diagnosed with "probable" EDS in early 2012 prior to her initial right hip implant and she was constantly told that the multiple

issues related to her joints were as a result of Ehlers Danlos. Her knees required surgery; she had a severe mechanical malalignment which could only be corrected with bone realignment. [Exh. 6 - Buly Def Ex 74:93-95 at 95.]

She was even given a likely diagnosis of ASIA (Autoimmune Syndrome Induced by Adjuvants) which as of 2017 was still not generally accepted in the scientific and medical community. Should the defendant concern themselves with any real analysis of the injuries which Mrs. Rouviere suffered from and when the malfunction caused them to manifest themselves when Stryker can just throw in every injury which their own experts attribute to Ehlers Danlos and submit that, for the purposes of this motion, they are injuries as meant in CPLR 214-c. (Baker v. Stryker Corp. 770 Fed. Appx. 12 (2d Cir. 2019).)

Despite these ongoing varied physical ailments, Mrs. Rouviere continued to work and was self-employed running a company called Junior Talent Management, which she operated until 2019 when she could no longer physically manage it. She did, however, continue to work through the implant in 2012 and the other health problems noted.

## LEGAL STANDARD

Under FRCP §56[c], summary judgment is mandated where there is no "genuine" issue of "material" fact. A dispute over irrelevant or unnecessary facts does not preclude summary judgment. See, Anderson v. Liberty Lobby, 477 U.S. 242, 247-8 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The burden rests upon the moving party to demonstrate the absence of any genuine material issue of fact (Heyman v. Commerce Industries Ins., 524 F.2d 1317, 1320 [2d Cir. 1975]). All ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought (Eastway Constr. v. NYC, 762 F.2d 243, 249 [2d Cir. 1985], cert. den. 44 U.S. 918 [1987]; Weinstock v. Columbia Univ., 224 F.3d 33, 41 [2d Cir. 2000]).

Summary judgment is not appropriate except where the movant shows that little or no evidence may be found in support of the non-moving party's position. roe, 996 F.2d 30, 32 (2d Cir. 1993).

Defendant's motion for summary judgment on the grounds that plaintiff's claims are barred by the applicable statute of limitations regarding the causes of action for negligence and strict products liability must fail as there exist numerous questions of fact which are in dispute. Defendant has failed to meet its burden of establishing entitlement to summary judgment as it has failed to eliminate all questions of fact pertaining to its claim that the action is time barred.

In deciding the motion, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008). The court should also "eschew credibility assessments." Amnesty Am. v. Town of West Hartford, 361 F.3d. 113, 122 (2d. Cir. 2004); In re World Trade Ctr. Lower Manhattan Disaster Site Litig., No. 07 CIV. 1521, 2015 WL 13680287, at *1 (S.D.N.Y. 2015).

The court must view the evidence in the light most favorable to the non-moving party, Tolan v. Cotton, 572 U.S. 650, 651 (2014) (per curiam), and draw all reasonable inferences in that party's favor. Scott v. Harris, 550 U.S. 372, 378 (2007) (citations omitted); see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 13 F.4th 247, 259 (2d Cir. 2021); Jackson v. Fed. Exp., 766 F.3d 189, 192 (2d Cir. 2014.) A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "On a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. Id. at 255; Tolan, 572 U.S. at 651.

Even if facts would "overwhelmingly" support a motion for summary judgment, as defendant contends, that would not be enough as, by definition, an "overwhelming" measure

leaves some questions of fact which would not support summary judgment, and the issue then becomes whether those facts are material in that they might affect the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The Meriam Webster dictionary defines "overwhelmingly" as "mostly by far."[3] Where the issue is one of timeliness and the analysis involves determining when the plaintiff was aware of injuries caused by the malfunction of the product, any fact which might lead a jury to conclude that the action was timely filed would be material and mandate denial of the motion. Under the standard which must be applied, the defendant's motion for summary judgment on the grounds of statute of limitations must be denied as the defendant has failed to eliminate all genuine dispute as to material facts upon which a jury might fund that the action was timely commenced. Fed. R. Civ. P. 56(a)

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper" (Bryant v. Maffucci, 923 F.2d 978-79, 982 [2d Cir. 1991]), since the function of the court is not "to weigh evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." The weighing of the evidence and the drawing of legitimate inferences from facts are jury functions, not those of the judge. Anderson v. Liberty Lobby, 477 U.S. at 249, 255. Further, "[w]e have repeatedly noted that 'summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.'" Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989), quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829 (1985); see also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962); Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir.1984); Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989).

---

[3] "Overwhelmingly." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/overwhelmingly

**ARGUMENT**

1. **PLAINTIFF'S CLAIMS ARE TIMELY PURSUANT TO NEW YORK STATE LAWAND THE APPLICABILITY OF CPLR 214-c**

It is abundantly clear that in this case, the applicable statute of limitations in New York State is governed by CPLR 214-c. Defendant's claim that CPLR 214-c does not apply is without merit. The cases they cite are inapposite to the facts in the present matter. In fact, other Federal Courts have held in similar product liability cases involving total hip implants that the applicable New York State statute of limitations is governed by CPLR 214-c. See, e.g., Galletta v. Stryker Corp., 283 F. Supp. 2d 914, 917 (S.D.N.Y. 2003).

CPLR 214-c(2) states that "the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." Subsection (1) defines "exposure" as meaning "direct or indirect exposure by absorption, contact, ingestion, inhalation, **implantation** or injection" (emphasis added).

The three-year statute of limitations proscribed by CPLR § 214-c(2) is triggered at the moment of discovery of symptoms, rather than the discovery of the symptoms' cause. Gaillard v. Bayer Corp., 986 F. Supp. 2d 241, 245–46 (E.D.N.Y. 2013) ("The three-year limitations period runs from the date when plaintiff first noticed symptoms, rather than when a physician first diagnosed those symptoms" (internal citations omitted). As the court previously ruled, under this discovery rule, a New York plaintiff's personal injury claim accrued on the date of his or her revision surgery. (Nov. 19, 2018, Mem. at 25–26)." *In Re: Smith & Nephew Birmingham Hip*

*Resurfacing (BHR) Hip Implant Products Liability Litigation*, 2020 WL 407136 (D. Md. 2020)

In Galletta, "the parties agree(d) that the statute of limitations on plaintiff's claim for injury from an implanted device is three years from the date of discovery of the injury," i.e., CPLR 214-c(2). Galletta, 283 F. Supp 2d at 916. The same defendant in Galletta, now presently before the same Court, disagrees with this holding and takes a contrary position claiming, although not very strongly, that CPLR 214-c does not apply. There should be no question regarding the applicability of CPLR 214-c to claims involving metal debris from a product placed within a person. Indeed, these cases are exactly the types of cases contemplated by the New York State Legislature in enacting CPLR 214-c. Matter of New York County DES Litigation, 89 N.Y.2d 506, 513 (1997) ("CPLR 214–c was enacted to overcome the effect of a line of Court of Appeals decisions holding that toxic tort claims accrue upon "impact" or exposure even though the resulting illness may not be manifested for a long time thereafter […] These decisions were regarded as overly harsh because they barred claims by individuals suffering from the latent effects of a harmful substance before the harm was even discovered").

