UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| JODI ROUVIERE and ANDRE ROUVIERE, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-04814-LJL-SDA |
| DEPUY ORTHOPAEDICS, INC. n/k/a MEDICAL DEVICE BUSINESS SERVICES, INC. and HOWMEDICA OSTEONICS CORPORATION d/b/a STRYKER ORTHOPAEDICS, | ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANT HOWMEDICA OSTEONICS CORP.'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS**

---

Plaintiffs Jodi Rouviere ("Ms. Rouviere") and Andre Rouviere (collectively "plaintiffs"), pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1 and in response to defendant Howmedica Osteonics Corp. ("HOC")'s Statement of Undisputed Material Facts, set forth the following:[1]

1. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

2. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

3. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

---

[1] HOC did not send Plaintiffs a Microsoft Word version of its Statement of Undisputed Material Facts as required by Your Honor's Local Rules.

4. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

5. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

6. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333. This is taken out of context - it is not that Mrs. Rouviere was aware of the injuries from 2012 on. The sentence literally means that the device ultimately caused injuries. Further, plaintiffs add that the response to the interrogatory calls for expert testimony and was an improper request for interrogatory in the first place. Plaintiff is not competent to opine as to the cause of her injuries.

7. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333. For the purposes of this motion, Plaintiff submits that HOC's experts, Drs. Kosnett,

8. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

9. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333. However, the allegation made in the Amended Complaint does not by itself indicate any knowledge by the plaintiff of any occurrence or condition prior to commencement of the action.

10. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

11. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333. However, for clarity, the medical record also indicates that Ms. Rouviere was concerned about possible Multiple Sclerosis; reported suffering from daily headaches since her 20s; and that Dr. Herskowitz's assessment was "[s]he has a lot of nonspecific symptoms which are difficult to explain" (Exh. 5, Jodi Rouviere Depo 141:4-43:14, ECF document #335-1). Plaintiffs also note that Ms. Rouviere testified that she has suffered from headaches since she was in her 20s and has been told there were "so many different causes" for them

(Exh. 5, Jodi Rouviere Depo 18:18-19:21; 142:18, ECF document #335-1) and, furthermore, the medical records are replete with chronic complaints of headaches.

12. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333,

13. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

14. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

15. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

16. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

17. Denies. Ms. Rouviere testified that while she asked for a metal test, she did not receive the results before she left the hospital and she "didn't know whatever happened to the metal test" (Exh. 5, Jodi Rouviere Depo. 154:5-7).

18. Denies. Dr. Alvarado came to see Ms. Rouviere at the hospital for a second opinion; she did not seek him out (Exh. 5, Jodi Rouviere Depo at 148.)

19. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

20. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

21. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

22. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

23. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

24. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

25. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

26. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

27. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

28. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

29. Not disputed. See Joint Statement of Undisputed Material Facts, Document # 333.

30. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

31. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

32. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

33. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

34. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

35. Not disputed. <u>See</u> Joint Statement of Undisputed Material Facts, Document # 333.

**AND AS AND FOR A COUNTERSTATEMENT OF FACTS WHICH DEMONSTRATE MATERIAL ISSUES OF FACT REQUIRING DENIAL OF SUMMARY JUDGMENT**

36. Ms. Rouviere saw Dr. Robert Buly on April 4, 2012, for an initial office consultation, at which time she complained of 9/10 right hip pain persisting for "a couple of years", and reported wearing a brace on the right, could barely walk, often used a wheelchair, and could not reciprocate stairs (Exh. 6 - Def Exhibit 74 at Buly Depo. , p53).

37. Ms. Rouviere saw Dr. Ernest Sink on June 12, 2012, for complaints of bilateral hip pain, right worse than left, and reported multiple other issues such as bilateral shoulder dislocations, bilateral hand issues, right knee surgery, and Ehlers-Danlos syndrome (Exh. 6 - Def Exhibit 74 at Buly Depo. p 71).

