UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/05/2022
```

---------------------------------------------------------------------X
                                                    :
JODI ROUVIERE and ANDRE ROUVIERE,                   :
                                                    :
                        Plaintiffs,                 :
                                                    :
                                                    :          18-cv-04814 (LJL)
             -v-                                    :
                                                    :          OPINION AND ORDER
                                                    :
HOWMEDICA OSTEONICS                                 :
CORPORATION d/b/a STRYKER                           :
ORTHOPAEDICS,                                       :
                                                    :
                        Defendant.                  :
---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        In 2012, Jodi Rouviere ("Rouviere") underwent hip replacement surgery and, as part of

that surgery, was implanted with a device that combined components made by two companies,

one of which is Howmedica Osteonics Corp. (the "Defendant").  Rouviere alleges that the two

components impinged on one another, resulting in the release of toxic metal debris into her body.

Based on alleged injuries she sustained as a result of the release of this metal debris, Rouviere

brings claims for negligence, strict products liability, breach of express warranty, and breach of

implied warranty against Defendant.  Her spouse, Andre Rouviere ("Mr. Rouviere," and with

Rouviere, "Plaintiffs"), brings a claim for loss of consortium against the Defendant.  Dkt. No. 26.

        Defendant now moves for summary judgment based on the statute of limitations, arguing

that Rouviere's claims are time-barred and Mr. Rouviere's loss-of-consortium claims should be

dismissed as derivative.  Dkt. No. 332.  For the following reasons, the motion for summary

judgment is granted.

## BACKGROUND

The following facts, which are largely drawn from the parties' Local Rule 56.1 statements of facts, Dkt. Nos. 333, 334, 341-1, 348, are undisputed unless otherwise indicated.[1]

Rouviere injured her right hip during an accident in her kitchen in July 2009.  Joint 56.1 Statement ¶ 1.  Rouviere reported right hip pain following the accident; she wore a brace on her right leg, could barely walk, often used a wheelchair, and could not climb up stairs.  P's 56.1 Counterstatement ¶ 36; D's Response to 56.1 Counterstatement ¶ 36.  After the accident, Rouviere underwent a number of arthroscopic procedures on her hips.  *Id.* ¶¶ 2–3.

Shortly after the third of these arthroscopic procedures, Rouviere was diagnosed with Ehlers-Danlos syndrome, a connective tissue disorder.  Joint 56.1 Statement ¶ 3.  As a result of her Ehlers-Danlos syndrome, Rouviere has suffered from neck, shoulder, back, and spinal cord issues and underwent an anterior cervical discectomy and fusion in February 21, 2013.  P's 56.1 Counterstatement ¶¶ 40–42; D's Response to 56.1 Counterstatement ¶¶ 40–42.  Medical records from April 2012 document that Rouviere's Ehlers-Danlos syndrome caused her shoulder to dislocate, severe popping of her neck, and her hands to be almost totally impaired due to subluxation of her thumbs.  Dkt. No. 346-7 at ECF p. 83.

On August 14, 2012, due to recurring pain in her right hip, Rouviere underwent a total right hip replacement surgery at the Hospital for Special Surgery in New York, performed by Dr.

---

[1] Defendant filed a Rule 56.1 joint statement of undisputed facts, which Defendant states that it compiled after meeting and conferring with Plaintiffs about what material facts are not in genuine dispute.  Dkt. No. 333 ("Joint 56.1 Statement").  Defendant also submitted a Rule 56.1 statement of undisputed facts in support of its motion for summary judgment, which is largely identical to the Joint 56.1 Statement, except it includes two additional paragraphs.  Dkt. No. 334 ("D's 56.1 Statement").  Plaintiffs submitted a response to D's 56.1 Statement as well as a counterstatement of facts (Paragraphs 36 to 83).  Dkt. No. 341-1 ("P's 56.1 Counterstatement").  Defendant submitted a response to P's 56.1 Counterstatement.  Dkt. No. 348 ("D's Response to 56.1 Counterstatement").

Robert Buly.  Joint 56.1 Statement ¶ 4.  As part of that surgery, Dr. Buly implanted a DePuy titanium femoral stem and ceramic head, as well as a Stryker MDM ® liner and insert and acetabular cup; the Stryker device is made and sold by Defendant.  *Id.* ¶ 5.

Upon implementation, Rouviere alleges that she suffered injury, physiological instability, toxicity, and toxic result from the interaction of the devices, although the parties dispute when exactly Rouviere became aware of the injuries.  *Id.* ¶ 6; *see* P's 56.1 Counterstatement ¶ 6.  On multiple occasions in September 2012, Rouviere experienced extreme dizziness, vertigo, nausea, and vomiting and went to the Emergency Room on September 11, 2012 as a result of these symptoms.  Joint 56.1 Statement ¶ 7.  In November 2012, Rouviere complained to her osteopath of increasing right hip pain as well as "searing, shooting pain down the right hip."  *Id.* ¶ 8.  Plaintiffs also alleged in their amended complaint that by the beginning of 2013, Rouviere "experienced pain and loss of range of motion."[2]  *Id.* ¶ 9 (quoting Dkt. No. 26 ¶ 209).  Further, as 2013 progressed, Rouviere's health declined, and she suffered more pain, instability, and less function in her right hip, her heart would start beating harder, and her body felt tired.  *Id.* ¶ 10.

In October 2013, Rouviere was treated by a neurologist, Dr. Brad Herskowitz, after she complained of headaches, heaviness in her arms and legs, an itchy head and face, an urgent need to urinate, and feeling like she had slowed down in general.  *Id.* ¶ 11.  The treatment records also state that Rouviere questioned whether she may have a multiple sclerosis-like disease.  P's 56.1 Counterstatement ¶ 11; *see* Dkt. No. 335-1 at 141–42.

---

[2] In their counterstatement, Plaintiffs do not contest this allegation, but state that "the allegation made in the Amended Complaint does not by itself indicate any knowledge by the plaintiff of any occurrence or condition prior to commencement of the action."  P's 56.1 Counterstatement ¶ 9.

Treatment records from her osteopath, Dr. Mark Sandhouse, from mid-to-late 2013 indicate that Rouviere continued to suffer instability and pain in her right hip and displacement of the hip occasionally.  Joint 56.1 Statement ¶ 12.  In February of 2014, Rouviere had an appointment with a neurologist, Dr. Simon Starosta-Rubenstein, after she grew concerned with her "functional neurological decline."  *Id.* ¶ 13.

On June 27, 2014, Rouviere told her physical therapist that she was suffering from, among other things, vertigo, lightheadedness, dizziness, double and blurred vision, tinnitus, nausea and vomiting, shaking episodes, tremors, changes in sleep patterns and appetite, numbness in her right leg, chronic pain, muscle pain at rest, speech difficulty, weakness in legs and arms, and heart palpitations.  *Id.* ¶ 14.  Doctor's notes related to that visit state that Rouviere believed that the "cause of the pain or condition to be Ehlers Danlos Syndrome."  Dkt. No. 346-7.

Due to recurring incidents of instability of her right hip, Rouviere was admitted to the hospital on May 17, 2015.  *Id.* ¶ 15.  The admission records state that, in addition to instability of the right hip, Rouviere had been having problems with temperature regulation, tremors, blurred vision, cognitive impairment, dizziness, and gaited instability for the previous eight months.  *Id.* The doctor's notes for the visit also state:

> Chief Complaint: Lower extremity pain. . . .  She has had difficulty walking. . . . 43 y/o F with a significant surgical history of Rt hip replacement. . . . The pt was taken to Broward general hospital where x-rays were done and they revealed no fractures or dislocations.  Even though the pt wasn't able to walk, she was discharged home with outpatient orders for an MRI of the rt hip.  MRI was done it showed that the pt has anatomy distortion of the hip, with diffuse metal artifact present with no evidence of fracture or dislocation.