"All that is necessary to start the limitations period is that plaintiff be aware of the **primary condition for which damages are sought**." Whitney v. Quaker Chem. Corp., 90 N.Y.2d 845, 847 (1997) (emphasis added); Socha v. 110 Church, LLC, 2014 WL 12940726, at *1 (S.D.N.Y. 2014). Defendant has certainly not established, as a matter of law, that plaintiff was aware of the primary condition for which she sought damages prior to May 31, 2015.

For implants, the time period is three years from the date of injury resulting from malfunction, not from the date of implantation of the device—unless implantation and malfunction occur at the same time. Martin v. Edwards Labs., Div. of Am. Hosp. Supply Corp., 60 N.Y.2d 417, 422 (1983) ("The Statute of Limitations for personal injury caused by the malfunctioning of a

prosthetic or contraceptive device implanted or inserted into the human body runs from the date of the injury resulting from the malfunction, not necessarily from the date of implantation or insertion"); Guisto v. Stryker Corp., 293 F.R.D. 132, 135–36 (E.D.N.Y. 2013).

In almost an afterthought, HOC, in two sentences, wants to argue both sides of the argument, that is, that the cause of the injury is not the relevant inquiry pursuant to CPLR 214-c but that the injury existed from the moment it was implanted. The implanted hip admittedly did not cause injury on the date it was implanted regardless of whether the device was otherwise defective. Under the secondary argument presented, secondary because even the defendant does not believe that this is a viable position, the plaintiff would be in the very position that the legislature intended to remedy by CPLR 214-c, that is having to bring a lawsuit prior to suffering injury resulting from the malfunction. Baker v. Stryker Corp., *supra*; Guisto v. Stryker Corp., *supra*. Defendant's posturing that this claim involves a mechanical defect rather than latent exposure to a substance, such as metal debris, that would fall under CPLR 214-c is entirely disingenuous.

In fact, the argument proffered by the defendant shows why the motion must be denied as there exist questions of fact on the issue of when the plaintiff was aware of the primary injuries on which her lawsuit is predicated and their relationship to the implant. Since the plaintiff was specifically told that metal on metal was not an issue with this implant then the injuries for which plaintiff seeks damages here, could not have been (according to defendants and their literature) as a result of the malfunction. The plaintiff had no reason to believe that any injury was related to that defect. (See Section 2 on estoppel.)

When was the injury discovered? The question is not as easy as it seems. This Court and the Courts of the State of New York have struggled over this very question. The injury is certainly

not when the plaintiff knew that the product implanted had malfunctioned or was otherwise defective, nor is it when the device was first implanted. The difficulty in pinpointing the date on when the injury is discovered is at the very heart of the motion to dismiss as it is that date when the action for product liability accrues and the Statute of limitations begins to run.

Defendant concedes that prior to the implanted product at issue, Mrs. Rouviere had extreme pain in her right hip. It was for that very reason, as well as the difficulty she had ambulating because of the pre-implant condition of her hip, that she underwent the surgery by Dr. Buly in the first place. (Exh. 5 -Jodi Rouviere deposition filed at ECF 316-6 at 51) Certainly, pain in the hip at or around the time of the placement of the product is not an appropriate trigger for the beginning of the time to commence an action for a claim for a defective hip. If that were the case, the courts would have held that post-operative pain was sufficient to meet the threshold of plaintiff suffering an injury from every implanted product.

The New York Court of Appeals has held that discovery of the injury means discovery of the "**primary condition** on which the claim is based." Matter of New York County DES Litigation, 89 N.Y.2d 506, 513 (1997) (emphasis added). The Court further held that, "the injury is discovered when a person discovers the manifestations or symptoms of the latent disease that the harmful substance produced." Id. at 514.

Federal Courts in this State have recognized the complexity of determining when, for the purposes of CPLR 214-c, the injury occurred. It is, as stated in Desenso v. Adria Labs, 1998 WL 440432 at *4 (E.D.N.Y. 1998) and Cerqua v. Stryker Corp., 2012 WL 5506119 (S.D.N.Y. 2012) "the date that a plaintiff constructively discovered his or her 'injury' is a mixed question of fact and law to be determined by the jury." […] This is especially true where the fact-finder's role is "implicated in the determination of ... whether a recently manifested medical problem is 'separate

- 13 -

and distinct' from an earlier one ... [as] statistical and medical testimony may be required ..."
(internal citations omitted); Cerqua v. Stryker Corp., 2012 WL 5506119 at *4 (S.D.N.Y. Nov. 9,
2012) ("On the basis of the record before this Court, a reasonable jury could find any of the
following: that Cerqua did or should have discovered the "primary condition" behind his claim
immediately after the 2004 surgery, during the period from 2004–2007 when he sought medical
advice, after the 2008 knee replacement failed to alleviate the hip pain, or in 2009 when the pain
intensified or he underwent the revision surgery. At the summary judgment stage, this Court cannot
choose among these competing alternatives").

At the very least, the complexity of defining when the injury occurred is not something to
be determined as a matter of law as it involves mixed issues of fact and law which must be resolved
by a jury. Desenso v. Adria Labs, 1998 WL 440432 at *4 (E.D.N.Y. 1998)

Discerning the injuries from Ms. Rouviere's right hip and these injuries attributable to other
physical conditions is a critical part of the analysis of when the claims against HOC accrued. The
law requires every reasonable inference be given to the party opposing the motion for summary
judgement. And the Court is to view the evidence in the light most favorable to the non-moving
party. Viewing the evidence on this specific claim in the light most favorable to plaintiff compels
this Court to deny the motion to dismiss for the reasons set forth below.