38. Ms. Rouviere also saw Dr. Vladimir Kramskiy on June 12, 2012, who described her as having a "complicated medical history"; in addition to her right hip complaints, Ms. Rouviere also reported previous adverse reactions to steroid injections consisting of diffuse pain, shakes, being bed bound, and having loose bowel movements; frequent dislocations in her right knee; multiple joint pains; several hand surgeries; and feeling as if she injured her shoulder while getting dressed that morning (Exh. 6 - Def Exhibit 74 at Buly Depo. p 43).

39. Ms. Rouviere was seen by Dr. Michael Wang on February 19, 2013, for complaints of severe, acute neck pain with radiation to the right shoulder; she reported being unable to move her neck and head, experienced weakness and numbness in her hands, and could not raise her head up and felt like she was always looking at the ground; imaging studies showed dislocation at C3-4 with stenosis and disc herniations at multiple levels; Dr. Wang recommended a 4-level anterior cervical discectomy and fusion (Exh. A to Plaintiff Statement of Facts (PSOF)– Dr. Wang records).

40. On February 21, 2013, Ms. Rouviere underwent anterior cervical discectomy and fusion at C3-4, C4-5, C5-6, and C6-7, performed by Dr. Wang. The pre- and post-operative diagnosis was cervical spinal stenosis and dislocation at C3-4 level due to Ehlers-Danlos syndrome (Exh. A PSOF)

41. Ms. Rouviere reported to Dr. Buly on April 29, 2013, that her hips were still dislocating, she was still having back pain, and she was using a wheelchair (Exh. 6 - Def Exhibit 74 at Buly Depo.  p 198).

42. Ms. Rouviere was seen by Dr. Fraser Henderson on June 25, 2014, "for what appears to be severe rotational instability at the C1/C2 level […], craniovertebral instability, and possibly temporomandibular joint syndrome in the setting of underlying Ehlers-Danlos syndrome, hypermobility type." She complained of severe pain in her neck and shoulders which was not improved by ACDF surgery. Dr. Henderson noted that "[t]here is, in aggregate, the presentation of a cervical medullary syndrome manifest by vertigo, dizziness, lightheadedness, tremors, the headache and neck pain, blurred vision at times on the left, visual flashes, vision halos, tinnitus, speech difficulties, hoarseness, choking, weakness of

the arms and legs, nausea, imbalance, poor coordination, dysphagia, and dysautonomia manifest by palpitations" (Exh. 7 JR:MNG Medical Records  p12).

43. Ms. Rouviere was seen at South Miami Hospital Emergency Department on July 6, 2014, for complaints of persistent headache for the past 8 days with neck pain, facial region pain, blurred vision, photophobia, nausea, numbness, and weakness; the report indicates that she chronically suffers from severe debilitating headaches due to Ehlers-Danlos syndrome and cervical neck instability; she reported that her headaches were worse and she was worried she may have a CSF (cerebrospinal fluid) leak brought on by recent travel. (Exh. 7 JR:MNG Medical Records)

44. Ms. Rouviere was seen by Dr. Joseph Tregaskes, a prosthodontist, on July 22, 2014, for complaints of headaches, neck pain, morning head pain, jaw pain, back pain, dizziness, facial pain, pain when chewing, shoulder pain, inability to open her mouth, fatigue, nocturnal teeth grinding, sinus congestion, limited mouth opening, eye pain, difficulty swallowing, ear congestion, ear pain, feeling unrefreshed in the morning, ringing in the ears, and throat pain (Exh. 7 JR:MNG Medical Records p65).

45. On October 2, 2014, Dr. Henderson reviewed all of Ms. Rouviere's CT myelograms of the cervical, thoracic, and lumbar spine; while there was concern for CSF leak, Dr. Henderson concluded from the CT scans that Ms. Rouviere's symptoms were not from a CSF leak but rather from craniovertebral and atlantoaxial instability. Dr. Henderson did not feel that Ms. Rouviere's exam or history suggested multiple sclerosis as an etiology for her disabling pain, but rather that her symptoms and findings, including her cervical complaints, dystonic movements, and temporomandibular joint syndrome, were very typical of the

hypermobility population (i.e., Ehlers-Danlos patients) (Exh. 7 JR:MNG Medical Records p. 65)

46. Ms. Rouviere was seen in the emergency department at Broward Health Medical Center on May 11, 2015, for complaints of right hip pain, onset 2 weeks ago and chronic. An additional history of Ehlers-Danlos disease and multiple hip surgeries was noted. No other complaints or histories were reported. No focal neurological deficits were observed. Ms. Rouviere was discharged with a diagnosis of hip sprain (000343).