Dkt. No. 335-15.  Rouviere's notes related to this visit dated May 18, 2015 state: "My hip mispositions again.  I cannot walk and am in excruciating pain.  I am admitted to Doctor's

Hospital (Coral Gables, FL) for 6 days of testing as I believe my unstable hip and neurological symptoms could be relational [sic] to metallosis."  *Id.*; *see* Dkt. No. 335-16.

In the amended complaint, Plaintiffs allege that in May 2015, Rouviere's blood was tested and demonstrated "highly elevated Chromium level of 0.9 [mcg/L], Arsenic of [mcg/L] 5 . . . Plaintiff has no source of exposure to chromium and cobalt and other metals that would account for her elevated blood levels of chromium or cobalt and other metals other than the subject product."  Joint 56.1 Statement ¶ 16.  Defendant claims that these blood test results were received on May 18, 2015, although Plaintiffs claim that Rouviere did not receive the results before she left the hospital and did not know what happened to the metal test.  D's 56.1 Statement ¶ 17; P's 56.1 Counterstatement ¶ 17.

On May 21, 2015, Rouviere met with Dr. Carlos Alvarado, an orthopedic surgeon, because her hip had displaced so many times and would get stuck and she was having "so many" systemic issues.  D's 56.1 Statement ¶ 18 (claiming that Rouviere went to see Dr. Alvarado); P's 56.1 Counterstatement ¶ 17 (claiming that Dr. Alvarado came to see Rouviere at the hospital).

On November 11, 2016, Rouviere underwent a partial revision surgery, performed by Dr. Alvarado, to remove and replace the two implanted devices.  Joint 56.1 Statement ¶ 19.  The surgeon for the revision surgery found that the DePuy titanium stem had impinged upon the Stryker MDM ® cobalt chrome liner resulting in a notch in the neck of the titanium stem.  *Id.* He also found "a significant amount of grayish brown soft tissue consistent with metal debris," which was indicative of metallosis.  *Id.*  The surgeon later told Rouviere that she was "covered in metallosis" and that she had "pseudotumors consistent with damage to the tissue."  *Id.* ¶ 20.

After this procedure, Rouviere underwent two additional revision surgeries in February 2017 and May 2017 to remove and replace various components in her right hip.  *Id.* ¶ 21.

Eventually, in October 2017, a procedure was performed in which all of the hip components were removed.  *Id.* ¶ 22.

In this action, Rouviere claims that, due to the implantation of Defendant's device, she has suffered injuries including physiological instability, pain, swelling, inflammation, adverse tissue reaction, necrosis, pseudotumor, metallosis, and toxicity resulting from metal debris generated by her hip components as well as decreased mobility of the hip.  *Id.* ¶ 23.  In her amended complaint, she alleges that by reason of Defendant's tortious acts, she "has suffered and/or is at an extremely high risk of suffering serious and dangerous side effects, including but not limited to severe pain and suffering, the need for additional surgery, as well as other severe and permanent health consequences."  Dkt. No. 26 ¶ 196; *see also id.* ¶¶ 270, 289, 313, 324, 335, 348, 371, 382, 393.  She alleges that she "has been severely and permanently injured and/or has been exposed to risk of severe and permanent injury, and has and will require more constant and continuous medical monitoring and treatment than prior to her implantation of Defendants' Summit Tapered Hip System and its stem."  *Id.* ¶ 198.  Plaintiffs' experts identify the following injuries as caused by metal debris released from her 2012 implants: tissue damage and necrosis, metallosis, chronic fatigue, nausea, headaches, weakness, dizziness/vertigo, cognitive impairment, hip and other joint and muscle pain, tachycardia, dry eyes/blurred vision, and other immunological and neurological symptoms.  Joint 56.1 Statement ¶ 24.

## PROCEDURAL HISTORY

Plaintiffs initiated this lawsuit on May 31, 2018 by filing a complaint against Defendant as well as Depuy International, Limited, DePuy Orthopaedics, Inc. ("DePuy"), Depuy Products, Inc., Johnson & Johnson Services, Inc., Johnson & Johnson, Inc., Stryker Corporation, and Stryker Sales Corporation.  Dkt. No. 1.  On October 19, 2018, Plaintiffs filed the operative, amended complaint against the same entities.  Dkt. No. 26.  That amended complaint seeks

damages for severe and permanent personal injuries including elevated blood levels of

chromium, chromium toxicity, elevated blood levels of cobalt, cobalt toxicity, titanium, titanium

toxicity, inflammation, pain, swelling, loss of range of motion, surgical removal and revision of

hip replacement system, hip explant, pain and suffering, economic loss and permanent disability,

all of which Rouviere allegedly sustained as a consequence of being impacted by devices

manufactured and sold by the defendants. *Id.* ¶ 1.

In December 2018, Plaintiffs voluntarily dismissed their claims against Stryker

Corporation and Stryker Sales Corporation, DePuy Products, Inc., DePuy International, Limited,

Johnson & Johnson, and Johnson & Johnson Services, Inc. Dkt. Nos. 43–44, 51, 52. On January

7, 2019, Defendant filed an answer to the amended complaint, asserting that Plaintiffs' claims

are barred by the applicable statute of limitations. Dkt. No. 54 at ECF p. 38.

On September 17, 2021, this Court granted summary judgment in favor of DePuy on all

counts, including because Plaintiffs offered no expert testimony in support of their defective-

design claim against DePuy and Plaintiffs failed to adduce evidence as to proximate causation in

support of their failure-to-warn claim against DePuy. Dkt. No. 318 at 7. Thus, Defendant was

left as the only remaining defendant in the case.

During a conference on February 17, 2012, the Court directed Defendant to file a motion

for summary judgment based only on the statute of limitations by March 18, 2022, and noted that

other summary judgment arguments and *Daubert* issues would be preserved pending the

outcome of that motion.

On March 18, 2022, Defendant filed its motion for summary judgment based on the

statute of limitations along with supporting papers. Dkt. Nos. 332–36. On May 23, 2022,

Plaintiffs filed their opposition to Defendant's motion for summary judgment, as well as

supporting papers.  Dkt. No. 341.  On May 27, 2022, Plaintiffs filed a motion to file certain

exhibits or portions of the exhibits under seal,[3] as well as a revised declaration with exhibits in

support of its opposition to summary judgment.  Dkt. Nos. 345–46.  Defendant filed their reply

memorandum of law in support of summary judgment as well as supporting documentation on

June 20, 2022.  Dkt. Nos. 347–49.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

---

[3] Plaintiffs seek leave to file certain exhibits under seal.  Dkt. No. 345.  Plaintiffs stated that these exhibits should be sealed as they contain material set forth in the protective order between the parties.  *Id.*  "Confidentiality agreements alone are not an adequate basis for sealing."  *Metcalf v. TransPerfect Translations Int'l, Inc.*, 2022 WL 2116686, at *1 (S.D.N.Y. June 13, 2022).  "Material designated as Confidential by a protective order might not overcome the presumption of public access once it becomes a judicial document" and "[d]ocuments submitted in support of or opposition to a dispositive motion are judicial documents."  *Id.* (internal quotation marks and citations omitted).  A party seeking to seal material subject to protective order must therefore justify why the presumption of public access over judicial documents should be overcome.  *Id.*  Here, Plaintiffs have failed to explain why sealing of this material is appropriate under the factors set forth in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  For this reason, the motion to seal is denied without prejudice to a revised motion to be filed within 14 days of the date of this Order that explains why "sealing (1) is necessary 'to preserve higher values,' and (2) 'is narrowly tailored to serve that interest.'"  *Metcalf*, 2022 WL 2116686, at *1 (quoting *Lugosch*, 435 F.3d at 120).  In the absence of such a timely-filed motion, the Court will unseal the materials.