The question of when the product first injured the plaintiff is also complicated when the
plaintiff suffers from a wide variety of unrelated ailments and maladies and presents frequently to
medical providers with a panoply of complaints that do not necessarily implicate concerns relating
to a failed hip implant.  There is no question that Mrs. Rouviere suffered from numerous physical
ailments which the defendant would like to use as the trigger for the statute of limitations It is not

only incorrect to do so but it would be contrary to the holdings of this and other Courts analyzing the NYS statute of limitations relating to implanted devices pursuant to CPLR 214-c

The analysis, which defendant ignores, is how the plaintiff prospectively had complaints resulting from the malfunction. Baker v. Stryker Corp., 770 Fed. Appx. 12 (2d Cir. 2019) (Summary Order.) Instead, defendant relies on statements and opinions by experts reviewing Mrs. Rouviere's history retrospectively and attributes those statements as if Mrs. Rouviere stated that those complaints were related to the hip implant.

The complaints made by the plaintiff were varied and not reasonably related to her hip. In fact, Mrs. Rouviere's complaints were more frequently associated with other parts of her body than her right hip. It is clear from the record that Mrs. Rouviere suffered from numerous ailments and complaints to a number of different parts of her body, not just her hip, making it difficult, to say the least, for plaintiff or anyone else to parse through which complaints could reasonably be related to the implant malfunction. If the statute of limitations runs from the date of the injury resulting from the malfunction or, as otherwise stated, when the product first injured the plaintiff, then the record before this Court does not justify a determination that the accrual date is any time prior to the revision surgery in November 2016.

In fact, plaintiff as mentioned above submits a declaration by Andre Rouviere relating to his attempts to file a complaint in early May 2018. If the Court finds that the injury related to the malfunction manifest itself prior to May 31, 2015, it is submitted that the only dates which might lend themselves to such a finding would be May 17, 2015, May 18, 2015 and May 21, 2015. On May 17, 2015, Mrs. Rouviere presented to Doctor's Hospital with right hip instability and while still suffering from a host of other, non-primary injuries, she mentions metallosis. The Court is

reminded that a diagnosis is not the significant trigger for CPLR 214-c. (Defendant Exh O – Doctor's Hospital Records.)

On May 18, defendants point out that blood test results were received. (Deft Memo p 14.) Initially it should be noted that there is no direct proof as to when Mrs. Rouviere learned of these results. The only proof submitted is the document Jodi Rouviere Medical (Deft. Exh P) which simply shows the date and the results. There is nothing that shows when Mrs. Rouviere learned of these results. While plaintiff submits that these results do not establish "injury" as used in CPLR 214-c, and that the Court should disregard this argument, plaintiff presents Mr. Rouviere's good faith effort to commence this action prior to May 18, 2018.

Lastly, the defendant points to a visit Mrs. Rouviere had with Dr. Alvarado on May 21, 2015 with complaints of her hip displacing. Again, defendants ignore the entire picture of Mrs. Rouviere's medical condition and attempts to focus everything on the hip as that is the critical date for Stryker. If the Court considers this date as a date of "injury" under CPLR 214-c, plaintiff again points out thar Mr. Rouviere acting pro se with his wife made good faith efforts to timely file the complaint. The Rouviere declaration (Exh. 4) is only relevant to these dates.

In January 2014, Mrs. Rouviere visited the emergency room at Baptist Hospital in Miami. She was seen in consultation with a neurosurgeon, Dr. Vitaly Siomin who generated a consultation report which is attached hereto as Exh. 11. The report is a thorough evaluation of Mrs. Rouviere's complaints and conditions. Her right hip is not mentioned once. Additionally, Mrs. Rouviere was seen on July 6, 2014, at South Miami Hospital where she was again evaluated this time by a neurologist who wrote an extensive report detailing her complaints and noting his impression. Numerous complaints are noted but nothing regarding a symptom related to a malfunction of the hip implant is apparent. (See Exh. 12 South Miami Hospital report.)

In fact, In Re: Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litigation, 2020 WL 407136 (D. Md. 2020), Judge Catherine C. Blake found that the actual injury sustained by the plaintiffs in the MDL arising out of hip implants was the revision surgery and as such that was the date, under New York State law, from which the statute of limitations would run. While the claim in this case was ultimately dismissed by Judge Blake because the revision surgery was more than three years prior to the commencement of the action, the analysis and ruling require a different result in the instant matter. Certainly, this action is timely based upon the date of Ms. Rouviere's revision surgery in November 2016.

In Delaremore v. Zimmer, Inc., 2019 WL 5394566 (E.D.N.Y. 2019), the court denied defendant's motion to dismiss on the grounds of the statute of limitations, noting that while New York starts the accrual date when the plaintiff first noticed symptoms, there may have been other reasons why the pain was not indicative of symptomology.

Defendant HOC here presents a series of physical complaints which Mrs. Rouviere suffered throughout the years, from prior to her total hip replacement in 2012 through the time she underwent a revision of that implant in 2016. They allege that each of these complaints were triggers or dates of accrual for the purposes of the statute of limitations.

Defendant states that Plaintiff's "disclosed experts identify local and systemic injuries caused by metal debris released from her 2012 implants, including chronic fatigue, nausea, headaches, weakness, dizziness/vertigo, cognitive impairment, hip and other joint and muscle pain, tachycardia, dry eyes/blurred vision, and other immunological and neurological symptoms. (See JSOF, ¶24; Exh. H, Tervaert Expert Report, pp. 3, 5-7; Exh. L, Tervaert Dep., 89:18- 91:4, 132:11-14, 133:2-12; 134:9-18; Exh. I, Frank Gannon Expert Report, p. 1; Exh. J, Bobst Expert Report,

pp. 2-3; Exh. K, Bobst Deposition, pp. 74:13-75:21; Exh. S, Jarrell Report, p. 8, ¶¶13-14.)" (ECF 335 Defendant Memorandum p. 8)

One would have to twist common sense to take these arguments to mean that the plaintiff's injuries occurred at the moment that Ms. Rouviere had the Stryker device implanted by Dr. Buly. These injuries occurred both prior to and subsequent to the implant because of the defect and were not known to be related to the device until Dr. Alvarado's revision surgery. In fact, only retrospectively do the plaintiff's experts opine that the metallosis caused Mrs. Rouviere's problems which initially were reasonably attributed to other causes, i.e., Ehlers-Danlos syndrome and multiple sclerosis. Even the defendant's experts render opinions that Mrs. Rouviere's injuries were related to some other factor.

a)    <u>Defendant's own experts state that plaintiff's injuries which may have been present in 2013-2015 were separate and distinct from any injury related to the malfunctioning of the implant</u>

i) <u>Defendant experts attributed plaintiff's numerous injuries to causes other than the malfunction of the implant</u>