47. Ms. Rouviere was admitted to Baptist Health South Florida – Doctors Hospital on May 17, 2015, after presenting to the emergency department for complaints of severe right hip pain radiating into her right leg with a burning sensation. She stated she injured hip a week earlier as a result of minimal trauma. Dr. Manuel Diaz noted that Ms. Rouviere "also has a history of multiple complaints which have been evaluated by a neurologist in the past. She saw a neurologist in September of last year for evaluation of headaches, dizziness, visual disturbances, slurred speech, nausea, etc. Apparently, she was told that everything was related to a history of cervical spinal listhesis which she had repaired in 2013" (001580 – also, can use (Exh. 9 - Jodi Medical Record, 170).

48. Ms. Rouviere testified that in addition to right complaints, she went to Doctors Hospital because she was concerned about many systemic issues she was having at that time such as poundings in her body, heart pounding, head pulsing, vision issues, blurred vision, double vision, overall feeling of sickness, and malaise (Exh. 5 JR Depo 149:15-19).

49. Dr. Carlos Alvarado saw Ms. Rouviere in consultation at Doctors Hospital on May 21, 2015, for a second opinion. Ms. Rouviere's chief complaint was right hip pain. The history indicates complaints of worsening right hip pain over the past year with painful burning in

the groin, a snapping or possible subluxation feeling or instability, "strange" numbness, tingling, and burning pain shooting down the leg, hypersensitivity to the feeling of instability in the hip, palpitations, and headaches (Exh. 5 JR Depo Exh 16  p52).

50. Laboratory values indicate that Ms. Rouviere's chromium level was 0.9 (Exh. 5 - JR Depo Exh 16,  p52).

51. Dr. Alvarado's assessment was that Ms. Rouviere had a "complicated problem", that her underlying Ehlers-Danlos syndrome likely resulted in her chronic hip pain, that radiographs did not demonstrate any mechanical issues with the prosthesis, that MRIs demonstrated a small fluid collection but that her chromium levels were normal; that her implant, a Stryker Titanium cup with an MDM head and liner, is not one associated with metal debris or metallosis and also had not been recalled, and that he believed her pain was probably due to "some amounts of subluxation" but not frank dislocations (Exh. 5 JR Depo Exh 16  p52).

52. After her discharge from Doctors Hospital in May 2015, Ms. Rouviere's next medical treatment was at South Miami Hospital-Baptist Health on December 14, 2015, for complaints of suprapubic and pelvic pain; at that time, she denied any current headaches or blurred vision. The evaluating physician believed her discomfort could be due to her chronic spinal issues, and also considered getting a neurology evaluation (Exh. 9 - Jodi Medical Record - 179).

53. In August 2016, Dr. Alvarado still felt the etiology of Ms. Rouviere's pain was unclear (Exh. 18 - Alvarado Dep. 56:7).

54. Dr. Alvarado felt that "this was a strange case" and a "[v]ery difficult case" (Exh. 18 - Alvarado Dep. 62:11).

55. Dr. Alvarado feels that the "overarching theme" throughout his treatment of Ms. Rouviere is that "this was a complex case, difficult patient, difficult surgical case" and even 5 years later, he still did not have a clear source for her pain or the failure of her hip implant (Exh. 18 - Alvarado Dep. 70:23-71:4).

56. At the time of the revision surgery in November 2016, Dr. Alvarado still had no explanation for Ms. Rouviere's clinical presentation (Exh. 18 - Alvarado Dep. 74:25-75:1).