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).[4]

---

[4] The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if

**DISCUSSION**

Defendant argues that Plaintiffs' products liability claims arising out of an August 14, 2012 right total hip replacement surgery are barred by the three-year statute of limitations and that, because such claims are time-barred, the derivative loss-of-consortium claim asserted by Mr. Rouviere is also subject to dismissal.

## I.   Product Liability Claims

To determine whether Plaintiffs' personal injury claims are barred by the statute of limitations, the Court must first decide what statute of limitations applies to Plaintiffs' products liability claims.  The parties agree that New York law governs this question and that a three-year statute of limitations applies.  Dkt. No. 336 at 6–7; Dkt. No. 341 at 10; *see Vuksanovich v. Airbus Americas, Inc.*, 2022 WL 2274543, at *6 (S.D.N.Y. June 23, 2022)) ("Under New York law, the general limitations period for personal injury claims is three years." (citing N.Y. C.P.L.R. § 214(5))).  The parties, however, dispute exactly when that three-year statute of limitations began to accrue.

First, the parties dispute whether N.Y. C.P.L.R. 214-c(2)—which provides a specific accrual rule for personal injury caused by the "latent effects of exposure" to any substance— applies to Plaintiffs' product liability claims.  C.P.L.R. 214-c(2) provides that where a person suffers personal injury from the "latent effects of exposure to any substance or combination of substances, in any form," the three-year limitations period runs "from the date of discovery of

---

necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

the injury by the plaintiff or from the date when through the exercise of reasonable diligence

such injury should have been discovered by the plaintiff, whichever is earlier." C.P.L.R. 214-

c(2). This is distinct from the general accrual rule for personal injury suits caused by the

malfunctioning of a device, which runs "from the date of injury resulting from malfunction, not

from the date of implantation of the device—unless implantation and malfunction occur at the

same time." *Guisto v. Stryker Corp.*, 293 F.R.D. 132, 135 (E.D.N.Y. 2013). "The goal of the

Legislature in adopting CPLR 214-c was to 'provide relief to injured New Yorkers whose claims

would otherwise be dismissed for untimeliness simply because they were unaware of the latent

injuries until after the limitations period had expired.'" *Matter of New York Cnty. DES Litig.*,

678 N.E.2d 474, 478 (N.Y. 1997) (citation omitted).

In a few sentences, Defendant appears to argue that C.P.L.R. 214-c(2) does not apply to

Plaintiffs' personal liability claims because, according to Plaintiffs, the "mechanical problem"

with the devices "caused pain and instability" in Rouviere's hip immediately upon

implementation; in Defendant's view, then, this is not a case in which the effects of the exposure

were "latent." Dkt. No. 336 at 17. In support of this argument, Defendant points to an

interrogatory response from Plaintiffs stating that "[t]he device caused injury upon

implementation, physiological instability, toxicity and toxic result over time." *Id.*; Dkt. No. 335-

3 at ECF p. 6. Plaintiffs respond that the "implanted hip admittedly did not cause injury on the

date it was implanted regardless of whether the device was otherwise defective." Dkt. No. 341 at

12.

The Court agrees with Plaintiffs that C.P.L.R. 214-c(2) applies to Plaintiffs' product

liability claims. To begin, the evidence supports that there was a latency period before Rouviere

discovered the alleged injury. The New York Count of Appeals has stated that "even effects

concealed for a few hours may be 'latent' within the meaning of the statute," *Giordano v. Mkt. Am., Inc.*, 941 N.E.2d 727, 731 (N.Y. 2010), and, here, the evidence indicates that the effects of the implantation were latent for at least a month.  Rouviere first identifies suffering injuries allegedly attributable to her exposure to the device around September 11, 2012—approximately one month after the implantation—when she began to experience "a spinning feeling paired with dizziness, nausea, and vomiting and was taken to the Emergency Room at Baptist Hospital for vertigo."  Dkt. No. 335-4 at 3; *see* Joint 56.1 Statement ¶ 7.  Plaintiffs' interrogatory response— stating that "[t]he device caused injury upon implementation"—does not compel a contrary conclusion.  Dkt. No. 335-3 at ECF p. 6.  Although the interrogatory response generally states that the device caused injury "upon implementation," it does not state that the injury occurred *immediately* upon implementation or, more important, state that the injury was patent.  A patient can be injured without the injury being discovered.  That is the point of the New York statute. The interrogatory is thus silent as to whether the injury was "latent" for some period of time prior to its discovery, and Defendant points to no other evidence that the effects of which Plaintiffs complain were immediately apparent to Rouviere.  *See BJB Ltd. v. iStar Jewelry LLC*, 533 F. Supp. 3d 83, 91 (E.D.N.Y. 2021) (defendant bears the burden of proof on a statute of limitations defense).

     To the extent Defendant is arguing that C.P.L.R. 214-c(2) does not apply because Rouviere suffered injury from a "mechanical problem" rather than "exposure to a[] substance," this argument is also unavailing.  Dkt. No. 336 at 17.  The heart of Plaintiffs' claims is that the impingement of the two component devices and the resulting friction caused the release of metal debris and ions that, in turn resulted in metallosis and other conditions that caused pain, swelling, inflammation, adverse tissue reactions, and a decrease in range of motion.  Dkt. No. 26 ¶¶ 126–

28; *see also* Dkt. No. 233 at 3.  Rouviere's injuries thus allegedly resulted from exposure to a toxic substance, not merely a mechanical problem: Plaintiffs claim that the DePuy titanium stem impinged with the Stryker cobalt-chrome liner, releasing toxic metals into Rouviere's body, which, in turn and over time, caused various ailments in Rouviere.  Joint 56.1 Statement ¶ 19; Dkt. No. 336 at 1.  These allegations, if true, are precisely the type with which the New York legislature was concerned when it passed C.P.L.R. 214-c(2).  *See Giordano*, 941 N.E.2d at 731 ("The Legislature's concern when it enacted the statute was the problems raised by toxic tort cases in which the latency of a substance's effect could prevent the plaintiff from bringing a timely lawsuit.").  It is also apparent from the statutory text that C.P.L.R. 214-c(2) applies to claims involving the malfunctioning of an implanted device.  "Exposure" is defined earlier in C.P.L.R. 214-c to mean "direct or indirect exposure by absorption, contact, ingestion, inhalation, *implantation* or injection."  C.P.L.R. 214-c(1) (emphasis added).  The use of the phrase "exposure by . . . implantation" specifically envisions that a party may be exposed to a substance causing injury in the manner alleged here.  *See, e.g.*, *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 429 (W.D.N.Y. 2001) (applying C.P.L.R. 214-c(2) to claims for physical harm resulting from defects in an internal fixation system implanted in the spine).