In fact, defendant's experts note that Mrs. Rouviere suffered from numerous physical ailments prior to her 2012 implant. "She has a significant medical history of Ehlers-Danlos Syndrome with hypermobility and chronic right patella dislocation, as well as dislocations of multiple other joints, including bilateral hips, bilateral wrists, right shoulder, and bilateral knees." (Exh.13 - Ochoa Report, p 7)

Dr. Kosnett, Stryker's expert toxicologist, reviewed extensive records and reports as set forth in his own report (Exh. 14 - Kosnett Report dated November 20, 2020, p. 9.) His findings and conclusions were as follows:

"1. None of Ms. Rouviere's systemic symptoms are attributable to metal ions released from implanted hip prostheses

a. Metal-containing hip implants have not been identified in epidemiological or clinical studies to increase the risk of recurrent systemic symptoms of the type reported by Ms. Rouviere (headache, palpitations, nausea, dizziness, lack of concentration)

b. The concentration of cobalt and chromium and titanium present in her serum or blood are characteristic of asymptomatic patients with well-functioning metal implants and have not been causally linked to systemic adverse health effects.

c. The temporal pattern of many systemic symptoms expressed by Ms. Rouviere are inconsistent with causation by her hip implants.

d. Other medical conditions diagnosed in Ms. Rouviere may readily account for her various systemic signs and symptoms

i. Ehlers-Danlos Syndrome, Hypermobility Type

ii. Cervical Medullary Syndrome and cervical spine instability

iii. Temporomandibular joint (TMJ) syndrome

iv. Chronic (transformed) migraine

v. Obstructive Sleep Apnea

vi. Chronic pain"

Further, Dr. Kosnett acknowledged that based upon his review of the "medical and case records…Mrs. Rouviere has episodically and often inconsistently reported the presence of multiple systemic signs and symptoms." (Exh. 14 - Kosnett Report p. 10) If the signs and symptoms were inconsistent when reviewed from the prospective of 2020, it is not reasonable to claim that Mrs. Rouviere had those injuries or reason to know of those injuries related to the malfunction prior to May 31, 2015.

Dr. Kosnett also stated that "Ms. Rouviere's serum (or plasma) cobalt and chromium, an established biomarker of systemic exposure to metal released from prosthetic hip joints, have not been of a magnitude sufficient to cause symptomatic systemic adverse health effects" (id. p. 12) and that "[f]actors in Ms. Rouviere's medical history unrelated to systemic exposure to metal ions released from metal-containing hip prostheses may be as likely or more likely to account for many of her systemic signs and symptoms." (id. p14). Defendant's own expert states that the very symptoms which defendant seeks to utilize as the accrual date for the statute of limitations

argument are most likely not symptoms related to the malfunction. (<u>Cf.</u> <u>Baker</u> v. Stryker, 770 Fed. Appx. 12, 15 (2d Cir. 2019) (Summary Order) ("District Court did not err in concluding that Baker's injury occurred on or around August 22, 2006—the date the devices were implanted, causing pain almost immediately thereafter—and that Baker's personal injury claims, for statute of limitations purposes, accrued on that date").

Each expert referenced by the defendant is someone who has reviewed records retrospectively and rendered an opinion, within the area of their respective expertise, regarding the defective product. It is, for the purposes of this motion, reasonable for the Court to take the fact that the product is defective as a matter of law in order to then determine the timeliness of the commencement of this action. The issue of whether the implant is defective is not a concern in analyzing the statute of limitations defense.

Defendants point to Mrs. Rouviere's mentioning of metallosis in May 2015 as a date by which the statute of limitations would run at the latest. This is misinterpreting the rationale of CPLR 214-c. As defendants point out *ad nauseum*, it is not the diagnosis of the condition, to wit: metallosis, but the symptoms caused by the malfunction that triggers the running of the statute of limitations.

When plaintiff's expert's render opinions they do so from the vantage point of 2020 and as we know all too well, hindsight is in fact 20/20. Imagine the uproar from the defendant if plaintiff's experts could not causally relate the plaintiff's injuries to the defect. There would be no case. For that reason, the injuries, as they occurred, not viewed retrospectively, must be of the nature to give the plaintiff reason to believe that the injury is related to the malfunction. Defendant's arguments would swallow the rule and the legislative purpose in its entirety.

Defendant refers to the testimony of witnesses exchanged by the plaintiff as identifying local and systemic injuries "caused by metal debris released from her 2012 implants". Neither this statement nor the testimony of these expert witnesses indicates that the local and systemic injuries occurred at the time of placement of her implants. When those injuries manifest themselves is the critical point for analyzing the accrual date for statute of limitation purposes. The defendant confuses expert opinion that the implants caused certain injuries and the incorrect assumption that those injuries manifest themselves at the time of implantation. This is exactly why the legislature passed CPLR 214-c. If the injury is unknown, then the plaintiff is not expected to commence a lawsuit.

As the Court can clearly see, the rationale for CPLR 214-c is to remove the experts retained for litigation from the analysis as to whether the symptoms or injuries initially presented within three years from the commencement of the action. Further, the task is clearly a factual one which ought to be submitted to the jury for determination.

Even reliance on the patient's conclusions is inappropriate for this analysis. It is her complaints of injury, that is, symptoms, not conclusions made by physicians or patients, that control an analysis of CPLR 214-c. For example, a patient might believe that her injury of pain is due to a genetic disorder. If that pain is associated with a part of the body where an implant was placed then, we agree, the time would start when the injury occurred regardless of plaintiff's belief. However, as manifested by defendant's own experts, Mrs. Rouviere's "symptoms" were varied, almost random and certainly insufficient to trigger the running of the statute of limitations pursuant to CPLR 214-c.

Indeed, it is well-settled law in the Appellate Divisions of the State of New York that symptoms which are "too isolated or inconsequential" cannot trigger the running of the Statute of

- 21 -

Limitations for the purposes of a CPLR 214-c (2) analysis. See, e.g., Cabrera v. Picker Int'l, Inc., 2 A.D.3d 308, 308–09 (1st Dept. 2003); O'Halloran v. 345 Park Co., 251 A.D.2d 260, 260–61 (1st Dept. 1998); Johnson v. Exxon Corp., 258 A.D.2d 946 (4th Dept. 1999); Malone v. Ct. W. Devs., Inc., 139 A.D.3d 1154, 1155–56 (3rd Dept. 2016); Castiglione v. E.A. Morse & Co., 22 A.D.3d 934, 934–35 (3rd Dept. 2005), These cases, like the instant case, concern latent injuries inflicted over time by exposure to toxic chemicals. Unlike these other cases, however, Mrs. Rouviere complained of numerous, varied, and often unrelated symptoms and maladies which, taken as a whole, could hardly be said to have constituted constructive notice of the injuries being claimed in this lawsuit. In contrast, Cabrera, O'Halloran, Johnson and Castiglione involved plaintiffs who were exposed to chemical fumes and gases as a result of their work which produced isolated and intermittent symptoms over time in the absence of a panoply of unrelated complaints and illnesses.

ii) Plaintiff's complex medical history does not lend itself to isolating a specific date prior to the revision surgery at which time the right hip was the primary injury resulting from the malfunction

As noted in Mrs. Rouviere's medical summary of her medical history presented in this report, her varied symptoms have included headaches; palpitations; fatigue; dysesthesias (numbness, tingling, pressure) in her neck, torso or extremities; weakness; chills; nausea, dizziness, and cognitive deficits, such as impaired memory, concentration, or expressive speech.