57. Dr. Alvarado testified that the revision surgery was performed to relieve Ms. Rouviere's pain, and the intraoperative findings compelled him to conclude that metallosis was potentially the source of her pain, which he still believes to be the case (Exh. 18 - Alvarado Dep. 90:11-25).

58. Stryker's dual mobility system was developed to provide surgeons with "a viable alternative to metal-on-metal devices" in order to gain market share in that category. Stryker wanted to market dual mobility out of the growing concern of metal-on-metal use and its relation to, amongst other issues, ALVAL and metal hypersensitivity. But it did not; the metal MDM liner's impingement with a metal stem by design introduced the same risks as metal-on-metal bearings with a metal-on-metal impingement. [Exh. STRROUV00005459]

59. Stryker deliberately placed the MDM on the market after it presented no clinical data to the FDA in support of the 510k application. [Exh. 16 - STRROUV00000900]

60. The FDA said the MDM had no clinical data and its performance could not be predicted from its predicate device. FDA believed the claim proposed of the predecessor device implied the subject device would also perform successfully and was therefore misleading. [Exh.16 -  STRROUV00001325, STRROUV00005459]

61. Design changes occurred in March 2011, after the MDM liner's FDA clearance was granted in February 2011. [Exh. 16 - STRROUV00000451-STRROUV00000454]

62. No relevant IFU or Surgical Protocol existed for the ADM/MDM and Trident shell to be put together in the MDM system as Stryker instructed surgeons to do in 2012 in the MDM's Surgical Technique. [Exh. 16  STRROUV00000129-152, STRROUV00000001-10]

63. The 2012 MDM Surgical Technique instructed surgeons that the MDM liner was for use with the titanium TRIDENT shell ONLY [STRROUV00000130], but the IFU for the MDM demonstrated the acetabular cup was the cobalt chromium RESTORATION ADM shell ONLY, which represented design differences, material differences, a different surgical technique and required different warnings and separate clearance by the FDA. [Exh. 16 - STRROUV00000005-6]

64. The Trident shell was represented to be the compatible shell in the MDM's 510K application to the FDA. [Exh. 16 - STRROUV00000906]

65. In 2012 the IFU for the ADM/MDM instructed the surgeon to pair the ADM/MDM with the ADM shell, not the Trident shell. But the Surgical Technique for the MDM paired the ADM/MDM with the Trident shell, not the ADM shell, deceptively deceiving, misleading and confusing the surgeons as to which shell was to be used with the ADM insert and MDM liner [Exh. 16- STRROUV00000001-10, STRROUV000000129-152]

66. No IFU existed in 2012 or in 2016 for the ADM/MDM to be paired with the Trident shell, and so warnings did not exist for the MDM "system" represented in the MDM Surgical Technique which instructed the surgeons to use the Trident shell as the acetabular shell for the system. [Exh. 16 - STRROUV00000001-10, STRROUV000000129-152]

67. The Surgical Technique for the ADM/MDM instructed the surgeon to pair the ADM insert and MDM liner with the Trident shell. But the Trident shell's Surgical Technique and IFU did not indicate the MDM liner at all. [Exh. 16 - STRROUV000000129-152]

68. In 2010, Stryker told surgeons that the anatomical ADM shell offered the potential for reduction of femoral neck impingement that hemispherical cups, like the Trident shell, imposed. [STRROUV00007608] However, Stryker's chief engineer testified that the ADM anatomical shell was not a cup most likely to prevent impingement. [Exh. 23 - Heff. Dep 167:4-167:16]

69. The warnings that existed in Stryker's 2009 Surgical Technique for the Restoration ADM were removed from the subsequent 2012 MDM Surgical technique, even though the risks still existed. No warnings appeared in the 2012 MDM Surgical technique related to impingement and its effects on metallosis which was expected with the Trident hemispherical shell. [Exh. B to PSOF and Exh. 16 -  Present: STRROUV00007608, Removed: STRROUV00000112]

70. Stryker's sales rep, who worked with plaintiffs' implanting surgeon, Dr. Buly, testified that the metal parts of the ADM/MDM X3 and cup were actually less likely, not more likely, impinge on a metal stem because of "geometry" (Exh. C to PSOF - Rodrig. Dep. 50:12-19).