The cases that Defendant cite in favor of its argument that C.P.L.R. 214-c(2) does not apply to Plaintiffs' claims are inapposite.  In *Baker v. Stryker Corp.*, 770 F. App'x 12 (2d Cir. 2019), the plaintiff's pain "began almost immediately after his" operation, *id.* at 14–15, and there was no allegation that the injury arose "from latent exposure to a substance," *id.* at 15.[5] Similarly, in *Guisto*, 293 F.R.D. 132, plaintiffs' claims "concern[ed] physical pain and

---

[5] The Second Circuit also noted in *Baker* in a footnote that "even if C.P.L.R. § 214-c did apply, Baker's personal injury claims would still be untimely."  *Id.* at 15 n.1.

discomfort resulting from a defective or malfunctioning device" and they "made no allegations of developing any condition or contracting any disease because of the device." *Id.* at 137.  In addition, the plaintiffs in *Guisto* asserted "that the implant was ill-fitting and caused her immense pain from the time of implantation." *Id.*  In this case, as noted, Rouviere complains not of physical pain or discomfort resulting from the implantation of the device, but of a condition that she developed as a result of exposure to toxic metal debris from the devices.  For these reasons, the Court finds that the accrual rule in C.P.L.R. 214-c(2) applies to Plaintiffs' claims.

Because C.P.L.R. 214-c(2) applies, the next issue is when the "discovery of the injury" occurred for purposes of the accrual of the three-year statute of limitations.  C.P.L.R. 214-c(2).

Defendant argues that discovery of the injury occurred shortly after the implant surgery in 2012 when Rouviere began to exhibit symptoms, allegedly caused by the metal debris released from the 2012 implants.  Dkt. No. 336 at 8–9.  In arguing that discovery of the injury occurred around late-2012 to early-2013, Defendant points to: (i) Plaintiffs' expert opinions, which rely on Rouviere's injuries having first occurred in 2012; (ii) Plaintiffs' own testimony and doctor records indicating that she started to suffer symptoms, including dizziness, vertigo, instability, and pain, beginning in late-2012 and throughout 2013; (iii) Plaintiffs' judicial admission in the amended complaint that "[b]y the beginning of 2013, she experienced pain and loss of range of motion"; (iv) Plaintiffs' interrogatory responses that Rouviere saw a doctor in March 2013 regarding vision problems, eye pain, sinus pressure, and headaches; and (v) deposition testimony from Rouviere that she saw the most decline in her health occur in 2013, when it started to "tak[e] a lot for [her] to do the normal things that [she] was doing." *Id.* at 8–13.  Defendant argues that these symptoms only became more pronounced in 2014, pointing to evidence, among

others, that Rouviere visited a neurologist in February 2014 due to concerns about "functional neurological decline." *Id.* at 13.

Plaintiffs respond that the issue of when exactly the injury was discovered is a question of fact unsuitable for summary judgment. Dkt. No. 341 at 19. Plaintiffs make several arguments in support of this point. Plaintiffs note that Rouviere suffered numerous ailments and complaints related to a number of different parts of her body, "not just her hip, making it difficult, to say the least, for plaintiff or anyone else to parse through which complaints could reasonably be related to the implant malfunction." *Id.* at 15. Plaintiffs also argue that Rouviere's symptoms were varied and random and thus insufficient to trigger the running of the statute of limitations. *Id.* at 21–22. Plaintiffs further state that Rouviere has had a complex medical history, with symptoms occurring before and continued after her 2012 surgery—which does not lend itself to isolating a specific date prior to the revision surgery at which time Plaintiff's injuries can be traced to the implantation malfunction. *Id.* at 22. For these various reasons, Plaintiffs argue that the accrual date did not run until the revision surgery in November 2016. *Id.* Plaintiffs, however, note that if the Court finds that "the injury related to the malfunction manifest[ed] itself prior to May 31, 2015, it is submitted that the only dates which might lend themselves to such a finding would be May 17, 2015, May 18, 2015 and May 21, 2015," which are the dates on which Rouviere first opined that her symptoms were related to metallosis and her blood was tested. *Id.* at 15–16. Plaintiffs note that if the claims accrued on the last of these three dates (*i.e.*, May 21, 2015), Plaintiffs' claims would not be untimely as Mr. Rouviere attempted to file the initial complaint on May 21, 2018. *Id.* at 1–2, 16.

The meaning of the phrase "discovery of the injury" in C.P.L.R. 214-c(2) has been explored at length by courts in this Circuit as well as New York State courts. The key case is

*Matter of New York County DES Litigation*, in which the New York Court of Appeals first addressed the meaning of the phrase.  678 N.E.2d 474.  In that case, the plaintiff experienced a number of reproductive difficulties and ailments which were initially misdiagnosed; she ultimately learned that her ailments may have been related to her mother's ingestion of diethylstilbestrol ("DES"), while pregnant with the plaintiff.  Upon that discovery, she sued the manufacturers of DES, claiming that they were responsible for her reproductive ailments.  Several of the defendants moved for summary judgment and the court ruled in their favor, directing the complaint to be dismissed as time-barred under C.P.L.R. 214-c(2).  *Id.* at 475–76.

The New York Court of Appeals accepted defendants' argument that the statute of limitations begins to run in a latent exposure case "when the injured party discovers the primary condition on which the claim is based."  *Id.* at 475.  In doing so, the court rejected plaintiff's argument that the limitations period would begin to run only when the plaintiff was aware that the injury was "caused by an outside, nonbiological source"; in other words, that the statute of limitations could not begin to run if the plaintiff knew "neither of the cause of the symptom nor of the very fact that th[e] symptoms have a nonnatural cause."  *Id.* at 477.

Although noting that the "interpretation plaintiff urges has some superficial appeal, since it would benefit potential claimants whose symptoms, like plaintiff's, are ambiguous and are not always associated with exposure to a foreign substance," the New York Court of Appeal rejected plaintiff's reading of the statute, finding that its "construction is out of harmony with the statutory design and is unsupported by the provision's legislative history."  *Id.*  The court recognized that the rule it was adopting would result in the statute of limitations beginning to run before the plaintiff knew that the harm she suffered was "caused by an outside, nonbiological source."  *Id.*  Indeed, Judge Smith, in dissent, noted that the rule would burden plaintiffs "with an

expiring Statute of Limitations when the only knowledge in their possession [wa]s the existence of an abnormal physical condition," and "disregard the diligence exercised by plaintiffs in attempting to discover the causes of their medical problems." *Id.* at 481 (Smith, J., dissenting). However, the Court of Appeals majority noted that a separate provision in C.P.L.R. 214-c addresses scenarios where a plaintiff "was aware of the 'injury' itself but there was a delay in the discovery of its 'cause'" and requires certain "statutorily prescribed conditions" to be satisfied to invoke this provision.[6]  *Id.* at 477.  Thus, discovery of the injury in C.P.L.R. 214-c(2) must have a different meaning than discovery of the cause of the injury.  In addition, the court stated that "the distinction plaintiff advances"—between discovery that symptoms have a nonbiological cause and the precise identity of that nonbiological cause—"is more semantic than real." *Id.* The court reasoned that:

> The knowledge that particular symptoms are attributable to an outside cause is almost invariably coupled with an awareness of the identity of that cause.  As a practical matter, physicians do not diagnose medical problems as having a nonbiological cause in a vacuum.  It is usually only after the discovery by

---

[6] That provision, *i.e.*, C.P.L.R. 214-c(4), states that:

> where the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury or when with reasonable diligence such injury should have been discovered, whichever is earlier, an action may be commenced or a claim filed within one year of such discovery of the cause of the injury; provided, however, if any such action is commenced or claim filed after the period in which it would otherwise have been authorized pursuant to subdivision two or three of this section the plaintiff or claimant shall be required to allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized and that he has otherwise satisfied the requirements of subdivisions two and three of this section.