Further, in Galletta, the complaints of injury by the plaintiff were specific and isolated to the knee where the prosthesis which was alleged to be defective was placed. 283 F. Supp. 2d 914 (S.D.N.Y. 2003). Here, however, Mrs. Rouviere's complaints were numerous, frequent, and wide-reaching throughout essentially the entirety of her bodily system and began before (and continued

after) her initial implant surgery. Defendant's motion does not specifically identify any single complaint which they contend shows the precise date Mrs. Rouviere supposedly began complaining of the injuries related to her hip implant. Rather, the record demonstrates a constellation of various complaints to various body parts made at various and frequent points in time that so muddy the overall picture of Mrs. Rouviere's health and functioning as to require resolution by a jury.  This is the very reason that the revision surgery was treated as the "aha" moment by plaintiff's doctors and transformed her treatment to dealing specifically with metallosis as a result of the hip prosthetic malfunction.

The fact that there is no definitive and undisputed instance of metallosis injury other than the revision surgery further demonstrates that at the very least there is a question of fact for the jury as to whether this claim was timely filed. In Cerqua v. Stryker Corp., 2012 WL 5506119 (S.D.N.Y. Nov. 9, 2012), the plaintiff underwent hip surgeries in 2004 and thereafter complained of pain and discomfort in his hip and thigh areas over the next three years. At one point, a surgeon theorized that his complaints were due to a knee issue and a total knee replacement was performed which did not alleviate plaintiff's complaints. It was not until 2009 that plaintiff's pain "intensified beyond belief", at which point a hip revision surgery revealed that a failed hip implant was the cause of his complaints. Judge Katherine B. Forrest found that on the basis of the record before the Court, a reasonable jury could find any of the following: that Cerqua did or should have discovered the "primary condition" behind his claim immediately after the 2004 surgery, during the period from 2004–2007 when he sought medical advice, after the 2008 knee replacement failed to alleviate the hip pain, or in 2009 when the pain intensified or he underwent the revision surgery, and that at the summary judgment stage, "the Court cannot choose among these competing alternatives." Id. at *4.

On this record, considering the vast multitude of complaints, related and unrelated, which Mrs. Rouviere made to her medical providers in the years before and after her hip implant surgery, summary judgment must be denied since this Court similarly cannot choose among so many competing alternatives. This is especially true because HOC has not demonstrated, *prima facie*, any specific date on which it can definitively be said that plaintiff first complained of any symptoms or injuries which would start the clock running on the statute of limitations.

Plaintiff does not dispute that CPLR 214-c(4) does not apply but not for the reasons set forth by defense. The fact is that the section would only provide a one-year period to commence an action after the plaintiff discovered the cause of the injury. Plaintiff acknowledges that on November 11, 2016, she underwent surgery at which time her hip implant was revised, and the cause of the injury discovered. To be timely under CPLR 214-c(4) the action would have had to be filed by November 11, 2017.

Dr. Buly told Mrs. Rouviere he would be implanting a safe alternative to metal-on-metal, so she did not need to be concerned with the risks metal-on-metal had presented in the past which she had concerns about (toxic poisoning and metallosis). [Exh. 5 - JR Dep. 291:18-291:22; Exh 6. - Def Exhibit 74, P 60].

Under New York law a determination of constructive discovery pursuant to CPLR 214-c is a mixed question of law and fact. Even in a case where the plaintiff filed a workers' compensation claim on or before that date at issue, if there is nothing else in the record to establish conclusively that discovery of the injury occurred or should have occurred at that time and where it does not conclusively appear that the plaintiff had knowledge of facts from which the injury could reasonably be inferred, the complaint should not be dismissed on motion and the question should be left to the trier of fact. Glod v. Morrill Press Div. of Engraph, Inc., 168 A.D.2d 954,

955–56, 564 N.Y.S.2d 905 (1990) [Citing Trepuk v Frank, 44 NY2d 723 (1978).]

Between July 2014 and May 2015, there is no treatment for any complaints that would support a finding that any of the prior complaints were related to the product. Mrs. Rouviere has had numerous physical conditions or injuries which cannot reasonably be attributed to the device. The complexity of her physical condition makes it impossible to state that as a matter of law any one injury was resultant from the malfunction or defect of the device. As such, the issues relating to timeliness of the action must, at a minimum be submitted to a jury for determination.

The connections between the complaints and the product that presented prior to 2016 and proffered by defendant as support for their motion are at best contested by their own experts. Additionally, the referenced to records from after 2016 wherein it is presented that Mrs. Rouviere complained of certain ailments back in 2012-2015 are subject to interpretation since the defendant's own experts attribute those ailments in various body parts to a connective tissue disorder, generally genetic in nature. If the date of accrual is when the injury from the malfunction presents, then that injury did not present until the revision surgery done in 2016. Certainly, a jury could find that the that the product did not injure the plaintiff until the time just prior to the revision.

In Galliard v. Bayer Corp., 986 F. Supp. 2d 241 (E.D.N.Y. 2013), in a footnote, the Court discussed the confusion about the word "condition" as it is used in evaluating the accrual date pursuant to CPLR 214-c, concluding that "condition" is synonymous with "symptoms" and "injury." Id. at 246 (FN3).

The Galliard Court explained that "(t)he use of the word "condition" by the Court of Appeals may cause some confusion about whether discovery requires anything beyond knowledge of physical symptoms or injuries. But it is clear from the opinion itself, and subsequent interpretations of it, that "condition" is synonymous with "symptoms" and "injury," the latter of

which is used in the text of CPLR 214–c(2). See Wetherill, 89 N.Y.2d at 514, 655 N.Y.S.2d 862, 678 N.E.2d 474 ("It is apparent ... that, in enacting a new 'discovery' rule for the commencement of toxic torts, the Legislature had in mind only the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced."); see also Neri v. R.J. Reynolds Tobacco Co., 185 F.Supp.2d 176, 180 (N.D.N.Y.2001) ("What is at issue is **whether these symptoms were significant enough to put John Jr. on notice of the injury that forms the basis of his claims.")** (Emphasis added.); Cochrane v. A.C. & S, Inc., No. 92 CIV. 8841, 1998 WL 642719, at *3 (S.D.N.Y. Sept. 18, 1998) ("Once **recognizable symptoms of a condition** are sufficiently present, the limitations period begins to run.") (Emphasis added.).