71. Stryker's sales rep testified that he is not allowed to talk about impingement, only range of motion, when he speaks with implanting surgeons (Exh. C to PSOF - Rodrig. Dep. 51:16-18).

72. Stryker's sales rep testified that impingement is determined by the positioning of the cup and stem by the implanting surgeon (Exh. C to PSOF - Rodrig. Dep. 51:19-24).

73. Yet Stryker's internal documents, withheld from implanting surgeons, state that "In dual mobility systems, neck impingement is part of the system's function and the related wear is a clinically relevant preoccupation." [STRROUV00006582]

74. In June 2010, Stryker was told by its own surgeon team regarding the dual mobility system, mechanical impingement should be avoided because it caused instability. [Exh. D to PSOF - STRROUV00001946]

75. Stryker deliberately did not include the cobalt-chromium metal MDM liner in their analysis of under-neck impingement, only polyethylene inserts were studied. Stryker made claims regardless of not testing the MDM, that the MDM liner would not be affected by the new dimensional changes to the ADM insert, even though the ADM was undergoing a dimension alteration that could affect the wear from under-neck stem impingement related to the MDM. [Exh. 16 - STRROUV00000451-454:452, Exh. E to PSOF - STRROUV00005643-5655, Exh. 23 - Heff. Dep. 171:24-173:19]

76. Stryker deliberately deceived the surgeons by making false representations as to what components would be impinging with the use of the MDM liner. It was not the ADM polyethylene insert that would impinge upon the metal stem, but the MDM cobalt-chromium metal liner. The metal-metal impingement was defined in the MDM's Surgical Technique as a metal-polyethylene impingement, but Stryker KNEW it was a metal-metal one. There is no mention of metal wear due to impingement. [Exh. 23 - -Heff. Dep. 200:23, 201:1, Exh. 16 - STRROUV00000144]

77. In 2012, ADM/MDM's IFU contained only warnings related to "polyethylene" wear but not "METAL" wear. [Exh. 16 - STRROUV00000007]

78. In the 2012 MDM Surgical Technique Stryker warned about only the premature wear of the polyethylene insert (ADM), but not the cobalt chromium liner (MDM). [Exh. 16 - STRROUV00000138]

79. Two open recalls existed in August 2012: Stryker's Restoration ADM X3 insert and MDM liner. Exh. 16 - STRROUV00000625, STRROUV00008134, STRROUV00001305,

80. These recalls correspond with Ms. Rouviere's product labels. [Exh. 6 - Def Exh. Buly 74:194]

81. Dr. Buly, plaintiff's implanting surgeon, was unaware that the components had any recalls, including in 2012. [Exh. 15 - Buly Dep. 103:22-104:4, 107:16-108:01, 232:17- 233:09]

82. Dr. Buly testified that if he had been aware of a component recall, he would not have used that component for Ms. Rouviere. [Exh. 15 - Buly Dep. 232:17- 233:09]

83. Dr. Alvarado, plaintiff's revising surgeon, similarly believed that the components had not had any recalls including in 2012. [Exh. 18 Alvarado Dep.  45:13-45:17, 46:02-46:05]

Dated: New York, New York
　　　　May 23, 2022

Respectfully Submitted,


__/s/ *Robert Godosky*_____
Robert Godosky
Godosky & Gentile, P.C.
100 Wall Street, Suite 1702
New York, New York 10005
212-742-9700

**CERTIFICATE OF SERVICE**

The undersigned certified that the foregoing document was electronically served on the following counsel of record via the Court's electronic filing system on this 23rd day of May, 2022:

Paul E. Asfendis, Esq.
GIBBONS, P.C.
One Pennsylvania Plaza, 37th Flr.
New York, NY 10119
(212) 613-2000

__/s/ Robert Godosky_____
Robert E. Godosky