C.P.L.R. 214-c(4).  In this case, both parties agree—although for different reasons—that this provision does not save Plaintiffs' claims and thus the Court does not address it.  *See* Dkt. No. 336 ("The 'Unknown Cause' exception of CPLR §214-c(4) does not apply."); Dkt. No. 341 ("Plaintiff does not dispute that CPLR 214-c(4) does not apply but not for the reasons set forth by defense.").

> researchers of the relationship between a particular toxic substance and a particular
> set of symptoms, such as the now known relationship between thalidomide and
> certain birth defects or between asbestos and certain lung diseases, that
> diagnosticians connect the observed symptoms to a nonbiological, outside cause.

*Id.* at 477–78.  The court further stated that: "CPLR 214-c(2)'s reference to 'discovery of the

injury' was intended to mean discovery of the condition on which the claim was based" and that

"nothing more is [] apparent from the legislative history of the provision."  *Id.* at 478.

Specifically, the court stated:  "It is apparent from this history that, in enacting a new 'discovery'

rule for the commencement of toxic torts, the Legislature had in mind only the discovery of the

manifestations or symptoms of the latent disease that the harmful substance produced."  *Id.*  For

these reasons, the court concluded that the "time for bringing the action begins to run under the

statute when the injured party discovers the primary condition on which the claim is based."  *Id.*

at 475.  The court noted that a different rule "would depend on such fortuitous circumstances as

the medical sophistication of the individual plaintiff and the diagnostic acuity of his or her

chosen physician."  *Id.* at 479.

Since the majority's holding in *Matter of New York County DES Litigation*, courts have

repeatedly held that claims are time barred under C.P.L.R. 214-c(2) where a plaintiff suffered

symptoms of an illness more than three years prior to filing suit, regardless of whether the cause

of those symptoms had been discovered.  For example, in *Vuksanovich*, the court dismissed a

plaintiff's claims as untimely after finding that they accrued when she began experiencing

serious illness, including pain, trouble breathing, and worsening eyesight, and were not tolled

during the period in which the doctors were unable to "identify the cause of her symptoms."

2022 WL 2274543, at *7–8.  Similarly, in *Trisvan v. Heyman*, the court found that a plaintiff's

claims were time-barred as the plaintiff admitted to suffering certain symptoms, including

gaining close to a hundred pounds and suffering hypertension, by the usage of the drugs in 2003

and did not file suit until 2015.  305 F. Supp. 3d 381, 389, 397 (E.D.N.Y. 2018).  In reaching its

result, the court held that it was irrelevant that plaintiff's medical physician had not linked his

side effects to the drugs at issue until 2015.  *Id.* at 389.  And, in *Whitney v. Quaker Chemical*

*Corp.*, the New York Court of Appeals held that the plaintiff's symptoms which resulted in him

making repeated visits to the hospital and the health center for treatment were sufficient to

trigger the running of the statute of limitations.  683 N.E.2d 768, 769 (N.Y. 1997).  The court

noted that "[n]either plaintiff's contention that his symptoms worsened and changed in 1991 nor

the diagnosis of a doctor he first visited in September 1991 that substances other than the coolant

caused his injury makes his claim timely."  *Id.*

It important to note that onset of *any* symptoms is not sufficient to trigger the statute of

limitations under C.P.L.R. 214-c(2).  Instead, the symptoms must put plaintiff on notice of the

"primary condition on which the claim is based."  *Matter of New York Cnty. DES Litig.*, 678

N.E.2d at 475; *see Grill v. Philip Morris USA, Inc.*, 653 F. Supp. 2d 481, 487 (S.D.N.Y. 2009)

("[T]he relevant inquiry for statute of limitations purposes is when the injured party became

aware of the primary condition on which the plaintiff's claim is based.").  "New York courts

have not established a bright-line rule for when symptoms or manifestations of a physical

condition are sufficient to trigger" notice of the primary condition on which the claim is based,

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 211 (2d Cir. 2014),

although the New York Court of Appeals cautioned in *Matter of New York County DES*

*Litigation* that "there may be situations in which the claimant may experience early symptoms

that are too isolated or inconsequential to trigger the running of the Statute of Limitations under

CPLR 214-c(2)," 678 N.E.2d at 478 n.4.  Applying this general guidance, the court in

*O'Halloran v. 345 Park Co.* found that a plaintiff's early symptoms were "too isolated or

inconsequential to trigger the running of the Statute of limitations" where the plaintiff who

brought an action to recover for toxic injuries allegedly caused by exposure to defendant's pain

product only "missed two and a half days of work," and "neither sought medical attention nor

filed a Workers' Compensation claim until" a later date.  675 N.Y.S.2d 55, 55 (1st Dep't 1998)

(citation omitted).  On the other hand, the court in *Scheidel v. A.C. & S. Inc.*, rejected plaintiff's

argument that the symptoms of the decedent (who was exposed to asbestos and developed

asbestosis as a result) "were so generalized and episod[ic] that they did not constitute the primary

condition upon which the claim was based."  685 N.Y.S.2d 829, 831 (3d Dep't 1999).  The court

stated that the "record reveals that decedent . . . experienced multiple manifestations of his

condition or injury which affected virtually all physical activity and prompted him to change the

nature of his employment" and thus was "not a situation in which decedent's symptoms were so

isolated or inconsequential that a reasonably diligent person would not attribute them to an injury

or disease."  *Id.* (further holding that "the fact that his illness was not diagnosed until November

1994 and he may not have been fully aware that the cause of his injury was an exposure to

asbestos is not dispositive").

　　　　Defendant has established that there is no genuine issue of material fact that Plaintiffs'

personal injury claims accrued more than three years prior to May 2018, when this lawsuit was

brought, and therefore the claims are time barred.  In the years leading up to May 2015, Rouviere

began to experience exactly those symptoms that she now seeks damages for and attributes to the

implantation of Defendant's device.  In September 2012, Rouviere went to the emergency room

because she was experiencing extreme dizziness and vertigo as well as nausea and vomiting.