"The court pronounced that 'the time for bringing the action begins to run under the statute when the injured party discovers the primary condition on which the claim is based.' Id.: accord, Whitney v. Quaker Chem. Corp., 90 N.Y.2d 845, 683 N.E.2d 768, 660 N.Y.S.2d 862 (1997)" *Cochrane v. A C & S, Inc.,* 1998 WL 642719, at *3 (S.D.N.Y. 1998) Based upon analysis of the defendant's expert reports the primary condition is in itself a factual issue incapable of being determined as a matter of law. (See Exh. 14 - Dr. Kosnett and Exh. 13 - Dr. Ochoa reports)

Plaintiff does not dispute that CPLR 214-c(4) does not apply but not for the reasons set forth by defense. The fact is that the section would only provide a year period to commence an action after the plaintiff discovered the cause of the injury. Plaintiff acknowledges that on November 11, 2016, she underwent surgery at which time her hip implant was revised, and the cause of the injury discovered. To be timely under CPLR 214-c(4) the action would have had to be filed by November 11, 2017.

The statute of limitations pursuant to CPLR 214–c(2), commences the period in which a plaintiff may recover for her injuries on the date of the "discovery of the injury by the plaintiff or

from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." *Taylor v. Int'l Bus. Machines Corp.*, 962 F. Supp. 722, 726 (D. Md. 1997) Applying NYS law.

The Court of Appeals has held that the key date is the date when the symptoms become apparent or should have become apparent to the reasonable person, not the date the symptoms are allegedly diagnosed as caused by a particular factor. §10:7 "Discovery rule," 1 N.Y. Products Liability 2d § 10:7.

b)      The very nature of CPLR 214-c is a combined mixture of law and fact and that under the facts in this case, defendant cannot establish entitlement to summary judgment as a matter of law.

The issue of constructive discovery is a mixed question of law and fact. Glod v. Morrill Press Div. of Engraph, Inc., 168 A.D.2d 954, 564 N.Y.S.2d 905 (4th Dept. 1990). Genuine issue of material fact as to when the plaintiff discovered the injury precluded summary judgment for manufacturer of machine on limitations grounds. Roman v. Radio Frequency Co., Inc., 207 A.D.2d 1012, 616 N.Y.S.2d 824 (4th Dept. 1994); Crossman v. Harding Indus. Tool, 222 A.D.2d 1081, 635 N.Y.S.2d 397 (4th Dept. 1995) (action time-barred).

For the purposes of the three-year limitations period for actions to recover damages for injuries to person or property caused by the latent effects of exposure to a substance, discovery occurs when the injured party discovers the primary condition on which the claim is based. In an action brought by a plaintiff who contracted mesothelioma as a result of alleged exposure to asbestos in cosmetic talcum powder, **there were genuine issues of material fact whether early symptoms of pain and effusion experienced by the plaintiff were in fact symptoms of malignant mesothelioma that were sufficient to trigger the statute, whether these early**

**symptoms were too isolated or inconsequential to trigger the statute of limitations, or whether the symptoms were related to another illness, thus precluding summary judgment in favor of the manufacturer**. In re New York City Asbestos Litigation, 53 Misc. 3d 579, 39 N.Y.S.3d 629 (Sup 2016).

Under New York law, in cases involving the malfunction of medical devices "implanted or inserted into the human body," the statute of limitations "runs from the date of the injury resulting from the malfunction." Thus, a patient's personal injury claims against a medical device manufacturer, alleging that his jaw implants were defectively designed or malfunctioning, accrued, and the three-year limitations period under New York law began to run, on or around the date that the devices were implanted, **as that was when an injury resulting from the malfunction occurred, since the patient alleged that very soon after the implant surgery he began to experience a choking sensation and also felt pain**. (Emphasis added,) *Baker v. Stryker Corporation*, 770 Fed. Appx. 12 (2d Cir. 2019) (applying New York law).

## 2. DEFENDANT IS ESTOPPED FROM ASSERTING THE DEFENSE OF STATUTE OF LIMITATIONS

Plaintiffs submit that, pursuant to the doctrine of fraudulent concealment, HOC should be equitably estopped from invoking a statute of limitations defense. New York law tolls a limitations period where "the plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant. Putter v. N. Shore Univ. Hosp., 7 N.Y.3d 548, 552–53, (2006)." In Re: Smith &

Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litigation, 2020 WL 407136 (D. Md. 2020) (Applying NY law.)

Defendant should be estopped from relying on the statute of limitations as a defense in that they not only misrepresented facts to the FDA and physicians using their implant but altered filings in order to present this product as metal on poly product without any possibility of having a metal-on-metal impingement.

Stryker's actions border on criminal for the sole purpose of getting a purported dual mobility modular hip system on the market. The amount of documentation which Stryker altered, misrepresented and failed to inform the FDA about would be an endless indictment in these papers; one which is unnecessary to meet plaintiff's burden of showing that the defendant's actions prevented the plaintiff from filing her complaint timely.

It is well settled in New York that issues of fact regarding equitable estoppel and fraudulent concealment, prevent a defendant from invoking the statute of limitations prior to trial. Knaysi v. A. H. Robins Co., 679 F.2d 1366 (11th Cir. 1982) (Applying New York law.); In re Steyer, 70 N.Y.2d 990, (1988) ("On this record, petitioners are estopped from asserting the Statute of Limitations to bar the disciplinary proceedings. This doctrine—rooted in the principle that one may not take advantage of one's own wrongdoing—operates to bar a party from asserting the Statute of Limitations when that party's own wrongful concealment has—engendered the delay in prosecution" [internal citations omitted]).

As a general rule, a defendant may be estopped from raising a statute of limitations defense if it wrongfully induced plaintiff from instituting a timely suit. For example, if the defendant misrepresented a fact which the plaintiff relied upon, and plaintiff's reliance resulted in the suit being brought in an untimely manner, an estoppel may lie. See, e.g., Zumpano v. Quinn, 6

N.Y.3d 666, 706 (2006).