Joint 56.1 Statement ¶ 7.  Even if those symptoms at the time could be deemed to be too

"inconsequential" or "isolated" to be the "primary condition" on which Plaintiffs' claim is based,

Rouviere testified at her deposition that by 2013 she felt like she saw "the most decline starting to happen" and experienced "[m]ore pain, more instability, less function" in her hip.  Dkt. No. 335-1 at ECF p. 13.  Rouviere further testified that in 2013 she was "receiving a lot of effects" such as her "heart would start beating harder," it was "taking a lot for [her] to do the normal things [she] was doing," "[e]xertion was exhausting for [her]," and "[her] body was tiring."  *Id.* at ECF pp. 13–14.  In 2013, Rouviere visited a neurologist due to symptoms including "heaviness in arms and legs, feeling like itching in her face and head, urinary urgency and hesitation," and "feel[ing] like she has slowed down in general" and questioned whether she had a disease such as multiple sclerosis.  *Id.* at ECF p. 15.  In 2014, at a physical therapy appointment, Rouviere reported feeling "shooting pain through her body" and that "she is getting worse" with "severe daily headaches" and extreme fatigue, Dkt. No. 335-14; at a neurosurgery appointment in that same year, Rouviere presented with "vertigo, dizziness, lightheadedness, tremors, the headache and neck pain, blurred vision at times on the left, visual flashes, vision halos, tinnitus, speech difficulties, hoarseness, choking, weakness of the arms and legs, nausea, imbalance, poor coordination, dysphagia, and dysautonomia manifest by palpitations," Dkt. No. 346-7 at ECF p. 12.  And, at the time of her visit to Dr. Alvarado in May of 2015, Rouviere again reported "poundings in [her] body" and head, blurred and double vision, "malaise," and an "[o]verall feeling of sickness."  *Id.* at ECF p. 18.  These symptoms map onto the injuries Plaintiffs' experts state that Rouviere experienced from Defendant's conduct, including "chronic fatigue, nausea, headaches, weakness, dizziness/vertigo, cognitive impairment, hip and other joint and muscle pain, tachycardia, dry eyes/blurred vision, and other immunological and neurological symptoms."  Joint 56.1 Statement ¶ 24.

Medical records also document that the impacts of these symptoms on Rouviere's life were immense in the years prior to the three-year period before Plaintiffs filed the complaint in this case. As one medical record from 2014 documents: "Notwithstanding the fact that she has been raising [] four children, she has been otherwise totally disabled. There was a cascade of injuries starting six years ago when she injured her hip . . . . Presently, with no activity and some pain medicine, her pain level is 6/10. With activity the pain is 9/10." Dkt. No. 346-7 at ECF p. 12. In 2014, Rouviere reported on a medical form that "living is a physical challenge," that she worked from her "bed," and that she suffered numerous symptoms including numbness of right leg, shaking episodes, tremors, headaches, blurred vision at times, double vision at times, ringing in ears, chronic pain, heart palpitations, poor coordination, speech difficulty, among other symptoms. Dkt. No. 346-7 at ECF pp. 36–37.

Thus, from this evidence, it is apparent that Rouviere knew of the condition on which her claim was based and that "virtually all of plaintiff's alleged symptoms emerged more than three years prior to her commencement of the action" on May 31, 2018.[7] *Bartlett v. Moore Bus. Forms, Inc.*, 2000 WL 362022, at *4–5 (N.D.N.Y. Mar. 30, 2000). Those symptoms, prior to

---

[7] Plaintiffs argue that the three-year period should be measured from May 21, 2018, which is when Plaintiffs state that Mr. Rouviere attempted to file the initial complaint but was unable to because he paid the fee with a personal check. Dkt. No. 341 at 1–2. That argument is without merit, but it is also immaterial. Mr. Rouviere, though appearing *pro se* on behalf of himself at the time he attempted to file the initial complaint, is also an attorney. Thus, he is entitled to no special solicitude. Dkt. No. 346-4 ¶ 1; *see Corbett v. City of New York*, 816 F. App'x 551, 553 (2d Cir. 2020); *Abraham v. Leigh*, 471 F. Supp. 3d 540, 553 (S.D.N.Y. 2020) ("[W]here, as here, an attorney represents herself in a proceeding, she is entitled to no special solicitude."). Moreover, a party claiming excusable neglect will almost always lose where a party "fail[s] to follow the clear dictates of a court rule." *Silvanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366–67 (2d Cir. 2003) (citation omitted). Plaintiffs do not detail any special circumstances why this general holding should not apply here. Finally, however, it is irrelevant whether the time runs back from May 21, 2018 or from May 31, 2018. Rouviere's symptoms manifested significantly prior to May 21, 2015 and by 2014, Rouviere described "living [as] a physical challenge" due to her symptoms. Dkt. No. 346-7 at ECF pp. 36–37.

March 31, 2015, were also sufficiently continuous and sufficiently severe that they were not "so isolated or inconsequential that a reasonably diligent person would not attribute them to an injury or disease." *Id.* at \*4; *see, e.g.*, *Cochrane v. A C & S, Inc.*, 1998 WL 642719, at \*6 (S.D.N.Y. Sept. 18, 1998) ("[I]solated and generic symptoms of shortness of breath do not suffice in commencing the running of the statute of limitations."); *Cabrera v. Picker Int'l, Inc.*, 770 N.Y.S.2d 302, 303 (1st Dep't 2003) (finding symptoms too isolated or inconsequential to trigger statute of limitations where "[w]hile plaintiff complained of shortness of breath and had intermittent coughs, her physical activities were not affected"). The conditions significantly affected Rouviere's physical activity and quality of life over an extended period of time. Rouviere stated in 2014 that, due to her symptoms, living was a "physical challenge," and she repeatedly went to various doctors during this period in order to seek treatment for her symptoms and to have them diagnosed. Dkt. No. 346-7 at ECF pp. 36–37; *see generally* Dkt. No. 346-7. Courts have held that symptoms of this degree trigger the running of the statute of limitations under C.P.L.R. 214-c(2) as a matter of law. *See Braunscheidel v. Stryker Corp.*, 2013 WL 1337013, at \*5 (N.D.N.Y. Mar. 29, 2013) (granting motion to dismiss where symptoms "consistently impacted Plaintiff's day-to-day life" and required "numerous appointments with a number of different doctors"); *Whitney*, 683 N.E.2d at 769 (granting summary judgment where "symptoms that afflicted plaintiff in 1989 led him to make repeated visits to the hospital and the health center for treatment"). They have also held that repeated complaints to doctors about symptoms are sufficient to trigger the running of the statute of limitations. *See Paesano v. Ethicon, Inc.*, 2022 WL 846899, at \*6 (S.D.N.Y. Mar. 22, 2022).