Where the injured party is simply unaware that a cause of action is available to him, either due to lack of diligence on his own part or because of the difficulty of discovering the injury, the courts have not applied the doctrine of equitable estoppel. Jordan v. Ford Motor Co., 73 A.D.2d 422, 424, 426 N.Y.S.2d 359, 361 (4th Dept. 1980).

Defendant's misrepresentations prevented the plaintiff from timely commencing an action. Dr. Buly would not have selected the Summit Tapered Hip System's stem and Biolox head with Stryker's ADMX3/MDM System and Trident shell had he known that its usage under normal, ordinary and foreseeable conditions would result in its impingement and higher than normal wear causing increased release of titanium, vanadium, aluminum, and other metals and metal ions into Mrs. Rouviere's body. (Exh. 15 - Deposition Dr. Robert Buly. p 30.)

Unbeknownst to anyone outside Stryker or in litigation with Stryker is the fact that the product implanted in Mrs. Rouviere was the subject of three recalls. This would certainly be a surprise to Dr. Buly, who testified that he was not aware of any of the components that he implanted in Mrs. Rouviere were ever recalled. (Exh. 15 - Buly Dep. 103:22-104:4, 107:14-108:2)

In 2010 Stryker's Restoration ADM insert MDM liner and Trident Acetabular shell Instructions for Use ("IFU") there were no warnings related to elevated metal ion levels in the blood. There was no other IFU before Mrs. Rouviere's surgery in 2012. At the time the component was placed in Mrs. Rouviere, Dr. Buly would have no reason to believe that there was a risk of elevated metal ions. In 2016, Stryker added this warning to the same exact device as reflected on the relevant IFU. (See 2010 IFU - Exh. 16 - STRROUV00000001-10, and 2016 IFU Exh. 17 - STRROUV00013762-72) Stryker misrepresented the warnings on the 2010 IFU and Mrs. Rouviere received an implant that Dr. Buly would never have used if the IFU was truthful.

- 30 -

Dr. Buly checked blood ion levels for symptomatic patients but only with a metal-on-metal articulation. [Exh. 15 - Buly Dep. 218:14-219:2] Dr. Buly testified the same risks of metal toxicity and metallosis did not exist for ceramic-on-polyethylene implants like Mrs. Rouviere's. [Exh. 15 - Buly Dep. 218:14-219:2] Dr. Buly did not test for blood ion levels with a ceramic-on-polyethylene bearing, even with a symptomatic patient. [Exh. 15 - Buly Dep. 218:14-219:2] Dr. Buly testified with a ceramic head and not a cobalt chrome head he was not aware of any degree of ions shed into the body. [Exh. 15 - Buly Dep. 220:13-17]

Dr. Alvarado testified that the MDM was not known to be associated with metallosis in 2012. [Exh. 18 - Alvarado Depo 54:13-56:10] The testimony of Mrs. Rouviere's surgeons unequivocally demonstrates that they were deliberately kept in the dark regarding the known risks and expected metal on metal impingement of the MDM.

**a) Stryker knowingly made numerous misrepresentations in its filings with the FDA and deceived both the FDA and the physicians using their product**

The Surgical Technique, the IFU and the 510(K) for the same product do not match. This is how Stryker got the component through the FDA process by essentially playing third card Monty and hiding the real device, the MDM liner, behind older different components.

Stryker lied and told the FDA that the shell to be used with the subject device (the Restoration ADM insert like Mrs. Rouviere's) was identical to the one previously cleared in the Restoration ADM System K072020, the ADM shell [Exh. 16 - STRROUV00000629]. But in 2012, Stryker instructed the surgeons in the MDM Surgical Technique to create the MDM system's acetabular construct by combining the Trident shell with the Restoration ADM insert and MDM liner, not the ADM shell. [Exh. 16 - STRROUV0000129-152:131]

Stryker presented the Trident shell, not the ADM shell, to the FDA to be a compatible shell

in the 2012 MDM Surgical Technique. [Exh. 16 - STRROUV00000906-907] Stryker did not create an IFU for the ADM/MDM and Trident shell to be put together in the MDM system despite instructed surgeons to do in 2012 in the Surgical Technique. [Exh. 16 -  STRROUV00000001-10]

In 2012 the IFU for the ADM/MDM instructed the surgeon to pair the ADM/MDM with the ADM shell, not the Trident shell. But the Surgical Technique for the MDM paired the ADM/MDM with the Trident shell, not the ADM shell. [Exh. 16 -  STRROUV00000001-108:5-6, STRROUV000000129-152:131]

Stryker presented the MDM liner as if it were substantially equivalent to the ADM shell in order to gain 510(K) clearances. A shell is the part of the product affixed to the acetabulum. The liner sits within the shell whether it is affixed or mobile. The ADM liner is poly. The ADM shell is metal, but it is not comparable to the MDM liner. The complexity of the process is exactly what Stryker counted on to get the MDM to market as fast as possible. Stryker's lies and misrepresentations made it almost impossible for the physicians to whom the warnings were to be given any idea of the real problems with the product.

The MDM liner was not an acetabular shell as Stryker represented to the FDA in order to gain fast 510k clearance. As per Stryker's definition, the MDM "Acetabular shell" was part of the outer portion of the acetabular prosthesis, fixed to the pelvis with bone cement and/or fixation devices. But actually, the MDM "liner" was part of an inner portion of the acetabular prosthesis, not fixed to the pelvis with bone cement and/or fixation devices but locked into the Trident acetabular shell using the Trident locking mechanism. The Trident shell was the acetabular shell that was fixated to the pelvis in the MDM system, not the MDM liner. (See Exh. 16 - STRROUV00000895,      STRROUV0000902,      STRROUV0000904.)      (See      also https://www.hipaaspace.com/medical_billing/coding/global.unique.medical.device.identification/

04546540666017 )

In fact, Dr. Buly and Dr. Alvarado did not think that what occurred to MRs Rouviere's implant was possible based on Stryker's representations.

Stryker deceived the FDA by not clearing the Restoration ADM insert to articulate with the MDM liner in the ADM or MDM dual mobility systems. This was Stryker's effort to avoid the 5-year PMA process and get their untested product to be the first to the market. Misleading the FDA allowed Stryker to get their product to the market avoiding the stringent PMA criteria, but in turn, misinformed the surgeons in the IFUs and the SURGICAL TECHNIQUES which are the only references and warnings provided to them regarding the product. As such, Stryker's deceit and misrepresentations prevented Mrs. Rouviere from filing her complaint early.

**(b) Stryker did not properly inform physicians or the public of recalls regarding the specific components of the MDM system implanted in Mrs. Rouviere**

In August 2012, open recalls existed for two of Stryker's components which had been implanted into Mrs. Rouviere, the RESTORATION ADM X3 INSERT and the MDM LINER.