It is true that there is evidence Rouviere did not begin to suspect that her symptoms were related to the implant malfunction until May 2015, and that her doctors did not determine that the

devices at issue were the cause of those symptoms until November 2016 (when she underwent her partial revision surgery).  Those facts make it understandable that she did not file suit prior to November 2016 (though it is more difficult to understand why she waited until May 2018).  But the fact that the statute of limitations would start to run before Rouviere was aware that the ailments she was experiencing were due to the implanted devices or even before she might have known that those ailments had a nonbiologic clause is what *Matter of New York County DES Litigation* requires.  For the three-year limitations period for toxic torts to start to run, a plaintiff need not know the cause of her injury or even know that the injury has a "nonbiological cause," *Whitney*, 683 N.E.2d at 768, and a doctor's misdiagnosis of a plaintiff's symptoms of that injury in the interim years does not toll the statute of limitations, *id.* at 769.  *See also Scheidel*, 685 N.Y.S.2d at 831 ("[T]he fact that his illness was not diagnosed until November 1994 and he may not have been fully aware that the cause of his injury was an exposure to asbestos is not dispositive."); *see also Braunscheidel*, 2013 WL 1337013, at *4 (concluding that fact that plaintiff "saw numerous physicians, all of whom failed to diagnose chondrolysis as the root of his shoulder pain" was irrelevant to timeliness analysis).  The New York Legislature did not "intend to make the running of the Statute of Limitations depend on claimants' subjective understanding of the etiology of their conditions."  *Matter of New York County DES Litigation*, 678 N.E.2d at 479.  As the New York Court of Appeals again held shortly after *Matter of New York County DES Litigation*, it is irrelevant that the plaintiff has no reason to believe that her injury has a nonnatural cause—it is sufficient that the Plaintiff have simply discovered the injury underlying his claim: "[a]ll that is necessary to start the limitations period is that plaintiff be aware of the primary condition for which damages are sought."  *Whitney*, 683 N.E.2d at 769.  A would-be plaintiff must, within the three-year period, receive a correct diagnosis of her other

than inconsequential, generalized, or isolated ailments lest she lose her claim even before she

knew she had it.  Rouviere was aware prior to May 2015 of the injuries which she now claims

were caused by Defendant's allegedly tortious acts.  That she was left in the dark as to its true

cause does not save her claims.[8]

Plaintiffs nonetheless argue that this case is ill-suited for resolution at summary judgment

as Rouviere has had a long and complex history of medical conditions and injuries, even prior to

the 2012 hip surgery at issue, and "[t]he complexity of her physical condition makes it

impossible to state that as a matter of law any one injury was resultant from the malfunction or

defect of the device."  Dkt. No. 341 at 25.  Plaintiffs state that the ailments that Rouviere

complained of "back in 2012-2015 are subject to interpretation since the defendant's own experts

attribute these ailments in various body parts to a connective tissue disorder, generally genetic in

nature."  *Id.*  Plaintiffs then appear to argue that the injury may not have presented itself "until

the revision surgery done in 2016."  *Id.*

The facts upon which Defendant bases this motion, however, are not genuinely in

dispute.  The legal conclusions she would have the Court draw do not follow.  *See Braunschidel*,

2013 WL 1337013, at *5 (rejecting argument that the statute of limitations defense raised a fact

issue precluding summary judgment).  To the extent that Plaintiffs would now have the Court

accept that the symptoms she experienced prior to May 2015 do not constitute part of the

primary condition on which their claim is based, "[t]hat is not how" Plaintiffs pleaded their case,

---

[8] Plaintiffs argue that Defendant is precluded from arguing that these symptoms triggered the
statute of limitations because Defendant's experts contend that these symptoms were not related
to the malfunction of the device but were caused by Rouviere's underlying medical issues.  Dkt.
No. 341 at 19–20.  The argument is a non-sequitur.  A defendant may contend that it did not
cause plaintiff's injury and that, if it did cause the injury, the plaintiff was aware of the injury
more than three years before she brought suit.

*Vuksanovich*, 2022 WL 2274543, at \*7.  Throughout this litigation, including in the amended complaint and Plaintiffs' briefing, interrogatory responses, as well as expert reports, Plaintiffs have proffered a theory of the case that the symptoms Rouviere suffered shortly after the 2012 surgery were attributable to the implementation of the devices.  *See, e.g.*, Dkt. No. 26 ¶ 209; Dkt. No. 335-3 at 6 (Rouviere Interrogatory Response: "The device cause injury upon implementation, physiological instability, toxicity, and toxic result over time."); Dkt. No. 335-10.  Plaintiffs also allege in the amended complaint that Rouviere suffered "elevated metal levels and instability" *prior* to the revision surgery and "[b]y the beginning of 2013, she experienced pain and loss of range of motion."  Dkt. No. 26 ¶¶ 6, 11.  These are key injuries that Rouviere claims were caused by implantation of Defendant's device.  Joint 56.1 Statement ¶ 23 ("Among the injuries claimed by Ms. Rouviere in this action include physiological instability, pain . . . toxicity.").  Plaintiffs cannot now state—solely for purposes of getting around the applicable statute of limitations—that it is unprovable whether any of these symptoms were, in fact, attributable to the devices and the only injury Plaintiff can be shown to have suffered was the revision surgery itself.  *See Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 319 (N.D.N.Y. 2013) ("[A] party 'may not raise new claims or theories of liability for the first time in opposition to summary judgment.'" (citation omitted)); *Webadviso v. Bank of Am. Corp.*, 2010 WL 521117, at \*2 (S.D.N.Y. Feb. 16, 2010) (Chin, J.) (Plaintiff "cannot now take a position, in an effort to defeat summary judgment, that so clearly contradicts the allegations of his own complaint."), *aff'd*, 448 F. App'x 95 (2d Cir. 2011).

Moreover, even if Rouviere subjectively believed that her ailments "were merely a continuation of h[er] pre-existing" conditions, "this is not a factor in the accrual of the statute of limitations."  *Braunscheidel*, 2013 WL 1337013, at \*4 (internal citations omitted).  The record

26

here, however, establishes that the ailments Rouviere suffered from were "new and different" and they "consistently impacted" her life.  *Id.* at *4–5.  Rouviere testified during her deposition that up until the August 2012 surgery she largely suffered from pain in her right hip as well as joint and ligament complaints, which were connected to her hip injury from her 2009 accident as well as her Ehlers-Danlos syndrome; however, after, the August 2012 surgery, Rouviere started to experience a host of new side effects throughout 2013 and 2014, including that her heart would start beating faster, "exertion was exhausting," her body was "tiring," and she was experiencing dizziness.  Dkt. No. 316-6 at 84–89, 135–36, 145.  Plaintiffs also submit expert opinions opining that these 2013 and 2014 symptoms were caused not by Rouviere's underlying medical conditions but by "excessive metal debris from the impacted hip components."  Dkt. No. 335-8; *see also, e.g.*, Dkt. No. 335-9.  In other words, this is not a case where the type of symptoms Rouviere suffered due to her underlying medical issues prior to her surgery were the identical symptoms that she suffered post-surgery and thus she would not have known she was injured.  To the contrary, Rouviere testified that the nature of her ailments changed markedly after the surgery making it unmistakable that she would have known she was injured.

The case is also distinguishable from the cases that Plaintiffs cite in support of their argument that the time period of accrual raises a question of material fact.  *Delaremore v. Zimmer, Inc.* arose at the motion to dismiss stage and the court decided that "further factual development" was necessary to determine when the statute of limitations accrued.  2019 WL 5394566, at *2 (E.D.N.Y. 2019); *see Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 136–37 (S.D.N.Y. 2016) (stating that "[t]he question of constructive knowledge and inquiry notice" in statute of limitations inquiries are "ill-suited for determination on a motion to dismiss").  The court reasoned that the complaint stated that the implant had caused plaintiff

pain starting approximately in July 2013, but was "not prepared to accept as a matter of law that the 'pain' plaintiff allegedly felt in 2013 necessar[il]y constitutes a symptom" as it may have "been fleeting" or otherwise not be "indictive of his symptomology."  2019 WL 5394566, at *2. The court continued that "[t]his is not to say that plaintiff is going to have an easy time distancing himself from the statement in his original complaint."  *Id.*  Unlike in *Delaremore*, this case arises after "factual development," and that factual development demonstrated that Rouviere's symptoms prior to the three-year period were not fleeting and were indicative of symptomology, as evidenced by Rouviere's numerous medical visits.  In *Cerqua v. Stryker Corp.*, 2012 WL 5506119 (S.D.N.Y. Nov. 9, 2012), the court found that there was a question of fact as to when the accrual period started as a reasonable jury could find that the symptoms plaintiff suffered prior to 2009 were relatively minor and thus may not have sufficiently warned plaintiff that he had been suffering "from a 'condition' at all."  *Id.* at *4.  Here, Rouviere's symptoms were not minor and, as she stated herself, impacted her qualify of life significantly at least as early as 2014.