Documentation Mrs. Rouviere obtained through a Freedom of Information Act request showed the Restoration ADM insert and MDM liner components implanted in August 2012 into Mrs. Rouviere were part of an open recall at that time. The recalls opened in 2011 remained open until March 2014. (Exh. 16 - STRROUV00000625, Exh. 19 - NWJ Stryker Howmedica Osteonics Corp., Mahwah, NJ,6-3-11 Urgent Product Correction Letter for Recall Z-0192,0193,1094-2012_Redacted; Exh. 20 - NWJ Stryker Howmedica Osteonics Corp., Mahwah, NJ, Res Report 60097 RecallZ-0192-2012_Redacted; Exh. 21 - NWJ Stryker Howmedica Osteonics Corp., Mahwah, NJ, 10-11-13 Firm Ltr for Z-0192,0193,1094-2012_Redacted; Exh. 22 - NWJ Stryker

Howmedica Osteonics Corp., Mahwah, NJ, 3-28-14 FDA Recall Termination Ltr to firm)

The recall product have been identified by Stryker as the product placed in Mrs. Rouviere in 2012.  (Exh. 14 - STRROUV00008134, Exh. 14 - STRROUV00001305)

The above documents establish that Stryker only gave a warning in the recall relating to the potential for hazards related to increased polyethylene debris generation leading to revision surgery, and, once again, gave no warning about the potential risks for metal debris with the MDM liner, even though even more serious risks existed for the potential of wear debris from the metal MDM liner, the component on recall, than from the polyethylene ADM insert. (Exh. 20 -  NWJ Stryker Howmedica Osteonics Corp., Mahwah, NJ, Res Report 60097 Recall Z-0192-2012_Redacted)

Further, Stryker reported to the FDA that 100% of Stryker's Branches/Agencies responded to the recall notice upon closing the recall in 2014, yet Stryker's representative testified that he did not know of any related recalls. [Exh. 23 - Hefferman. Dep 47:23-48:01, 62:16-70:14)

Stryker's representative testified that the ADM/MDM and Trident components implanted in Mrs. Rouviere had never been recalled (Exh. 23 - Hefferman Dep  63:14-64:4, 66:8-66:10, 66:12-66:19, 68:06-69:06)

Dr. Buly depended on the FDA's approval for proof of the safety and efficacy of the implants he used. [Exh.  15 - Buly Dep. 185:1-185:4, 199:7-199:11, 207:17-207:23, 301:8-301:12]

Dr. Buly testified that if he had been aware of a component recall, he would not have implanted that component into Mrs. Rouviere. [Exh. 15 - Buly Dep.  232:17- 233:09] Dr. Buly thought the components he implanted into Mrs. Rouviere had not had any recalls including in 2012. [Exh. 15 - Buly Dep. 103:22-104:4, 107:16-108:01, 232:17- 233:09]

 Dr. Alvarado also thought the Stryker components implanted into Mrs. Rouviere had not

had any recalls including in 2012. [Exh. 18 - Alvarado Dep. 45:13-45:17, 46:02-46:05]

The Plaintiff alleges that the defendant was aware of the dangers associated with the implant, and that they failed to convey these dangers to hospitals, doctors, or patients through labeling, marketing, or direct communication. To that end, the plaintiff broadly states that the marketing and labeling, including warnings for the implant represented that the implant would conform to representations and was safe and effective. Furthermore, the Plaintiff alleges that the Defendant continually provided reassurances that the implant was safe and effective.

**Breach of Warranty**

For claims for breach of warranty the statute of limitations pursuant to UCC 2-725(2) is four years from when the tender of delivery is made, and since the implant was placed in 2012 and the action was not commenced until 2018 the action would be untimely, however, the estoppel of the defendant from asserting the statute of limitations as a defense applies to the breach of warranty claims as well.

The UCC holds that, "except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered. N.Y. UCC 2–725(2); see also Gelber v. Stryker Corp., 788 F. Supp. 2d 145, 166 (S.D.N.Y. 2011) (applying N.Y. U.C.C. 2-725-2); Orlando v. Novurania of Am., Inc., 162 F. Supp. 2d 220, 223 (S.D.N.Y. 2001)" *Viania v. Zimmer, Inc.,* No. 217CV1641ADSAYS, 2017 WL 5714725, at *2 (E.D.N.Y. Nov. 27, 2017)

Dr. Buly told Mrs. Rouviere the ceramic-on-polyethylene construct he was implanting was a safe alternative to metal-on-metal, so she did not need to be concerned with the risks metal-on-metal had presented in the past (toxic poisoning and metallosis) [Exh. 5 - Jodi Dep. 291:18-291:22,

Exh. 15 - Buly Dep. 220:13-220:17, 230:14-230:15; Exh. 6 - Def Exhibit 74 at Buly Depo. P60]

<u>Defendant Should be Estopped from Asserting a Statute of Limitations Defense and Plaintiff's Negligence, Strict Products Liability and Breach of Warranty Claims Should be Allowed to Proceed</u>

*Gaillard v. Bayer Corp.*, 986 F. Supp. 2d 241 (E.D. N.Y. 2013) (applying New York law) to invoke equitable estoppel under New York law, for limitations purposes, the plaintiff has to establish that specific actions by the defendant somehow kept him or her from timely bringing suit HOC submitted false and misleading data to the FDA in order to get the MDM system approved.

**CONCLUSION**

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See <u>Adickes v. S.H. Kress and Co.</u>, 398 U.S. 144, 157 (1970). There exist genuine material questions of fact as to when the primary injury from the malfunction of the implant occurred. Stryker's actions are such that the Court should not permit them to hide behind obvious misrepresentations and falsehoods presented to physicians and the public with respect to medical products placed within humans.

The defendant's motion for summary judgment should be denied in its entirety.

Dated: New York, New York
  May 23, 2022

         Respectfully submitted,

         GODOSKY & GENTILE, P.C

         By: __/s/ **Robert Godosky**_____
          Robert Godosky
          100 Wall Street, Suite 1702
          New York, New York 10005
          212-742-9700
          Attorneys for the Plaintiffs

- 37 -

**CERTIFICATE OF SERVICE**

The undersigned certified that the foregoing document was electronically served on the

following counsel of record via the Court's electronic filing system on this 23rd day of May, 2022:


Paul E. Asfendis, Esq.
GIBBONS, P.C.
One Pennsylvania Plaza, 37th Flr.
New York, NY 10119
(212) 613-2000


___/s/ Robert Godosky_____
Robert E. Godosky