Plaintiffs' personal injury claims are thus time-barred, and Defendant is entitled to summary judgment on these claims.

## II.    Implied and Express Warranty Claims

Defendant also argues that Plaintiffs' claims for implied and express warranty are barred by the statute of limitations.  Dkt. No. 336 at 24.  Although Defendant notes that these claims seek damages for personal injury and thus should be barred under the three-year statute of limitations period discussed above for personal injury claims, Defendant argues that, even if this court applied the four-year statute of limitations for breach of warranty claims under New York law, the claims are nonetheless barred.  *Id.*  Because this Court agrees that the breach of warranty

claims are barred even if a four-year statute of limitations period applies, the Court does not address which of these two statute of limitations periods is more appropriate.

"Section 2-725 of the New York Uniform Commercial Code establishes a four-year statute of limitations for breach of warranty claims." *Baker*, 770 F. App'x at 15 (quoting N.Y. U.C.C. § 2-725). "For such claims, the statute begins to run when 'the product is placed in the stream of commerce or at the time of sale by the manufacturer.'" *Id.* (quoting *Schrader v. Sunnyside Corp.*, 747 N.Y.S.2d 26, 28 (2d Dep't 2002)). Here, the device at issue, which was implanted into Rouviere, must have been placed in the stream of commerce or been sold prior to the device being implanted into Rouviere on August 14, 2012. Because August 14, 2012 is more than four years prior to the May 2018 date that this action was initiated, the breach of warranty claims are time-barred. *See Galletta v. Stryker Corp.*, 283 F. Supp. 2d 914, 916 (S.D.N.Y. 2003) ("There is no question that the breach of warranty claim is time barred, because the polyethylene implant had to have been delivered to the hospital where the operation was performed prior to the date of the operation—April 23, 1996—and the lawsuit was not commenced until May 1, 2002.").

Plaintiffs' argument that the implied and express warranty claims are not time barred because they were tolled pursuant to N.Y. U.C.C. § 2–725(2) is unavailing. Under U.C.C. § 2–725(2), "[i]f a plaintiff demonstrates that the defendant made an explicit warranty as to the future performance of its device, that could toll the limitations period for an express warranty cause of action until the 'breach is or should have been discovered.'" *Guisto*, 293 F.R.D. at 137 (quoting N.Y. U.C.C. § 2–725(2)). Implied warranty claims, however, are not subject to tolling under U.C.C. § 2–725(2). *Id.*; *see Orlando v. Novurania of America, Inc.*, 162 F. Supp. 2d 220, 224 (S.D.N.Y. 2001) ("The [future performance] exception speaks to express warranties not implied

warranties."). Moreover, Plaintiffs do not identify any express warranty that Defendant made as to the future performance of its device. *See Gelber v. Stryker Corp.*, 788 F. Supp. 2d 145, 166 (S.D.N.Y. 2011) ("A warranty of future performance is one that guarantees that the product will work for a specified period of time."). In support of this argument, Plaintiffs in their opposition brief quote only a statement made by Dr. Buly about the device. Dkt. No. 341 at 35. Thus, the statute of limitations is not tolled on this basis and summary judgment is granted in Defendant's favor on these claims.

### III. Derivative Loss-of-Consortium Claim

Mr. Rouviere's loss of consortium claim is derivative of Rouviere's claims. Because Defendant is entitled to summary judgment on Rouviere's claims, summary judgment must be granted on the loss of consortium claim as well. *See Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996); *Rouviere v. DePuy Orthopaedics, Inc.*, 560 F. Supp. 3d 774, 802 (S.D.N.Y. 2021), *reconsideration denied*, 2021 WL 5854283 (S.D.N.Y. Dec. 9, 2021).

### IV. Equitable Estoppel

Finally, Plaintiffs argue that Defendant is estopped from asserting any statute of limitations defense due to fraudulent concealment. Dkt. No. 341 at 28–29. Plaintiffs argue that Defendant's misrepresentations prevented Plaintiffs from timely commencing an action because Dr. Buly would never have implanted the device in Rouviere had he known that it would cause impingement and that it would result in the release of metals into Rouviere's body. *Id.* at 30. Plaintiffs state that Defendant made numerous misrepresentations in its filings with the Food and Drug Administration ("FDA") and deceived both the FDA and physicians about the true nature of the product. *Id.* at 31.

"Equitable estoppel is an 'extraordinary remedy.'" *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y.), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (quoting *Pulver v.*

*Dougherty*, 871 N.Y.S.2d 495, 496 (3d Dep't 2009)); *see also Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 616 (S.D.N.Y. Feb. 26, 2021), *aff'd*, 2022 WL 211702 (2d Cir. Jan. 25, 2022).  It applies "where [a party] is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the other."  *Pulver*, 871 N.Y.S.2d at 496 (citation omitted).  "Such fraud, misrepresentations, or deception must be affirmative and specifically directed at preventing the plaintiff from bringing suit; failure to disclose the basis for potential claims is not enough, nor are broad misstatements to the community at large."  *Twersky*, 993 F. Supp. 2d at 442; *see Doe v. Kolko*, 2008 WL 4146199, at *4 (E.D.N.Y. Sept. 5, 2008) ("This argument demonstrates plaintiffs' fundamental misunderstanding of the equitable estoppel doctrine.  Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants' misconduct toward the potential plaintiff, not a community at large."); *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1184 (N.Y. 2012) ("[I]n cases where the alleged concealment consisted of nothing but defendants' failure to disclose the wrongs they had committed, we have held that the defendants were not estopped from pleading a statute of limitations defense.").

"The case law draws a distinction between misrepresentations made to the community at large, and specific misrepresentations or deceptive conduct sufficient to constitute a basis for equitable estoppel."  *Roeder*, 523 F. Supp. 3d at 619 (cleaned up).  "The former is insufficient to make out a claim for equitable estoppel 'in light of the specificity requirement in the equitable estoppel standard; equitable estoppel is only "appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants" misconduct toward the potential plaintiff, not a community at large.'"  *Id.* (quoting *Twersky*, 993 F. Supp. 2d at 445).

In the case at hand, Plaintiffs' allegations of fraud on behalf of the Defendant—even if true—involve misrepresentations made to the community at large and thus are insufficient to justify equitably estopping Defendant from asserting a statute of limitations defense.  *See Roeder*, 523 F. Supp. 3d at 619; *Twersky*, 993 F. Supp. 2d at 442.  Plaintiffs allege that Defendant failed to disclose the true nature of its product from consumers, doctors, and the FDA *generally*.  Plaintiffs do not allege that any of these statements or concealments were specifically directed at Plaintiffs or, even more specifically, directed at preventing Plaintiffs from timely filing suit.  *See Roeder*, 523 F. Supp. at 620 (statement to a third party may be sufficient to invoke equitable estoppel "if it is directed to a plaintiff or intended to frustrate his ability to timely sue").  Accordingly, these allegations are not of the type that justify the application of equitable estoppel, a doctrine which is to be invoked "only under exceptional circumstances." *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006) (citation omitted); *see Roeder*, 523 F. Supp. 3d at 620 (rejecting equitable estoppel argument where "there are no plausible allegations" that the statement was "directed to Plaintiffs as opposed to the more general public in response to public concerns").

## CONCLUSION

The motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 332, 345.  The Clerk of Court is also respectfully directed to close this case.

SO ORDERED.

Dated: December 5, 2022
      New York, New York                                          _____
                                                                  LEWIS J. LIMAN
                                                                  United States District Judge